JS 44 (Rev. 11/04, WIWD 12/06)

Case: 3:08-cv-00198    Document #: 1-2    Filed: 04/08/2008    Page 1 of 2

## CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

### I. (a) PLAINTIFFS

**Trek Bicycle Corporation**

**(b)** County of Residence of First Listed Plaintiff   Jefferson, Wisconsin
(EXCEPT IN U.S. PLAINTIFF CASES)

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Gass Weber Mullins LLC
309 N. Water Street
Milwaukee, WI 53202
(414) 223-3300

### DEFENDANTS

**LeMond Cycling, Inc.**

County of Residence of First Listed Defendant *   Hennepin, Minnesota
(IN U.S. PLAINTIFF CASES ONLY)

Attorneys (If Known)

* Note: in land condemnation cases, use the location of the land involved.

### II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- [ ] 1 U.S. Government Plaintiff
- [ ] 2 U.S. Government Defendant
- [ ] 3 Federal Question (U.S. Government Not a Party)
- [X] 4 Diversity (Indicate Citizenship of Parties in Item III)

### III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)

(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated or Principal Place of Business In This State | [X] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated and Principal Place of Business In Another State | [ ] 5 | [X] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

Does this case challenge the constitutionality of a state statute (nature of suit 950) or a federal statute pursuant to Fed. R. Civ. P. 5.1? [ ]Yes [X]No
Note: The filing party is responsible for serving notice of a constitutional question on the State Attorney General if a state statute is challenged, or on the U.S. Attorney General if a federal statute is challenged, either by certified mail or by sending it to an electronic address designated by the attorney general for that purpose.

### IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| [ ] 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | [ ] 610 Agriculture | [ ] 422 Appeal 28 USC 158 | [ ] 400 State Reapportionment |
| [ ] 120 Marine | [ ] 310 Airplane | [ ] 362 Personal Injury - Med. Malpractice | [ ] 620 Other Food & Drug | [ ] 423 Withdrawal 28 USC 157 | [ ] 410 Antitrust |
| [ ] 130 Miller Act | [ ] 315 Airplane Product Liability | [ ] 365 Personal Injury - Product Liability | [ ] 625 Drug Related Seizure of Property 21 USC 881 | | [ ] 430 Banks and Banking |
| [ ] 140 Negotiable Instrument | [ ] 320 Assault, Libel & Slander | [ ] 368 Asbestos Personal Injury Product Liability | [ ] 630 Liquor Laws | **PROPERTY RIGHTS** | [ ] 450 Commerce |
| [ ] 150 Recovery of Overpayment & Enforcement of Judgment | [ ] 330 Federal Employers' Liability | | [ ] 640 R.R. & Truck | [ ] 820 Copyrights | [ ] 460 Deportation |
| [ ] 151 Medicare Act | [ ] 340 Marine | **PERSONAL PROPERTY** | [ ] 650 Airline Regs. | [ ] 830 Patent | [ ] 470 Racketeer Influenced and Corrupt Organizations |
| [ ] 152 Recovery of Defaulted Student Loans (Excl. Veterans) | [ ] 345 Marine Product Liability | [ ] 370 Other Fraud | [ ] 660 Occupational Safety/Health | [ ] 840 Trademark | [ ] 480 Consumer Credit |
| [ ] 153 Recovery of Overpayment of Veteran's Benefits | [ ] 350 Motor Vehicle | [ ] 371 Truth in Lending | [ ] 690 Other | **SOCIAL SECURITY** | [ ] 490 Cable/Sat TV |
| [ ] 160 Stockholders' Suits | [ ] 355 Motor Vehicle Product Liability | [ ] 380 Other Personal Property Damage | **LABOR** | [ ] 861 HIA (1395ff) | [ ] 810 Selective Service |
| [X] 190 Other Contract | [ ] 360 Other Personal Injury | [ ] 385 Property Damage Product Liability | [ ] 710 Fair Labor Standards Act | [ ] 862 Black Lung (923) | [ ] 850 Securities/Commodities/ Exchange |
| [ ] 195 Contract Product Liability | | | [ ] 720 Labor/Mgmt. Relations | [ ] 863 DIWC/DIWW (405(g)) | [ ] 875 Customer Challenge 12 USC 3410 |
| [ ] 196 Franchise | | | [ ] 730 Labor/Mgmt.Reporting & Disclosure Act | [ ] 864 SSID Title XVI | [ ] 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | [ ] 740 Railway Labor Act | [ ] 865 RSI (405(g)) | [ ] 891 Agricultural Acts |
| [ ] 210 Land Condemnation | [ ] 441 Voting | [ ] 510 Motions to Vacate Sentence | [ ] 790 Other Labor Litigation | **FEDERAL TAX SUITS** | [ ] 892 Economic Stabilization Act |
| [ ] 220 Foreclosure | [ ] 442 Employment | Habeas Corpus: | [ ] 791 Empl. Ret. Inc. Security Act | [ ] 870 Taxes (U.S. Plaintiff or Defendant) | [ ] 893 Environmental Matters |
| [ ] 230 Rent Lease & Ejectment | [ ] 443 Housing/ Accommodations | [ ] 530 General | | [ ] 871 IRS—Third Party 26 USC 7609 | [ ] 894 Energy Allocation Act |
| [ ] 240 Torts to Land | [ ] 444 Welfare | [ ] 535 Death Penalty | | | [ ] 895 Freedom of Information Act |
| [ ] 245 Tort Product Liability | [ ] 445 Amer. w/Disabilities - Employment | [ ] 540 Mandamus & Other | | | [ ] 900 Appeal of Fee Under Equal Access to Justice |
| [ ] 290 All Other Real Property | [ ] 446 Amer. w/Disabilities - Other | [ ] 550 Civil Rights | | | [ ] 950 Constitutionality of State Statutes |
| | [ ] 440 Other Civil Rights | [ ] 555 Prison Condition | | | |

### V. ORIGIN (Place an "X" in One Box Only)

- [X] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from another district (specify)
- [ ] 6 Multidistrict Litigation
- [ ] 7 Appeal to District Judge from Magistrate Judgment

### VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity): 28 U.S.C. Section 1332

Brief description of cause: Declaratory Judgment - Dispute Concerning Contractual Rights

### VII. REQUESTED IN COMPLAINT:

[ ] CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $ Dec. Action

CHECK YES only if demanded in complaint:
JURY DEMAND: [X] Yes [ ] No

### VIII. RELATED CASE(S) IF ANY

(See instructions): JUDGE _____ DOCKET NUMBER _____

DATE   April, 8, 2008

SIGNATURE OF ATTORNEY OF RECORD   s/ Ralph A. Weber

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

**EXHIBIT 1**

Dockets.Justia.com

JS 44 Reverse (Rev. 11/04)

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.      (a) Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

(b) County of Residence. For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

(c) Attorneys. Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

If the case challenges the constitutionality of a Wisconsin statute or a federal statute, select Yes. Otherwise, select No.

**II.      Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.C.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.

United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.

United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.

Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; federal question actions take precedence over diversity cases.)

**III.      Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.      Nature of Suit.** Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section VI below, is sufficient to enable the deputy clerk or the statistical clerks in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

**V.      Origin.** Place an "X" in one of the seven boxes.

Original Proceedings. (1) Cases which originate in the United States district courts.

Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.

Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.

Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.

Multidistrict Litigation. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407. When this box is checked, do not check (5) above.

Appeal to District Judge from Magistrate Judgment. (7) Check this box for an appeal from a magistrate judge's decision.

**VI.      Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.**          Example:          U.S. Civil Statute: 47 USC 553
                                                                Brief Description: Unauthorized reception of cable service

**VII.      Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.

Demand. In this space enter the dollar amount (in thousands of dollars) being demanded or indicate other demand such as a preliminary injunction.

Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.      Related Cases.** This section of the JS 44 is used to reference related pending cases if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

AO 440 (Rev. 8/01) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

| WESTERN | District of | WISCONSIN |
|---|---|---|

TREK BICYCLE CORPORATION

**SUMMONS IN A CIVIL ACTION**

V.

LEMOND CYCLING, INC.

CASE NUMBER:   08-CV-198

TO: (Name and address of Defendant)

LEMOND CYCLING, INC.
641 East Lake Street, Suite 204P
Wayzata, MN 55391

**YOU ARE HEREBY SUMMONED** and required to serve on PLAINTIFF'S ATTORNEY (name and address)

Ralph A. Weber and Christopher P. Dombrowicki
Gass Weber Mullins LLC
309 N Water St
Milwaukee, WI 53202

an answer to the complaint which is served on you with this summons, within _____ 20 _____ days after service of this summons on you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. Any answer that you serve on the parties to this action must be filed with the Clerk of this Court within a reasonable period of time after service.

CLERK

DATE

(By) DEPUTY CLERK

✎AO 440  (Rev.  8/01)  Summons in a Civil Action

## RETURN OF SERVICE

| | DATE |
|---|---|
| Service of the Summons and complaint was made by me[1] | |
| NAME OF SERVER *(PRINT)* | TITLE |

*Check one box below to indicate appropriate method of service*

☐ Served personally upon the defendant.  Place where served:

☐ Left copies thereof at the defendant's dwelling house or usual place of abode with a person of suitable age and discretion then residing therein.

    Name of person with whom the summons and complaint were left:

☐ Returned unexecuted:

☐ Other (specify):

## STATEMENT OF SERVICE FEES

| TRAVEL | SERVICES | TOTAL $0.00 |
|---|---|---|

## DECLARATION OF SERVER

       I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Return of Service and Statement of Service Fees is true and correct.

Executed on _____        _____
             Date                                        *Signature of Server*


                            _____
                            *Address of Server*

(1) As to who may serve a summons see Rule 4 of the Federal Rules of Civil Procedure.

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

---

TREK BICYCLE CORPORATION,
          Plaintiff,

v.                                          Case No.  08-CV-198

LEMOND CYCLING, INC.

          Defendant.

---

## COMPLAINT

---

Plaintiff Trek Bicycle Corporation, by its attorneys Gass Weber Mullins LLC, by

Ralph A. Weber and Christopher P. Dombrowicki, alleges as follows for its Complaint

against Defendant LeMond Cycling, Inc:

### Parties

1.      Plaintiff Trek Bicycle Corporation ("Trek") is a Wisconsin corporation with

its principal place of business located at 801 West Madison Street, Waterloo, Wisconsin,

53594.

2.      Defendant LeMond Cycling, Inc. ("LeMond Cycling") is a Minnesota

corporation with its principal place of business located in Wayzata, Minnesota.

### Jurisdiction And Venue

3.      This court has jurisdiction of this action pursuant to 28 U.S.C. § 1332 due to

diversity of citizenship between Trek as plaintiff and LeMond Cycling as defendant, and

because the amount in controversy exceeds $75,000, exclusive of interest and costs.

4.      Venue is proper in this court pursuant to 28 U.S.C. § 1391, as a substantial part of the events or omissions giving rise to the claims occurred in this judicial district, LeMond Cycling is subject to personal jurisdiction in this judicial district and Wisconsin law applies to this dispute.

### Factual Background

5.      Trek has built a reputation for excellent bicycles.  Trek's trademarks have become synonymous with industry-leading quality and innovation, and the goodwill associated with its trademarks has substantial value to Trek's business.  Based on the strength of its trademarks, Trek markets its products to a diverse group of consumers including amateur and professional bicycle racers, cycling enthusiasts, health and fitness enthusiasts, recreational cyclists and families.

6.      Greg LeMond, a former world class cyclist and three-time winner of the Tour de France, formed LeMond Cycling for the purpose of developing and licensing the various trademarks associated with his name ("LeMond trademarks").

7.      On June 29, 1995, Trek and LeMond Cycling entered a Sublicense Agreement whereby LeMond Cycling, as licensor, granted Trek an exclusive license to sell cycling products bearing the LeMond trademarks.  A copy of the Sublicense Agreement is attached to this Complaint as Exhibit 1.

8.      Greg LeMond elected to sublicense his brand to Trek after his other efforts to build and sell bicycles met with limited success.

9.      Given the circumstances, Trek took on significant risk and expense in entering into the 1995 agreement.  For example, since 1995 Trek has paid LeMond more than $5 million, and has invested millions more to design, manufacture and market

2

LeMond-branded bicycles. Accordingly, it expected LeMond to cooperate fully with Trek and its dealers so as to promote, not damage, the LeMond brand.

10.     On August 10, 1999, Trek and LeMond Cycling entered a First Amendment to the Sublicense Agreement which, among other things, increased the minimum royalty Trek was required to pay LeMond Cycling for use of the trademarks to $350,000 per contract year, extended the term of the agreement to September 30, 2010, and granted Trek two five-year options to renew the agreement until 2020. A copy of the First Amendment to the Sublicense Agreement is attached to this Complaint as Exhibit 2.

11.     Pursuant to paragraph 16.03 of the Sublicense Agreement, titled "Certain Conditions," LeMond Cycling is required to "cause [Greg LeMond] to render his services hereunder in a professional and conscientious manner." Pursuant to paragraph 2.02, Greg LeMond's services include "promotion" of the LeMond bicycles and bicycle frames.

12.     Pursuant to paragraph 2.01 of the Sublicense Agreement, LeMond Cycling granted to Trek "the exclusive right and license (without the right to assign the same or grant sublicense thereunder), to use the Mark in the Territory during the Contract Period in connection with the manufacture, advertisement, promotion, sale and distribution of" LeMond bicycles and bicycle frames. The First Amendment to the Sublicense Agreement retained the language regarding Trek's exclusive right to sell and distribute LeMond Bicycles in the Territory in the Contract Period.

13.     Contrary to the contract promises and Trek's reasonable expectations, Greg LeMond has repeatedly damaged his brand, and Trek's other business interests. Instead of helping to grow a valuable business, Greg LeMond has for years impaired, and now destroyed, 13 years' efforts by Trek and its dealers.

3

### Greg LeMond Wrongly Purchases, Resells or Distributes
### LeMond Bicycles In Competition with
### Trek's Authorized LeMond Dealers

14.     Trek operates its business through an extensive network of Independent

Bicycle Dealers ("IBD's").  In exchange for meeting numerous obligations to Trek

pursuant to Dealer Agreements, Trek's IBD's have exclusive rights to sell to consumers

Trek bicycles, including LeMond-branded bikes.  This exclusive right to purchase and

resell Trek bicycles, including LeMond-branded bicycles, is of course at the heart of the

Trek – Dealer relationship.  Accordingly, Trek and its Dealers take very seriously any

improper efforts to undercut these Dealer rights through unauthorized sales or distribution

of Trek bicycles, including LeMond-branded bicycles.

15.     As a person experienced in the bicycle industry, and as a sophisticated

businessman earning millions of dollars from his license of his LeMond brand to Trek,

Greg LeMond is well aware of this Trek – Dealer relationship, its extreme importance to

Trek and its IBDs, and how unauthorized sales of LeMond-branded bikes outside of the

Dealer network would harm those dealers and cause harm to Trek – Dealer relationships.

16.     Notwithstanding his limited rights under the Sublicense Agreement to a

small number of bikes each year for personal use (ie., 15), since 1999 Greg LeMond has

made numerous purchases of LeMond bicycles at employee pricing from Trek with a

suggested retail value of over $2,500,000.  Upon information and belief, Greg LeMond has

resold, bartered for value or otherwise distributed many or most of these bikes, harming

Trek and its dealers.

17.     As one example, in early March 2008, a Trek Dealer sold two LeMond

Zurich bicycles to two customers.  These bicycles sell at retail for more than $2,800, each,

4

and thus are important sales. This Dealer ordered the bikes and expected to complete the sales when the bikes arrived. On or about March 15, 2008, one of the two customers who had ordered the LeMond Zurich bicycles returned and informed Trek's Dealer that he and the other customer were able to get LeMond-branded bicycles directly from Greg LeMond himself, at a price much lower than the retail price. The customer explained that since they were saving over 50% by buying from Greg LeMond instead of from the Dealer, they ordered La Victoires, a more expensive LeMond-branded bicycle ($5,279.99 suggested retail price), instead of the Zurich bicycles they had ordered from the Dealer. As his business was harmed by the loss of sales as a result of LeMond's unauthorized and unlawful conduct, the Dealer commented:

> "Why would we support a vendor that is deliberately using back-channels to sell products in our market? As an immediate resolution to this problem, the only fair and practical thing that I can see is to bill Mr. Lemond's account for the lost profit $$ that we have foregone as a result of his action. Furthermore, going forward, I would like an apology and his word that he will not sell around his dealers going forward."

18.     When Trek checked its records, it discovered that on or about March 13, 2008, less than two weeks after Trek had warned LeMond that his "employee pricing" purchases were so high as to constitute lost business opportunities for Trek and Trek's LeMond dealers, Greg LeMond indeed had purchased two La Victoire bicycles from Trek at employee pricing.   Upon information and belief, those were the bicycles sold to the Dealer customers described above.

19.     Just days ago, Greg LeMond attempted to purchase two more LaVictoire's at employee pricing.

20.     Upon information and belief, Greg LeMond has resold, bartered for value or
otherwise distributed many or most of the other bicycles that he purchased from Trek at
employee pricing.  Greg LeMond has used these improper purchases to act as an
unauthorized dealer of LeMond-branded bicycles, wrongly competing with Dealers in
breach of Trek's exclusive rights and knowingly and intentionally harming Dealers, Trek
and Trek's relationship with its Dealers.

### Greg LeMond Harms Trek by
### Publicly Disparaging an Important Trek-Endorsed Athlete

21.     As early as 2001, Greg LeMond began publicly disparaging Lance
Armstrong.  Greg LeMond's statements are quoted at length in a complaint that LeMond
Cycling recently served upon Trek but has not, to date, filed.

22.     During the 2004 Tour de France, Greg LeMond repeated and intensified his
public disparagements.  Greg LeMond made these statements during television interviews,
in national and international newspapers, magazines, trade press and publications, and on
the internet.  LeMond has also made negative comments about other professional cyclists
and athletes.

23.     As a result of Greg LeMond's statements, Trek received numerous
complaints from customers.  For example, one customer wrote, "I was considering
purchasing a LeMond bike but after hearing the comments he has been making about
Lance Armstrong the only thing I would use it for is an anchor for my boat.  Have fun
selling bikes, what a great spokesperson."

24.     Another customer's complaint cogently demonstrated both the value of
brand identification and the damage done to the LeMond brand by Greg LeMond's
statements:

6

"Every year, for the last 4 years, I have purchased a LeMond bike for its quality and robustness. And of course, because it bears the name of an athlete who once had class and panache. Perhaps, in the big picture, I am insignificant, but please inform the CEO that he has just lost a once faithful customer. I can understand the relentless attacks on Armstrong from European sources. But make me understand what Mr. LeMond has to gain by joining the cacophony???  To further glorify his wins??? . . . .

25.     Many emails raised the fact that Trek is associated with both LeMond and

Armstrong:

- One customer commented, "[d]oesn't Trek sponsor both Lance AND LeMond bikes?  What's going on there?"

- Another wrote, noting his "disgust," and remarked, "I was writing a letter to his [LeMond's] Cycle company, when I saw that you own them?  How awkward must that be for you, the best thing ever to happen to the sport and Trek, attacked by the namesake of one of your brands?"

- Yet another remarked, sarcastically, "[i]t must be great comfort to the great people at Trek who sponsor Lance Armstrong (which builds and distributes LeMond bicycles) that they also represent a jerk in Greg LeMond."

26.     Accordingly, Trek's president John Burke discussed multiple times with

Greg LeMond Trek's concern over the effect of the statements on the value of the LeMond

trademarks, Trek's business, and Trek's goodwill. John Burke reminded Greg LeMond

that since Armstrong endorsed and used Trek products, and since Armstrong created

interest in road bicycles of the type sold under the LeMond brand, Armstrong's

accomplishments helped both the Trek and the LeMond brands. The value of any

trademark is the positive link in the consumer's mind between the mark and the product,

7

which motivates the consumer to have dealings with the company. Accordingly,

LeMond's disparaging comments tarnished LeMond's image, and/or Armstrong's image,

and thus impaired the value of important Trek assets.

27.     Apparently recognizing the damage he was doing, Greg LeMond made

repeated commitments to refrain from making further disparaging statements and to honor

the obligations under the Sublicense Agreement so as not to harm the value of his brand

and Trek's business.

28.     Greg LeMond's disparaging statements substantially damaged the value of

the LeMond trademarks he agreed to license to Trek and damaged Trek's ability to market

and sell its LeMond line of bicycles. In addition, Greg LeMond's disparaging statements

likewise damaged the value of Trek's non-LeMond business interests, including but not

limited to its endorsement agreement with Lance Armstrong, and thus impaired Trek's

ability to market and sell its non-LeMond product lines to its diverse consumer base.

29.     Accordingly, Trek informed LeMond Cycling in August 2004 that it was in

breach of the Sublicense Agreement and that Trek was entitled to terminate because

LeMond Cycling and/or Greg LeMond took action which "damage[d] or ha[d] an adverse

impact" on the trademarks LeMond Cycling licensed to Trek, and also on Trek, Trek's

business, and Trek's goodwill. Instead of providing Notice of Termination at that time,

Trek asked LeMond to find another licensee for his brand.

30.     After learning he could not find another company who would license his

brand, in December 2004 Greg LeMond had LeMond Cycling serve and threaten to file a

lawsuit making numerous disparaging statements harmful to Trek and its business

interests. Greg LeMond did so in order to compel Trek to withdraw its Notice of Breach

and continue to do business with him and LeMond Cycling, notwithstanding Trek's right
to terminate the Agreement. As it stated at the time in January 2005, given the damage
litigation would cause to Trek and the LeMond brand, Trek was forced to withdraw the
Notice of Breach and to continue doing business with LeMond and LeMond Cycling.

31.     After a face-to-face meeting with Greg LeMond in April 2005, John Burke
emailed Greg LeMond explaining, as he had in person, "Trek does not have any problem
with you making general comments regarding the negative affects of doping on the sport
and the positive steps being done to address it. Just do not publicly comment on specific
athletes. Commenting on specific athletes is not good for you, Trek or the LeMond
brand."

32.     John Burke went on to explain in his email that, "we want to move the
public perception back to Greg LeMond, first American to win the Tour, three-time Tour
winner, overall great guy and someone who cares deeply about the cleanliness of the sport.
Please let me know if you agree."

33.     Greg LeMond emailed John Burke on April 12, 2005, stating, "I am ready
to move on regarding the doping and LA."

34.     Thereafter, Greg LeMond again assured Trek he understood the need to
protect his brand, and reassured Trek he would not again make disparaging remarks about
Lance Armstrong. In a December 15, 2005 email to Trek's President, John Burke,
LeMond wrote:

> "I want to reassure you that I have no intentions of going out
> there and blasting off on LA. I want to move beyond this
> last period and start to enjoy riding the bike and the bike
> business."

35.     Once again, Greg LeMond broke his promise, again and again, and

disparaged Lance Armstrong and other professional athletes.  Once again, customers were

angered.

36.     One customer made his point through humor:

> "I recently purchased a LeMond bike and am having an unusual problem.
> When I place it in the garage next to my Specialized and Trek bicycles it
> begins to whine and complain that the other bikes are cheaters and that it is
> the only true "American Champion."  I was wondering, if maybe Greg
> himself would stop being a whining asshole, maybe this piece of shit bike
> would also stop.  Please have him do it publicly so I can bring the bike in to
> watch it on TV.  I suppose this is not covered under warranty."

37.     Yet another complaint again showed the link between LeMond's statements

and brand damage.  The customer comment came in the following form:

> "Name:  Former LeMond Fan
> Email:  lemondsucks@yahoo.com
> Comments:  Has Greg always been a sniveling, insecure jerk who
> needs to denigrate others accomplishments in order to boost his
> own self esteem?  If Greg's bikes display the same quality as
> he displays as an individual, please keep them far away from me."

38.     Another recent example of the damage occurred at a key time for Trek's

promotion of the LeMond line in Europe.  Last fall, Greg LeMond gave an interview to the

most influential European road bicycle magazine, "Tour."  In the October 2007 issue, in

response to a question, "You haven't been in touch with Road Racing for a while,"

LeMond responded, "This is for my problems with Armstrong.  I criticized his cooperation

with Michael Ferrari and for that reason got into big trouble with Trek.  If I had loudly said

what I thought this would have been suicide for my business."

39.     Trek's European Director promptly received a complaint from Trek's

German subsidiary, forwarding the interview comments and stating, "Those quotes don't

help our image in Germany." Trek's European Director in turn forwarded the complaint to

John Burke, noting,

> "So I bust my balls to get LeMond on the booth at Eurobike and into our
> GAS dealer programme and then up pops Greg in Tour Magazine (The
> most influential European/GAS road magazine) and slags off Trek right
> slap bang in the middle of pre-season when we are trying to get the bikes
> (the ones with his name on) into the dealers.
>
> The guy is legend and I have the utmost respect for what he achieved in the
> sport but from a commercial perspective he's an idiot and I don't see any
> way back for us in Europe."

40.     In November 2007, John Burke met privately with Greg LeMond and

advised him informally that Trek would not be extending its Agreement with LeMond

beyond its 2010 initial term. LeMond asked for permission to look for other business

partners, and Trek agreed, later providing certain business information at LeMond's

request so as to assist LeMond with finding a new supplier.

41.     Once again, on March 20, 2008, with the intent to compel Trek to continue

to do business with him, or to pay him amounts not due, Greg LeMond had LeMond

Cycling again serve and threaten to file a lawsuit with disparaging statements harmful to

Trek and its business interests.

42.     This threatened Complaint purports to be about Trek's alleged failure to use

"best efforts" to promote the LeMond line, but in fact the document is filled with

disparaging remarks about Lance Armstrong, other professional athletes and Trek that

have nothing to do with purported "best efforts" issues. These allegations are included

with the intent to cause Trek to fear their publication and thus pay sums not due and/or

continue with the LeMond brand against its will. Indeed, in the transmittal letter to Trek

with the unfiled Complaint, Greg LeMond and LeMond Cycling's counsel notes that the
Complaint is not "publicly-available at this time."

## FIRST CLAIM FOR RELIEF
### Declaratory Relief—Trek Has Not Breached "Best Efforts" Clause

43.    All prior paragraphs are incorporated by reference.

44.    Pursuant to paragraph 5.02 of the Sublicense Agreement, Trek is to use its
"best efforts to exploit the Mark in respect of Licensed Products [bicycles and bicycle
frames bearing the LeMond trademark], and to promote the sale of Licensed Products in
the Territory so as to try to maximize sales, consistent with the quality and reputation of
Licensor [LeMond Cycling], and only to retailers (and distributors who sell to retailers)
which properly reflect the image and reputation of Licensor and LEMOND [Greg
LeMond]."

45.    Pursuant to paragraph 4 of the Sublicense Agreement, Trek must pay
LeMond Cycling a minimum royalty each year.

46    Pursuant to paragraph 8.01 of the Sublicense Agreement, Trek must spend a
"reasonable amount" on marketing, promotion and advertising of LeMond bicycles and
frames consistent with its promotion of comparable lines of bicycles and frames, and
agreed that a "reasonable amount" was equivalent of approximately 3% of the Net Sales
for each contract year.

47.    Pursuant to paragraph 12 of the Sublicense Agreement, Trek is subject to
minimum sales requirements and if not met, subject to termination by LeMond Cycling
upon 180 days notice.

48.    During the course of its contractual relationship with LeMond Cycling and
LeMond, Trek has at all times complied with all obligations under the Sublicense

12

Agreement, including its obligation to "use its best efforts to exploit the Mark in respect of Licensed Products [bicycles and bicycle frames bearing the LeMond trademark], and to promote the sale of Licensed Products in the Territory so as to try to maximize sales, consistent with the quality and reputation of Licensor [LeMond Cycling], and only to retailers (and distributors who sell to retailers) which properly reflect the image and reputation of Licensor and LEMOND [Greg LeMond]." In compliance with this obligation Trek, among other things:

(a)     Consistently invested significant sums on marketing, promotion, and advertisement of LeMond bicycles and bicycle frames;

(b)     Created an entirely new and revamped LeMond product line for the 2006 model year;

(c)     Designed and launched the 2007 LeMond Tete de Course, which was the lightest production bicycle frame in the industry;

(d)     Conducted marketing campaigns for the LeMond line, including a dealer showcase in Wisconsin (for which Trek flew in more than 100 top dealers, and at which John Burke personally and extensively praised Greg LeMond's many accomplishments), and a media showcase in California (for which Trek flew in the major bicycle media representatives to view, ride and review LeMond bicycles);

(e)     Sold, marketed and advertised the LeMond bicycles and frames through high quality bicycle retailers, distributors and dealers.

49.     Trek has used the contractually required best efforts notwithstanding LeMond's harmful self-dealing and disparaging statements that damaged Trek.

13

50.     LeMond disputes that Trek has used the contractually required best efforts
and has sought and will seek payment of money from Trek due to Trek's alleged failure to
comply with the best efforts clause.  Thus, an actual controversy exists pursuant to 28
U.S.C. § 2201 as to whether Trek has complied with its contractual best efforts
requirement.

51.     Trek seeks a declaration that it has fully complied with the "best efforts"
clause of the Sublicense Agreement.

52.     Alternatively, Trek seeks a declaration that the "best efforts" clause is
indefinite and unenforceable.

### SECOND CLAIM FOR RELIEF
#### Declaratory Relief—Trek's Right to Terminate

53.     All prior paragraphs are incorporated by reference.

54.     Pursuant to paragraph 13.02.01 of the Sublicense Agreement, Trek is
entitled to terminate the Sublicense agreement because LeMond Cycling and/or Greg
LeMond took action which "damage[d] or ha[d] an adverse impact" on the trademarks
LeMond Cycling licensed to Trek, and also on Trek, Trek's business, and Trek's goodwill.

55.     Pursuant to paragraph 13.02.03 of the Sublicense Agreement, Trek is
entitled to terminate the Sublicense Agreement because LeMond Cycling and or Greg
LeMond took action which breached "material provision[s] of the [Sublicense]
Agreement" and has failed to cure those breaches.

56.     LeMond Cycling disputes that Trek is entitled to terminate the Sublicense
agreement and disputes that LeMond Cycling and/or Greg LeMond's actions have
breached the License Agreement or damaged or had an adverse impact on the trademarks
LeMond Cycling licensed to Trek, or on Trek, Trek's business, or Trek's goodwill.  Thus,

14

an actual controversy exists pursuant to 28 U.S.C § 2201 regarding Trek's entitlement to terminate the Sublicense Agreement.

57.     Due to Greg LeMond's actions, Trek seeks a declaration that it is entitled to terminate the Sublicense Agreement, discontinue using the trademarks, and discontinue paying royalties to LeMond Cycling.

58.     In addition, Paragraph 16.03 entitled "Certain Conditions" requires LeMond Cycling to "cause [Greg LeMond] to render his services hereunder in a professional and conscientious manner." Pursuant to paragraph 2.02, Greg LeMond's services include "promotion" of the LeMond bicycles and frames.

59.     As a result of the conduct described above, including but not limited to the improper purchases and resales, bartering for value or other distribution of bicycles undermining Trek's dealers and the Trek-dealer relationship, the disparaging public statements directed at Lance Armstrong and other athletes, and the repeated threats to harm the LeMond brand and Trek, LeMond Cycling has not met the condition of rendering Greg LeMond's services in a "professional and conscientious manner."

60.     Trek further seeks a declaration that LeMond Cycling's failure constitutes a nonoccurrence of a condition and given all the damage that has been done to Trek and the LeMond brand, it is too late for the condition to occur, and therefore, it may treat its duty as discharged and the contract as terminated.

WHEREFORE, Trek Bicycle Corporation seeks the following relief:

1.     A declaration, pursuant to 28 U.S.C. § 2201, that Trek has complied with the "best efforts" provision of the Sublicense Agreement with LeMond Cycling or,

15

alternatively, a declaration that the "best efforts" provision is indefinite and therefore unenforceable; and

    2.    A declaration, pursuant to 28 U.S.C. § 2201, that LeMond has breached the Sublicense Agreement and that Trek is entitled to terminate its Sublicense Agreement with LeMond Cycling; and

    3.    A declaration, pursuant to 28 U.S.C. § 2201, that LeMond Cycling failed to comply with the "condition" set forth in the Sublicense Agreement that it "cause [Greg LeMond] to render his services hereunder in a professional and conscientious manner" thereby entitling Trek to suspend performance or discharging Trek from performing the "best efforts" obligation; and

    4.    Costs and attorney's fees pursuant to the License Agreement and applicable law; and

    5.    All other relief as the Court deems just and appropriate.

TREK DEMANDS A TRIAL BY JURY

Dated this 8th day of April 2008.

                        s/ Ralph A. Weber
                        Ralph A. Weber SBN 1001563
                        Christopher P. Dombrowicki SBN 1041764
                        Attorneys for Plaintiff Trek Bicycle Corporation
                        Gass Weber Mullins LLC
                        309 North Water Street
                        Milwaukee, WI 53202
                        414-223-3300 Telephone
                        414-224-6116 Facsimile
                        weber@gasswebermullins.com
                        dombrowicki@gasswebermullins.com

32133-4bikes

## SUBLICENSE AGREEMENT

AGREEMENT made as of the 29th day of June, 1995, between LEMOND CYCLING, INC., a corporation organized under the laws of the State of Minnesota, having its principal place of business at 3000 Willow Drive, Medina, Minnesota 55340 ("Licensor"), and TREK BICYCLE, CORP., a Wisconsin corporation with offices at 801 West Madison Street, P.O. Box 183 Waterloo, WI 53594 ("Licensee").

### W I T N E S S E T H :

WHEREAS, Greg LeMond is a world famous champion bicycle racer, and has formed Licensor for purposes of developing and licensing out the various trademarks associated with his name; and

WHEREAS, the name and trademark "GREG LEMOND CYCLES", or such other similar trademark as the parties shall mutually agree in advance incorporating all or part of the name GREG LEMOND (as so selected, hereinafter referred to as the "Mark") has acquired a reputation for a high standard for quality and, through usage, has acquired distinctiveness and has become associated in the public's mind with the business of GREG LEMOND ("LEMOND"), and, by master license, Licensor; and

WHEREAS, Licensor is willing to grant to Licensee and Licensee desires to acquire from Licensor, upon the terms and conditions hereinafter set forth, a sub-license with respect to the Mark,

NOW, THEREFORE, in consideration of the mutual promises, covenants and conditions of the parties hereinafter set forth, it is agreed as follows:

1.   Definitions.

As used herein, the following words shall have the following meanings:

1.01 Products: bicycles and bicycle frames, and no other products. A Product bearing any part of the Mark shall be a "Licensed Product."

1.02 Territory: the United States, its territories and possessions, and the countries Licensee has designated and which are set forth on Exhibit "1.02" hereto.

1.03 Net Sales: gross amounts of shipments, as invoiced, directly or indirectly, by or under authority from Licensee, of Licensed Products, in any transaction in commerce, less (a) all trade discounts (not to exceed usual industry practices) to the extent actually taken and (b) all returns of Licensed Products other than for exchange:

1.03.01   "Net Basic Sales" shall be sales to Licensee's regular customers in the ordinary course of its business; and

1.03.02   "Net Distributor Sales" shall be sales to Licensee's distributors, i.e., those who purchase for resale only to retailers and not to ultimate consumers.

1.04 <u>Contract Period</u>:  the period commencing on the date hereof and ending (a) on September 30, 2005 (the "Primary Term"), provided that the same shall be extended and continue thereafter to the applicable September 30 of the final "Contract Year" (as hereinafter defined) hereunder, as to which either party shall have given the other two (2) full years notice to terminate effective at such time (the earliest effective date of which may be the last day of the Primary Term), or (b) on September 30 of such earlier year if this Agreement is earlier terminated under Paragraph 12 below.

1.05 <u>Expiration Date</u>:  the last day of the Primary Term, or the last effective Contract Year thereafter as set forth in Paragraph 1.04, or such earlier Contract Year if this Agreement is earlier terminated under Paragraph 12 below, whichever is applicable as the final period hereunder.

1.06 <u>Contract Year</u>:  initially the period commencing on the date hereof and ending on September 30, 1996, and thereafter each twelve-month period ending on September 30, during the Contract Period.

1.07 <u>Contract Quarter</u>:  initially the period commencing on the date hereof and ending on December 31, 1995 and thereafter each successive three-month calendar period during the Contract Period.

1.08 <u>License</u>:  the sublicense of rights acquired from GREG LEMOND.

2.   <u>Grant of Rights, Services and Guarantees</u>.

2.01 Licensor hereby grants to Licensee, and Licensee hereby accepts, subject to the terms of this Agreement, the exclusive right and license (without the right to assign the same or grant sublicenses thereunder), to use the Mark in the Territory during the Contract Period in connection with the manufacture, advertisement, promotion, sale and distribution of Licensed Products; provided, however, that only those items of Products approved by Licensor (or not requiring approval) as hereinafter provided in Paragraph 5.01, may be manufactured and sold by Licensee hereunder.  Licensor reserves all rights not expressly herein provided (and LEMOND reserves the same to the extent not heretofore granted to Licensor), including, but not limited to, all rights to utilize the Mark or variations thereof and the name of LEMOND in connection with (a) all products, merchandise and services other than Products in the Territory, and (b) all products, merchandise and services including Products outside the Territory; provided, however, that neither Licensor nor LEMOND shall grant any third party in the business of manufacturing or selling Products the right to use the Mark or

- 2 -

32133-4bikes

LEMOND's name, in any form, for any purpose, during the Contract Period.

2.02 Licensor shall provide the reasonable services of LEMOND in connection with the development and design of Licensed Products and the promotion thereof.

2.02.01   As and when requested by Licensee, Licensor shall cause LEMOND to be available for up to thirty (30) "Working Days" in the first Contract Year, less the number of Working Days LEMOND provides to Licensee under any other agreement, at times and places convenient and reasonably acceptable to LEMOND and subject, in any event, to his personal and professional schedule, for promotional services relating to the Licensed Products, including personal appearances, appearances on television or radio talk shows, press conferences, attendance at trade shows and the participation in photo shoots to develop materials for advertising literature, point of sale displays and editorial pieces.  Licensor shall require LEMOND to be similarly reasonably available in subsequent Contract Years based upon, and for the number of Working Days contained in, a promotional campaign jointly developed and reasonably approved by the parties.

2.02.02   Licensor shall cause LEMOND to reasonably cooperate with Licensee in the design and development of Licensed Products, including the styling, fabrication, colors, component parts and other non-generic features.

2.02.03   All reasonable expenses relating to LEMOND's services hereunder shall be paid or reimbursed by Licensee, including business class air travel for international and coach for domestic flights, hotel accommodations and meals for LEMOND and one companion, ground transportation and other incidental items (exclusive of personal expenditures).

2.02.04   For purposes hereof a Working Day shall consist of six (6) hours, exclusive of travel time.  Travel time will be considered in determining Working Days on a case by case basis, to be determined in advance by the parties acting reasonably, with reference to the following guidelines: travel in excess of an hour, but less than four (4) hours shall be deemed one half ($\frac{1}{2}$) a Working Day, and travel time in excess of four (4) hours shall constitute a full Working Day.  Other conditions relating to Working Days are set forth in Paragraph 16 hereof.

2.03 To the extent Licensor has undertaken to make certain assurances for and provide the services of LEMOND hereunder, by endorsement below, LEMOND guarantees to Licensee that such assurances are correct and such services shall be provided.

2.04 As a condition to the rights granted to Licensee hereunder, its parent corporation, INTREPID CORPORATION, of N14 W23833 Stone Ridge Drive, Suite #250, Waukesha, WI 53188 (the "Guarantor"), shall execute and attach hereto a guaranty in favor

- 3 -

Case 0:07-cv-01687-JNE-JJG   Document 25-1   Filed 05/10/07   Page 24 of 36
Case: 3:08-cv-00198   Document #: 1-2   Filed: 04/08/2008   Page 4 of 23
32133-4bikes

of Licensor and LEMOND, of the due and timely performance by
Licensee of all obligations, undertakings, responsibilities and
commitments of Licensee hereunder and relating hereto vis-a-vis
Licensor and LEMOND, and agreeing to the application of all
provisions of this Agreement to, including permitting the
enforcement against the Guarantor in the first instance without
exhausting remedies against Licensee, as if Guarantor were a
contract party hereto directly with Licensor and LEMOND, as their
interests appear.

3.   Earned Royalty.

3.01 In consideration of the rights herein granted,
Licensee shall pay Licensor a percentage royalty ("Earned
Royalty") as follows:

3.01.01   three percent (3%) of all Net Basic
Sales and two percent (2%) of all Net Distributor Sales
(provided Net Distributor Sales do not exceed ten
percent (10%) of all Net Sales during any Contract
Year, with three percent (3%) of Net Distributor Sales
in excess thereof.

3.01.02   Earned Royalties shall accrue as and
when Licensed Products are shipped by Licensee.

3.02 Earned Royalty payments shall be made by Licensee
to Licensor quarterly as to all Earned Royalties accrued during
each Contract Quarter, no later than the due date for statements
for the applicable Contract Quarter pursuant to paragraph 3.03.
Licensee may deduct from Earned Royalties due for any Contract
Year, only payments theretofore actually made of "Minimum
Royalties" (as hereinafter defined) for the same Contract Year.

3.03   Licensee shall provide Licensor, within thirty
(30) days after the end of each Contract Quarter, a complete and
accurate statement of its Net Sales of Licensed Products and
accrued Earned Royalties for such Contract Quarter, said
statement to be certified as accurate by the chief financial
officer of Licensee and to include such information and detail as
Licensor may from time to time reasonably request.  The same
shall contain separate reports as to Net Basic Sales and Net
Distributor Sales, with Earned Royalty calculations and the
application of Minimum Royalty payments to the aggregate Earned
Royalty then due.  The statement for each fourth Contract Quarter
in each Contract Year shall contain all of the foregoing
information for such Contract Quarter as well as a recapitulation
of the information for the full Contract Year, with any necessary
reconciliation.  Attached hereto and made a part hereof as
Exhibit "3.03" is a prototype report setting forth the
information necessary for each Contract Quarter, in a form
acceptable to Licensor, until further notice from Licensor.

3.04 All royalties and other obligations payable to
Licensor under this Agreement shall be paid in United States
dollars, by check drawn on Licensee's regular bank.  Payments of

Case 0:07-cv-01687-JNE-JJG   Document 25-1   Filed 05/10/07   Page 25 of 36
Case: 3:08-cv-00198   Document #: 1-2   Filed: 04/08/2008   Page 5 of 23
32133-4bikes

Earned Royalty for each Contract Quarter shall be credited with the "Minimum Royalty" (as hereafter defined) payments for such Contract Quarter.

3.05 Interest at the rate of three percent (3%) over prime (at Licensee's regular bank) per annum (or the highest amount permitted by law, whichever is lower) shall accrue on any amount payable to Licensor hereunder, from and after the date upon which the payment is due until the date of receipt of payment by Licensor.  Such charge shall not be in lieu of or otherwise limit any rights of Licensor in the event a payment is not made by Licensee when due.

4.   <u>Minimum Royalty</u>.

4.01 Licensee agrees to pay Licensor a guaranteed minimum royalty in each Contract Year (the "Minimum Royalty") during the first five (5) Contract Years of the Primary Term (the "Lock Term"), of One Hundred Thirty Five Thousand Dollars ($135,000), and in each Contract Year thereafter, a sum equal to the annual average of the total amounts paid to Licensor hereunder during the immediately preceding three (3) Contract Years, but in no event less than the Minimum Royalty paid in the immediately preceding Contract Year.

4.02 As to the first Contract Year, Thirty Five Thousand Dollars ($35,000) out of the Minimum Royalty, i.e., One Hundred Thirty Five Thousand Dollars ($135,000), shall be paid upon execution.  The balance thereof for the said first Contract Year (i.e., $100,000), and the Minimum Royalty for each Contract Year thereafter, shall be payable in four (4) equal quarterly installments, in advance, on the first day of each October, January, April and July of each such Contract Year.  Minimum Royalty payments in each Contract Year shall constitute non refundable advances for such Contract Year, shall not be credited against sums due in any subsequent Contract Year and shall not be recoverable from Earned Royalty in any other Contract Year.

4.03 Payments of Earned Royalty made with respect to any Contract Year in excess of the Minimum Royalty for such Contract Year shall not be credited against the Minimum Royalty thereafter payable for any other Contract Year.

5.   <u>Development, Licensor's Approvals and Quality Control</u>.

5.01 Throughout the Contract Period, the parties shall meet in person, by telephone or other means of communication as the parties may agree from time to time, to discuss plans for new lines or items of Licensed Products hereunder, during which they shall determine the overall concepts for the Licensed Products, including, but not limited to, the nature and number of items, styles, colors, fabrications, configurations, accessories and anticipated retail and distributor prices which Licensee might charge and all other relevant matters.  Licensor will be consulted as to all new Products, but express approval is not

- 5 -

32133-4bikes

required as to any new Product which is a conventional Product
and the quality of the Trek/Fisher line is met.   Except as
provided in the immediately preceding sentence, Licensor shall
have the right of approval as to all other new Products,
including the design of each and the quality.   Licensor will
provide Licensee with its reasonable basis for any such
disapproval.   As to all Licensed Products, Licensor has the right
to approve the use of the trademark and all advertising and
promotional materials.   Before any commercial sale by Licensee of
any proposed new Licensed Product, Licensee shall deliver to
Licensor for its consideration, preproduction samples thereof,
unless waived by Licensor.   If disapproved by Licensor for any
reason, the same shall not be associated thereafter in any way
with the Licensor, LEMOND or the Mark.   Thereafter, all
production of the said Licensed Products shall conform to such
approved samples.   Upon request from time to time by Licensor,
Licensee shall provide Licensor with a randomly selected
production sample of each Licensed Product, for examination by
Licensor in determining such conformity.   All designs and
sketches which are or become unique to Licensed Products and
become associated in the public's mind with Licensor, LEMOND or
the Mark, shall not be utilized by Licensee or any third party,
after the Contract Period, without Licensor's express further
approval.

    5.02 Licensee shall use its best efforts to exploit the
Mark in respect of Licensed Products, and to promote the sale of
Licensed Products in the Territory so as to try to maximize
sales, consistent with the quality and reputation of Licensor,
and only to retailers (and distributors who sell to retailers)
which properly reflect the image and reputation of Licensor and
LEMOND.

    5.03 During each Contract Year, Licensee shall provide
LEMOND, at no charge, three (3) high end and two (2) low end
Licensed Products (completed bicycles) for the personal use of
LEMOND and his family, provided that during the Contact Period
LEMOND shall ride no other bicycles.

    5.04 Licensee shall establish and maintain quality
control practices and procedures for Licensed Products at least
comparable to those employed by it for its Fisher line of
Products.   Licensee shall not ship any Licensed Products which
Licensor reasonably determines, on notice to Licensee, does not
meet such standard.

    5.05 As further provided above, and in Paragraph 8.02,
Licensor shall have the right to reasonably approve in advance
all consumer promotion and advertising of the Licensed Products
("Promotional Material") in the Territory.   Without limiting the
provisions of Paragraph 8.01 hereof, Licensee shall be
responsible for payment of all expenses incurred for advertising,
promoting and marketing the Licensed Products.

    5.06 All Licensed Products and Promotional Material
shall contain appropriate legends, markings and notices as

- 6 -

reasonably requested from time to time by Licensor, to give
appropriate notice of Licensor's right, title and interest in and
to the Mark, or for other reasonable business purposes.   In
addition, Licensee shall include all such notices, labels,
instructions or legends as may be required by any applicable law
or regulation, and shall otherwise be responsible for the
compliance therewith in all respects.

5.07 After the approval by Licensor of any item of
Licensed Products or Promotional Material has been granted,
Licensee shall not depart therefrom in any material respect
without first obtaining the further approval of Licensor.

5.08 Licensee will permit Licensor's designees, upon
reasonable prior notice, to enter the premises where the Licensed
Products are being manufactured or stored, during regular
business hours, for the purpose of inspecting the Licensed
Products and the facilities in which the Licensed Products are
being manufactured and packaged.

6.    Use and Registration of Mark.

6.01 As between Licensee and Licensor, Licensee
acknowledges that Licensor and LEMOND, as their interests may
appear, own all right, title and interest in and to the Mark in
any form or embodiment thereof and also own the good will
attached or which shall become attached to the Mark in connection
with the business and merchandise in relation to which the same
has been, or shall be used.   Sales by Licensee shall be deemed to
have been made by Licensor and/or LEMOND, as the case may be, for
purposes of trademark registration and all uses of the Licensed
Mark by Licensee shall inure to the benefit of Licensor and/or
LEMOND, as the case may be, for purposes thereof.

6.02 Licensor shall, at its sole cost and expense (but
with Licensee's full cooperation at Licensee's expense), take all
reasonable steps with respect to the registration and maintenance
of the Mark in the United States, in International Class 12 and
such other classes as Licensee shall reasonably request and as
Licensor's counsel shall deem necessary and appropriate, to the
extent the same cover Licensed Products not otherwise covered by
existing registrations.

6.03 If Licensee intends to sell any of the Licensed
Products or otherwise use the Mark in any jurisdiction in the
Territory outside the United States, Licensee shall promptly
notify Licensor of such intention in writing specifying the
jurisdiction involved.   Licensee shall advance the costs and
expenses in connection with and may thereupon file an application
and use its best efforts to register the Mark therein in the name
of Licensor or LEMOND, as Licensor may direct.   In the event
Licensee uses the Mark in any jurisdiction prior to notification
of Licensor of its filing of the aforesaid application, it shall
indemnify Licensor and LEMOND, in accordance with Paragraph 10.02
hereof.   Licensee and Licensor (and LEMOND) shall, at each
other's request, execute any documents, including Registered User

- 7 -

32133-4bikes

agreements, and adopt any form of label, reasonably required by Licensor to confirm Licensor's and LEMOND's respective rights in and to the Mark in the jurisdiction and the respective rights of Licensor and LEMOND, such other parties designated by Licensor and Licensee pursuant to this Agreement.  Anything elsewhere contained in this Agreement to the contrary notwithstanding, and provided Licensee has advised Licensor of the cost and expense of effecting such registration promptly after such registration is issued, Licensee is hereby authorized and directed to deduct from Earned Royalties otherwise payable to Licensor from Net Sales in the jurisdiction wherein Licensee paid to register the Mark as aforesaid, up to fifty (50%) thereof on an on-going basis until paid in full, the reasonable cost and expense of effecting such registration.

6.04 Licensee shall use the Mark in each jurisdiction in the Territory strictly in compliance with the legal requirements obtaining therein and shall use such markings in connection therewith as may be required by such jurisdiction's applicable legal provisions.  Consistent with other provisions of this Agreement, Licensee shall cause to appear on all Licensed Products and on all materials on or in connection with which the Mark is used, such legends, markings and notices as may reasonably be necessary in order to give appropriate notice to any trademark, trade name, copyright or other rights therein or pertaining thereto, or as shall be reasonably requested by Licensor.

6.05 Licensee shall not challenge Licensor's and LEMOND's respective ownership of and rights in or the validity of the Mark or any application for registration thereof, or any trademark registrations thereof, nor contest the fact that Licensee's rights under this Agreement are solely those set forth in the Agreement.

6.06 Licensee shall cooperate with Licensor and LEMOND in every reasonable respect in connection with actions necessary or recommended by counsel to Licensor or LEMOND to enhance, protect, secure or otherwise maintain Licensor's rights in and to the Mark in any jurisdiction.

7.   **Infringement of Mark.**

7.01 Licensee agrees to assist Licensor in all respects in the enforcement of any rights of the Licensor in the Mark. Licensee shall notify Licensor in writing of any actual or potential infringements or imitations by third parties which may come to Licensee's attention.  Licensor shall have the sole right to determine whether or not any action shall be taken on account of any such claimed infringement or imitation.  Licensee shall, at Licensor's request, act as sole plaintiff or join with Licensor in such action as Licensor deems appropriate, at Licensor's expense.  Licensee shall not contact any third party, make any demands or claims, institute any suit or take any other action on account of such claimed infringements or imitations, and any such conduct by Licensee shall be a material violation

- 8 -

32133-4bikes

hereof and, without in any manner limiting Licensor's rights with respect thereto, including the right to terminate this Agreement, all costs and expenses, including attorneys' fees, incurred in connection with any action taken or suit instituted by Licensee without the consent of Licensor, including all such costs and expenses as well as all damages sustained by Licensor, shall be borne solely by Licensee.

7.02 With respect to all claims, actions, suits or proceedings, including suits in which Licensee is joined or otherwise appears as a party, Licensor shall have the sole right to employ counsel of its choosing and to direct the handling of the litigation and any settlement thereof. Licensor shall be entitled to receive and retain all amounts awarded as damages, profits or otherwise in connection with such suits; provided, however, that to the extent any recovery relates specifically to actual out of pocket losses of and damages to Licensee (exclusive of lost profits and consequential damages of any kind), then, after Licensor is fully reimbursed for all costs, expenses, fees and disbursements relating in any way to such claims, actions, suits or proceedings, Licensor shall share with Licensee the net remaining proceeds, if any, in proportion to the damages proven by each relating specifically to Licensed Products, but in no event shall Licensee's share thereof exceed fifty percent (50%) of such net remaining proceeds.

8.   Advertising and Promotion.

8.01   During each Contract Year, Licensee shall expend a reasonable amount on the marketing, promotion and advertising of Licensed Products, both to the trade and to consumers (including corporate advertising), consistent with its promotion of comparable lines of Products.   It is understood that a reasonable amount is the equivalent of approximately three percent (3%) of the Net Sales for each Contract Year.

8.02 Because of the reputation and goodwill associated with Licensor, and without limiting any other right of Licensor hereunder, Licensee agrees that no use of the Mark will be made in any advertising or Promotional Material without, unless and until the same has been approved by Licensor, acting reasonably.

9.   Books and Records.

9.01 Licensee agrees to keep accurate books of account and records covering all transactions relating to the license being granted herein.   Such books and records, or an accurate copy thereof, shall be maintained at Licensee's principal place of business.   Licensor's representatives shall have the right, upon at least two (2) business days prior notice, to examine and/or audit Licensee's books of account and records and all other documents, records and material in the possession or under the control of Licensee, with respect to the subject matter of this Agreement, and to make copies and extracts thereof.   In the event that any such examination or audit reveals an underpayment by Licensee, Licensee shall immediately remit payment to Licensor

Case 0:07-cv-01687-JNE-JJG   Document 25-1   Filed 05/10/07   Page 30 of 36
Case: 3:08-cv-00198   Document #: 1-2   Filed: 04/08/2008   Page 10 of 23
32133-4bikes

in the amount of such underpayment plus interest at the rate of
three percent (3%) over the prime/base rate at Licensee's bank
per annum (or the highest amount permitted by law, whichever is
lower) calculated from the date such payment was actually due
until the date when payment is received by Licensor.   Further, in
the event that any such underpayment is greater than three
percent (3%) for any Contract Quarter, Licensee shall reimburse
Licensor for the actual costs and expenses of such audit.   Such
charge shall not be in lieu of or otherwise limit any rights of
Licensor in the event a payment is not made by Licensee when due.

9.02 All books of account and records of Licensee
covering all transactions relating to the license hereunder shall
be retained and made available by Licensee for at least three (3)
years after the "Expiration Date" for examination and/or audit by
Licensor's representatives.

10. Indemnification.

10.01 Licensor hereby agrees, conditioned, however,
upon Licensee's having been and being in compliance with all of
the provisions of this Agreement, to defend, indemnify and hold
harmless, Licensee and its officers, employees and agents,
against any and all claims, demands, causes of action and
judgments, damages, losses, costs and expenses (including
reasonable attorneys' fees), but not lost profits or other
consequential damages, arising solely out of Licensee being
judicially restrained from making use of the Mark for Licensed
Products in the Territory, as provided in this Agreement.
Licensor shall not be liable to indemnify Licensee for any
settlement of any such claim or suit effected without Licensor's
express prior written consent.

10.02 Licensee hereby agrees to defend, indemnify and
hold harmless, Licensor and its officers, employees and agents,
and LEMOND individually, against any and all claims, demands,
causes of action and judgments, damages, losses, costs and
expenses (including reasonable attorneys' fees) arising out of
the Licensee's actions and conduct, including, but not limited to
claims of alleged defects in the design, material or workmanship
of any Licensed Product.   With respect to the foregoing
indemnity, Licensee agrees to defend and hold Licensor harmless
at no cost or expense to Licensor whatsoever including, but not
limited to, attorneys' fees and courts costs, and Licensor shall
have the right to such defense utilizing attorneys of its own
selection.

11. Products Liability Insurance.

Licensee shall maintain (during the Contract Period and
covering the period thereafter during which any claim might be
asserted against Licensor) at its own cost and expense in full
force and effect, from a reputable and qualified insurance
company which provides Licensee's general insurance, product
liability insurance coverage with respect to Licensed Products
throughout the Territory, in customary form.   Such coverage shall

32133-4bikes

be in an amount not less than Two Million Dollars ($2,000,000)
basic product liability coverage (plus Licensee's current
umbrella coverage). Such insurance shall be for the benefit of
and shall include Licensee, Licensor and their affiliated
entities, as named insureds, including officers and directors of
each entity, and shall provide for at least ten (10) days' prior
written notice to Licensor and Licensee from the insurer in the
event of any proposed modification, cancellation or termination
thereof. Licensee shall furnish to Licensor evidence of the
maintenance of the insurance as above required. Notwithstanding
the foregoing, in the event Licensee determines to eliminate
product liability insurance from its corporate insurance
portfolio and not replace it with comparable coverage (similarly
applicable to Licensor, LEMOND, etc. as aforesaid), before doing
so it shall consult with Licensor in advance thereof and provide
Licensor, LEMOND, etc. as aforesaid, with alternative protection
reasonably satisfactory to Licensor, as the parties shall
mutually agree.

12.  Sales Obligations and Right of Termination.

12.01 Minimum Sales Obligations and Termination:
Licensee shall have the obligation to achieve a minimum aggregate
of Net Sales ("Minimum Sales") in each Contract Year commencing
with the third Contract Year during the Lock Term, of an annual
average of Four Million Dollars ($4,000,000), and in each
Contract Year after the Lock Term, a sum equal to the annual
average of the total Minimum Sales effected during the
immediately preceding three (3) Contract Years.

12.02 The failure of Licensee to reach the Minimum
Sales in any Contract Year after the Lock Term shall give the
Licensor the right to terminate this Agreement on one hundred
eighty (180) days notice.

13.  Expiration or Termination.

13.01 Licensor shall have the right to terminate this
Agreement by giving written notice to Licensee if Licensee does
any of the following:

13.01.01 takes any action which damages or has an
adverse impact upon the Licensor, the Licensor's business or
goodwill, any Licensed Product or the Mark;

13.01.02 fails to make payment of any Earned
Royalty or Minimum Royalty, or to make any other payment accruing
hereunder when due (it being understood that any late payment
shall be accompanied with interest as provided in this
Agreement), or fails to make timely submission of statements when
due;

13.01.03 avails itself, or is made the subject
(and does not have the same bonded or vacated within thirty
days), of any creditor relief statute or procedure;

- 11 -

Case 0:07-cv-01687-JNE-JJG   Document 25-1   Filed 05/10/07   Page 32 of 36
Case: 3:08-cv-00198   Document #: 1-2   Filed: 04/08/2008   Page 12 of 23
32133-4bikes

13.01.04 breaches any other material provision of this Agreement and fails to cure such breach within fifteen (15) days after notice thereof; or

13.01.05 breaches any other agreement between the parties, and fails to cure the same within any applicable cure period, or in the event any such other agreement is otherwise canceled or terminated.

13.02 Licensee shall have the right to terminate this Agreement by giving written notice to Licensor if Licensor or LEMOND does any of the following:

13.02.01 takes any action which damages or has an adverse impact upon the Licensee or the Licensee's business or goodwill, or if LEMOND is convicted of a felony involving moral turpitude or gross dishonesty;

13.02.02 avails itself, or is made the subject (and does not have the same bonded or vacated within thirty days), of any creditor relief statute or procedure;

13.02.03 breaches any other material provision of this Agreement and fails to cure such breach within thirty (30) days after notice thereof; or

13.02.04 breaches any other agreement between the parties, and fails to cure the same within any applicable cure period, or in the event any such other agreement is otherwise canceled or terminated.

13.03 The right of each party to terminate this Agreement for default as provided above, shall be without prejudice to any other rights it may have against the other party and such termination shall not operate to release the breaching party from any liability for damages and expenses (including reasonable attorneys' fees) incurred by the non-breaching party arising as a result of the event of default which formed the basis for such termination.

14.   Post-Termination and Expiration Rights and Obligations.

From and after the Expiration Date or the earlier termination of this Agreement, if applicable, all of the rights of Licensee to the use of the Mark and any reference to the name or trade name "LEMOND" in any manner, shall cease absolutely and Licensee shall not thereafter use the same.

15.   Final Statement Upon Termination or Expiration.

Within thirty (30) days after the Expiration Date or earlier termination of the Contract Period, as the case may be, Licensee shall deliver to Licensor a statement indicating the number and description of the Licensed Products which it had on hand or in the process of manufacturing as of the Expiration Date or termination date.  Licensee shall dispose of such inventory

- 12 -

32133-4bikes

only as herein provided or in such manner as Licensor shall
expressly approve in writing.  Licensor shall have the option of
conducting a physical inventory upon at least two (2) days prior
notice to Licensee, at any reasonable time in order to ascertain
or verify such statement.

16.   Certain Conditions.

16.01 If Licensor or LEMOND cancels a previously
scheduled engagement hereunder, Licensor will cooperate with
Licensee, to the fullest extent reasonably possible, and as the
exclusive remedy of Licensor, to reschedule such engagement at
the earliest available time thereafter.

16.02 Licensee shall arrange all of the services of
LEMOND at its sole cost and expense, and shall provide Licensor
and LEMOND with an itinerary for any appearances and traveling
not less than twenty (20) days prior to any scheduled appearance
(except as the parties may otherwise agree, on a case by case
basis).  Each engagement hereunder, where applicable, shall be in
accordance with and be subject to the regulations of any
applicable union, guild or collective bargaining unit to which
LEMOND may belong, and to the terms and conditions of any appli-
cable union, guild or collective bargaining agreements, and
Licensee shall pay any additional fees, costs, dues and expenses
which may arise with respect to such engagements.

16.03 Licensor shall cause LEMOND to render his
services hereunder in a professional and conscientious manner.
Licensee shall use its best efforts to forward, or cause to be
forwarded, unopened, to Licensor, all correspondence addressed to
LEMOND and received by Licensee and/or its advertising agency.

17.   Assignment.

Licensee may not sublicense or assign any of its rights
or delegate any of its duties under this Agreement without the
express prior written approval of Licensor, except to Guarantor,
or a corporate subsidiary or affiliate of Guarantor.  A change of
control or a transfer of shares of Licensee shall be deemed such
an assignment.

18.   Representations and Warranties of Licensor.

Licensor represents and warrants that:

18.01 Licensor has the right, power and authority to
enter into this Agreement and to grant to Licensee the rights and
license granted hereby, except only as hereinbelow set forth;

18.02 Licensor is duly organized and validly existing
corporation, in good standing in Minnesota;

18.03 The performance by Licensor or LEMOND of any of
the terms and conditions of this Agreement on its or his part to
be performed does not and will not constitute a breach or

- 13 -

32133-4bikes

violation of any judgment, decree or order or any agreement or
understanding, written or oral, to which it or he is a party or
by which it or he is bound;

        18.04 There are no adverse proceedings, claims or
actions pending or threatened against Licensor or LEMOND which
would impair or adversely affect Licensor's ability to perform
and comply with all terms, conditions and provisions contained in
this Agreement, or jeopardize Licensee's rights under this
Agreement;

        18.05 Neither Licensor nor LEMOND has granted any
rights in or under the Mark or to the name LEMOND in the
Territory to any third party inconsistent with the rights granted
to Licensee hereunder.

        18.06 Licensor has all rights in and to the Mark in the
United States.  No representation is made as to any rights in the
Mark in other jurisdictions in the Territory, except as expressly
set forth in Paragraph 18.05.

    19. Representations and Warranties of Licensee.

        Licensee, for itself and Guarantor, represents and
warrants that:

        19.01 The execution and delivery of this Agreement and
the performance of the transactions contemplated hereby have been
duly authorized by all appropriate corporate action;

        19.02 The performance by Licensee of any of the terms
and conditions of this Agreement on its part to be performed does
not and will not constitute a breach or violation of any
judgment, decree or order or any agreement or understanding,
written or oral, to which it is a party or by which it is bound;

        19.03 Licensee and Guarantor are duly organized and
validly existing corporations, in good standing in Wisconsin; and
Guarantor is the owner of all of the issued and outstanding
shares of Licensee;

        19.04 There are no adverse proceedings, claims or
actions pending or threatened against Licensee which would impair
or adversely affect Licensee's ability to perform and comply with
all terms, conditions and provisions contained in this Agreement,
or jeopardize Licensor's rights in the Mark;

        19.05 Licensee has the right, power and authority to
enter into this Agreement and receive the rights and license
granted hereby, and Guarantor has the right, power and authority
to guaranty all of the obligations of Licensee under this
Agreement;

        19.06 Licensee has sufficient net worth and operating
capital, and is in otherwise adequate financial condition, to

- 14 -

32133-4bikes

duly perform its obligations under and carry out the intentions
of this Agreement.

20.  **Confidential Information.**

Each party shall maintain in confidence all information
which may be furnished to it, by or on behalf of the other party
in connection with this Agreement and which is identified as
confidential by such other party at the time such information is
so furnished.  Each party's commitment hereunder with respect to
confidential information of the other party shall not apply to
any part of such confidential information of the other party
which:

20.01 was known to the receiving party prior to
disclosure by the other party;

20.02 was known or available to the public prior to
disclosure by the other party;

20.03 becomes known or available to the public
subsequent to disclosure by the other party through no wrongful
act of the party receiving the confidential information.
Either party shall be permitted to disclose such confidential
information to the extent required by applicable laws and
regulations, or pursuant to a court order.

21.  **Relationship of Parties.**

Nothing herein contained shall create any association,
partnership, joint venture, or the relationship of principal and
agent between the parties hereto, and neither party shall have
authority to bind the other or the other's representatives in any
way.  Any and all obligations incurred by Licensee in connection
with the manufacture, distribution, promotion, advertising and
sale of Licensed Products and use of the Mark and any other right
granted hereby shall be solely at Licensee's own risk and
Licensor shall not be liable in any way, except as otherwise
expressly provided herein.

22. **Notices.**

Any notice under this Agreement, including any
statement required to be delivered by Licensee to Licensor, or
approval requested of Licensor, must be in writing and shall be
considered given when delivered personally or sent by confirmed
telecopier to the party for which intended, in each event at the
following addresses or telecopy numbers (or at such address or
numbers as either party may specify by notice to the other
hereunder):

To Licensor:
3000 Willow Drive,
Medina, Minnesota  55340
Telecopier No.: (612) 478-6073

- 15 -

32133-4bikes

with copy to:
Wolf Haldenstein Adler Freeman & Herz LLP
270 Madison Avenue
New York, NY 10016
Attn: Sidney D. Bluming, Esq.
Telecopier No.: (212) 686-0114

To Licensee:
801 West Madison Street,
P.O. Box 183
Waterloo, WI 53594
Telecopier No.: (414) 478-2774
Attn: Mr. John Burke

with copies to:
Intrepid Corporation
N14 W23833 Stone Ridge Drive, Suite #250
Waukesha, WI 53188
Telecopier No.: (414) 523-0700
Attn: Mr. Dick Burke

and:
Sherwin C. Peltin, Esq.
Weiss, Berzowski, Brady & Donahue
700 North Water Street #1500
Milwaukee, WI 53202
Telecopier No.: (414) 276-0458

23.   <u>Modification; Waiver; Remedies Not Exclusive</u>.

No waiver of any performance obligation or of any
default, breach or violation of any of the obligations shall be
considered a continuing waiver or a waiver of any other or
subsequent performance obligation, default, breach or violation.
No delay or omission in enforcing any right or pursuing any
remedy provided herein shall be construed as a waiver of such
right or remedy.  Any waiver of any provision of this Agreement
must be in writing and signed by the party or parties making such
a waiver.  No enforcement of any right or pursuit of any remedy
shall be deemed an election of remedies or be held to exhaust any
such right or remedy, and every such right may be enforced and
every such remedy may be pursued from time to time.

24.   <u>Agents and Brokers</u>.

Licensee and Licensor represent to each other and agree
that there have not been and there are no agents or brokers
involved in bringing about this Agreement or in the negotiation
thereof.

25.   <u>Binding Agreement</u>.

This Agreement shall be binding upon and inure to the
benefit of Licensee and Licensor and their respective legal

- 16 -