Timebase Pty Ltd v. Thomson Corporation, The                                    Doc. 7 Att. 1

Case 0:07-cv-01687-JNE-JJG   Document 25-2   Filed 05/10/07   Page 1 of 48
Case: 3:08-cv-00198   Document #: 1-2   Filed: 04/08/2008   Page 17 of 23
32133-4bikes

representatives, successors and permitted assigns.


26.  Entire Agreement.

        This Agreement, together with the exhibits hereto
constitutes the sole and entire agreement between Licensor and
Licensee with respect to the subject matter hereof and supersedes
all other or prior agreements except as otherwise expressly set
forth herein.  There are and have been no representations or
agreements except as herein set forth.  This Agreement may not be
amended, discharged or terminated orally; any amendment,
discharge or termination, and any consent, approval or
designation (except as otherwise provided in this Agreement) must
be in writing, duly executed by the party against which
enforcement is sought.


27.  Severability of Provisions.

        If any provision of this Agreement or the application
thereof to any person or circumstance shall to any extent be held
invalid or unenforceable, in whole or in part, the remainder of
this Agreement, or such provision, or the application thereof to
persons or circumstances other than those as to which it is held
to be invalid or unenforceable, shall not be affected thereby,
and each provision hereof shall be valid and enforceable to the
fullest extent permitted by law.

28.  Paragraph Headings.

        The headings of the paragraphs herein are for the
convenience of the parties only and are not to be considered part
of this Agreement in construing the same.


29.  Survival of Provisions.

        Following termination of this Agreement, the provisions
of this Agreement shall survive to the fullest extent necessary
to allow the parties to enforce all of their respective rights
and remedies.

30.  Settlement of Prior Litigation.

        In connection with the settlement by LEMOND of his
litigation with Renegade Sports, Ltd. and CKKG, Inc. d/b/a Clark
Kent Bicycles, Licensee and Licensor undertake and agree as
follows:

        30.01    Licensee shall pay Licensor the additional
sum of One Hundred Thirty Five Thousand Dollars ($135,000), of
which Fifty Thousand Dollars ($50,000) has heretofore been paid.
The balance thereof, of Eighty Five Thousand Dollars ($85,000),
shall be paid upon execution hereof;

- 17 -

Dockets.Justia.com

32133-4bikes

30.02     Licensee shall purchase from Renegade Sports, Ltd. the inventory of one hundred one (101) frames, as set forth on Exhibit "30.03" attached, for a total of Sixty One Thousand Three Hundred Seventy Nine Dollars Five Cents ($61,379.05), which shall be paid directly to Renegade Sports, Ltd. promptly after receipt of invoice and inspection; it shall allow LEMOND to purchase up to ten (10) of such frames from it at the price paid therefor;

30.03     Licensee shall assume all warranty coverage required for bicycles heretofore sold in association with the LEMOND name and/or trademark (i.e., not manufactured by Licensee); provided, however, that Licensee shall charge against sums due Licensor hereunder fifty percent (50%) of its frame manufacturing cost (i.e., $125) as to each frame replaced thereunder; and

30.04     LEMOND maintains product liability insurance, and will cause Licensee and Guarantor to be named as covered insureds thereunder.

31.  Outside Activities.

At any time when LEMOND and/or Licensor becomes involved in a commercial way with a promotional project (such as consulting with a racing team, etc.), LEMOND will use reasonable efforts to provide Licensee with the opportunity to have Licensed Products utilized.  Neither LEMOND nor Licensor shall consent to or authorize in any way any association of LEMOND or the Marks with any Products other than Licensed Products, but Licensor acknowledges that they cannot control third party operations.

IN WITNESS WHEREOF,  the parties have caused this Agreement to be executed as of the date first above written.

LEMOND CYCLING, INC.

By: _____ (re)

TREK BICYCLE, CORP.

By: _____

- 18 -

32133-4bikes

<u>LEMOND CYCLING, INC.</u>

LICENSEE: TREK BICYCLE, CORP.

EXHIBIT 1.02

ADDITIONAL COUNTRIES TO BE INCLUDED IN THE TERRITORY AS OF THE
DATE OF THE WITHIN AGREEMENT:

| | |
|---|---|
| ARGENTINA | SOUTH AFRICA |
| ARUBA | TAHITI |
| AUSTRALIA | THAILAND |
| BAHRAIN | TURKEY |
| BERMUDA | URUGUAY |
| BOLIVIA | VENEZUELA |
| BRAZIL | WEST INDIES |
| CANADA | |
| CANARY ISLANDS | AUSTRIA |
| CHILE | BELGIUM |
| COLOMBIA | DENMARK |
| COSTA RICA | FRANCE |
| CYPRUS | GERMANY |
| CZECH REPUBLIC | JAPAN |
| ECUADOR | LUXEMBOURG |
| EGYPT | NETHERLANDS |
| EL SALVADOR | SPAIN |
| FINLAND | SWEDEN |
| GUATEMALA | SWITZERLAND |
| HONG KONG | UNITED KINGDOM |
| HUNGARY | |
| ICELAND | |
| INDONESIA | |
| IRELAND | |
| ISRAEL | |
| ITALY | |
| JORDAN | |
| KUWAIT | |
| MEXICO | |
| NEW CALEDONIA | |
| NEW ZEALAND | |
| NORWAY | |
| OMAN | |
| PANAMA | |
| PERU | |
| POLAND | |
| PORTUGAL | |
| PUERTO RICO | |
| RUSSIA | |
| SINGAPORE | |
| SLOVENIA | |

32133-4bikes

## LEMOND CYCLING, INC.

### LICENSEE: TREK BICYCLE, CORP.

### PRODUCT CATEGORY: BICYCLES AND FRAMES

### REPORT OF NET SALES AND ROYALTIES

PERIOD: FROM _____ TO _____

GROSS SHIPMENTS TO **RETAILERS:**          $_____ *

RETURNS                 $_____

CASH DISCOUNTS          _____

TOTAL DEDUCTIONS                    _____

NET **BASIC** SALES                    $_____

SALES ROYALTY   3% x   $_____   = $_____

GROSS SHIPMENTS TO **DISTRIBUTORS:**       $_____ *

RETURNS                 $_____

CASH DISCOUNTS          _____

TOTAL DEDUCTIONS                    _____

NET **DISTRIBUTOR** SALES               $_____

SALES ROYALTY   2% x   $_____
SALES ROYALTY   3% x   $_____

     TOTAL DISTRIBUTOR SALES ROYALTY   = $_____

TOTAL ROYALTIES, RETAIL AND DISTRIBUTOR  =   _____

LESS:

MINIMUM GUARANTY PAID TO DATE FOR YEAR  =   _____

EARNED ROYALTY PAID TO DATE FOR YEAR  = $_____

     NET ROYALTY DUE                = $_____

* ATTACHED IS SCHEDULE OF LICENSED PRODUCTS BY CATEGORY AND ITEM
AND/OR STYLE NUMBER, SHOWING INVOICED PRICE THEREFOR, AND TOTAL
UNITS SOLD AND GROSS SALES THEREOF, BY COUNTRY. IF THIS STATEMENT
IS FOR FOURTH CONTRACT QUARTER, IT SHALL REPORT FOR FULL CONTRACT
YEAR.

### EXHIBIT "3.03"

32133-4bikes

## CERTIFICATION

The undersigned, _____, chief financial officer of
TREK BICYCLE, CORP., does hereby certify this report as correct
and accurate in all respects as of _____, 199 , and otherwise
according to the books and records of TREK BICYCLE, CORP., which
have been maintained in accordance with generally acceptable
accounting principles, consistently applied.

_____

**EXHIBIT "3.03"**
CONT'D

- 21 -

32133-4bikes

## LEMOND CYCLING, INC.


### LICENSEE: TREK BICYCLE, CORP.


INVENTORY OF FRAMES TO BE ACQUIRED FROM RENEGADE SPORTS, LTD.
ATTACHED HERETO, CONSISTING OF 101 FRAMES AT A TOTAL COST OF
$61,379.05.

**EXHIBIT "30.03"**

32133-4bikes

## GUARANTIES

The undersigned corporation, INTREPID CORPORATION, of N14 W23833 Stone Ridge Drive, Suite #250, Waukesha, WI 53188, does hereby affirm and certify the accuracy of the representations and warranties made by Licensee in the foregoing Sublicense Agreement with LEMOND CYCLING, INC., dated June , 1995, and guarantees to Mr. LeMond the due and timely performance by Licensee of each and every obligation, covenant, undertaking and agreement of Licensee thereunder.  The undersigned expressly agrees to the provisions of said Agreement including, but not limited, paragraphs 2.04, 21, 28 and 29.  The undersigned acknowledges that the execution and delivery of this Guaranty is an inducement to and is being relied upon by LEMOND CYCLING, INC. and Mr. Greg LeMond, in causing them to execute and deliver the within Sublicense Agreement.


Dated: As of June 29, 1995


                                   INTREPID CORPORATION

                                   BY: _____


            *    *    *    *    *    *    *


The undersigned, GREG LEMOND, of 3000 Willow Drive, Medina, Minnesota 55340, does hereby affirm and undertake and agree, that I will personally perform all services require to be provided by the Licensor in the within Sublicense Agreement, and will cooperate in all reasonable respects, including consenting to applications to trademark registrations, in connection with the registration and enforcement of the Mark.  He does also affirm all representations and warranties made by Licensor in Paragraph 18 of the Sublicense Agreement.

As of June 29, 1995

                                   _____
                                      Greg LeMond


- 23 -

# FIRST AMENDMENT

AGREEMENT made as of the 6th day of August, 1999, between LEMOND CYCLING, INC., a corporation organized under the laws of the State of Minnesota, having its principal place of business at 641 East Lake Street - Suite 204P, Wayzata, Minnesota 55391 ("Licensor"), and TREK BICYCLE CORPORATION (formerly Trek Bicycle Corp.), a Wisconsin corporation with offices at 801 West Madison Street, P.O. Box 183 Waterloo, WI 53594 ("Licensee").

## W I T N E S S E T H :

WHEREAS, the parties entered into a certain Sublicense Agreement dated as of June 29, 1995 (the "Sublicense Agreement"), relating to bicycles and bike frames ("Products"); and

WHEREAS, the parties also entered into a certain Sublicense Agreement dated as of June 29, 1995, thereafter amended on July 19, 1996, for certain products relating to cycling (the "TCG Agreement"); and

WHEREAS, the parties have terminated the TCG Agreement and have determined to amend the Sublicense Agreement, on the terms and conditions herein provided ; and

WHEREAS, Trek Bicycle Corp. has changed its name to Trek Bicycle Corporation and Intrepid Corporation has changed its name to Trek Corporation,

NOW, THEREFORE, in consideration of the mutual promises, covenants and conditions of the parties hereinafter set forth, it is agreed as follows:

A.   **Contract Period**.   Paragraph 1.04(a) is hereby amended to read in its entirety as follows:

> "on September 30, 2010 (the "Primary Term"), provided that Licensee shall have an option to extend the Primary Term for an option period of five (5) additional Contract Years, i.e., the period ending September 30, 2015, on two (2) full years notice to Licensor of its election to do so, or . . ."

B.   **Restrictive Covenant**.   Paragraph 2.01 is amended by changing the *proviso* at the end to read, in its entirety, as follows:

> "; provided, however, that neither Licensor nor LEMOND shall grant to any "Prohibited Vendor" (as hereinafter defined) the right to use the Mark or LEMOND's name, in any form, for product endorsement (or license), during the Contract Period. The term Prohibited Vendor shall mean the entities designated on Exhibit '2.01' hereof, subject to Licensee's right, upon sixty (60) days prior notice to Licensor, to substitute for any entity listed on Exhibit '2.01' any other entity the principal business of which is manufacturing and selling Products in competition with Licensed Products, provided that such substitution shall not affect any deal

made by Licensor prior to the effective date of Licensee's notice hereunder, and the implementation of any such deal shall not constitute a violation of any provision hereof."

C.   **Appearances**.   Paragraph 2.02.01 is amended in the following respects:

(i)   Change the words "the first" to "each" in the third line, and delete the phrase "less the number of Working Days LEMOND provides to Licensee under any other agreement."

(ii)   Delete the last sentence, and substitute in its place the following:

"Anything herein contained to the contrary notwithstanding, no more than ten (10) Working Days per Contract Year for the five (5) Contract Years commencing October 1, 1999, and seven (7) Working Days per Contract Year thereafter, shall occur on weekends (Friday, Saturday or Sunday) or on Holidays (as per Exhibit '2.02.01' annexed).   The use of Working Days shall be contained in a promotional campaign jointly developed and reasonably approved by the parties."

D.   **Earned Royalty**.

(i)   Delete the last sentence of Paragraph 3.02, and substitute in its place the following:

"Licensee may deduct from Earned Royalties on Net Sales made in the United States ("US Sales") due for any Contract Year, only payments theretofore actually made of the "US Minimum" (as hereinafter defined) for the same Contract Year, and from Earned Royalties on Net Sales made outside the United States ("International Sales") due for any Contract Year, only payments theretofore actually made of the "International Minimum" (as hereinafter defined) for the same Contract Year."

(ii)   Delete the second sentence of Paragraph 3.03, and substitute in its place the following:

"The same shall contain separate reports as to Net Basic Sales and Net Distributor Sales, and as to US Sales and International Sales, with Earned Royalty calculations and, separately, the application of US Minimum and International Minimum payments to the aggregate Earned Royalty then due for US Sales and International sales, respectively.   By way of illustration, if total Earned Royalties on US Sales for a Contract Year are $300,000, the excess Earned Royalty of $50,000 on US Sales (over the US Minimum) shall be paid to Licensor without reducing or otherwise being a credit against, and without a credit for the International Minimum for such

-2-



Contract Year, thus resulting in a total of $400,000 being paid to Licensor in such Contract Year."

E.    **Minimum Royalty.**    Paragraph 4.01 is amended to replace the number $135,000 (written and in numbers) with $350,000, provided, however, that such number shall not affect any obligations of Licensee prior to October 1, 1999 notwithstanding the effectiveness of this Amendment, with $250,000 ("US Minimum") being attributable to US Sales and $100,000 ("International Minimum") being attributable to International Sales provided in said Paragraph.

F.    **Bicycles.**    The following additional sentence shall be added to Paragraph 5.03 (as an addendum and not as a substitution or limitation of the first sentence):

"In addition, in each Contract Year, Licensee shall provide to LEMOND, at no charge, and in consideration of the rights granted under Paragraph 2.05 hereof, ten (10) Licensed Products (completed bicycles) consisting of LeMond Zurichs (or other comparable bicycle manufactured by Licensee of at least equal value - subject to LEMOND's reasonable approval, which approval will not be unreasonably withheld); provided, however, that LEMOND is free to ride each and any of said bicycles notwithstanding the previous sentence."

G.    **Notices.**    Paragraph 22 is modified to provide that notices to Licensor and Licensee, as otherwise therein provided, shall be addressed to Licensor and Licensee, respectively, with copies, only as follows:

To Licensor:  641 East Lake Street - Suite 204P   **AND**   3000 Willow Drive,
              Wayzata, Minnesota 55391                     Medina, Minnesota  55340
              Telecopier No.: (612) 476-7852              (612) 478-6073

with copy to: Sidney D. Bluming, P.C.
              315 West 57th Street - Suite 501
              New York, NY 10019
              Telecopier No.: (212) 977-8811

To Licensee:  801 West Madison Street,
              P.O. Box 183
              Waterloo, WI 53594
              Telecopier No.: (920) 478-2774
              Attn: Mr. John Burke

with copies to: Robert Burns, Esq.            and
                Mr. Joe Siefkes
                P.O. Box 183
                Waterloo, WI 53594
                Telecopier No.: (920) 478-2774

-3-

H.   **New Provisions**.

(i)   A new Paragraph regarding the Contract Period shall be inserted as follows:

"During the Contract Period and for six (6) months thereafter, Licensor agrees that before granting a sublicense to any third party to use the Mark in the Territory on and in association with Products commencing after the Expiration Date, Licensor shall give written notice to Licensee (the "Refusal Notice") of its intent to grant such sublicense, including the material business terms thereof.  Licensee shall have the right of first refusal to obtain such sublicense and become the licensee thereunder upon all of such terms.  Such right must be exercised by Licensee by written notice to Licensor delivered to Licensor within thirty (30) days after receipt of the Refusal Notice.  In the event that Licensee fails to timely exercise its right hereunder,  the Licensor may enter into a sublicense agreement with any third party, provided however that the terms and conditions of such sublicense shall not be more favorable to the third party than those offered to Licensee in the Refusal Notice (unless a further Refusal Notice is issued by Licensor).  If Licensee effectively makes its election hereunder, the commencement date therefor shall commence the first day after the Expiration Date or the effective date of such new sublicense, whichever is later."

(ii)   A new Paragraph 2.05 regarding the right to produce and distribute premiums or promotional items by Licensee shall be inserted as follows:

"Licensee shall have the further right to make, have made exclusively for it, and sell or give away as premiums only, in connection with its sale of Licensed Products (and not to sell or give away in connection with or for promotion of any other item or entity),  reasonable quantities of typical promotion items (such as caps, shirts, coffee mugs and drinking glasses), produced in connection with the promotion of Licensed Products and either included with the Products, provided after sale to purchasers of the Licensed Products (with coupon or otherwise) or distributed (by gift or sale) as a part of a direct promotion for the Licensed Products. Each such premium item, as well as the promotional program, must be approved in advance by Licensor, which approval (to the extent of non-bicycle accessory items) shall not be unreasonably withheld or delayed, and must otherwise conform to all requirements for Licensed Products hereunder; and provided, further, that each premium item shall contain such phrase and reference to the Licensed Products as Grantor shall expressly approve in advance in writing as herein provided.  Until further notice from Licensor, the phrases 'Greg LeMond Bicycles,' 'LeMond Bicycles,' 'LeMond Cycles' and 'Greg LeMond Cycles' are approved."

-4-



IN WITNESS WHEREOF, the parties have caused this Agreement to be executed as of the date first above written.

LEMOND CYCLING, INC.

By: _____

TREK BICYCLE CORPORATION

By: _Joseph R. Siffers_____

**AGREED:**

TREK CORPORATION

BY: _Joseph R. Siffers_____

**APPROVED:**

_____
Greg LeMond

-5-

## LEMOND CYCLING, INC.

### LICENSEE: TREK BICYCLE CORPORATION

### PRODUCT CATEGORY: BICYCLES AND FRAMES

### PROHIBITED VENDORS

### EXHIBIT 2.01

SPECIALIZED

CANNONDALE

SCHWINN/GT

GIANT

BRUNSWICK

-6-

<u>LEMOND CYCLING, INC.</u>

LICENSEE: TREK BICYCLE CORPORATION

PRODUCT CATEGORY: BICYCLES AND FRAMES

<u>HOLIDAYS</u>

**EXHIBIT 2.02.01**

New Year's Day
New Year's Eve
President's Day
Easter
Memorial Day
July 4
Labor Day
Veteran's Day
Thanksgiving Day
Day after Thanksgiving
Christmas
Day after Christmas
New Year's Eve

In any calendar year in which the above holidays are officially celebrated on days other than the calendar date therefor, such celebration date shall be deemed the holiday in that calendar year.

-7-



CASE TYPE:  CONTRACT

STATE OF MINNESOTA                                          DISTRICT COURT

COUNTY OF HENNEPIN                              FOURTH JUDICIAL DISTRICT

LeMond Cycling, Inc.,

                         Plaintiff,          Case No. _____

vs.

Trek Bicycle Corporation,                      **COMPLAINT**

                   Defendant.          **JURY TRIAL DEMANDED**

Plaintiff LeMond Cycling, Inc. ("LeMond Cycling"), for its Complaint against Defendant

Trek Bicycle Corporation ("Trek"), states and alleges as follows:

### INTRODUCTION

1.      LeMond Cycling is a Minnesota corporation founded by Greg LeMond.

Mr. LeMond is a world-famous champion bicycle racer who won the prestigious Tour de France

in 1986, 1989, and 1990.  Mr. LeMond was the first American to ever win this race.

2.      Mr. LeMond licensed his name and image to LeMond Cycling, which serves as

his licensing company with the power to sublicense for various products and services under the

LeMond name and trademarks.

3.      Mr. LeMond started an earlier bike company, LeMond Bicycles, in 1986.  It was

on a LeMond-branded bicycle built by LeMond Bicycles that Mr. LeMond won his last Tour de

France in 1990.  This was the first time that the Tour de France was won on a bike built by an

MP-Primary 80000008.1

**EXHIBIT 2**

American company. LeMond-branded bicycles built by LeMond Bicycles were also used by one of the top professional racing teams in Europe from 1990 until 1994.

4.   Trek is a Wisconsin corporation that manufactures and sells bicycles and bicycle accessories throughout the United States and the world, including the State of Minnesota.

5.   On June 29, 1995, LeMond Cycling and Trek entered into a "Sublicense Agreement" ("Agreement"), which was amended in August of 1999 ("the 1999 Amendment"). The Agreement allowed Trek to use the name and trademark "Greg LeMond Cycles" and other similar trademarks incorporating the name "Greg LeMond" on which the parties would mutually agree. The collection of trademarks associated with Mr. LeMond's name will be collectively referred to as "the LeMond brand."

6.   Trek entered into this Agreement because Mr. LeMond's name has "acquired a reputation for a high standard for quality." Trek wanted to use the LeMond name for the purpose of effectively taking over and marketing the LeMond brand of bicycles and bicycle frames, which had been manufactured since 1986 by LeMond Cycling and others.

7.   The LeMond brand has developed world-wide recognition due to Mr. LeMond's extensive racing in Europe and his three Tour de France victories.

8.   Mr. LeMond is known in the industry for helping create several successful companies such as Giro Helmets, which has long been one of the leading helmet companies in the cycling industry. Mr. LeMond also lent his sports celebrity to the launch of the first sports-eyewear company, Oakley. Mr. LeMond was the first athlete to wear Oakley Pilots and was wearing Oakley sunglasses when he won his first Tour de France in 1986.

2

9.     Upon information and belief, since at least 2004 and likely earlier, Trek has sought to unilaterally wind down the LeMond brand, despite contractual obligations that it exert best efforts to promote and market the brand.  Also upon information and belief, Trek's effort to wind down the LeMond brand is the result of pressure from one or more third parties.

10.     The Agreement explicitly identifies 60 countries, including France, Spain, Holland, Austria and Belgium, as "the Territory" for the agreement.  Given previous failure to make adequate efforts, the 1999 Amendment to the Agreement intentionally included international minimums in order to provide an economic incentive to Trek to develop and promote sales in markets outside of the United States.  Upon information and belief, despite frequent requests, Trek has done little to develop and market LeMond-branded cycles internationally.

11.     Out of his concern for both the sport of cycling and athletes all over the world, Mr. LeMond has been public about problems with the use of performance enhancing drugs in cycling throughout his career.  Mr. LeMond has been and continues to be outspoken about problems with the use of performance enhancing drugs in cycling during his retirement from cycling.

12.     Since 1990, over one hundred young professional cyclists have died from suspected complications stemming from the use of performance enhancing drugs.

13.     Mr. LeMond was public about his concerns about performance enhancing drugs prior to 2001. Although not an isolated example, Mr. LeMond publicly commented on what is known as the 1998 Festina Affair, where approximately 400 vials and capsules of doping

3

products were confiscated from a team vehicle just three days before the Tour de France cycling race was set to begin.

14.     The sport of cycling was nearly destroyed by the investigation associated with the 1998 Festina Affair and the related public revelations of how rampant and wide-spread the use of illegal performance enhancing drugs was in professional cycling.   Mr. LeMond publicly commented in part that the 1998 Festina Affair was "a shame, a terrible thing for the Tour de France and sports in general," but that given the problems with the use of performance enhancing drugs, it was "a good thing it came out into the open."

15.     Prior to 2001, Mr. LeMond was outspoken about the damage that certain doctors who support and prescribe the use of performance enhancing drugs do and have done to athletes in professional cycling.

16.     Lance Armstrong built a veritable sports empire based on his feats as a cyclist and his recovery from cancer.  Mr. Armstrong won the Tour de France in the years 1999-2005.  Upon information and belief, since at least 1998 Mr. Armstrong has had a contractual relationship with Trek, pursuant to which he acts as endorser and spokesperson for Trek-branded bicycles, and Trek sponsored the professional cycling team for which Armstrong once raced.   Since the inception of the relationship, Trek has used Mr. Armstrong's name and image extensively in its advertising, including on its website.

17.     Prior to the inception of Trek's relationship with Mr. Armstrong, Trek never suggested to Mr. LeMond that he should not speak publicly about problems with the use of performance enhancing drugs in cycling.

4

18.     Trek never commented on or interfered with Mr. LeMond's outspoken comments regarding the use of performance enhancing drugs in cycling until 2001.

19.     Trek's representatives have characterized Trek as "in the middle" of an alleged dispute between Mr. LeMond and Mr. Armstrong that began in 2001.

20.     Mr. Armstrong, perhaps in part due to his close association with individuals known to have used or supported the use of performance enhancing drugs, has been under constant scrutiny regarding his own record with respect to the use of performance enhancing drugs.

21.     Publicly reported incidents have contributed to the scrutiny Mr. Armstrong has faced.  For example, Sunday Times of London sports writer David Walsh reported that Mr. Armstrong received a positive doping result in 1999 based on a positive sample for a banned hormone that was present in his urine sample.  Walsh's account maintains that the test results were later reversed when Mr. Armstrong's team received a back-dated prescription that was ultimately accepted by the President of the Union Cycliste Internationale ("UCI"), Hein Verbruggen, contrary to the anti-doping regulations and procedures of the governing body of cycling.  Other examples of publicly reported incidents that have put Mr. Armstrong under scrutiny will be addressed in the body of this complaint.

22.     Since 2001, Trek has systematically sought to silence Mr. LeMond's right to make comments that constitute an informed and honest opinion on matters of legitimate public interest—the problems associated with the use of performance enhancing substances.  Mr. LeMond's comments, as evidenced by recent revelations, public discourse, and Congressional activity, were ahead of the times.

5

23.    Upon information and belief, on numerous occasions Mr. Armstrong and/or his representatives have taken actions or made remarks that are disparaging of Mr. LeMond and therefore harmful to the LeMond brand.  Also upon information and belief, Trek has done nothing to protect the LeMond brand from such actions and remarks even when faced with explicit requests from Mr. LeMond that Trek intervene for the protection of the LeMond brand.

### PARTIES

24.    LeMond Cycling is a Minnesota corporation founded by Greg LeMond.

25.    LeMond Cycling is a Minnesota corporation with its principal place of business in Wayzata, Minnesota.  Mr. LeMond himself is domiciled in Hennepin County, Minnesota.

26.    Trek is a Wisconsin corporation with offices at 801 West Madison Street, Waterloo, Wisconsin 53594.  Trek manufactures and sells bicycles and bicycle accessories throughout the United States and the world, including the State of Minnesota.

27.    Mr. John Burke is the Chief Executive Officer of Trek.

### JURISDICTION AND VENUE

28.    This action arises under the Minnesota Declaratory Judgment Act, Minn. Stat. § 555.01 *et. seq*, as well as the common law of Minnesota.

29.    Venue is proper within this judicial district pursuant to Minn. Stat. § 542.01 *et. seq*.

### JURY TRIAL DEMAND

30.    LeMond Cycling demands a jury trial on all counts so triable.

## FACTS

**I.   THE AGREEMENT BETWEEN LEMOND CYCLING AND TREK**

31.     On June 29, 1995, LeMond Cycling and Trek entered into a "Sublicense Agreement" ("Agreement") that allowed Trek to use the name and trademark "Greg LeMond Cycles" and other similar trademarks incorporating the name "Greg LeMond" on which the parties would mutually agree. Trek entered into this Agreement because Mr. LeMond's name has "acquired a reputation for a high standard for quality." Trek, which was known for conventional family bicycle products, wanted to use his name for the purpose of marketing a new high-end line of bicycles and bicycle frames separate and distinct from the Trek-branded product, i.e., under the LeMond brand.

32.     Also on June 29, 1995, LeMond Cycling and Trek entered into a separate agreement for certain cycling-related products (the "TCG Agreement").

33.     In August 1999, LeMond Cycling and Trek terminated the TCG Agreement for business reasons and at the same time entered into the 1999 Amendment to the Agreement, pursuant to which, among other things, the "Primary Term" of the Agreement was extended to September 30, 2010.

34.     The Agreement contains a minimum royalty provision. The 1999 Amendment to the Agreement amended the minimum royalty provision to increase the overall minimum royalty and set forth a separate international minimum royalty.

35.     Section 13.02.01 of the Agreement ("the Moral-Turpitude Section") allows Trek to terminate the Agreement before the Primary Term expires if LeMond Cycling or Mr. LeMond "takes any action which damages or has an adverse impact upon [Trek] or [Trek's] business or

MP-Primary 80000008.1

7

goodwill" or if Mr. LeMond were to be "convicted of a felony involving moral turpitude or gross dishonesty."

36.    Section 5.02 of the Agreement obligates Trek to use its "best efforts" to exploit LeMond Cycling's trademarks and to promote the sale of Trek's products bearing any part of LeMond Cycling's trademarks "so as to try to maximize sales, consistent with the quality and reputation" of LeMond Cycling and Mr. LeMond.

37.    Section 5.01 of the Agreement obligates Trek to "meet in person, by telephone or other means of communication as the parties may agree from time to time, to discuss plans for new lines or items of Licensed Products [ . . . ]". Section 5.01 also provides that "[a]ll designs and sketches which are or become unique to Licensed Products and become associated in the public's mind with Licensor, LEMOND or the Mark, shall not be utilized by Licensee or any third party, after the Contract Period, without Licensor's express further approval."

38.    Section 6.02 of the Agreement requires that LeMond Cycling, at its own cost and expense, register and maintain its trademarks in the United States as requested by Trek.  Section 6.03 of the Agreement states

> [ . . . ] provided Licensee has advised Licensor of the cost and expense of effecting such registration promptly after such registration is issued, Licensee is hereby authorized and directed to deduct from Earned Royalties otherwise payable to Licensor from Net Sales in the jurisdiction wherein Licensee paid to register the Mark as aforesaid, up to fifty (50%) thereof on an on-going basis until aid in full, the reasonable cost and expense of effecting such registration.

39.    Section 1.02 of the Agreement defines the territory of the Agreement as "the United States, its territories and possessions, and the countries Licensee has designated and

8

which are set forth on Exhibit '1.02' hereto." Exhibit 1.02 lists 60 countries as part of the territory, including more than 10 countries in Europe.

40.     Section 8.01 of the Agreement requires that Trek "expend a reasonable amount on the marketing, promotion and advertising of Licensed Products, both to the trade and to consumers (including corporate advertising), consistent with its promotion of comparable lines of products."

41.     Upon information and belief, Trek's marketing, promotion and advertising efforts for comparable lines of products have included advertising in cycling publications.

42.     Upon information and belief, Trek's international marketing, promotion and advertising for comparable lines of products have included advertising in international cycling publications that target international bicycle markets.

43.     Upon information and belief, Trek's international marketing, promotion and advertising for comparable lines of products have included sponsorship of Pro Tour professional cycling teams.

44.     Upon information and belief, Trek's international marketing, promotion and advertising for comparable lines of products have included the establishment of geographic distribution channels.

45.     Section 2.02.01 of the Agreement contemplates up to thirty "Working Days" of appearances by Mr. LeMond to be used for promotional services related to LeMond-branded products.   Section 2.02.03 provides that Trek will pay or reimburse LeMond Cycling for expenses related to the development, design, and promotion of LeMond-branded products. Despite such provisions, on numerous occasions Trek has failed to inform or invite Mr. LeMond

9

to promotional events for LeMond-branded products and Mr. LeMond has attended, at his own initiative and expense, to appear and promote the LeMond brand.

46.    Section 5.03 of the Agreement requires that "[d]uring each contract year" Trek provide LeMond, "at no charge, three (3) high end and two (2) low end Licensed Products (completed bicycles) [ . . . ]". In addition, Section F of the 1999 Amendment added the following provision "as an addendum and not as a substitution or limitation" of the existing section 5.03:

> In addition, in each Contract Year, Licensee shall provide to LEMOND, at no charge, and in consideration for the rights granted under Paragraph 2.05 hereof, ten (10) Licensed Products (complete bicycles) consisting of LeMond Zurichs (or other comparable bicycle manufactured by Licensee of at least equal value – subject to LEMOND's reasonable approval, which approval will not be unreasonably withheld); provided however that LEMOND is free to ride each and any of said bicycles notwithstanding the previous sentence.

47.    Section 16.01 of the Agreement requires that LeMond Cycling cause Mr. LeMond to perform in a "professional and conscientious manner." At all times during the term of the Agreement, Mr. LeMond has performed in a professional and conscientious manner.

48.    Upon information and belief, the Agreement is governed by the laws of the state of Minnesota.

## II.    LANCE ARMSTRONG, TREK, AND PROBLEMS WITH DOPING IN CYCLING

49.    Mr. LeMond has been public and consistent about his concerns with the use of performance enhancing drugs, especially in the sport of cycling.

50.    Mr. LeMond was public about his anti-doping stance before Trek extended his contract in August 1999. For example, in a July 1998 interview, Mr. LeMond stated that the

10

doping scandal that engulfed the 1998 Tour de France was "the best thing that's happened in cycling [. . .] The worst would be for drugs to stay on the back side and nobody doing anything about it." And in January 1999, Mr. LeMond stated:

> For years now doping has been a problem in sport. But in the 1980's when I raced there was a lot of suspicion cast on individuals thought to be cheating, but not on entire teams organizing doping systematically. It's such a shame, a terrible thing for the Tour de France and sports in general. But it's a good thing it came out into the open.

51. Lance Armstrong built a veritable sports empire based on his feats as a cyclist and his recovery from cancer. Mr. Armstrong won the Tour de France in the years 1999-2005.

52. One of the key public figures in professional cycling's many doping scandals was and remains Dr. Michele Ferrari, an Italian doctor. As early as 1999, Dr. Ferrari was explicitly tied to the use of blood doping to improve the performance of cyclists. In 2003, Dr. Ferrari was convicted in his native Italy for sporting fraud and abuse of the medical profession. "At the heart of the prosecution case is the allegation that the blood-thickness levels of Ferrari's charges varied from winter to summer, coinciding with major races, and implying the possible use of EPO." William Fotheringham, *Cycling: Ferrari defends record on drugs*, The Guardian (London), Apr. 17, 2003 at 32. In addition, and upon information and belief, Dr. Ferrari corresponded with his local pharmacy with regard to a range of banned substances and received many of these substances at his home. At least one professional cyclist also provided testimony that Dr. Ferrari demonstrated to him how to use a banned substance without getting caught.

53. There have been public reports that Mr. Armstrong received a positive doping result in 1999 based on a positive result for a banned hormone that was present in his urine sample. It has also been publicly reported that the test results were later reversed when Mr.

Armstrong's team received a back-dated prescription that was ultimately accepted by the President of the Union Cycliste Internationale ("UCI"), Hein Verbruggen, contrary to the anti-doping regulations and procedures of the governing body of cycling.

54.     In 2000, Julien DeVriese, a mechanic who once worked for Mr. LeMond and who was the head mechanic for Mr. Armstrong's team at the time, told Mr. LeMond that Mr. Verbruggen had received a $500,000 payoff related to the back-dated prescription.     Mr. DeVriese also shared with Mr. LeMond that Mr. Armstrong was working with Dr. Michele Ferrari. Despite the dismay that this information caused Mr. LeMond, he withheld judgment until it could be confirmed that Mr. Armstrong was working with Dr. Ferrari.

55.     There have been public reports that two members of Mr. Armstrong's cycling team, U.S. Postal, were filmed dumping doping products in the year 2000. The details behind the reports were subsequently investigated for nearly two years by French authorities. It was publicly reported that Mr. Armstrong's team refused to provide blood samples in connection with the investigation, which prevented the continuation of the inquiry.

56.     Upon information and belief, Mr. Armstrong's professional relationship with Dr. Ferrari spanned nearly a decade, beginning as early as 1995 and ending only upon or after Dr. Ferrari's conviction. As a result of media reports, this relationship became widely known as early as 2001.

57.     David Walsh, an award-winning sports journalist for the *Sunday Times of London*, co-authored a book entitled *L.A. Confidentiel: Le Secrets de Lance Armstrong*.

58.     In July 2001, Mr. LeMond responded to certain questions by a reporter regarding the association between Mr. Armstrong and Dr. Ferrari. Among other things, Mr. LeMond noted

MP-Primary 80000008.1

that he was "devastated" to learn of Mr. Armstrong's involvement with Dr. Ferrari. Mr. LeMond further made the unremarkable observation that if Mr. Armstrong was innocent of doping, his career represented the greatest comeback in the history of sport—referring to Mr. Armstrong's struggle with testicular cancer—and if Mr. Armstrong was not innocent of doping, his comeback represented the greatest fraud in the history of sport. Mr. LeMond's statements were generally repeated in the book published in 2004 entitled *L.A. Confidentiel: Les Secrets de Lance Armstrong*, and he made other confirmatory statements regarding Dr. Ferrari and Mr. Armstrong in response to questions from reporters regarding *L.A. Confidentiel.*

59.    The substance erythropoietin ("EPO") is an endurance-boosting hormone. EPO is naturally produced in the kidney.    Once released, it serves to stimulate an increase in hemoglobin, thus increasing the oxygen-carrying capacity of the blood. The *American Journal of Sports Medicine* includes references to EPO's "side effects":

> Artificially raising hemoglobin levels can have dangerous consequences. In 1987, the first year of EPO release in Europe, 5 Dutch cyclists died of unexplained reasons. Between 1997 and 2000, 18 cyclists died from stroke, myocardial infarction, or pulmonary embolism. These events have brought the drug into the forefront of discussion in endurance sport. Ramifications like these prompted the American College of Sports Medicine to take a position stand against the use of any ergogenic aid designed to artificially raise hemoglobin mass, calling them unethical and unfair, and they stated that this practice exposes the athlete to unwarranted and potentially serious health risks.

John M. Tokish, S. Mininder, and Richard J. Hawkins, *Ergogenic aids: a review of basic science, performance, side effects, and status in sports; Team Physician's Corner*, The American Journal of Sports Medicine, Sept. 1, 2004.

60.    EPO is banned in professional cycling. Nevertheless, Dr. Ferrari was once noted as stating that EPO is no more dangerous than orange juice.

13

61.   Upon information and belief, Trek has known of Mr. Armstrong's relationship with Dr. Ferrari since as early as 2001.  Additionally, in 2001, Mr. LeMond shared with Trek that he had received information about doping on Mr. Armstrong's team and warned Trek of the dangers of continued association with a team engaged in such practices.

62.   In August 2005, the French sports newspaper *L'Équipe* publicly renewed speculation about Armstrong's use of performance-enhancing substances.  *L'Équipe* conducted an investigation that uncovered EPO tests from frozen urine samples taken from Mr. Armstrong during the 1999 Tour de France.  These recent charges received press coverage by the American media, including the *New York Times*.

63.   Since 2005, a number of Mr. Armstrong's former teammates, including the now discredited Floyd Landis — who has been stripped of his Tour de France title — have tested positive for use of performance-enhancing substances.  Other former teammates who have been found guilty and/or been suspended for use of performance enhancing substances include Tyler Hamilton and Roberto Heras.

64.   In September 2006, two other former teammates of Mr. Armstrong admitted to using performance enhancing drugs while preparing for the 1999 Tour de France.

65.   In 2005, pursuant to a subpoena, Mr. LeMond gave confidential testimony in a private arbitration between Mr. Armstrong and a company that he sued.  This testimony was leaked to the media by a third-party not known by or associated with Mr. LeMond or LeMond Cycling.  Upon information and belief, the third-party who leaked the testimony was a representative for Mr. Armstrong.

14

66.     After Mr. Landis tested positive for performance-enhancing substances, Mr. LeMond was once again contacted by members of the media.   Mr. LeMond made the unremarkable comment that he was "devastated and disappointed" by Mr. Landis's test result.

## III.   TREK'S EARLY ATTEMPTS TO SILENCE MR. LEMOND

67.     David Walsh's July 2001 interview with Mr. LeMond led to the following quote:

> When Lance won the prologue to the 1999 Tour, I was in tears. When I heard he was working with Michele Ferrari, I was devastated.  If Lance is clean, it is the greatest comeback in the history of sports. If he isn't, it would be the greatest fraud.

David Walsh, *Sunday Times of London*, July 29, 2001.

68.     Shortly after the publication of Mr. Walsh's article in 2001, Mr. LeMond received a phone call from Mr. Armstrong.  In this call, Mr. Armstrong tacitly acknowledged his use of EPO and threatened to "find" people who he could have come forward to implicate Mr. LeMond in the use of EPO unless Mr. LeMond retracted his statements.  Mr. LeMond indicated to Mr. Armstrong that Mr. Armstrong could not find such people because Mr. LeMond had never used EPO, and that if such accusations surfaced, he would know that they were instigated by Mr. Armstrong.  Mr. Armstrong also indicated to Mr. LeMond that if Mr. LeMond wanted to throw stones, then Mr. Armstrong could also throw stones.

69.     After Mr. Armstrong telephoned Mr. LeMond, Mr. LeMond received telephone calls from three business associates of Mr. Armstrong.  Each of these three individuals delivered the message that Mr. LeMond should remain silent or that there would be consequences.

70.     After Mr. Armstrong telephoned Mr. LeMond, Trek contacted Mr. LeMond to notify him that Mr. LeMond's comments in the article upset Mr. Armstrong.

15

71.   In the afternoon of August 13, 2001, John Burke, Trek's Chief Executive Officer, in an apparent attempt to persuade Mr. LeMond to participate in efforts to appease Mr. Armstrong, said that if the situation was not taken care of, Mr. Armstrong would escalate the dispute and in graphic terms, implied that Mr. Armstrong would financially harm Mr. LeMond.

72.   In the same conversation on August 13, 2001, Mr. Burke indicated that Mr. Armstrong and his agent wanted Mr. LeMond to issue a statement that had been drafted for him, and that in Mr. Burke's opinion, the draft statement allowed Mr. LeMond leeway to later claim that if Mr. Armstrong was still using performance-enhancing drugs, Mr. LeMond could remind people of his previous statements regarding Mr. Armstrong's association with Dr. Ferrari.   Mr. Burke also confirmed that the press release had been drafted by Mr. Armstrong's attorney, Bill Stapleton.

73.   In the same conversation on August 13, 2001, Mr. Burke indicated that if Mr. LeMond did not issue a press release in a form approved by Mr. Armstrong, Mr. Armstrong would sever his relationship with Trek and Mr. LeMond's relationship with Trek would suffer.

74.   In a subsequent conversation on August 13, 2001, Mr. LeMond and Mr. Burke agreed that the nature of Mr. Armstrong's pressure upon Mr. LeMond and Trek constituted extortion.

75.   In that same conversation on August 13, 2001, in response to Mr. LeMond's statement that people cannot threaten others, Mr. Burke told Mr. LeMond that one can threaten people over the short term.

76.   In that same conversation on August 13, 2001, Mr. Burke told Mr. LeMond that Mr. LeMond was also on the threatened list.

MP-Primary 80000008.1

77. During another conversation with Mr. LeMond on August 13, 2001, Mr. Burke opined to Mr. LeMond that Dr. Ferrari was not good for Mr. Armstrong.

78. Despite concerns that Trek's ultimatum amounted to extortion, and out of fear for his business and to gratify Trek's repeated requests, among other things, Mr. LeMond eventually acquiesced to allow the release of a public statement that restated his views regarding Dr. Ferrari. Instead of a press release, however, a purported interview was published in *USA Today*,

79. Mr. LeMond never conducted an interview with any individual from *USA Today* during 2001, nor did he either authorize or approve the release of any story creating the impression that an interview had taken place.

80. Upon information and belief, the purported interview published in *USA Today* was orchestrated by a representative for Mr. Armstrong.

## IV.  TREK'S NOTIFICATION TO LEMOND CYCLING OF ITS ALLEGED BREACH OF THE AGREEMENT

81. Mr. LeMond's three-year old comments drew renewed focus in the summer of 2004, with the publication *L.A. Confidentiel: Les Secrets de Lance Armstrong*, which generally repeats that same quotation included in the July 2001 article referenced above. Numerous individuals were interviewed as a part of the research conducted for the book and the subsequent interest it created.

82. In July 2004, Mr. LeMond was besieged with requests for interviews concerning Mr. Walsh's book. He agreed to speak to only two journalists, one from ESPN and another from the French newspaper *Le Monde*, related to the contents of David Walsh's book *L.A. Confidentiel: Les Secrets de Lance Armstrong*. In the French newspaper, in response to

questions about the phone call he had with Mr. Armstrong in 2001, Mr. LeMond was quoted as stating that "Lance is ready to do anything to keep his secret. . . . I don't know how he can continue to convince everybody of his innocence." He was also quoted as stating, as he was in 2001, that "If [Lance Armstrong is] clean, it's the greatest comeback. And if he's not, then it's the greatest fraud."

83.    Within days of the publication of the interview in *Le Monde*, Trek contacted LeMond's attorney to complain about the interview. Trek claimed that it had received a large volume of emails expressing a negative reaction to the article. Upon information and belief, the actual volume of emails was significantly smaller than what was claimed. Also upon information and belief, a large percentage of these emails were drafted either by Trek or with Trek's involvement.

84.    In a letter dated August 10, 2004, Trek, through its attorney, wrote to LeMond Cycling and provided formal notice that Mr. LeMond's actions put LeMond Cycling in breach of the Agreement. As the basis for this alleged breach, Trek cited the above-described Moral-Turpitude Section in the Agreement.

85.    Although Trek has never claimed that Mr. LeMond lied or defamed Mr. Armstrong in any way, in 2004 Trek began making the claim that Mr. LeMond's statements regarding Mr. Armstrong constituted a breach of the LeMond Cycling/Trek Agreement.

86.    Trek's notification of a breach relied in part on the arguments: (1) that statements made by Mr. LeMond "harm the value of the LeMond name and trademark," which, in turn, supposedly harm Trek; (2) that Mr. LeMond made statements that constitute public accusations of doping by Mr. Armstrong; (3) that Mr. LeMond damaged Trek's "Endorsement and

18

MP-Primary 80000008.1

Spokesperson Agreement" with Mr. Armstrong; (4) that during the several weeks preceding the notice of a breach on August 10, 2004, Trek received a large number of customer and dealer complaints concerning Mr. LeMond's statements about Mr. Armstrong.

87.    Neither Mr. LeMond nor LeMond Cycling have taken any action that damaged, or had an adverse impact upon Trek, Trek's business, or Trek's goodwill.   Indeed, Trek has consistently failed to provide LeMond Cycling with *any* evidence indicating *any* material negative impact caused by Mr. LeMond's factually accurate statements.  Furthermore, and upon information and belief, Trek's sales of LeMond-related bicycles in the United States increased from Trek's fiscal year 2001 to 2002 (*i.e.*, approximately the year after Mr. LeMond made his 2001 statements), and increased from Trek's fiscal year 2003 to 2004.

88.    Trek has taken no legal action since 2004.  Consequently, LeMond believes that Trek has waived any purported claim of breach.  Nevertheless, Trek's four-year-old notice of breach and associated actions have left LeMond in limbo.

## V.    MR. LEMOND HAS NOT DAMAGED TREK, TREK'S BUSINESS, OR TREK'S GOODWILL

89.    Mr. LeMond's high standards and reputation in the cycling world are the reasons that Trek wanted to be in business with him.  And Mr. LeMond was public about his anti-doping stance before Trek extended his contract in August 1999.  For example, Mr. LeMond stated that the doping scandal that engulfed the 1998 Tour de France was "the best thing that's happened in cycling. . . .  The worst would be for drugs to stay on the back side and nobody doing anything about it."  Arthur Brice, *Lemond: Drug scandal is best thing to happen to cycling*, The Atlanta Journal and Constitution, Aug. 29, 1998 at 14E; *see also* Erica Bulman, *Former cyclist Greg*

19

*LeMond decries recent doping scandals*, Associated Press Worldstream, Jan. 14, 1999 ("'For
years now doping has been a problem in sport,' said LeMond, a three-time winner of the Tour de
France. 'But in the 1980's when I raced there was a lot of suspicion cast on individuals thought
to be cheating, but not on entire teams organizing doping systematically.' 'It's such a shame, a
terrible thing for the Tour de France and sports in general,' said LeMond. 'But it's a good thing
it came out into the open.'"); Samuel Abt, *LeMond Considers Drug Issue a Wake-Up Call*,
International Herald Tribune (Neuilly-sur-Seine, France), July 30, 1998 at 18 ("'[Mr. LeMond
said,] This is probably good for cycling. It's a wake-up call. I think riders will think twice now
about team-influenced programs. Drugs are the sick side of sports, not just cycling but in many
sports.'").

90.     Cyclists' use of performance-enhancing drugs harms the sport of cycling because
it injures the integrity of the sport as well as the health of the athletes.

91.     Doping scandals do more to damage sports like cycling than do open and frank
discussion of the problem.

92.     Doping scandals involving professional athletes cause potential damage to
children by tarnishing their role models.

93.     Besides professional cycling, other sports have struggled with the use of
performance enhancing substances. For example, the *Report to the Commissioner of Baseball of
an Independent Investigation into the Illegal Use of Steroids and Other Performance Enhancing
Substances by Players in Major League Baseball*, informally known as the "Mitchell Report,"
was released in December of 2007. This report detailed the results of former United States

Senator George J. Mitchell's 20-month investigation into the use of anabolic steroids and human growth hormone in Major League Baseball.

94.     The stated reasons for the preparation of the Mitchell Report included the health effects of performance enhancing substances, fair play, and the reality that baseball players act as role models for child athletes.

95.     In response to the Mitchell Report, Baseball Commissioner Allan H. (Bud) Selig published a statement on Major League Baseball's website that noted, in part: "His report is a call to action. And I will act."

96.     After the Mitchell Report was released, President George W. Bush, former co-owner of the Texas Rangers, stated in an article released by the Associated Press that "we can jump to this conclusion: that steroids have sullied the game."

97.     The sport of track and field has also been besieged with the problems associated with performance enhancing drugs.

98.     In October 2007, after years of denying that she had used performance enhancing substances, American track and field star Marion Jones admitted to lying to federal agents about her use of steroids prior to the 2000 Summer Olympics.

99.     In response to Ms. Jones' belated admissions, Peter Ueberroth, Chairman of the U.S. Olympic Committee, issued a statement demanding Ms. Jones "immediately step forward and return the Olympic medals she won while competing in violation of the rules." Mr. Ueberroth further noted that Ms. Jones' admission was "long overdue and underscores the shame and dishonor that are inherent with cheating."

21

100.    Allegations regarding Mr. Armstrong's alleged involvement in doping were publicized and well known prior to the publication of the statements attributed to Mr. LeMond in 2004. Accordingly, Trek cannot prove that the statements attributed to Mr. LeMond caused any damage to Trek, Trek's business, or Trek's goodwill, as opposed to the already publicized and well-known allegations regarding Mr. Armstrong.   Indeed, for example, in an article concentrating on accusations regarding American cyclist's Tyler Hamilton's alleged use of performance-enhancing drugs, *USA Today* referred to Mr. Armstrong's "constant battle with doping accusations." *Hamilton Denies Doping*, USA Today, Sept. 22, 2004 at 1C; *see also* Jeremy Whittle, *Ferrari conviction leads Armstrong to cut ties with shamed doctor*, The Times (London), Oct. 2, 2004 at 31 ("Ferrari has long been one of Armstrong's main advisers.").

101.    As recently as March 2008, a reporter has renewed suspicions regarding Mr. Armstrong's use of performance enhancing substances.   Specifically, in an article for the publication Orange Coast, writer Martin Dugard quoted Mr. Landis as saying: "Just so you know, Marty, Lance doped." Martin Dugard, *Doubting Floyd*, Orange Coast Magazine (March 2008), <http://www.orangecoastmagazine.com/site/pp.asp?c=ahKQL8NTE&b=3854793>.

102.    Trek has never contended that Mr. LeMond lied about Mr. Armstrong.

103.    Trek has never contended that Mr. LeMond defamed Mr. Armstrong.

104.    Trek has never contended that Mr. LeMond ever made any negative statements about Trek.

105.    The truth cannot cause damage to Trek, Trek's business, or Trek's goodwill.

106.    A statement that doping is bad for cycling cannot hurt cycling.

22

107.   One person's comments regarding the state of the sport of cycling cannot hurt cycling.

108.   Mr. LeMond's comments to the press constitute an informed and honest opinion on matters of legitimate public interest. Had Mr. LeMond made no statements in response to the questions, his own reputation might well have been damaged; if he had made any statement which was intentionally false, this dishonesty itself could possibly have constituted a breach of the Moral-Turpitude Section and if disclosed would certainly damage his reputation and potentially cause an unwarranted inference that Mr. LeMond condoned doping. Indeed, Mr. LeMond would not be acting, as required by the contract, in a "professional and conscientious manner."

## VI.   TREK'S FAILURE TO EXERT BEST EFFORTS REGARDING LEMOND'S BRAND.

109.   Upon information and belief, since at least 2004, Trek has been purposefully, without discussion with LeMond Cycling, and in violation of the Agreement, winding down its efforts with respect to the LeMond brand.

110.   Upon information and belief, in late 2004 and/or early 2005, without any valid justification and without any prior discussion with Mr. LeMond, Trek's sales representatives in numerous states were notified that Trek was giving up the LeMond brand. Also upon information and belief, as early as November 2004, these sales representatives notified dealers who carried the LeMond brand that Trek was giving up the LeMond brand.

23

MP-Primary 80000008.1

111.   During late 2004 and early 2005, several dealers expressed to Mr. LeMond that they wanted to continue selling LeMond-branded bikes, but could not get LeMond-branded bikes and had been told that the LeMond brand was being discontinued.

112.   Mr. LeMond remains a popular figure in Europe, including but not limited to the countries of France, England, Belgium, Holland, Switzerland, Ireland, Italy, Spain, Germany, and Denmark.  In addition, LeMond has a following in non-European countries such as South Africa, New Zealand, and Australia.

113.   Mr. LeMond frequently receives requests for interviews from reporters and media sources in at least France, England, Holland, Belgium, Germany, and Spain.

114.   On many occasions, Mr. LeMond has been approached by French bike distributors with requests to distribute LeMond-branded bikes.  In response, Mr. LeMond has indicated that they would have to work through Trek.  On one specific occasion, the head of the company that sells and distributes Trek bikes in France told Mr. LeMond that he wanted to be able to sell his bikes in France because Mr. LeMond had a strong image in France.  Mr. LeMond has expressly notified Trek of such interest and requested that Trek establish more distributors in France.

115.   From the inception of the Agreement, LeMond Cycling has requested that Trek develop and market LeMond-branded bikes internationally.   Due to LeMond Cycling's disappointment with Trek's international efforts, LeMond Cycling negotiated separate international minimum royalties as a part of the 1999 Amendment.  Mr. LeMond's objective in negotiating for a minimum royalty allocated to foreign sales was to motivate Trek to improve its efforts to develop and market LeMond-branded bikes internationally.

24

116.    According to licensing standards and norms, minimum royalties are not ultimate goals, but, by definition, merely minimums. Minimum royalty provisions are inherently instinct with the obligation that Licensee will seek to surpass the minimum royalty by significant margins.

117.    Trademarks associated with the LeMond brand have been registered in a number of countries. Because of insufficient use in many of the countries where the trademarks have been registered, LeMond Cycling and Mr. LeMond have exerted significant effort and resources defending many of these marks.

118.    Upon information and belief, Trek has done little to develop and market LeMond-branded bikes internationally, despite repeated requests. Also upon information and belief, as early as November 2004, international distributors were being informed that Trek's distribution of the LeMond brand was ending.

119.    Upon information and belief, Trek has not developed or placed advertising for LeMond-branded products in cycling publications that target international bicycle markets consistent with its efforts for comparable lines of products.

120.    Despite numerous requests by Mr. LeMond, Trek has not established a cycling team sponsorship using the LeMond brand.

121.    Upon information and belief, Trek has made minimal effort to establish international distribution channels for LeMond-branded products.

122.    Trek did not reach the separate international minimum royalty from the 1999 Amendment until 2007 – eight years after the minimum was established.

MP-Primary 80000008.1

123.    Between September of 2001 and June of 2007, Trek only achieved $10,393.03 in total sales for the entire country of France. This constitutes an average of roughly $1,700 in total sales per year in the entire country of France.

124.    Between September of 2001 and June of 2007, Trek only achieved $37,880.76 in total sales for the entire country of Spain. This constitutes an average of roughly $6,300 in total sales per year in the entire country of Spain.

125.    Between September of 2001 and June of 2007, Trek only achieved $26,133.47 in total sales for the entire country of Holland. This constitutes an average of roughly $4,300 in total sales per year in the entire country of Holland.

126.    The Trek 100 is an annual charity ride sponsored by Trek. In the past, Mr. LeMond has frequently participated in the ride as an effort to support a good cause and increase the goodwill associated with the LeMond brand. Mr. LeMond was not extended an invitation to the 2007 Trek 100.

127.    Dealer shows represent an important method by which Trek demonstrates its products and brands to bike dealers.

128.    The annual Trek dealer show in Madison, Wisconsin is one of Trek's largest, if not the largest, marketing events for Trek.

129.    In August of 2006, Trek made a request that Mr. LeMond not attend the annual Trek dealer show in Madison, Wisconsin. LeMond protested that this decision was detrimental to the LeMond brand, but Trek insisted that Mr. LeMond not attend.

130.    Despite three full years left on the Agreement, Mr. LeMond was neither invited to nor provided any official notification regarding the August 2007 Trek dealer show in Madison,

26

Wisconsin. Mr. LeMond only learned the date and location of the August 2007 Trek dealer show through a chance conversation with a Trek dealer in Seattle, Washington.

131.     At the August 2007 dealer show, Trek Chief Executive Officer John Burke made an opening speech to an audience of Trek's most important national dealers. In this speech, Mr. Burke mentioned every brand in the Trek family *except* the LeMond brand. In this speech, Mr. Burke also indicated that no branded product manufactured by Trek would have a life-cycle of more than three years.

132.     Upon learning the date and location for the August 2007 Trek dealer show, Mr. LeMond traveled to the event, at his own expense, to assist with the promotion of LeMond-branded products. Upon arriving at the trade show, Mr. LeMond was approached by numerous dealers who expressed concern that John Burke's opening speech had failed to mention the LeMond brand. Numerous dealers also inquired as to what was going on with the LeMond brand and Trek and whether there were new bikes being planned consistent with the three-year life cycle announced in John Burke's speech or whether the brand was being discontinued.

133.     Upon arriving at the August 2007 Trek dealer show, Mr. LeMond attempted to find the break-out session where the LeMond-branded products were being presented to dealers. Mr. LeMond could not find a single Trek employee who could direct him to the location of the LeMond break-out session, and the printed materials indicating the locations of all break-out sessions made no mention of LeMond-branded products. Mr. LeMond located his products after searching for ninety minutes. The LeMond-branded products were presented along with the Fisher-branded products. The area was marked with signs for the Fisher brand, but there was no

27

signage indicating that the LeMond-branded products were being presented in that or any other area.

134.   While attending the August 2007 Trek dealer show, Mr. LeMond shared the inquiries he had received from concerned dealers with a Trek product manager responsible for LeMond-branded products.  The product manager indicated he shared a concern about the LeMond brand having been left out of John Burke's speech and noted that he understood that it had been an intentional decision made by Trek's upper management.  When Mr. LeMond asked what plans were in place for new LeMond-branded designs in the context of the newly announced limited product cycle for Trek manufactured products, the product manager noted that: (1) he and his team wanted to continue with the brand because they believed it was a good brand; (2) planning for new designs needed to have been done "yesterday"; and (3) Mr. LeMond should talk to John Burke immediately to find out what was going on.  When Mr. LeMond asked the product manager for the drop-dead deadline for a new design, the product manager first implied that it was too late and only when pressed indicated that a September of 2007 deadline would possibly work if a design were developed and approved within a week.

135.   The majority of the LeMond-branded designs are in the second year of their life cycle.  Under the three-year product cycle announced by John Burke, these designs will terminate more than 2 and 1/2 years before the Primary Term of the Agreement expires.

136.   After returning from Trek's 2007 annual trade show, Mr. LeMond tried repeatedly to schedule time with John Burke to meet and discuss plans for new lines or items of LeMond-branded products.  Mr. Burke did not make himself available to meet with Mr. LeMond until November 20, 2007.

28

137.   Upon information and belief, it is Trek's practice to ensure dealers have adequate stock of products in the months leading up to the spring and summer cycling seasons. Also upon information and belief, since at least 2007 and up to the present, dealers have struggled with low stock of LeMond-branded products due to Trek's failure to replenish sold-out stock.

138.   Upon information and belief, Trek's failure to provide dealers with adequate stock of LeMond-branded products has and will negatively impact sales of LeMond-branded products.

139.   Despite its obligation to do so, Trek has not complied with Section 5.03 of the Agreement and the added requirement in Section F of the 1999 Amendment which require Trek to provide Mr. LeMond a total of 15 bikes per contract year.

140.   Mr. LeMond has requested that Trek credit him for charges made against his royalty for bikes which should have been provided free of charge under Section 5.03 of the agreement and the added requirement in Section F of the 1999 Amendment. Trek has failed to do so.

## VII.   THE RELATIONSHIP BETWEEN ARMSTRONG AND TREK.

141.   Upon information and belief, Mr. Armstrong has a contractual relationship with Trek, pursuant to which he acts as endorser and spokesperson for Trek-branded bicycles, and Trek sponsored the professional cycling team for which Armstrong once raced. Since the inception of their relationship, Trek has used Mr. Armstrong's name and image extensively in its advertising.

142.   Upon information and belief, Mr. Armstrong is a shareholder of Trek.

143.   In 2004, when making the claim that LeMond Cycling was in breach of the Agreement, Trek additionally claimed that Mr. Armstrong was an asset of Trek and that because

Mr. LeMond was causing harm to one of Trek's assets, Trek could end the relationship with LeMond Cycling and possibly seek damages.

144.   Upon information and belief, Trek's 2004 notification of LeMond Cycling's breach of the Agreement and Trek's efforts to restrict Mr. LeMond's ability to comment on the subject of doping are the result of pressure from one or more third parties. Indeed, Trek's representatives have characterized Trek as "in the middle" of an alleged dispute between Mr. LeMond and Mr. Armstrong.

145.   Upon information and belief, in early 2005 Mr. Armstrong and/or someone working on his behalf disparaged a LeMond-branded product to a potential customer. Trek was informed of the alleged incident, but did nothing to intervene for the protection of the LeMond brand.

146.   Upon information and belief, on numerous occasions Mr. Armstrong and/or his representatives have taken actions or made remarks that are disparaging of Mr. LeMond and therefore harmful to the LeMond brand. Also upon information and belief, Trek has done nothing to protect the LeMond brand from such actions and remarks even when faced with explicit requests from Mr. LeMond that Trek intervene for the protection of the LeMond brand.

147.   Despite the dangers associated with performance enhancing substances, heightened public concern for the world's young athletes, Congressional intervention and ever increasing intervention by sports leagues, federations and other governing bodies, Trek has remained silent on the issue of the dangers and problems associated with performance enhancing substances except to rebuke Mr. LeMond.

30

148.   Trek's request that Mr. LeMond not attend the 2006 Trek dealer show in Madison, Wisconsin was made almost immediately after Mr. LeMond noted in the press that he was "devastated and disappointed" by Mr. Landis's test results.

149.   Upon information and belief, the reason that Mr. LeMond was not extended an invitation to the 2007 Trek 100 is because Lance Armstrong was participating in the event.

150.   In light of all that had transpired, when Mr. Burke finally met with Mr. LeMond on November 20, 2007, Mr. LeMond explicitly raised the issue of the parties' business relationship. During that conversation, Mr. Burke indicated verbally that Trek would not be renewing the relationship with LeMond Cycling. At the time of this November 20, 2007 conversation, nearly three-years remained on the term for the Agreement.

151.   On November 27, 2007, just one week after Mr. Burke told Mr. LeMond that Trek would not be renewing the relationship with LeMond Cycling, an attorney for Mr. Armstrong contacted Mr. LeMond's attorney. Mr. Armstrong's attorney indicated that he would like to broker a "truce" between Mr. Armstrong and Mr. LeMond because Trek would no longer be in a position to temper things between Mr. Armstrong and Mr. LeMond given that the relationship between LeMond Cycling and Trek was ending. Upon information and belief, Mr. Armstrong's attorney based his understanding of the status of the parties' relationship on a conversation that he or Mr. Armstrong had with Mr. Burke. Mr. LeMond's attorney noted to Mr. Armstrong's attorney that: (1) there were still three years left on the Agreement; and (2) the suggestion of a truce was interesting since Mr. Armstrong had only recently inserted himself and sought to damage Mr. LeMond's position in a property dispute that Mr. LeMond had in Montana.

MP-Primary 80000008.1

## COUNT ONE
### *Declaratory Judgment*

152.   LeMond Cycling repeats and realleges each and every allegation, matter, and thing set forth in paragraphs 1-151 of this Complaint as though fully set forth herein.

153.   LeMond Cycling is a "person" within the meaning of Minn. Stat. § 555.13.

154.   Pursuant to the Minnesota Declaratory Judgment Act, Minn. Stat. §§ 555.01 *et seq.* (including, without limitation, Minn. Stat. §§ 555.02 and 555.03), an actual controversy exists between LeMond Cycling and Trek regarding the status of and performance under the Agreement.

155.   LeMond Cycling respectfully requests that this Court enter a judgment declaring that LeMond Cycling has not breached the Agreement.

156.   LeMond Cycling respectfully requests that this Court enter a judgment declaring that Trek has breached the Agreement.

## COUNT TWO
### *Injunction*

157.   LeMond Cycling repeats and realleges each and every allegation, matter, and thing set forth in paragraphs 1-156 of this Complaint as though fully set forth herein.

158.   LeMond Cycling respectfully requests a temporary, preliminary, and permanent injunction maintaining the parties' existing relationship under the Agreement and requiring Trek to comply with all of its contractual obligations, including but not limited to: the use of best efforts to promote the sale of LeMond-branded products in the United States and internationally; development and planning for new lines of LeMond-branded products; and marketing and promotion efforts consistent with comparable lines of products .  Consistent with this, LeMond

32

Cycling respectfully requests an Order enjoining Trek from taking any action that would prevent LeMond Cycling from benefiting from the specific performance of the Agreement to which it is entitled.

**COUNT THREE**
*Breach of Contract*

159.   LeMond Cycling repeats and realleges each and every allegation, matter, and thing set forth in paragraphs 1-158 of this Complaint as though fully set forth herein.

160.   Trek has failed, as contractually required, to satisfy its covenant of good faith and fair dealing regarding the Agreement.

161.   Trek has failed, as contractually required, to exert best efforts regarding the LeMond brand.

162.   Trek's failure to exert best efforts and satisfy its covenant of good faith and fair dealing pursuant to the Agreement has caused LeMond Cycling to lose revenue in an amount to be proven at trial and caused damage to the LeMond brand.

**PRAYER FOR RELIEF**

LeMond Cycling respectfully requests that this Court:

1.   enter a judgment declaring that LeMond Cycling did not breach the Agreement;

2.   enter a judgment declaring that Trek is in breach of the Agreement;

3.   temporarily, preliminarily, and permanently enjoin Trek from repudiating or otherwise violating the Agreement and enjoin Trek from taking any action that would prevent LeMond Cycling from benefiting from the specific performance of the Agreement to which it is entitled;

MP-Primary 80000008.1

4.      award LeMond Cycling damages for the losses incurred based on Trek's failure to

exert best efforts and also the damage done to the LeMond brand;

5.      award LeMond Cycling its reasonable attorneys' fees pursuant to §§ 10.02 and

13.03 of the Agreement;

6.      award LeMond Cycling the costs of suit; and

7.      award LeMond Cycling such other and further relief as the Court deems

equitable.

Dated: March 20, 2008

                              ROBINS, KAPLAN, MILLER & CIRESI L.L.P.

                              By: _____
                                    Christopher W. Madel #230297
                                    Denise S. Rahne #331314

                              2800 LaSalle Plaza
                              800 LaSalle Avenue
                              Minneapolis, Minnesota 55402-2015
                              (612) 349-8500

                              ATTORNEYS FOR PLAINTIFF LEMOND
                              CYCLING, INC.

34