# Exhibit C

to

## TIMEBASE'S RESPONSE TO THOMSON'S MOTION FOR A STAY

Dockets.Justia.com

LEXSEE 1981 US DIST LEXIS 14890

Analysis
As of: Jun 21, 2007

**Unidisco, Inc. v. Schattner**

**No. HM80-2617**

**United States District Court for the District of Maryland**

***1981 U.S. Dist. LEXIS 14890; 210 U.S.P.Q. (BNA) 622***

**June 15, 1981**

**LexisNexis(R) Headnotes**

***Civil Procedure > Judgments > Entry of Judgments > Stays of Proceedings > General Overview***

[HN1] Courts consider three major points in evaluating the need for a stay. First and foremost is the burden on the party seeking the stay to make out a clear case of hardship or inequity in being required to go forward if the imposition of a stay might harm the opposing party. Second is that the court may consider, but need not regard as dispositive, the extent of participation of the non-moving party in the proceeding in favor of which a stay is sought, as well as the extent to which the non-moving party will be bound by the result of that other proceeding. Finally, it is an abuse of discretion to grant a stay for an indefinite period of time absent a showing of "pressing need."

***Civil Procedure > Appeals > Standards of Review > Clearly Erroneous Review***
***Patent Law > Jurisdiction & Review > Standards of Review > Clearly Erroneous Review***
***Trademark Law > Infringement Actions > Standards of Review > Clearly Erroneous Review***

[HN2] The factual determinations of the Patent and Trademark Office are not given deference by the courts, even if supported by substantial evidence on the record as a whole. This is so because the question of patent validity is one of law for the courts and is not subject to the "clearly erroneous" standard of review.

**COUNSEL: [*1]**

Semmes, Bowen & Semmes, Baltimore, Md., Harold Haidt, and Brooks, Haidt, Haffner & Delahunty, both of New York, N.Y., and Mark J. Hanket, Cincinnati, Ohio, for plaintiff.

Alvin I. Frederick, and Eckleston & Seidler, both of Baltimore, Md., and Alan J. Malasky, James A. Kidney, and Arent, Fox, Kintner, Plotkin & Kahn, all of Washington, D.C., and Herbert Cohen, and Wigman & Cohen, both of Arlington, Va., for defendant.

**OPINION BY:**

MURRAY

**OPINION:**

Murry, District Judge.

The factual background of this litigation was fully set forth in this court's *Memorandum and Order of February 4, 1981, 210 USPQ 615,* and need not be rehearsed in detail herein. n1 In brief, this is an action seeking a declaratory judgment of noninfringement as well as invalidity and unenforceability of defendant's patent in SPORICIDIN, a sterilizing and disinfecting composition sold for use in the practice of dentistry. In arriving at its decision in February, the court considered prolix motions and affidavits in support of defendant's motion to dismiss, or, in the alternative, to stay the instant case. The ground for the motion to dismiss was the absence of an actual controversy under the Declaratory Judgment Act, **[*2]** *28 U.S.C. § 2201;* the ground for the motion to stay was the pendency of both a garnishment action in the Eastern District of Michigan and attachment proceedings in the Northern District of Illinois.

n1 That Memorandum and Order is attached hereto as an Appendix.

[See original.]

At the argument on these motions, counsel for plaintiff, Mr. Haidt, recounted the history of this case and related litigation, and he characterized defendant Schattner's motions as one of a series of attempts to forestall judicial inquiry into the validity of his patent for SPORICIDIN. This court's opinion of February 4 did not comment on that characterization but did deny the motion to dismiss (treated as a motion for summary judgment) because of the existence of an actual controversy and also denied the motion for a stay because the other litigation involved no issues of patent validity or infringement, hence was not duplicative of the issues in the instant case.

Two weeks after that Memorandum and Order was filed, Schattner filed yet another motion to stay, the motion currently before the court. This time the ground argued is that the court should stay this expensive patent litigation **[*3]** until the conclusion of a proceeding in the United States Patent & Trademark Office ("PTO") for the reissue of the patent in SPORICIDIN, United States Letters Patent No. *4,103,001* ("the *'001* patent"). Defendant Schattner did not actually get around to filing such a reissue application until after plaintiff had opposed the present motion for a stay.

Congress has provided for the reissue of a patent "[w]henever any patent is, through error without any deceptive intention, deemed wholly or partly inoperative or invalid. * * *" *35 U.S.C. § 251.* The reissue procedure before the PTO permits the re-examination of the claims of the patent by an expert in the field to which the patent relates, in this case the art of buffered phenol-gluteraldehyde sterilizing compositions. This procedure, it is argued, will provide the court at a later date with the considered, expert judgment of the PTO as to the validity of all the patent's claims, including an evaluation of the prior art cited in P8 of the complaint for declaratory judgment and of the allegations of public use and sale, fraud and inequitable conduct in PP9 and 11 of the complaint, Schattner urges that use of the reissue procedure **[*4]** will substantially reduce the time and expense of this litigation and promote judicial economy. A general understanding of the reissue procedure is therefore necessary to full consideration of the instant motion.

Subject to the approval of the Secretary of Commerce, the Commissioner of Patents and Trademarks has the authority, granted by statute, to "establish regulations, not inconsistent with law, for the conduct of proceedings in the Patent and Trademark Office." *35 U.S.C. § 6*(a). Pursuant to this grant of authority, the Commissioner issued regulations governing the reissue procedure, which were amended, effective March 1, 1977, primarily to add sub-paragraph (a) (4) to pre-existing *37 C.F.R. § 1.175. 42 Fed. Reg. 5588, 5594-95* (Jan. 28, 1977). Under the amended regulations, a patentee (or his assignee) can obtain from the PTO a ruling on the validity of the patent witout the necessity of declaring under oath his belief that the original patent is wholly or partly inoperativce or invalid. The pertinent provisions of *37 C.F.R. § 1.175* reads as follows:

(a) Applicants for reissue, in addition to complying with the requirements of the first sentence of § 1.65, must **[*5]** also file with their applications a statement under oath or declaration as follows:

(4) When the applicant is aware of prior art or other information relevant to patentability, not previously considered by the Office, which might cause the examiner to deem the original patent wholly or partly inoperative or invalid, particularly specifying such prior art or other information and requesting that if the examiner so deems, the applicant be permitted to amend the patent and be granted a reissue patent.

Under the guidelines found in the PTO's Manual of Patent Examining Procedures ("Manual"), reissue applications in which questions of fraud or the violation of the duty of disclosure are involved are forwarded to the Assistant Commissioner of Patents, Manual § 721.01, and resolution of the fraud issues is deferred while the prior art issues are considered by the Primary Examiner.

"Although not equal to the litigation opportunities of discovery and confrontation, the new rules do allow for protest. Under *37 C.F.R. § 1.291*, members of the public are afforded a means to both protest the reissue, and to cite prior art to the PTO." *Fisher Controls Co., Inc. v. Control Components, Inc.,* **[*6]** *443 F.Supp. 581, 582, 196 USPQ 817, 818-819 (S.D. Iowa 1977).* Initially, this was the extent of protestor participation contemplated by the rules, *42 Fed. Reg. 5589* (Jan. 28, 1977), but in December of 1978 the PTO adopted additional guidelines, 977 Official Gazette, U.S. Patent and Trademark Office 11 (Dec. 12, 1978) ("O.G."), which were comprehensively discussed in Judge Murray Schwartz's opinion in *PIC, Inc. v. Prescon Corp., 485 F.Supp. 1302, 1304-05, 205 USPQ 228, 233-235 (D. Del. 1980)* ["PIC II"].

The PIC litigation originated as an action for patent infringement brought by the patentee's assignee wherein the defendant counterclaimed for a declaratory judgment that the patent was invalid for several reasons, including the existence of prior art and the perpetration of fraud upon the PTO. In *PIC, Inc. v. Prescon Corp., 77 F.R.D. 678, 195 USPQ 525 (D. Del. 1977)* ["PIC I"], Judge Caleb Wright granted a stay of the ligitation to permit the patentee to seek reissue of his patent. After all the proceedings before the PTO had been concluded, the plaintiff moved for partial summary judgment on issues of invalidity by reason of prior art and fraud in the procurement on the ground **[*7]** that the PTO decision in the reissue proceeding should be given preclusive effect in the federal court. Denying this motion in PIC II, Judge Schwartz found that the proceedings in the PTO were essentially ex parte and did not provide a protestor with a full and fair opportunity to litigate. In reaching this conclusion, Judge Schwartz described in detail the limited rights of participation enjoyed by a protestor under the current regulations. These have been summarized by counsel for Unidisco in their Opposition to the Motion for a Stay, at 5-6:

(1) Although a protestor may monitor proceedings in the reissue application, file additional papers and request copies of PTO actions and documents mailed by the PTO, the documents will be sent to protestors at the "sole discretion of and for the convenience of" the PTO.

(2) Although the reissue applicant is entitled to oral interviews or communications with the patent examiners, protestors must refrain from such oral communications and protestors may be present at interviews only at the discretion of the patent examiner where "special justifying circumstances exist".

(3) While the reissue applicant has the right to respond to Official **[*8]** Actions of the patent examiner, such opportunity of comment is afforded to the protestor at the discretion of the examiner and supervisory examiner and where it would appear in the opinion of the examiner that it would "appear to be of benefit to the examining process".

(4) Only the reissue applicant has the right to appeal from an adverse decision of the examiner to the Board of Appeals. The protestor can not take such an appeal.

(5) While the protestor may file comments on the brief filed by the reissue applicant on appeal, his attendance and right to be heard at the oral hearing is at the discretion of the Board of Appeals.

(6) Any reissue applicant dissatisfied with the decision of the Board of Appeals may appeal to the U.S. Court of Customs and Patent Appeals or to the federal district court. *37 C.F.R. 1.301* and *1.303*. The protestor does not have such a right.

(7) Neither the reissue application nor the protest proveedings is a "contested case" and the PTO declines to declare them such, * * * which means that there is no opportunity for discovery, taking testimony of witnesses and hearings as provided in *35 USC § 23*, 24 and *37 CFR 1.201-1-1.287* if it were a "contested **[*9]** case". [See also Manual § 1309.02, which states that "the question of patentability has been uniformly looked upon as ex parte in character. It is a question between the applicant and the office on behalf of the public."]

After mentioning its deja vu feeling at encountering yet another motion to stay, plaintiff Unidisco, in opposing the motion, questions the delay in filing the application for reissue and questions defendant's failure to include in his first motion the grounds for a stay now

advanced, claiming that such seriatim pursuit of the same or similar remedies serves only to delay. Citing decisions which advise a court to weigh the benefits of a PTO examination against any prejudice to the parties, plaintiff disputes the defendant's basic premise that proceeding before the PTO will further the goals of judicial economy. Plaintiff points out the procedural infirmities, previously discussed, which would make its participation in the reissue proceedings uncertain or at best limited. Plaintiff also observes that reissue proceeding protests are specifically designed to deal with citations of prior art, and that the other issues of fraud, failure to comply with the duty **[*10]** of candor and disclosure in the original application, and public use and sale are not dealt with in the reissue proceeding itself but are only addressed in separate proceedings subsequent to the disposition of the reissue application, and only then at the discretion of the agency.

Characterizing plaintiff's opposition as "the continuing effort of a giant conglomerate to flex its corporate muscle to financially destroy an individual inventor, who has dedicated his total resources to develop a product, by crushing him under the weight of enormous litigation costs", defendant has retorted with a lengthy reply memorandum and a volume of accompanying exhibits. Defendant denies that the reissue proceeding will result in undue delay and makes several representations to the court, to wit: (1) Schattner will dedicate the *'001* patent if the result of the reissue proceeding is a determination that his invention is not patentable (Reply Br. at 5); (2) if plaintiff files a protest in the reissue proceeding and if the PTO declines to provide plaintiff with copies of all documents, Schattner undertakes to provide plaintiff with copies of all documents he receives from or files with the PTO; (Reply **[*11]** Br. at 9); (3) although protestors are not afforded oral interviews and communications with PTO Examiners as the reissue applicants are, Schattner represents that if the PTO denies plaintiff's request to participate in interviews between Schattner and the Examiner, Schattner will himself invite plaintiff to attend and will advise the Examiner of that fact (Reply Br. at 9-10); (4) although protestors do not, unlike applicants, have the right to respond to Official Actions of the Examiner, Schattner will inform the PTO that he agrees to the participation of the protestor in the examination process and will ask the Examiner to authorize the protestor to comment upon Schattner's responses to Official Actions of the Examiner (Reply Br. at 10); (5) finally, Schattner suggests that the court permit limited discovery to continue, for a period of approximately 60-90 days, delaing solely with issues that may be raised before the PTO (Reply Br. at 14). n2

> n2 Other courts have permitted limited discovery when granting a stay, as none is provided by the procedures of the PTO. *Rohm & Haas Co. v. Mobil Corp., 462 F.Supp. 732, 201 USPQ 80 (D. Del. 1978); Sander Industries, Inc. v. Carborundum Co., 201 USPQ 240 (N.D. Ohio 1978).*

**[*12]**

One purpose of the 1977 amendments to the reissue procedure was to permit a patentee whose patent was possibly vitiated by prior art to initiate a reissue application and, simultaneously, to seek a stay of judicial proceedings challenging the patent's validity until the PTO could act upon the reissue application. See "New Patent Office Rules May Aid Patent Litigation, Interview with Chief Judge Howard T. Markey, Court of Customs and Patent Appeals," 9 The Third Branch, No. 9 at 7-8 (Sept. 1977).

The potential virtues of the reissue examination were extolled by the court in an oft-quoted passage from *Fisher Controls Co., Inc. v. Control Components, Inc., 443 F.Supp. 581, 582, 196 USPQ 817, 818-819 (S.D. Iowa 1977),* wherein the court said:

[S]everal distinct advantages can be observed in allowing examination of a reissue application before continuing with patent litigation:

1. All prior art presented to the Court will have been first considered by the PTO, with its particular expertise.

2. Many discovery problems relating to prior art can be alleviated by the PTO examination.

3. In those cases resulting in effective invalidity of the patent, the suit will likely **[*13]** be dismissed.

4. The outcome of the reexamination may encourage a settlement without the further use of the Court.

5. The record of reexamination would likely be entered at trial, thereby reducing the complexity had length of the litigation.

6. Issues, defenses, and evidence will be more easily limited in pre-trial conferences after a reexamination.

7. The cost will likely be reduced both for the parties and the Court.

citing the interview with Judge Markey in The Third Branch, noted supra. However many of these factors may be present in any particular case, this court views them as far from dispositive on the issue but merely as possibilities the court should weigh, along with any disadvantage that a stay in favor of prosecuting a reissue application might place upon the party opposing the stay, as well as the court's own interests in the just, speedy and inexpensive resolution of matters on its civil docket. See *FED. R. CIV. P. 1*.

Resolution of a motion to stay must begin with consideration of the landmark decision in *Landis v. North American Co., 299 U.S. 248 (1936).* In his opinion for the Court for the Mr. Justice Cardozo wrote:

[T]he power to stay proceedings **[*14]** is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants. How this can best be done calls for the exercise of judgment, which must weigh competing interests and maintain an even balance. * * * [T]he suppliant for a stay must make out a clear case of hardship or inequity in being required to go forward, if there is even a fair possibility that the stay for which he prays will work damage to someone else .

*Id. at 254-55* (citations omitted; emphasis supplied).

Landis was a case of importance, not only in terms of the legal issues presented but in terms of societal interests as well; the case was part of a major constitutional challenge, brought by the Electric Bond & Share Company and affiliated holding companies, to the validity of the Public Utility Holding Company Act of 1935.The Supreme Court was considering the spectacle of forty-eight such suits, pending in thirteen different federal district Courts, in the light of the government's request to stay all but one lawsuit, which would be the "test case" in which the Supreme Court would ultimately rule **[*15]** on the constitutionality of the statute. The affiliated holding companies opposed the stay, "asserting that the questions to be passed upon in their suits were not identical with the questions presented in the test one, pointing out that the Act, even if valid as applied to some companies, might be invalid as applied to others, and dwelling upon the loss that they were suffering day by day while the menace of the Act obstructed their business and cast a cloud on its legality." *Id. at 251.*

The district court in Landis had granted the government's request for a stay, but the court of appeals had reversed, apparently on the theory that there was no power in the district court to compel an unwilling litigant to await the outcome of another litigation to which he was not a party. The Supreme Court for the finding that determination too narrow and mechanical, reversed, viewing the issue as a matter of judicial discretion rather than a limitation upon judicial power, and noting that all the cases which had adopted the latter approach "could have been adequately disposed of on the ground that discretion was abused by a stay of indefinite duration in the absence of a pressing need." *Id. at 255.* **[*16]**

[HN1] Three major points may be gleaned from the Supreme Court's opinion in Landis. First and foremost is the burden on the party seeking the stay to make out a clear case of hardship or inequity in being required to go forward if the imposition of a stay might harm the opposing party. Second is that the court may consider, but need not regard as dispositive, the extent of participation of the non-moving party in the proceeding in favor of which a stay is sought, as well as the extent to which the non-moving party will be bound by the result of that other proceeding. Finally, it is an abuse of discretion to grant a stay for an indefinite period of time, even in a case of great public moment like Landis, absent a showing of "pressing need."

Applying this tripartite analysis to the instant case, the court will deny the motion for a stay. With regard to the primary concern articulated by the Landis Court for the defendant herein has failed to make out a clear case of hardship or inequity in being required to go forward with the case. Defendant complains of being forced to participate in lengthy and expensive patent litigation, but his contentions are unconvincing based on what this court **[*17]** knows of the litigation history of this case. Prior to the institution of this case by Unidisco, defendant Schattner had initiated at least four different proceedings in the District of Columbia, the Eastern District of Michigan, the Northern District of Illinois, and here in the District of Maryland, and had also, as this court has previously found, threatened Unidisco with an infringement suit. Furthermore, the court has been struck by the voluminous memoranda and accompanying

exhibits that defense counsel has filed in connection with each motion heard to date. The court therefore finds that defendant has not met his burden of establishing a clear case of hardship or inequity.

The Rohm & Haas decision relied on so heavily by defendant presented a much more substantial justification for a stay. That case was described by the court as a classic "blocking patent" situation: neither party could manufacture or sell the chemical compounds at issue without infringing the other's patent, and the issues of prior art were not only quite complex n4 but also of paramount significance to that particular case. *Rohm & Haas Co. v. Mobil Oil Corp., 462 F.Supp. 732, 201 USPQ 80 (D. Del. 1978).* **[*18]** In the instant case, by contrast, the court does not deem the prior art issues to be either as complex or as significant vis-a-vis the other allegations of patent invalidity. n5

n4 Rohm & Haas held patents on certain diphenyl ether compounds useful as herbicides, which it marketed under the trade name "Blazer"; Mobil owned a patent covering a class of diphenyl ether compounds that allegedly included the Blazer compounds. As described by the court:

One of the central issues in this case is whether Mobil's application for the 437 patent, which was filed on September 29, 1975, was a "continuation" of a prior Mobil application filed on February 11, 1971, and, therefore, entitled under *35 U.S.C. § 120* to the benefit of the earlier filing date. If it was not a continuation, the Netherlands patent application of Rohm & Haas published in 1973 would be prior art with respect to the 437 patent and present a statutory bar to its patentability under *35 U.S.C. § 102.*

The written description in the 1971 application and the 437 patent disclosed a generic formula, 26 detailed examples of typical chemical compounds included in the invention and a list of 57 other compounds denominated "non-limiting examples." Rohm & Haas avers that the number of possible compounds embraced by the generic formula may be as high as 200 billion. It further alleges that Mobil's 1971 application did not disclose specifically any of the Blazer compounds and that Mobil, in fact, did not know of their existence or importance until after it examined Rohm & Haas' Netherlands patent application, published in September 1973. Mobil, on the other hand, contends that one of the compounds listed as an example of the invention in the 1971 application is a reverse insomer of the Blazer compounds. Mobil further contends that the disclosure of the compound referred to plus the generic formula was sufficient to support the first claim in the 437 patent, which in turn encompassed the Blazer compounds.

*462 F.Supp. at 734-35, 201 USPQ at 81-82* (footnote omitted).

n5 In addition to the prior art issues, the complaint for declaratory judgment contains substantial allegations of public use and sale, breach of the duty of candor and disclosure, inequitable conduct by reason of concealment and suppression of relevant facts from the original patent examiner, and patent misuse.

**[*19]**

With respect to the second of the Landis factors, the paucity of opportunity for protestor participation in a reissue proceeding has already been discussed. Notwithstanding defendant's representations that he would provide plaintiff with copies of all documents filed in the reissue proceeding and that he would invite plaintiff to attend the interview and participate in other proceedings before the Examiner, n6 it is totally within the discretion of the agency to permit or not to permit protestor participation. How the PTO will exercise that discretion is beyond the power of this court or the defendant to divine, but what is certain is that the PTO will not give a protestor a hearing as a matter of right. *Rohm & Haas, supra, 462 F.Supp. at 735-36 n. 7, 201 USPQ at 82-83 n.7* citing *Carey v. The New York Sewing Machine Co., Home Sewing Machine Co., 1901 Decisions of the Commissioner of Patents 165, 97 O.G. 1171* (Nov. 5, 1901).

n6 In these times of crowded court dockets, it is appealing for courts to encourage the formulation of procedures that may result in less of a judicial role in patent cases. It must be recognized, however, that to the extent that PTO reissue proceedings begin to resemble adversary judicial proceedings, the advantage to the patentee of obtaining a relatively quick and inexpensive determination from the PTO is diminished.

*PIC II, supra, 485 F.Supp. at 1313, 205 USPQ at 241.*

**[*20]**

Defendant also attempted to counter plaintiff's arguments concerning deficiencies in the protest procedures with the following:

It is true that, under the present rules, a protestor may not appeal the Examiner's decision or participate as of right in oral hearings before the Board [of Appeals]. However, the concern expressed by plaintiff because of these alleged deficiencies in the protest rules is premature and unwarranted. On January 13, 1981, the PTO published new proposed rules on Reexamination and Inter Partes Protest Proceedings. *46 Fed. Reg. 3162.* The comment period for these proposed rules is set to expire on April 16, 1981. (Id.), and the PTO has expressed the intention to put final regulations in effect by July 1, 1981 -- the effective date of the recent Act to Amend the Patent and Trademark Laws, Pub. L. 96-517, section 1 of which relates to reexamination of patents. *(35 U.S.C. §§ 301*-307).

These new regulations will totally cure the deficiencies complained about by plaintiff. * * *
Reply Br. at 11 (footnotes omitted).

Whatever the merit of this line of argumentation may be, the court need not decide that matter as the PTO has already issued the final **[*21]** regulations referred to. Significantly, the final rules as promulgated did not adopt the proposals relating to inter partes protest. *46 Fed. Reg. 29,176* (May 29, 1981). This excision was done because the majority of comments received either opposed the proposal for inter partes protest or suggested that adoption of the proposal be deferred. Some of the comments went so far as to suggest removal of any public access to reissue applications, limitation of participation in the examination of reissue applications, and restoring the rules in these areas to their pre-1977 form, including the repeal of *37 C.F.R. § 1.175(a)(4).* In this climate, the court finds that plaintiff's concern about lack of participation in the reissue proceedings is justified. n7

n7 Defendant's suggestion that even if plaintiff is not granted the right of participation it will not be significantly harmed because it will not be collaterally estopped from contesting the PTO's decision is lacking in substance.

The third concern expressed by the Landis court was that district courts not issue stays of indefinite duration absent a showing of pressing need. No such showing of need has been made by defendant, **[*22]** and a review of recent cases has convinced the court that the likely duration of all the proceedings before the PTO would be, even if not indefinite, sufficiently lengthy so as to outweigh any benefit to the court.

In *Gilbreth Int'l Corp. v. Lionel Leisure, Inc., 208 USPQ 890 (E.D. Pa. 1980),* two and one-half years elapsed before the Examiner made his findings in connection with the rejection of the reissue application, and the applicant still came back to the court to ask for (and receive) an extension of the stay to pursue remedies before the Board of Appeals. n8 PIC II sets forth a similarly protracted period. The reissue application therein was filed in April of 1977, with a request for expedited consideration which was granted by the Assistant Commissioner, and the Primary Examiner's decision, which did not involve the issues relating to fraud (as consideration of those issues had been deferred), was filed on December 30, 1977. This decision was unfavorable to the patentee who sought reconsideration, and the Examiner's second decision, filed April 24, 1978, still found invalidity because of prior art. The patentee filed yet another response, and the Examiner noted his final **[*23]** decision on August 19, 1978. An appeal was then taken. The patentee filed a brief on October 3, 1978, the Examiner filed an answering brief, the patentee filed a reply brief and requested an expedited hearing; that hearing was held on December 7, 1978, and the decision reversing the Examiner was issued on January 31, 1979. Only then did the PTO turn to the fraud issues, and the matter finally ended on November 9, 1979 when the PTO officially closed that particular reissue proceeding. The final irony of this case occurred when, after the Board of Appeals had reversed the Examiner and upheld the patent's validity and after the patentee sought summary judgment from the court on that basis, the court denied the motion on March 5, 1980, holding itself not bound by the action of the PTO. In the words of Judge Sprecher of the Seventh Circuit Court of Appeals:

n8 The Gilbreth court granted the additional stay for a period of three months because it was advised that proceedings before the Board of Appeals would be disposed of within that period.

Nothing whatsoever was accomplished, and the judicial proceedings were stayed and delayed for more than two-and-one-half years. Similar **[*24]** facts existed in *Komline-Sanderson Eng. Corp. v. Ingersoll-Rand Co., 485 F.Supp. 973, 205 USPQ 314 (D. Del. 1980),* where a voluntary reissue was sought by the patentee on March 30, 1977. The reissue proceeding resulted in a finding of validity, but, almost three years later, the district court nevertheless held the patent invalid.

*Johnson & Johnson, Inc. v. Wallace A. Erickson & Co., 627 F.2d 57, 61, 206 USPQ 873, 877-878 (7th Cir. 1980).*

Additionally, it is the practice of the PTO that only after considering prior art and after considering questions of public use and sale, will questions relating to the duty of disclosure be considered. In the Altenpohl case, it took the agency five years to progress thus far. See *In re Altenpohl, 198 USPQ 289* (Com'r Patents 1976).

According to statistics released by the PTO, federal district courts had, by mid-1980, issued stays in 44 actions where a reissue application was filed and denied stays in 10 such actions. U.S. Patent and Trademark Office, Sampling of Court Orders and Denials of "Stays" of Litigation Pending PTO Consideration of Reissue Patent Applications (August 19, 1980), cited in *Gilbreth Int'l, supra, 208 USPQ at 892 n.1.* **[*25]** Defense counsel has stated at oral argument that in only two cases were applications for a stay by a willing patentee denied by the court, and he argued that the reason for the denial in those cases was that discovery was complete and a trial date had been set. See *General Tire & Rubber Co. v. Watson-Bowman Associates, Inc., 193 USPQ 479 (D. Del. 1977); Starlight Associates v. Berkey-Colortran, Inc., 201 USPQ 307 (S.D.N.Y. 1978).* However, given that defendant himself has suggested that the court permit discovery on the issues that will be presented before the PTO, the posture of the case at the conclusion of said discovery will more closely resemble the General Tire and Starlight Associates cases just cited, which casts further doubt on the wisdom of issuing a stay.

Finally, it should be noted that [HN2] the factual determinations of the PTO are not given deference by the courts, even if supported by substantial evidence on the record as a whole. This is so because the question of patent validity is one of law for the courts and is not subject to the "clearly erroneous" standard of review. See *PIC II, supra, 485 F.Supp. at 1313, 205 USPQ at 241,* citing *Minnesota Mining & Mfg. Co. v.* **[*26]** *Berwick Industries, Inc., 532 F.2d 300, 190 USPQ 209 (3d Cir. 1976); Hadco Products, Inc. v. Walter Kidde & Co., 462 F.2d 1265, 174 USPQ 358* (3d Cir.), cert. denied, *409 U.S. 1023, 175 USPQ 678 (1972).* "to say that the reissue process would 'strengthen' the rebuttal presumption of validity is to say nothing." *Johnson & Johnson, supra, 627 F.2d at 62, 206 USPQ at 877-878.*

Defendant's final argument is that the stay should be granted because the case will be tried before a jury which, bereft of the PTO's expert determination, will encounter serious difficulties in analyzing and evaluating expert testimony concerning the relevance and effect of prior art. The court notes in passing that any problems with jury competence to decide factual issues in this case must be laid at defendant's doorstep, as it was the defendant who demanded a jury trial and now seeks to use that circumstance to delay this litigation in favor of the reissue proceeding. Even apart from this, however, defendant's contention is without merit. First, it is doubtful whether the record of the entire reissue proceedings will be any more comprehensible to a jury than would live, expert testimony. Second, and perhaps **[*27]** more important, it is unclear whether all of the issues presented in this case should be tried before a jury or whether those that are equitable in nature should be tried to the court alone. The court need not and does not decide that question at this juncture, but is convinced in any event that this case should not be stayed and that the parties should hasten with their discovery and bring this dispute to a conclusion.

For all of the foregoing reasons, it is this 15th day of June 1981, by the United States District Court for the District of Maryland,

Ordered :

(1) that defendant's motion for a stay of litigation be, and the same hereby is, Denied ;

(2) that the parties proceed with their discovery with appropriate dispatch; and

(3) that the Clerk of the Court mail copies of this Memorandum Opinion and Order to each of the parties.