# Exhibit J

to

# TIMEBASE'S RESPONSE TO THOMSON'S MOTION FOR A STAY

1 of 2 DOCUMENTS

Copyright (c) 2004 Patent and Trademark Office Society, All Rights Reserved
Journal of the Patent and Trademark Office Society

June 2004

*86 J. Pat. & Trademark Off. Soc'y 441*

**LENGTH:** 9047 words

ARTICLE: Reexamination vs. Litigation -- Making Intelligent Decisions in Challenging Patent Validity

**NAME:** Paul Morgan & Bruce Stoner

**BIO:** Paul Morgan has been practicing patent law for 41 years, and is now the Assistant General Patent Counsel of a U.S. company. He authored an early article on reexaminations for the John Marshall Law School "Intellectual Property Law Review 1982," pp. 215-250, entitled "Hobson's Choice -- Reexamination or Reissue?" He can be reached by email at >paul.morgan@usa.xerox.com<

Bruce Stoner is well known to many readers as the Chief Judge of the USPTO Board of Patent Appeals and Interferences for many years, and as a patent examiner before then. He recently retired from the USPTO to enter private practice (including reexaminations) and can be reached at Greenblum and Bernstein, in Reston, VA, email: >bstoner@gbpatent.com<

This article does not necessarily represent the views of any former or current firm, employer or client of the authors.

**TEXT:**

 [*441]  A. REEXAMINATION IS DANGEROUS, BUT SO IS LITIGATION

Deciding whether to challenge the validity of a patent with a reexamination is a very important client question. The frequency with which that question is being examined is increasing due to increases in threatening patent licensing letters and contingent fee patent suits. The question can arise absent, before, during, or even after, litigation. Yet a really informed, thorough, and balanced consideration of all the pros and cons of reexamination and litigation on patent invalidity issues is not always made. A client may be simply counseled that "reexaminations are dangerous." That is quite true, as noted below (although, as also noted below, some reexamination dangers are avoidable). However, a better client question *ought* to be: *"how much more dangerous is reexamination than trying to invalidate those same patent claims in patent litigation?"* One might also ask to what extent could some of the known dangers of reexaminations be reduced. This paper attempts to bring to the reader's attention some matters that the authors believe ought to be routinely considered in the evaluation of challenging a patent's validity by way of reexamination.

 [*442]  B. GAINING PERSPECTIVE: THE VALUE OF A SECOND OPINION

U.S. patent owners may overlook the worthwhile option of seeking an independent second opinion, including an exploration of the alternatives to litigation, prior to engaging in litigation. This is surprising, given the potential dangers and very high costs of patent litigation. Good business practice would seem to dictate that the patent owner consider carefully the source of any advice, with due attention paid to such factors as the advising counsel's familiarity with *both*

patent litigation and patent reexamination practice, the relative costs and benefits of litigation and reexamination, and matters that can impact on the advice rendered, such as lost litigation billing opportunities. Obtaining an independent second opinion before undergoing major surgery is now mandatory for most corporate employees, yet obtaining an independent second opinion from another law firm before undergoing potentially dangerous multi-million dollar patent litigation still seems relatively infrequent in the U.S. Understandably, some *ex parte* USPTO practitioner specialists do not fully appreciate the extent to which things said or done in reexaminations can impact future litigation, and some litigation specialists have not had direct experience with USPTO reexamination practice. [Before one expensive patent trial the trial counsel told the client that a reexamination could no longer be used because the patent had expired. In fact, reexaminations are available for the full term of patent enforceability, which includes the entire post-expiration recovery period for past infringement damages.]

Although not always appreciated, the difference between USPTO claim construction and court claim construction may be very important to the outcome of a patentability question, and therefore, one's choice of forum. As noted in Section 18.4 on page 1003 of the 6th Edition of 2003 of the leading treatise by Robert L. Harmon, "Patents and the Federal Circuit":

"In prosecution, the PTO construes claims as broadly as possible to reduce the possibility that allowed claims will be given a broader scope than is justified. <343> Thus claims subject to reexamination will be given their broadest reasonable interpretation consistent with the specification, and limitations appearing in the specification are not to be read into the claims. <344> . . Claims in reexamination are to be construed as broadly as possible even though the patent is simultaneously in litigation. <345>

 [*443]  343 *In re Yamamoto, 740 F.2d 1569, 222 USPQ 934 (Fed. Cir. 1984).*

344 *In re Etter, 756 F.2d 852, 225 USPQ 1 (Fed. Cir. 1985).*

345 *In re Yamamoto, 740 F.2d 1569, 222 USPQ 934 (Fed. Cir. 1984).*"

Thus, during a typical reexamination, the USPTO will not accord the claims a presumption of validity, contrary to what a court is required to do pursuant to *35 U.S.C. § 282*. The sole exception relates to a reexamination involving an expired patent, in which case the claims will be construed to sustain their patentability. *Ex parte Papst-Motoren, 1 USPQ2d 1655* (Bd. Pat. App. & Int. 1986). In general, then, it ought to be easier to demonstrate unpatentability over prior art in a proceeding before the USPTO than in a district court proceeding.

C. RISKS: SOME LOSSES ARE MORE PAINFUL THAN OTHERS

Attacking the validity of a patent claim with a reexamination, and losing, is, of course, a major risk for both negotiation and litigation purposes. See, e.g., *Hewlett-Packard Co. v. Bausch & Lomb Inc., 909 F.2d 1464; 15 USPQ2d 1525, 1527 (Fed. Cir. 1990)* indicating that "the burden of showing, by clear and convincing evidence, the invalidity of the claims . . is especially difficult when the prior art was before the PTO examiner during prosecution of the application."

However, even in apparently "losing" reexaminations, prosecution history statements made by the patent owner's attorneys to obtain re-allowance of claims [known in reexamination as "confirming" patentability - see *35 U.S.C. § 307*(a) in those situations where the claim language is unchanged] may well create or greatly strengthen a third party's non-infringement argument! Thus, a third party reexamination requestor will not necessarily be unhappy even if the patentability of one or more claims is confirmed, where, to gain that confirmation, the patent owner has made arguments limiting the scope of his claims or otherwise created prosecution history estoppel, so as to preclude infringement.

The opposite side of that coin, from the patent owner's perspective, is that the potential for unintentional creation of file wrapper estoppel is increased in reexaminations, particularly those reexaminations not coordinated with experienced

trial counsel. Also, failure of the patent owner in a reexamination to meet its duty of disclosure of material prior art patents, or publications, first noted following issuance of the patent, or making material misrepresentations, may generate a new unenforceability defense for the adverse requestor.

 [*444]  D. IMPROVING YOUR CHANCES IN REEXAMINATION BY UNDERSTANDING THE DIFFERENCES BETWEEN REEXAMINATION AND ORDINARY PROSECUTION

One reason that some reexaminations have been "unsuccessful" (and what you mean by that will vary, depending on whether you are the patent owner or a third party) is that they were approached as though they were ordinary ex parte applications for patent. That approach has resulted in some of the bad reexamination experiences that have discouraged greater use of reexaminations.

Failing to present a fully effective *prima facie* anticipation or obviousness case in the reexamination request can lead to bad results for the third party requestor An effective third party request will include detailed proposed rejections suitable for direct adoption by the examiner at the proper time, claim comparison charts, and, where appropriate, carefully prepared affidavits or declarations.

MPEP § 2246 instructs the examiner to "not decide, and no statement should be made as to, whether the claims are rejected over the patents and printed publications" in the decision on the initial request for reexamination. There is a time lag between ordering reexamination and the examiner's actual consideration of the patentability of the claims over the prior art. Thus, if you want the examiner to adopt your language in making a rejection, structure your request so that the examiner can find that proposed rejection several months later when the question of patentability over the prior art patents and publications will be considered. In addition to laying out a rejection for the examiner to make at the appropriate time, it may also be useful to model for the examiner an appropriate order granting the request, as found in MPEP § 2247.01. At the least, you may wish to cite MPEP § 2246 and § 2247.01 to the examiner.

MPEP § 2205 indicates that affidavits or declarations relating to prior art documents may accompany a pre-request prior art citation under *35 U.S.C. § 301*. Notably, that sections states:

Affidavits or declarations relating to the prior art documents submitted may accompany the citation to explain the contents or pertinent dates in more detail. A commercial success affidavit tied in with a particular prior art document may also be acceptable. For example, the patent owner may wish to cite a patent or printed publication, which raises the issue of obviousness of at least one patent claim. Together with the cited art, the owner may file (a) an affidavit of commercial success or other evidence of nonobviousness, or (b) an affidavit which questions the enablement of the teachings of the cited prior art.

 [*445]  MPEP § 2216, § 2217 and § 2258 make clear that affidavits or declarations explaining the contents or pertinent dates of prior art patents and publications are appropriate for consideration in assessing whether there is a substantial new question. However, MPEP § 2258 underscores the point that while affidavits or declarations of this sort can be used, any rejection must be based on the so-explained prior art patents or publications, rather than upon the affidavits or declarations. [Note that the declarant cannot be deposed in the reexamination itself, which makes the use of declarations in a reexamination somewhat less risky when there is no parallel litigation discovery.]

It is imperative that you recognize that reexaminations are very different from ordinary *ex parte* prosecution in the following ways:

1. In an *ex parte* reexamination the adverse requester normally gets only "one bite," and is subsequently totally excluded from all further proceedings (other than getting copies of the papers) unless a second reexamination attack can be initiated and combined with the first. A "shotgun" reexamination request merely citing many references is, therefore, a mistake. At the same time, the adverse requestor needs to recognize that if the examiner finds a substantial new question of patentability ("SNQ") with regard to any claim, all claims will be reexamined, following current practice; see MPEP

§ 2216. One should not leave the matter to chance -- posit all the rejections you want made, but do so in a thoughtful way.

2. Although there is no right to have the examiner's determination that an SNQ exists reviewed by petition or immediate appeal, a patent owner can petition to have an *ultra vires* reexamination order vacated, such as (1) where the reexamination is not based on patents or printed publications, (2) where all claims have been finally held invalid by a court, (3) where reexamination has been ordered for the wrong patent (don't laugh, stranger things have happened), (4) where reexamination has been ordered based on a duplicate request (that is, the same reexamination has been ordered twice). See MPEP § 2246. Where a petition to vacate has been filed by the patent owner, the third party requestor can oppose. See *id.*

3. If the examiner determines that there is no SNQ, the requestor may petition from denial of the request, but that ends the matter: there is no appeal beyond the decision on the petition. See MPEP § 2246. Should the petition be granted, an examiner other than the one who denied reexamination will ordinarily be assigned. See MPEP § 2248.

4. Reexamination requests need to be appropriately timed relative to any pending litigation. One should not expect to request reexamination after litigation has already been pending for a year or more, and then represent to the judge that the reexamination will quickly avoid any need for trial.

 [*446]  5. The special dispatch provision of *35 U.S.C. § 305* has resulted in the USPTO setting response periods that are shorter than those in ordinary *ex parte* prosecution and making extensions of time much more difficult to obtain. Note that in reexamination, extensions of time are governed by 37 CFR § 1.550 and granted only for cause.

6. 37 CFR § 1.550(f) imposes service requirements that must be followed. See also 37 CFR § 1.248 and § 1.540 and note MPEP § 2252.

7. Be particularly aware of your obligations under 37 CFR § 10.23(c)(8) to inform your client or even a former client of correspondence received from the USPTO. If you happen to be the first listed attorney of record in the patent file, you are likely to be the one receiving that correspondence. See also MPEP § 2220, § 2222, and § 2224.

8. Continuations, etc. are not part of reexamination practice. See MPEP § 2271 ("Both the patent owner and the examiner should recognize that a reexamination proceeding may result in the final cancellation of claims from the patent and that the patent owner does not have the right to renew or continue the proceedings by refiling under 37 CFR § 1.53(b) or § 1.53(d), . . . nor by filing a request for continued examination under 37 CFR § 1.114.") Reexaminations thus have been referred to as a "sudden death overtime" system. However, a *35 U.S.C. § 145* District Court review may be possible (only for the patent owner) under *35 U.S.C. § 306* from final Board decisions in an *ex parte* reexamination, whereas under *35 U.S.C. § 315* both parties in an *inter partes* reexamination must appeal directly from the Board to the Federal Circuit. But in an *inter partes* reexamination the patent owner may be able to obtain a stay of pending litigation of those patent claims under *35 U.S.C. § 318*.

9. Be aware of your obligation as the patent owner to provide a timely statement of any interview you might have with the examiner. The need for a statement can not be waived by the examiner. See 37 CFR § 1.560(b) and MPEP § 2281.

E. SUGGESTIONS FOR EFFECTIVE USE OF REEXAMINATION

1. If you are the patent owner, seize the opportunity afforded by reexamination to clean up inventorship problems of which you've become aware; litigation or interference proceedings, where there is another party scrutinizing every step you take, is a far less attractive time to make needed changes.

2. If you are the patent owner, take this opportunity to clean up minor specification and claim errors (as long as you do

not broaden) without need for a reissue declaration.

 **[\*447]**  3. As the patent owner, think long and hard before providing a patent owner's statement pursuant to 37 CFR § 1.530, since doing so triggers a right of reply for the third party requestor under 37 CFR § 1.535. See MPEP § 2249 and § 2251. ("If no statement is filed by the patent owner, no reply is permitted from the third party requestor.") On the other hand, if you are a third party requestor and the patent owner has filed a statement under § 1.530, you've received an additional shot at the patent owner that you shouldn't waste.

4. Be conscious of the provisions of 37 CFR § 1.555 regarding duty to disclose information material to patentability in a reexamination proceeding. § 1.555(a) provides, inter alia, that, "The duty to disclose the information exists with respect to each claim pending in the reexamination proceeding until the claim is canceled. Information material to the patentability of a cancelled claim need not be submitted if the information is not material to patentability of any claim remaining under consideration in the reexamination proceeding."  n1

5. While you are doing what you can to help the examiner order reexamination (including laying out the rejections you want made), go the next step and make sure the examiner is aware of any pending litigation. MPEP § 2240 indicates that the examiner has the burden of requesting a litigation search; help him discharge that burden. Note that existence of litigation draws the attention of the Technology Center Director (see MPEP § 2240 and § 2286).

6. If you are trying to get a second reexamination ordered, be sure to include the same art on which the first was ordered; unless the first reexamination has been concluded, that measure should ensure that the second gets ordered as well. See MPEP § 2240.

7. Be conscious of the possibility of using an admission by the patent owner, whether of record in the file or in a court record, in conjunction with a patent or printed publication for the purpose of establishing an SNQ; see MPEP § 2258.

8. Don't expect to file an "11th hour" request for reexamination to delay issuance of a reissue patent or to achieve merger between the reissue and the reexamination proceeding (recognizing in this instance that the "11th hour" actually extends to within 3 months prior to issuance of the reissue patent). On the other hand, if you request it on time, you can achieve merger and thus have something to say regarding the prior art aspects of the reissue; see MPEP § 2285.

 **[\*448]**  F. CHANGES IN USPTO REEXAMINATION POLICY: EXAMINER ASSIGNMENT AND PATENTABILITY REVIEW CONFERENCE

One of the bases for distrust of the reexamination process stemmed from the likelihood that the reexamination proceeding would be solely handled by the same single examiner responsible for granting the patent. That criticism is no longer valid, in view of USPTO reexamination procedural changes that many patent attorneys may not be aware of. Those changes in practice were implemented by the PTO Director in *an August 29, 2000 OG Notice at 1237 OG 138* entitled: "Change in Policy of Examiner Assignment in *Ex Parte* Reexamination Proceedings and Establishment of Patentability Review Conferences in *Ex Parte* Reexamination Proceedings," indicating, *inter alia,* that:

"Effective immediately, the USPTO is implementing the following two changes in *ex parte* reexamination practice:

I. Examiner Assignment Policy: It will be the general policy of the USPTO to assign ex parte requests for reexamination of a patent to an examiner different from the examiner(s) who examined the patent application.

II. Patentability Review Conference: A "patentability review conference" will be convened in each ex parte reexamination proceeding (1) just prior to issuing a final rejection, and (2) just prior to issuing a Notice of Intent to Issue Reexamination Certificate (NIRC).

The patentability review conference will be similar to the appeal conference presently carried out prior to the issuance of an examiner's answer following the filing of a Notice of Appeal and Brief [NIRC]. See MPEP 1208."

The assignment policy mentioned above has been memorialized in MPEP § 2236 and is worthy of further consideration. That section provides:

It is the policy of the Office that the SPE will assign the reexamination request to an examiner different from the examiner(s) who examined the patent application. Thus, under normal circumstances, the reexamination request will not be assigned to an SPE, primary examiner, or assistant examiner who was involved in any part of the examination of the patent for which reexamination is requested (e.g., by preparing/signing an action). Exceptions to this general policy include cases where the SPE is the only primary examiner in the art unit, or where the original examiner is the only examiner with adequate knowledge of the relevant technology to examine the case. In the unusual case where there is a need to assign the request to  [*449]  the original examiner, the assignment must be approved by the Technology Center (TC) Director, and the fact that such approval was given by the TC Director must be stated by the examiner in the decision on the request for reexamination.

CONSEQUENCES OF INADVERTENT ASSIGNMENT TO AN "ORIGINAL EXAMINER"

Should a reexamination be inadvertently assigned to an "original examiner" (in a situation where the TC Director's approval is not stated in the decision on the request), the patent owner or the third party requester who objects must promptly file a paper alerting the Office of this fact. Any request challenging the assignment of an examiner to the case must be made within two months of the first Office action or other Office communication indicating the examiner assignment, or reassignment will not be considered. Reassignment of the reexamination to a different examiner will be addressed on a case-by-case basis. In no event will the assignment to the original examiner, by itself, be grounds for vacating any Office decision(s) or action(s) and "restarting" the reexamination.

You may want to be careful what you wish for in choice of an examiner. It may be the situation in a close case that an examiner is reluctant to take a position at odds with one taken by his co-worker, while having no compunctions about over-ruling his own previous position (particularly where good art of which the examiner was not aware has been put forward). It could also be the case that you end up with an examiner less experienced or less capable than the one who handled the original examination. It is not unheard of for a patent owner requesting reexamination to explicitly ask (successfully) that the reexamination be assigned to the original examiner, Office policy on the matter notwithstanding, particularly where that examiner possesses recognized expertise in the particular art.

Be aware, also, of the consequences (or non-consequences) of error in assigning the case to the original examiner, as stated in MPEP § 2236, as well as the need to move promptly should you be dissatisfied with an inadvertent assignment to the original examiner.

MPEP § 2271, § 2271.01 and § 2287 provide details concerning the manner in which the USPTO has implemented the "patentability review conference." § 2271.01 makes clear that these conferences are mandatory at two stages of a reexamination, (1) just prior to issuing a final rejection; and (2) just prior to issuing a Notice of Intent to Issue a Reexamination Certificate (NIRC), with certain exceptions.

Per § 2271:

 [*450]  After an examiner has determined that the reexamination proceeding is ready for final rejection, the examiner will formulate a draft preliminary decision to issue a final rejection, the preliminary decision setting forth which claims to reject, the grounds of rejection, which claims to allow/confirm and reasons for allowance/confirmation. The examiner will then inform his/her Supervisory Patent Examiner (SPE) of his/her intent to issue the final rejection. The SPE will convene a patentability review conference, and the conference members will review the patentability of the claim(s) pursuant to MPEP § 2271.01. If the conference confirms the examiner's preliminary decision to reject and/or allow the claims, the Office action (Notice of Intent to Issue a Reexamination Certificate (NIRC) or final

rejection) shall be issued and signed by the examiner, with the two other conferees initialing the action (as "conferee") to indicate their presence in the conference. If the conference does not confirm the examiner's preliminary decision, the pro-posed final rejection will not be issued by the examiner; but rather, the examiner will issue the appropriate Office action reflecting the decision of the conference.

The consequences (or non-consequences) of failing to hold this conference are spelled out in MPEP § 2271.01:

Should the examiner issue a final rejection or NIRC without holding a patentability review conference, the patent owner or the third party requester who wishes to object must promptly file a paper alerting the Office of this fact. Any challenge of the failure to hold a patentability review conference must be made within two months of the Office action issued, or the challenge will not be considered. In such cases, whether to convene a patentability review conference to reconsider the examiner's decision will be addressed on a case-by-case basis. In no event will the failure to hold a review conference, by itself, be grounds for vacating any Office decision(s) or action(s) and "restarting" the reexamination proceeding.

G. INTER PARTES REEXAMINATION: TOO SOON TO EVALUATE THE POSSIBILITIES

Deciding between using an *ex parte* and an *inter partes* reexamination will not be discussed in any detail here. *Inter partes* reexaminations are only available for use against the relatively few patents originally filed for after November 29, 1999. Thus, only approximately 25 *inter partes* reexamination requests have been filed to 2003 - one in 2001, four in 2002, and all the rest in 2003. There are important differences to consider carefully between these two alternatives even if the latter *is* available. The increased rights of participation and appeal (now all the way to the Federal Circuit) of the  **[*451]**  adverse 3rd party in an *inter partes* reexamination come with serious estoppel dangers.

The PTO on December 30, 2003, at *68 Fed. Reg. 75217-8,* requested public comments to be filed by email on whether inter partes reexamination proceedings are believed to be "inequitable" for either party, and for suggestions for changes that could remove such inequities. On February 17, 2004, a public roundtable was held in Arlington, VA, to gather information for a report on reexamination mandated by Congress which is due in 2004. One public commentator suggested the following discussion topics:

"(a) Is the existing scope of inter partes reexamination estoppel in *35 U.S.C. 315*(c) and 317(b) (applying to any subsequent civil proceeding), as to any ground or issues the requestor "could have raised" [not just as to cited patent or publication prior art], so undefined in scope and legal dangers as to be discouraging greater reexamination use?

(b) In that respect, how costly and extensive a prior art search, if any, is required to (possibly) avoid this "could have raised" estoppel, and/or to meet the accompanying statutory exception of "unavailable to the requestor or the PTO"? [In what was contemplated to be a low cost administrative proceeding] How can the public rely on interpretations of these key but disputable estoppel terms "could have raised" and "unavailable" when the Federal Circuit is unlikely to receive such a case for some years, with only 25 such reexaminations even requested to date?

(c) Should the current limitation of inter partes reexaminations to only those patents originally filed after 11/29/99 (inconsistent with ex parte reexaminations) be maintained?

(d) How can inter partes (contested case) reexaminations, with relatively complex PTO rules, be effectively "tried" by ordinary patent examiners lacking legal training or experience in such matters? Should the PTO assign Board APJs with contested case experience to supervise [the relatively small number of] inter partes reexaminations? Would that save time and effort in reducing Board reversals? and/or,

(e) Should an alternative be a new and APJ-managed "opposition system," if Congress so provides? and

(f) If so, of what scope? In particular, how could an opposition system limited to only one year after the issue date of a

patent be of value as to the vast majority of asserted patents (which are asserted later than one year), or provide invalid **[*452]** patent harassment protection for any [unforeseeable] future U.S. products [unlike reexaminations]? [Also, why has Japan just abandoned such a limited-term opposition system for an unlimited-term invalidity system?]

(g) Is the response time provided sufficient for parties to effectively respond, in situations in which expert declarations or other additional evidence is needed?

(h) In view of the statutory requirements for expedited handling of all reexaminations, why are [reportedly] some of them taking up to a year just to be assigned to an examiner, and allegedly not all being adequately supervised, with excessive PTO delays or even plural non-final office actions in some cases? Also, 3rd party obtaining of copies of pending reexamination files (to which the public is entitled, and often needs expeditiously) has been reported to be a problem in some cases, and even resulted in a lawsuit against the PTO to force such access in one known case."

   H. OTHER THINGS TO PONDER WHEN CONSIDERING REEXAMINATION AS AN ALTERNATIVE TO LITIGATION

   Not discussed herein is an alternative tactic of using material prior art which other potential licensees are not aware of to negotiate a favorable private licensing settlement with the patent owner. A threat of public reexamination or litigation could be used to reduce the ability of the patent owner to extract much higher amounts from other licensees unaware of that prior art. It will be interesting to see if the 2004 joint FTC/DOE IP/antitrust recommendations will have anything to say about that tactic, if the settlement is attacked as an agreement of secrecy or document destruction.

   One who wishes to bring prior art to the attention of the public or to create what might be considered an enforcement "cloud" over the patent, or provide "ammunition" for a Director ordered reexamination, can do so, anonymously if so desired, by the tactic of presenting that prior art to the USPTO for inclusion in the patent file under the provisions of *35 U.S.C. § 301* and 37 CFR § 1.501. That under-utilized tactic will not trigger a reexamination, but that prior art becomes a part of the official file of the patent, *35 U.S.C. § 301,* and should be considered by the examiner in any later requested reexamination filed by anyone. It might also be effective to trigger a patent owner's duty to investigate that art of record under FRCP Rule 11 before filing infringement suits?

   Another alternative, starting interference litigation in the PTO, is not the subject of this paper, but should also be considered for the obtaining of independent professional advice. An interfering application **[*453]** of one's own [potentially sacrificial] is required, of course, with claims complying with both of the *35 U.S.C. § 135*(b)(1) and (b)(2) time bars. Most interferences are now decided on patentability issues (not limited to just patents or publications), which are fully tried and decided before priority issues. There are some significant advantages in attacking patentability in an interference.

   However, getting to a really final interference decision, especially if it is dragged on into a district court under *35 U.S.C. § 146,* typically costs a lot more and takes longer than a reexamination. However, a reexamination can even be used in some cases to avoid an undesired interference and obtain claims that would have interfered but for a successful reexamination. For example, by forcing the removal (by cancellation or amendment) of interfering claims from a junior (later filed) patent with a successful reexamination: (1) based on the § 102(e)/103 prior art date of your earlier filed pending application if it has been U.S. or PCT (in English) published; (2) based on a rush-issued divisional of your application containing different (promptly allowable) claims; and/or (3) based on other patents or publications that are 102(b) bar prior art to that other party but not to you. [This is assuming that you can keep your earlier filed application or a continuation thereof pending in the meantime without interference litigation, and have avoided a § 135(b)(1) or (2) bar date for your interfering claims.]

   Turning to another question, may a reexamination still be used to render a patent claim invalid *in rem* even if a district court decision had already held that same patent claim not invalid? Apparently so, at least in a reexamination requested by anyone other than the losing party. See § 18.4, page 999, of the 6th Edition of 2003 of the treatise by

Robert L. Harmon, "Patents and the Federal Circuit," citing in footnote 324 *Ethicon v. Quigg, 849 F.2d 1422, 7 USPQ2d 1152 (Fed. Cir. 1988).* It notes that *res judicata* does not apply to anyone else attacking a patent's validity, and states that MPEP Section 2286 is incorrect. Even *res judicata* limitations on the losing party itself would seem to be avoidable if a CAFC appeal is filed but stayed for the reexamination outcome, because there is yet no final decision. However, if there is enough bad press about a patent so that a third party request can cause a Director Ordered Reexamination, even after an adverse district court decision, that is even better. Reportedly, that was recently accomplished in a case involving a large software company.

Also note that the CAFC has even upheld the use of a reexamination after a patent infringement defendant has already "settled" by taking a **[\*454]** running-royalties license. (The defendant had filed a reexamination to invalidate the patent to avoid further royalty payments.)

I. PROS AND CONS OF REEXAMINATION AND LITIGATION

Presented below are generalized checklists of key pros and cons for additional better-informed client decision-making between using reexaminations or litigation to challenge patent validity. In particular, the lists are intended to facilitate comparison of reexamination and a pretrial summary judgment motion (SJM) for patent invalidity in patent litigation. There may well be others. These numbered lists of pro and con considerations are not in order of importance - that will vary with your particular situation. However, to the extent possible, the numbers are paralleled between the two alternatives. Also note that in some cases of pre-existing litigation a reexamination and a SJM could even be used in parallel.

*REEXAMINATION:*

1. Pro -- Normally orders of magnitude cheaper

2. Pro - No presumption of patent validity, no burden of "clear and convincing evidence," and claims are read broadly against prior art [See the above authority cites.]

3. Pro - Most examiners understand claims versus prior art better than most juries or judges

4. Pro - Normally run on a strict, short, timetable, with time extensions only by petition, and no continuations. The patent owner thus has very limited time to prepare responses to any rejections, and normally cannot introduce any new supporting evidence after the 2d office action -- this is a "sudden death overtime" proceeding against patents

5. Pro - Cannot be avoided by arguing that there are disputed fact issues [unlike an SJM]

6. Pro - Compare PTO reexamination statistics on the odds of an adverse requestor canceling or narrowing patent claims, even of patents in litigation, with statistics below on obtaining, and CAFC sustaining, a judicial invalidity decision

7. Pro - Most reexamination requests are promptly granted, and that might even enable staying some discovery in co-pending litigation in some cases. A reexamination request can now even be based on unappreciated aspects of prior **[\*455]** art already of record in the patent prosecution IF "a substantial new question of patentability" is demonstrated in the reexamination request - Congress overruled *In re Portola* in 2002 - see amended *35 U.S.C. § 303.*

8. Pro - Claims narrowed by reexamination will not be enforceable for any past infringement before the reexamination certificate issued, and are subject to "intervening rights" like a reissue. *Bloom Engineering Co. v. North American Mfg. Co., 129 F.3d 1247, 44 USPQ2d 1859, 1861 and 1862 (Fed. Cir. 1997)*

8A. Con - Patentee may be able to obtain allowance of narrowed claims for future enforceability against future products not protected by intervening rights

9. Pro - No obligation on the part of the ex parte requestor to disclose all prior art the requester is aware of [may even be able to save some of it to rebut patentee arguments later in a second reexamination request], yet the patent owner *does* have a full disclosure duty for additional patents and publications it is on notice of, and thus may commit inequitable conduct by not disclosing same in the reexamination, e.g., art cited against foreign equivalents. The requestor does not need to expose any other defenses. An *ex parte* reexamination request can even be made anonymously, as the PTO has recognized (see MPEP 2212), although such an option is not available in inter partes reexamination.

10. Con - Limited to patents and publications - but note that "publications" can include sales brochures, service manuals, laid-open prosecution file history contents, indexed college theses, materials showing the state of the art, dictionaries, etc. Also, the cited references can be supported by declarations for level of ordinary skill or general knowledge in the art, reference combining, or unobviousness, which cannot be cross-examined in the reexamination, only rebutted by patent owner declarations which may be used against them in litigation.

11. Con - If *ex parte,* the adverse requestor cannot participate at all after the initial submissions, except by filing a second reexamination request with additional patents or publications, and has no right of appeal, while the patent owner can have ex parte interviews, even bringing in experts (usually inadequately recorded), and can appeal all the way to the CAFC. Confirmation of the patentability of any claims will heighten the burden of showing their invalidity in any subsequent litigation. [Only inter partes reexamination requestors can appeal (now, all the way to the CAFC), but two dangerous estoppels apply.]

12. Con - No opportunity to depose or cross-examine the authors of any patent owner declarations

 [*456] 13. Con - Conducted by a single patent examiner, who is typically, but not invariably, not an attorney (but under the current procedure, his or her decision is reviewed by two other examiners before issuance of the reexamination certificate).

14. Pro or con (depending on your circumstances) - In a reexamination, the issue of patent validity is usually isolated from equities or conduct. Thus, a reexamination is much less likely to be influenced by such tactics as one party painting the other as a "copyist" or as having "unclean hands" or the like. However, it may be desirable to lay out facts in the reexamination request such that the reexamination examiner may conclude that the prior examiner was not adequately or fairly apprised of material facts in the original issuance. For example, pointing out that material prior art in related U.S. or foreign applications was not cited in the original patent prosecution. Likewise, attaching news reports to the effect that the patent owner is "shaking down" an entire industry with a "licensing scheme," providing the requestor was not the source or instigator of those articles. [Recent news reports suggest that complaints directed to the Director of the USPTO sometimes result in a Director-ordered reexamination. One can speculate that complaints to the Federal Trade Commission might inspire that agency to request reexamination in an appropriate instance.]

*LITIGATION - ESPECIALLY SUMMARY JUDGMENT MOTIONS (SJM):*

1. Con - Normally orders of magnitude more costly than reexamination before any decision

2. Con - Strong presumption of patent validity and a high "clear and convincing evidence" burden

3. Con - Lay judge may be confused by technology and/or claim language and conflicting declarations

4. Con -The Judge may simply sit on an SJM, right up to trial, thus not reducing any costs or risks

5. Con - An SJM will not normally be granted if there are any material disputed facts, and is likely to be reversed on that basis

6. Con -- Low percentage of actual judicial invalidity decisions (particularly for obviousness where references have to be combined). Relatively low percentage of CAFC decisions sustaining invalidity decisions, as a percentage of litigated patents, or as compared to reexaminations. A particularly high reversal rate by the CAFC of SJ's of invalidity. [See below]

 [*457]  7. Con -- Invalidity defenses are frequently not even seriously considered by the district court until after costly discovery, and after infringement and other issues are decided

8. Pro -- A patentee cannot narrow claims or add narrower claims - claims that are held invalid because held too broad are eliminated, and cannot be replaced with claims narrowed to avoid the prior art in the litigation itself

9. Con -- An SJM itself does not force the patent owner to disclose all known prior art - that requires discovery

10. Pro - Can be on any grounds of invalidity, not just prior patents or publications -- e.g., an "on sale" or "public use" bar, non-marking defense, etc. [which can be raised in parallel with a reexamination on patents or publications]

11. Pro - Usually opportunity for full participation, oral arguments, briefs, and an appeal or trial

12. Pro - Normally an opportunity for parties to depose and cross examine affidavits and other testimony

13. Pro or con (depending on your viewpoint and the facts) - conducted by a Federal Judge rather than a PTO examiner --see also 3 above.

14. Pro or con (depending on your circumstances): The issue of patent validity is not isolated from the "equities" and other influencing factors. One party might be effectively "labeled" as a "copier," "pirate," "bad actor," "poor little inventor whose invention is being stolen by a big evil foreign corporation," or the like.

J. STATISTICS

Turning now to some comparative patent litigation statistics to consider, as to appeals, the following statistics on Federal Circuit appeal decisions on district court patent invalidity/validity decisions were kindly provided by Professor Janicke from the University of Houston Law Center. For the 2000-2001 time period, there were 97 district court patent invalidity holdings handled on appeal. In 55 instances the accused infringers held onto their invalidity victories on appeal, and in 42 instances they suffered a reversal. There were 73 patent validity holdings appealed in that same time period - 55 of these were affirmed and 18 reversed. So, the CAFC affirmance rate for appealed invalidity holdings was 56%, but the CAFC reversal rate for appealed validity holdings was only 25%. [Considering the low odds of the CAFC holding a patent invalid that was held not-invalid below, one might also  [*458]  assume that many other such cases were settled rather than appealed.] In other words, don't count on the CAFC "saving your bacon" if you lose your invalidity defense below.

But even more significant is the difficulty in obtaining any actual District Court decision of patent invalidity to begin with. The authors do not have good district court statistics, but note the above relatively low number (97) of appeals on that issue. The widespread conventional wisdom is that convincing a jury to overcome the influence of the U.S. Government seal and ribbon on the patent and the high "clear and convincing evidence" requirements of the jury instructions is definitely not easy. What some other available statistics (below) *do* clearly suggest is that most patent invalidity issues *never actually get decided* in patent litigation these days. That should raise serious questions as to whether "saving" a strong prior patent or publication based invalidity defense for patent litigation [rather than using it in

an early reexamination] will effectively maximize the value of that defense, for settlement or otherwise. Infringement is now commonly the *only* issue that gets decided (or, more commonly, effectively forces a settlement) thanks to both *Markman* hearings and the fact that infringement is normally the only issue the patent owner has the burden of proving.

For example, "IDEA" - "The Journal of Law and Technology," Vol. 41, No. 2 (2001), contains an interesting study of "Trends in Patent Cases: 1990-2000" from available district court data for that 10 year period. In 2000, 2484 patent cases were filed, 2221 terminated, and 2888 were pending. Although the total number of patent cases "terminated" by district courts each year from 1990-2000 dramatically increased, until recently the number of patent cases actually decided by the District Courts over that same time period remained relatively stable. The percentage of cases terminated with a judgment declined from about 31% in 1990 to about 24% in 2000, i.e., as compared to cases terminated by out-of-court settlements, etc. *Further excluding cases terminated by default judgments or consent judgments,* the number of actual court decisions reportedly grew by only 81% over this time period and *accounted for only 14% of the total case terminations* in 2000, and the latter remained consistent over the 10 year period. As understood, this article also indicated that the percentage of decisions in favor of plaintiffs decreased from 39% or higher to 27% by 2000, while the percentage of cases decided in favor of defendants increased from 46% in 1990 to 60% in 2000. [However, was that due to increasing non-infringement decisions?]

**[*459]** Likewise, the Spring 2002 issue of the ABA's IPL Section "Newsletter," on pp. 6-15 & 53, in an article entitled "An In-Depth Look at Historical Patent and Trademark Damage Trends," indicated that although the number of patent infringement cases filed has increased 60% since 1993, so that in FY 2000 (ending Sept. 20, 2000) 2,484 patent litigations were commenced, *only 3.9 percent of all patent cases reached trial* in FY 2000 (compared to 5.6 percent in 1997) and *only 2.5 percent were decided by a jury* in FY 2000. *In conclusion, the odds of getting an invalidity decision in patent litigation are low.*

In contrast to the reported fates of district court decisions at the CAFC, the PTO Solicitor's Office reports only one patent decision from the PTO Board reversed by the CAFC in FY 2002, versus 18 affirmances (but 27 total patent and trademark decisions by the PTO were remanded or dismissed, some of which may be partial reversals). Another PTO figure reports 80% affirmances of all PTO patent and trademark decisions appealed to the CAFC. No specific figures for CAFC appeals from reexamination decisions are available.

The following reexamination statistics are from the 2003 USPTO Performance and Accountability Report:

TABLE 13A                EX PARTE REEXAMINATION

(FY 1999 - FY 2003)

| ACTIVITY | 1999 | 2000 | 2001 | 2002 | 2003 |
|---|---|---|---|---|---|
| Requests filed, total | 385 | 318 | 296 | 272 | 392 |
|     By patent owner | 173 | 137 | 144 | 121 | 136 |
|     By third party | 191 | 172 | 150 | 140 | 239 |
|     Commissioner ordered | 31 | 9 | 2 | 11 | 17 |
| Determinations on requests, total | 367 | 338 | 342 | 272 | 381 |
|     Requests granted | | | | | |
|         By examiner | 327 | 320 | 263 | 262 | 360 |
|         By petition | 1 | 2 | 2 | 1 | 1 |
|     Requests denied | 39 | 16 | 77 | 9 | 20 |

TABLE 13A            EX PARTE REEXAMINATION
(FY 1999 - FY 2003)

| ACTIVITY | 1999 | 2000 | 2001 | 2002 | 2003 |
|---|---|---|---|---|---|
| Requests known to have related litigation | 62 | 80 | 80 | 52 | 109 |
| Filings by discipline, total | 385 | 318 | 296 | 272 | 392 |
|     Chemical | 138 | 96 | 90 | 87 | 124 |
|     Electrical | 107 | 103 | 89 | 78 | 118 |
|     Mechanical | 140 | 119 | 117 | 107 | 150 |

[*460]

TABLE 13B            INTER PARTES REEXAMINATION
(FY 2000 - FY 2003)

| ACTIVITY | 2000 | 2001 | 2002 | 2003 |
|---|---|---|---|---|
| Requests filed, total | - | 1 | 4 | 21 |
| Determinations on requests, total | - | - | 5 | 20 |
|     Requests granted | - | - | 5 | 18 |
|         By examiner | - | - | - | 18 |
|         By petition | - | - | - | - |
|     Requests denied | - | - | - | 2 |
| Requests known to have retated litigation | - | - | - | 4 |
| Filings by discipline, total | - | 1 | 4 | 21 |
|     Chemical | - | 1 | 2 | 3 |
|     Electrical | - | - | - | 7 |
|     Mechanical | - | - | 2 | 11 |

    The following additional reexamination statistics were also provided by the PTO -- note the bolded statistics in particular:

*EX PARTE REEXAMINATION FILING DATA - SEPTEMBER 30, 2003*

1.    Total requests filed since start of ex parte reexam on 07/01/81    6786

    a. By patent owner    2890    43%
    b. By other member of public    3738    55%
    c. By order of Commissioner    158    2%

Case 0:07-cv-01687-JNE-JJG   Document 43   Filed 06/21/2007   Page 15 of 17

Page 14
86 J. Pat. & Trademark Off. Soc'y 441, *460

2. Number of filings by discipline

|   |   |   |
|---|---|---|
| a. Chemical Operation | 2156 | 32% |
| b. Electrical Operation | 2114 | 31% |
| c. Mechanical Operation | 2516 | 37% |

3. Annual Ex Parte Reexam Filings

| FISCAL YR. | NO. | FISCAL YR. | NO. | FISCAL YR. | NO. |
|---|---|---|---|---|---|
| 1981 | 78 (3 mos.) | 1989 | 243 | 1997 | 376 |
| 1982 | 187 | 1990 | 297 | 1998 | 350 |
| 1983 | 186 | 1991 | 307 | 1999 | 385 |
| 1984 | 189 | 1992 | 392 | 2000 | 318 |
| 1985 | 230 | 1993 | 359 | 2001 | 296 |
| 1986 | 232 | 1994 | 379 | 2002 | 272 |
| 1987 | 240 | 1995 | 392 | 2003 | 392 |
| 1988 | 268 | 1996 | 418 | | |

[*461]

4. Number known to be in litigation — 1392 — 21%

5. Determinations on requests — 6562

    a. No. granted — 5932 — 90%
        (1) By examiner — 5827
        (2) By Director (on petition) — 105

    b. No. denied — 630 — 10%

        (1) By examiner — 596
        (2) Order vacated — 34

6. Total examiner denials — 701
(includes denials reversed by Director)

    a. Patent owner requester — 407 — 58%
    b. Third party requester — 294 — 42%

7. Overall reexamination pendency (Filing date to certificate issue date)

    a. Average pendency — 21.2 (mos.)

    b.    Median pendency         16.6 (mos.)

8.    Reexam certificate claim analysis:

|  | Owner Requester | 3rd Party Requester | Comm'r Initiated | Overall |
|---|---|---|---|---|
| a. All claims confirmed | 23% | 30% | 13% | 26% |
| b. All claims cancelled | 7% | 12% | 19% | 10% |
| c. Claims changes | 70% | 58% | 68% | 64% |

9.    Total ex parte reexamination certificates issued (1981 - present)     4786

    a. Certificates with all claims confirmed     1271    26%
    b. Certificates with all claims canceled     473    10%
    c. Certificates with claims changes     3042    64%

[*462]

10.    Reexam claim analysis - requester is patent owner or 3rd party; or Comm'r initiated.

    a.    Certificates - PATENT OWNER REQUESTER     2110
        (1) All claims confirmed     487    23%
        (2) All claims canceled     149    7%
        (3) Claim changes     1474    70%

    b.    Certificates - 3rd PARTY REQUESTER     2547
        (1) All claims confirmed     767    30%
        (2) All claims canceled     300    12%
        (3) Claim changes     1480    58%

    c.    Certificates - COMM'R INITIATED REEXAM     129
        (1) All claims confirmed     17    13%
        (2) All claims canceled     24    19%
        (3) Claim changes     88    68%

    The FY 2003 statistics indicate that the total number of *ex parte* patent reexamination requests increased from 272 in 2002 to 392 in 2003. Commissioner-ordered reexaminations rose from 11 to 17. Third party requested *ex parte* reexaminations jumped from 140 to 239, while patent owner requests rose only slightly from 121 to 136. This difference in *who* is initiating reexaminations is perhaps the most interesting. While the total numbers are roughly comparable to the 1999 level, the big difference is in 3rd party (adverse party) requests for *ex parte* reexamination, which have now increased from 181 in 1999 to 239 in 2003. Of course, **all** *inter partes* reexamination requests are by

3rd parties.

K. CONCLUSION

The authors hope that the information they have collected and provided herein will prove useful in making objective reexamination decisions when faced with adverse patents of questionable validity over prior patents or publications. Of course, there will be differences, and unexpected consequences, in almost every particular fact situation and decision. There will be many cases in which at least one of the parties will be very dissatisfied with the PTO handling of the reexamination. However, that can be compared with numerous reports of unsatisfactory District Court handling of similar issues, usually after much greater expenditures.

[*463] Finally, we note two recent events. First, the USPTO published in the January 20, 2004, Official Gazette the final version of several rules changes in *inter partes* reexaminations (especially as to end-stages and appeals), effective January 21, 2004. Second, an article entitled "Reexamination, Opposition or Litigation? Legislative Efforts to Create a Post-Grant Patent Quality Control System" by Qin Shi, Esq. was published in the Vol. 31, No. 4, AIPLA Quarterly Journal, covering a few of the same topics as this article. Neither appears to affect anything said in this article.

**Legal Topics:**

For related research and practice materials, see the following legal topics:
Patent LawClaims & SpecificationsEnablement RequirementGeneral OverviewPatent LawInfringement ActionsGeneral OverviewPatent LawU.S. Patent & Trademark Office ProceedingsExaminationsGeneral Overview

**FOOTNOTES:**

n1 But be aware of *Semiconductor Energy Laboratory Co. v. Samsung Electronics Co., 54 USPQ2d 1001, 1007 (Fed. Cir. 2000)* (PTO rules set a floor, not a ceiling, on conduct).