# Exhibit 1

## SUBLICENSE AGREEMENT

AGREEMENT made as of the 29th day of June, 1995, between LEMOND CYCLING, INC., a corporation organized under the laws of the State of Minnesota, having its principal place of business at 3000 Willow Drive, Medina, Minnesota 55340 ("Licensor"), and TREK BICYCLE, CORP., a Wisconsin corporation with offices at 801 West Madison Street, P.O. Box 183 Waterloo, WI 53594 ("Licensee").

### W I T N E S S E T H :

WHEREAS, Greg LeMond is a world famous champion bicycle racer, and has formed Licensor for purposes of developing and licensing out the various trademarks associated with his name; and

WHEREAS, the name and trademark "GREG LEMOND CYCLES", or such other similar trademark as the parties shall mutually agree in advance incorporating all or part of the name GREG LEMOND (as so selected, hereinafter referred to as the "Mark") has acquired a reputation for a high standard for quality and, through usage, has acquired distinctiveness and has become associated in the public's mind with the business of GREG LEMOND ("LEMOND"), and, by master license, Licensor; and

WHEREAS, Licensor is willing to grant to Licensee and Licensee desires to acquire from Licensor, upon the terms and conditions hereinafter set forth, a sub-license with respect to the Mark,

NOW, THEREFORE, in consideration of the mutual promises, covenants and conditions of the parties hereinafter set forth, it is agreed as follows:

1.    Definitions.

As used herein, the following words shall have the following meanings:

1.01 <u>Products</u>: bicycles and bicycle frames, and no other products. A Product bearing any part of the Mark shall be a "Licensed Product."

1.02 <u>Territory</u>: the United States, its territories and possessions, and the countries Licensee has designated and which are set forth on Exhibit "1.02" hereto.

1.03 <u>Net Sales</u>: gross amounts of shipments, as invoiced, directly or indirectly, by or under authority from Licensee, of Licensed Products, in any transaction in commerce, less (a) all trade discounts (not to exceed usual industry practices) to the extent actually taken and (b) all returns of Licensed Products other than for exchange:

1.03.01    "Net Basic Sales" shall be sales to Licensee's regular customers in the ordinary course of its business; and

LCI 03595
CONFIDENTIAL

1.03.02    "Net Distributor Sales" shall be sales to Licensee's distributors, i.e., those who purchase for resale only to retailers and not to ultimate consumers.

1.04 <u>Contract Period</u>:  the period commencing on the date hereof and ending (a) on September 30, 2005 (the "Primary Term"), provided that the same shall be extended and continue thereafter to the applicable September 30 of the final "Contract Year" (as hereinafter defined) hereunder, as to which either party shall have given the other two (2) full years notice to terminate effective at such time (the earliest effective date of which may be the last day of the Primary Term), or (b) on September 30 of such earlier year if this Agreement is earlier terminated under Paragraph 12 below.

1.05 <u>Expiration Date</u>:  the last day of the Primary Term, or the last effective Contract Year thereafter as set forth in Paragraph 1.04, or such earlier Contract Year if this Agreement is earlier terminated under Paragraph 12 below, whichever is applicable as the final period hereunder.

1.06 <u>Contract Year</u>:  initially the period commencing on the date hereof and ending on September 30, 1996, and thereafter each twelve-month period ending on September 30, during the Contract Period.

1.07 <u>Contract Quarter</u>:  initially the period commencing on the date hereof and ending on December 31, 1995 and thereafter each successive three-month calendar period during the Contract Period.

1.08 <u>License</u>:  the sublicense of rights acquired from GREG LEMOND.

2.    <u>Grant of Rights, Services and Guarantees</u>.

2.01 Licensor hereby grants to Licensee, and Licensee hereby accepts, subject to the terms of this Agreement, the exclusive right and license (without the right to assign the same or grant sublicenses thereunder), to use the Mark in the Territory during the Contract Period in connection with the manufacture, advertisement, promotion, sale and distribution of Licensed Products; provided, however, that only those items of Products approved by Licensor (or not requiring approval) as hereinafter provided in Paragraph 5.01, may be manufactured and sold by Licensee hereunder.  Licensor reserves all rights not expressly herein provided (and LEMOND reserves the same to the extent not heretofore granted to Licensor), including, but not limited to, all rights to utilize the Mark or variations thereof and the name of LEMOND in connection with (a) all products, merchandise and services other than Products in the Territory, and (b) all products, merchandise and services including Products outside the Territory; provided, however, that neither Licensor nor LEMOND shall grant any third party in the business of manufacturing or selling Products the right to use the Mark or

- 2 -

LCI 03596
CONFIDENTIAL

LEMOND's name, in any form, for any purpose, during the Contract Period.

2.02 Licensor shall provide the reasonable services of LEMOND in connection with the development and design of Licensed Products and the promotion thereof.

2.02.01 As and when requested by Licensee, Licensor shall cause LEMOND to be available for up to thirty (30) "Working Days" in the first Contract Year, less the number of Working Days LEMOND provides to Licensee under any other agreement, at times and places convenient and reasonably acceptable to LEMOND and subject, in any event, to his personal and professional schedule, for promotional services relating to the Licensed Products, including personal appearances, appearances on television or radio talk shows, press conferences, attendance at trade shows and the participation in photo shoots to develop materials for advertising literature, point of sale displays and editorial pieces. Licensor shall require LEMOND to be similarly reasonably available in subsequent Contract Years based upon, and for the number of Working Days contained in, a promotional campaign jointly developed and reasonably approved by the parties.

2.02.02 Licensor shall cause LEMOND to reasonably cooperate with Licensee in the design and development of Licensed Products, including the styling, fabrication, colors, component parts and other non-generic features.

2.02.03 All reasonable expenses relating to LEMOND's services hereunder shall be paid or reimbursed by Licensee, including business class air travel for international and coach for domestic flights, hotel accommodations and meals for LEMOND and one companion, ground transportation and other incidental items (exclusive of personal expenditures).

2.02.04 For purposes hereof a Working Day shall consist of six (6) hours, exclusive of travel time. Travel time will be considered in determining Working Days on a case by case basis, to be determined in advance by the parties acting reasonably, with reference to the following guidelines: travel in excess of an hour, but less than four (4) hours shall be deemed one half ($\frac{1}{2}$) a Working Day, and travel time in excess of four (4) hours shall constitute a full Working Day. Other conditions relating to Working Days are set forth in Paragraph 16 hereof.

2.03 To the extent Licensor has undertaken to make certain assurances for and provide the services of LEMOND hereunder, by endorsement below, LEMOND guarantees to Licensee that such assurances are correct and such services shall be provided.

2.04 As a condition to the rights granted to Licensee hereunder, its parent corporation, INTREPID CORPORATION, of N14 W23833 Stone Ridge Drive, Suite #250, Waukesha, WI 53188 (the "Guarantor"), shall execute and attach hereto a guaranty in favor

- 3 -

of Licensor and LEMOND, of the due and timely performance by Licensee of all obligations, undertakings, responsibilities and commitments of Licensee hereunder and relating hereto vis-a-vis Licensor and LEMOND, and agreeing to the application of all provisions of this Agreement to, including permitting the enforcement against the Guarantor in the first instance without exhausting remedies against Licensee, as if Guarantor were a contract party hereto directly with Licensor and LEMOND, as their interests appear.

3.   Earned Royalty.

3.01 In consideration of the rights herein granted, Licensee shall pay Licensor a percentage royalty ("Earned Royalty") as follows:

3.01.01   three percent (3%) of all Net Basic Sales and two percent (2%) of all Net Distributor Sales (provided Net Distributor Sales do not exceed ten percent (10%) of all Net Sales during any Contract Year, with three percent (3%) of Net Distributor Sales in excess thereof.

3.01.02   Earned Royalties shall accrue as and when Licensed Products are shipped by Licensee.

3.02 Earned Royalty payments shall be made by Licensee to Licensor quarterly as to all Earned Royalties accrued during each Contract Quarter, no later than the due date for statements for the applicable Contract Quarter pursuant to paragraph 3.03. Licensee may deduct from Earned Royalties due for any Contract Year, only payments theretofore actually made of "Minimum Royalties" (as hereinafter defined) for the same Contract Year.

3.03   Licensee shall provide Licensor, within thirty (30) days after the end of each Contract Quarter, a complete and accurate statement of its Net Sales of Licensed Products and accrued Earned Royalties for such Contract Quarter, said statement to be certified as accurate by the chief financial officer of Licensee and to include such information and detail as Licensor may from time to time reasonably request.  The same shall contain separate reports as to Net Basic Sales and Net Distributor Sales, with Earned Royalty calculations and the application of Minimum Royalty payments to the aggregate Earned Royalty then due.  The statement for each fourth Contract Quarter in each Contract Year shall contain all of the foregoing information for such Contract Quarter as well as a recapitulation of the information for the full Contract Year, with any necessary reconciliation.  Attached hereto and made a part hereof as Exhibit "3.03" is a prototype report setting forth the information necessary for each Contract Quarter, in a form acceptable to Licensor, until further notice from Licensor.

3.04 All royalties and other obligations payable to Licensor under this Agreement shall be paid in United States dollars, by check drawn on Licensee's regular bank.  Payments of

- 4 -

CONFIDENTIAL

Earned Royalty for each Contract Quarter shall be credited with the "Minimum Royalty" (as hereafter defined) payments for such Contract Quarter.

3.05 Interest at the rate of three percent (3%) over prime (at Licensee's regular bank) per annum (or the highest amount permitted by law, whichever is lower) shall accrue on any amount payable to Licensor hereunder, from and after the date upon which the payment is due until the date of receipt of payment by Licensor. Such charge shall not be in lieu of or otherwise limit any rights of Licensor in the event a payment is not made by Licensee when due.

4.    Minimum Royalty.

4.01 Licensee agrees to pay Licensor a guaranteed minimum royalty in each Contract Year (the "Minimum Royalty") during the first five (5) Contract Years of the Primary Term (the "Lock Term"), of One Hundred Thirty Five Thousand Dollars ($135,000), and in each Contract Year thereafter, a sum equal to the annual average of the total amounts paid to Licensor hereunder during the immediately preceding three (3) Contract Years, but in no event less than the Minimum Royalty paid in the immediately preceding Contract Year.

4.02 As to the first Contract Year, Thirty Five Thousand Dollars ($35,000) out of the Minimum Royalty, i.e., One Hundred Thirty Five Thousand Dollars ($135,000), shall be paid upon execution. The balance thereof for the said first Contract Year (i.e., $100,000), and the Minimum Royalty for each Contract Year thereafter, shall be payable in four (4) equal quarterly installments, in advance, on the first day of each October, January, April and July of each such Contract Year. Minimum Royalty payments in each Contract Year shall constitute non refundable advances for such Contract Year, shall not be credited against sums due in any subsequent Contract Year and shall not be recoverable from Earned Royalty in any other Contract Year.

4.03 Payments of Earned Royalty made with respect to any Contract Year in excess of the Minimum Royalty for such Contract Year shall not be credited against the Minimum Royalty thereafter payable for any other Contract Year.

5.    Development, Licensor's Approvals and Quality Control.

5.01 Throughout the Contract Period, the parties shall meet in person, by telephone or other means of communication as the parties may agree from time to time, to discuss plans for new lines or items of Licensed Products hereunder, during which they shall determine the overall concepts for the Licensed Products, including, but not limited to, the nature and number of items, styles, colors, fabrications, configurations, accessories and anticipated retail and distributor prices which Licensee might charge and all other relevant matters. Licensor will be consulted as to all new Products, but express approval is not

- 5 -

LCI 03599
CONFIDENTIAL

required as to any new Product which is a conventional Product and the quality of the Trek/Fisher line is met. Except as provided in the immediately preceding sentence, Licensor shall have the right of approval as to all other new Products, including the design of each and the quality. Licensor will provide Licensee with its reasonable basis for any such disapproval. As to all Licensed Products, Licensor has the right to approve the use of the trademark and all advertising and promotional materials. Before any commercial sale by Licensee of any proposed new Licensed Product, Licensee shall deliver to Licensor for its consideration, preproduction samples thereof, unless waived by Licensor. If disapproved by Licensor for any reason, the same shall not be associated thereafter in any way with the Licensor, LEMOND or the Mark. Thereafter, all production of the said Licensed Products shall conform to such approved samples. Upon request from time to time by Licensor, Licensee shall provide Licensor with a randomly selected production sample of each Licensed Product, for examination by Licensor in determining such conformity. All designs and sketches which are or become unique to Licensed Products and become associated in the public's mind with Licensor, LEMOND or the Mark, shall not be utilized by Licensee or any third party, after the Contract Period, without Licensor's express further approval.

5.02 Licensee shall use its best efforts to exploit the Mark in respect of Licensed Products, and to promote the sale of Licensed Products in the Territory so as to try to maximize sales, consistent with the quality and reputation of Licensor, and only to retailers (and distributors who sell to retailers) which properly reflect the image and reputation of Licensor and LEMOND.

5.03 During each Contract Year, Licensee shall provide LEMOND, at no charge, three (3) high end and two (2) low end Licensed Products (completed bicycles) for the personal use of LEMOND and his family, provided that during the Contact Period LEMOND shall ride no other bicycles.

5.04 Licensee shall establish and maintain quality control practices and procedures for Licensed Products at least comparable to those employed by it for its Fisher line of Products. Licensee shall not ship any Licensed Products which Licensor reasonably determines, on notice to Licensee, does not meet such standard.

5.05 As further provided above, and in Paragraph 8.02, Licensor shall have the right to reasonably approve in advance all consumer promotion and advertising of the Licensed Products ("Promotional Material") in the Territory. Without limiting the provisions of Paragraph 8.01 hereof, Licensee shall be responsible for payment of all expenses incurred for advertising, promoting and marketing the Licensed Products.

5.06 All Licensed Products and Promotional Material shall contain appropriate legends, markings and notices as

LCI 03600
CONFIDENTIAL

reasonably requested from time to time by Licensor, to give appropriate notice of Licensor's right, title and interest in and to the Mark, or for other reasonable business purposes. In addition, Licensee shall include all such notices, labels, instructions or legends as may be required by any applicable law or regulation, and shall otherwise be responsible for the compliance therewith in all respects.

5.07 After the approval by Licensor of any item of Licensed Products or Promotional Material has been granted, Licensee shall not depart therefrom in any material respect without first obtaining the further approval of Licensor.

5.08 Licensee will permit Licensor's designees, upon reasonable prior notice, to enter the premises where the Licensed Products are being manufactured or stored, during regular business hours, for the purpose of inspecting the Licensed Products and the facilities in which the Licensed Products are being manufactured and packaged.

## 6. Use and Registration of Mark.

6.01 As between Licensee and Licensor, Licensee acknowledges that Licensor and LEMOND, as their interests may appear, own all right, title and interest in and to the Mark in any form or embodiment thereof and also own the good will attached or which shall become attached to the Mark in connection with the business and merchandise in relation to which the same has been, or shall be used. Sales by Licensee shall be deemed to have been made by Licensor and/or LEMOND, as the case may be, for purposes of trademark registration and all uses of the Licensed Mark by Licensee shall inure to the benefit of Licensor and/or LEMOND, as the case may be, for purposes thereof.

6.02 Licensor shall, at its sole cost and expense (but with Licensee's full cooperation at Licensee's expense), take all reasonable steps with respect to the registration and maintenance of the Mark in the United States, in International Class 12 and such other classes as Licensee shall reasonably request and as Licensor's counsel shall deem necessary and appropriate, to the extent the same cover Licensed Products not otherwise covered by existing registrations.

6.03 If Licensee intends to sell any of the Licensed Products or otherwise use the Mark in any jurisdiction in the Territory outside the United States, Licensee shall promptly notify Licensor of such intention in writing specifying the jurisdiction involved. Licensee shall advance the costs and expenses in connection with and may thereupon file an application and use its best efforts to register the Mark therein in the name of Licensor or LEMOND, as Licensor may direct. In the event Licensee uses the Mark in any jurisdiction prior to notification of Licensor of its filing of the aforesaid application, it shall indemnify Licensor and LEMOND, in accordance with Paragraph 10.02 hereof. Licensee and Licensor (and LEMOND) shall, at each other's request, execute any documents, including Registered User

LCI 03601
CONFIDENTIAL

agreements, and adopt any form of label, reasonably required by Licensor to confirm Licensor's and LEMOND's respective rights in and to the Mark in the jurisdiction and the respective rights of Licensor and LEMOND, such other parties designated by Licensor and Licensee pursuant to this Agreement. Anything elsewhere contained in this Agreement to the contrary notwithstanding, and provided Licensee has advised Licensor of the cost and expense of effecting such registration promptly after such registration is issued, Licensee is hereby authorized and directed to deduct from Earned Royalties otherwise payable to Licensor from Net Sales in the jurisdiction wherein Licensee paid to register the Mark as aforesaid, up to fifty (50%) thereof on an on-going basis until paid in full, the reasonable cost and expense of effecting such registration.

6.04 Licensee shall use the Mark in each jurisdiction in the Territory strictly in compliance with the legal requirements obtaining therein and shall use such markings in connection therewith as may be required by such jurisdiction's applicable legal provisions. Consistent with other provisions of this Agreement, Licensee shall cause to appear on all Licensed Products and on all materials on or in connection with which the Mark is used, such legends, markings and notices as may reasonably be necessary in order to give appropriate notice to any trademark, trade name, copyright or other rights therein or pertaining thereto, or as shall be reasonably requested by Licensor.

6.05 Licensee shall not challenge Licensor's and LEMOND's respective ownership of and rights in or the validity of the Mark or any application for registration thereof, or any trademark registrations thereof, nor contest the fact that Licensee's rights under this Agreement are solely those set forth in the Agreement.

6.06 Licensee shall cooperate with Licensor and LEMOND in every reasonable respect in connection with actions necessary or recommended by counsel to Licensor or LEMOND to enhance, protect, secure or otherwise maintain Licensor's rights in and to the Mark in any jurisdiction.

7. Infringement of Mark.

7.01 Licensee agrees to assist Licensor in all respects in the enforcement of any rights of the Licensor in the Mark. Licensee shall notify Licensor in writing of any actual or potential infringements or imitations by third parties which may come to Licensee's attention. Licensor shall have the sole right to determine whether or not any action shall be taken on account of any such claimed infringement or imitation. Licensee shall, at Licensor's request, act as sole plaintiff or join with Licensor in such action as Licensor deems appropriate, at Licensor's expense. Licensee shall not contact any third party, make any demands or claims, institute any suit or take any other action on account of such claimed infringements or imitations, and any such conduct by Licensee shall be a material violation

- 8 -

LCI 03602
CONFIDENTIAL

hereof and, without in any manner limiting Licensor's rights with
respect thereto, including the right to terminate this Agreement,
all costs and expenses, including attorneys' fees, incurred in
connection with any action taken or suit instituted by Licensee
without the consent of Licensor, including all such costs and
expenses as well as all damages sustained by Licensor, shall be
borne solely by Licensee.

7.02 With respect to all claims, actions, suits or
proceedings, including suits in which Licensee is joined or
otherwise appears as a party, Licensor shall have the sole right
to employ counsel of its choosing and to direct the handling of
the litigation and any settlement thereof. Licensor shall be
entitled to receive and retain all amounts awarded as damages,
profits or otherwise in connection with such suits; provided,
however, that to the extent any recovery relates specifically to
actual out of pocket losses of and damages to Licensee (exclusive
of lost profits and consequential damages of any kind), then,
after Licensor is fully reimbursed for all costs, expenses, fees
and disbursements relating in any way to such claims, actions,
suits or proceedings, Licensor shall share with Licensee the net
remaining proceeds, if any, in proportion to the damages proven
by each relating specifically to Licensed Products, but in no
event shall Licensee's share thereof exceed fifty percent (50%)
of such net remaining proceeds.

8.    Advertising and Promotion.

8.01 During each Contract Year, Licensee shall expend
a reasonable amount on the marketing, promotion and advertising
of Licensed Products, both to the trade and to consumers
(including corporate advertising), consistent with its promotion
of comparable lines of Products. It is understood that a
reasonable amount is the equivalent of approximately three
percent (3%) of the Net Sales for each Contract Year.

8.02 Because of the reputation and goodwill associated
with Licensor, and without limiting any other right of Licensor
hereunder, Licensee agrees that no use of the Mark will be made
in any advertising or Promotional Material without, unless and
until the same has been approved by Licensor, acting reasonably.

9.    Books and Records.

9.01 Licensee agrees to keep accurate books of account
and records covering all transactions relating to the license
being granted herein.  Such books and records, or an accurate
copy thereof, shall be maintained at Licensee's principal place
of business.  Licensor's representatives shall have the right,
upon at least two (2) business days prior notice, to examine
and/or audit Licensee's books of account and records and all
other documents, records and material in the possession or under
the control of Licensee, with respect to the subject matter of
this Agreement, and to make copies and extracts thereof.  In the
event that any such examination or audit reveals an underpayment
by Licensee, Licensee shall immediately remit payment to Licensor

- 9 -

4bikes

in the amount of such underpayment plus interest at the rate of three percent (3%) over the prime/base rate at Licensee's bank per annum (or the highest amount permitted by law, whichever is lower) calculated from the date such payment was actually due until the date when payment is received by Licensor. Further, in the event that any such underpayment is greater than three percent (3%) for any Contract Quarter, Licensee shall reimburse Licensor for the actual costs and expenses of such audit. Such charge shall not be in lieu of or otherwise limit any rights of Licensor in the event a payment is not made by Licensee when due.

9.02 All books of account and records of Licensee covering all transactions relating to the license hereunder shall be retained and made available by Licensee for at least three (3) years after the "Expiration Date" for examination and/or audit by Licensor's representatives.

10. Indemnification.

10.01 Licensor hereby agrees, conditioned, however, upon Licensee's having been and being in compliance with all of the provisions of this Agreement, to defend, indemnify and hold harmless, Licensee and its officers, employees and agents, against any and all claims, demands, causes of action and judgments, damages, losses, costs and expenses (including reasonable attorneys' fees), but not lost profits or other consequential damages, arising solely out of Licensee being judicially restrained from making use of the Mark for Licensed Products in the Territory, as provided in this Agreement. Licensor shall not be liable to indemnify Licensee for any settlement of any such claim or suit effected without Licensor's express prior written consent.

10.02 Licensee hereby agrees to defend, indemnify and hold harmless, Licensor and its officers, employees and agents, and LEMOND individually, against any and all claims, demands, causes of action and judgments, damages, losses, costs and expenses (including reasonable attorneys' fees) arising out of the Licensee's actions and conduct, including, but not limited to claims of alleged defects in the design, material or workmanship of any Licensed Product. With respect to the foregoing indemnity, Licensee agrees to defend and hold Licensor harmless at no cost or expense to Licensor whatsoever including, but not limited to, attorneys' fees and courts costs, and Licensor shall have the right to such defense utilizing attorneys of its own selection.

11. Products Liability Insurance.

Licensee shall maintain (during the Contract Period and covering the period thereafter during which any claim might be asserted against Licensor) at its own cost and expense in full force and effect, from a reputable and qualified insurance company which provides Licensee's general insurance, product liability insurance coverage with respect to Licensed Products throughout the Territory, in customary form. Such coverage shall

- 10 -

be in an amount not less than Two Million Dollars ($2,000,000) basic product liability coverage (plus Licensee's current umbrella coverage). Such insurance shall be for the benefit of and shall include Licensee, Licensor and their affiliated entities, as named insureds, including officers and directors of each entity, and shall provide for at least ten (10) days' prior written notice to Licensor and Licensee from the insurer in the event of any proposed modification, cancellation or termination thereof. Licensee shall furnish to Licensor evidence of the maintenance of the insurance as above required. Notwithstanding the foregoing, in the event Licensee determines to eliminate product liability insurance from its corporate insurance portfolio and not replace it with comparable coverage (similarly applicable to Licensor, LEMOND, etc. as aforesaid), before doing so it shall consult with Licensor in advance thereof and provide Licensor, LEMOND, etc. as aforesaid, with alternative protection reasonably satisfactory to Licensor, as the parties shall mutually agree.

### 12. Sales Obligations and Right of Termination.

12.01 <u>Minimum Sales Obligations and Termination</u>: Licensee shall have the obligation to achieve a minimum aggregate of Net Sales ("Minimum Sales") in each Contract Year commencing with the third Contract Year during the Lock Term, of an annual average of Four Million Dollars ($4,000,000), and in each Contract Year after the Lock Term, a sum equal to the annual average of the total Minimum Sales effected during the immediately preceding three (3) Contract Years.

12.02 The failure of Licensee to reach the Minimum Sales in any Contract Year after the Lock Term shall give the Licensor the right to terminate this Agreement on one hundred eighty (180) days notice.

### 13. Expiration or Termination.

13.01 Licensor shall have the right to terminate this Agreement by giving written notice to Licensee if Licensee does any of the following:

13.01.01 takes any action which damages or has an adverse impact upon the Licensor, the Licensor's business or goodwill, any Licensed Product or the Mark;

13.01.02 fails to make payment of any Earned Royalty or Minimum Royalty, or to make any other payment accruing hereunder when due (it being understood that any late payment shall be accompanied with interest as provided in this Agreement), or fails to make timely submission of statements when due;

13.01.03 avails itself, or is made the subject (and does not have the same bonded or vacated within thirty days), of any creditor relief statute or procedure;

- 11 -

13.01.04 breaches any other material provision of this Agreement and fails to cure such breach within fifteen (15) days after notice thereof; or

13.01.05 breaches any other agreement between the parties, and fails to cure the same within any applicable cure period, or in the event any such other agreement is otherwise canceled or terminated.

13.02 Licensee shall have the right to terminate this Agreement by giving written notice to Licensor if Licensor or LEMOND does any of the following:

13.02.01 takes any action which damages or has an adverse impact upon the Licensee or the Licensee's business or goodwill, or if LEMOND is convicted of a felony involving moral turpitude or gross dishonesty;

13.02.02 avails itself, or is made the subject (and does not have the same bonded or vacated within thirty days), of any creditor relief statute or procedure;

13.02.03 breaches any other material provision of this Agreement and fails to cure such breach within thirty (30) days after notice thereof; or

13.02.04 breaches any other agreement between the parties, and fails to cure the same within any applicable cure period, or in the event any such other agreement is otherwise canceled or terminated.

13.03 The right of each party to terminate this Agreement for default as provided above, shall be without prejudice to any other rights it may have against the other party and such termination shall not operate to release the breaching party from any liability for damages and expenses (including reasonable attorneys' fees) incurred by the non-breaching party arising as a result of the event of default which formed the basis for such termination.

14. <u>Post-Termination and Expiration Rights and Obligations</u>.

From and after the Expiration Date or the earlier termination of this Agreement, if applicable, all of the rights of Licensee to the use of the Mark and any reference to the name or trade name "LEMOND" in any manner, shall cease absolutely and Licensee shall not thereafter use the same.

15. <u>Final Statement Upon Termination or Expiration</u>.

Within thirty (30) days after the Expiration Date or earlier termination of the Contract Period, as the case may be, Licensee shall deliver to Licensor a statement indicating the number and description of the Licensed Products which it had on hand or in the process of manufacturing as of the Expiration Date or termination date. Licensee shall dispose of such inventory

- 12 -

LCI 03606
CONFIDENTIAL

only as herein provided or in such manner as Licensor shall
expressly approve in writing. Licensor shall have the option of
conducting a physical inventory upon at least two (2) days prior
notice to Licensee, at any reasonable time in order to ascertain
or verify such statement.

16. Certain Conditions.

16.01 If Licensor or LEMOND cancels a previously
scheduled engagement hereunder, Licensor will cooperate with
Licensee, to the fullest extent reasonably possible, and as the
exclusive remedy of Licensor, to reschedule such engagement at
the earliest available time thereafter.

16.02 Licensee shall arrange all of the services of
LEMOND at its sole cost and expense, and shall provide Licensor
and LEMOND with an itinerary for any appearances and traveling
not less than twenty (20) days prior to any scheduled appearance
(except as the parties may otherwise agree, on a case by case
basis). Each engagement hereunder, where applicable, shall be in
accordance with and be subject to the regulations of any
applicable union, guild or collective bargaining unit to which
LEMOND may belong, and to the terms and conditions of any appli-
cable union, guild or collective bargaining agreements, and
Licensee shall pay any additional fees, costs, dues and expenses
which may arise with respect to such engagements.

16.03 Licensor shall cause LEMOND to render his
services hereunder in a professional and conscientious manner.
Licensee shall use its best efforts to forward, or cause to be
forwarded, unopened, to Licensor, all correspondence addressed to
LEMOND and received by Licensee and/or its advertising agency.

17. Assignment.

Licensee may not sublicense or assign any of its rights
or delegate any of its duties under this Agreement without the
express prior written approval of Licensor, except to Guarantor,
or a corporate subsidiary or affiliate of Guarantor. A change of
control or a transfer of shares of Licensee shall be deemed such
an assignment.

18. Representations and Warranties of Licensor.

Licensor represents and warrants that:

18.01 Licensor has the right, power and authority to
enter into this Agreement and to grant to Licensee the rights and
license granted hereby, except only as hereinbelow set forth;

18.02 Licensor is duly organized and validly existing
corporation, in good standing in Minnesota;

18.03 The performance by Licensor or LEMOND of any of
the terms and conditions of this Agreement on its or his part to
be performed does not and will not constitute a breach or

- 13 -

LCI 03607
CONFIDENTIAL

violation of any judgment, decree or order or any agreement or understanding, written or oral, to which it or he is a party or by which it or he is bound;

18.04 There are no adverse proceedings, claims or actions pending or threatened against Licensor or LEMOND which would impair or adversely affect Licensor's ability to perform and comply with all terms, conditions and provisions contained in this Agreement, or jeopardize Licensee's rights under this Agreement;

18.05 Neither Licensor nor LEMOND has granted any rights in or under the Mark or to the name LEMOND in the Territory to any third party inconsistent with the rights granted to Licensee hereunder.

18.06 Licensor has all rights in and to the Mark in the United States. No representation is made as to any rights in the Mark in other jurisdictions in the Territory, except as expressly set forth in Paragraph 18.05.

19. <u>Representations and Warranties of Licensee</u>.

Licensee, for itself and Guarantor, represents and warrants that:

19.01 The execution and delivery of this Agreement and the performance of the transactions contemplated hereby have been duly authorized by all appropriate corporate action;

19.02 The performance by Licensee of any of the terms and conditions of this Agreement on its part to be performed does not and will not constitute a breach or violation of any judgment, decree or order or any agreement or understanding, written or oral, to which it is a party or by which it is bound;

19.03 Licensee and Guarantor are duly organized and validly existing corporations, in good standing in Wisconsin; and Guarantor is the owner of all of the issued and outstanding shares of Licensee;

19.04 There are no adverse proceedings, claims or actions pending or threatened against Licensee which would impair or adversely affect Licensee's ability to perform and comply with all terms, conditions and provisions contained in this Agreement, or jeopardize Licensor's rights in the Mark;

19.05 Licensee has the right, power and authority to enter into this Agreement and receive the rights and license granted hereby, and Guarantor has the right, power and authority to guaranty all of the obligations of Licensee under this Agreement;

19.06 Licensee has sufficient net worth and operating capital, and is in otherwise adequate financial condition, to

- 14 -

LCI 03608
CONFIDENTIAL

duly perform its obligations under and carry out the intentions of this Agreement.

20. Confidential Information.

Each party shall maintain in confidence all information which may be furnished to it, by or on behalf of the other party in connection with this Agreement and which is identified as confidential by such other party at the time such information is so furnished. Each party's commitment hereunder with respect to confidential information of the other party shall not apply to any part of such confidential information of the other party which:

20.01 was known to the receiving party prior to disclosure by the other party;

20.02 was known or available to the public prior to disclosure by the other party;

20.03 becomes known or available to the public subsequent to disclosure by the other party through no wrongful act of the party receiving the confidential information. Either party shall be permitted to disclose such confidential information to the extent required by applicable laws and regulations, or pursuant to a court order.

21. Relationship of Parties.

Nothing herein contained shall create any association, partnership, joint venture, or the relationship of principal and agent between the parties hereto, and neither party shall have authority to bind the other or the other's representatives in any way. Any and all obligations incurred by Licensee in connection with the manufacture, distribution, promotion, advertising and sale of Licensed Products and use of the Mark and any other right granted hereby shall be solely at Licensee's own risk and Licensor shall not be liable in any way, except as otherwise expressly provided herein.

22. Notices.

Any notice under this Agreement, including any statement required to be delivered by Licensee to Licensor, or approval requested of Licensor, must be in writing and shall be considered given when delivered personally or sent by confirmed telecopier to the party for which intended, in each event at the following addresses or telecopy numbers (or at such address or numbers as either party may specify by notice to the other hereunder):

> To Licensor:
> 3000 Willow Drive,
> Medina, Minnesota 55340
> Telecopier No.: (612) 478-6073

LCI 03609
CONFIDENTIAL

with copy to:
Wolf Haldenstein Adler Freeman & Herz LLP
270 Madison Avenue
New York, NY 10016
Attn: Sidney D. Bluming, Esq.
Telecopier No.: (212) 686-0114

To Licensee:
801 West Madison Street,
P.O. Box 183
Waterloo, WI 53594
Telecopier No.: (414) 478-2774
Attn: Mr. John Burke

with copies to:
Intrepid Corporation
N14 W23833 Stone Ridge Drive, Suite #250
Waukesha, WI 53188
Telecopier No.: (414) 523-0700
Attn: Mr. Dick Burke

and:
Sherwin C. Peltin, Esq.
Weiss, Berzowski, Brady & Donahue
700 North Water Street #1500
Milwaukee, WI 53202
Telecopier No.: (414) 276-0458

### 23. Modification; Waiver; Remedies Not Exclusive.

No waiver of any performance obligation or of any
default, breach or violation of any of the obligations shall be
considered a continuing waiver or a waiver of any other or
subsequent performance obligation, default, breach or violation.
No delay or omission in enforcing any right or pursuing any
remedy provided herein shall be construed as a waiver of such
right or remedy. Any waiver of any provision of this Agreement
must be in writing and signed by the party or parties making such
a waiver. No enforcement of any right or pursuit of any remedy
shall be deemed an election of remedies or be held to exhaust any
such right or remedy, and every such right may be enforced and
every such remedy may be pursued from time to time.

### 24. Agents and Brokers.

Licensee and Licensor represent to each other and agree
that there have not been and there are no agents or brokers
involved in bringing about this Agreement or in the negotiation
thereof.

### 25. Binding Agreement.

This Agreement shall be binding upon and inure to the
benefit of Licensee and Licensor and their respective legal

LCI 03610
CONFIDENTIAL

representatives, successors and permitted assigns.

### 26. Entire Agreement.

This Agreement, together with the exhibits hereto constitutes the sole and entire agreement between Licensor and Licensee with respect to the subject matter hereof and supersedes all other or prior agreements except as otherwise expressly set forth herein. There are and have been no representations or agreements except as herein set forth. This Agreement may not be amended, discharged or terminated orally; any amendment, discharge or termination, and any consent, approval or designation (except as otherwise provided in this Agreement) must be in writing, duly executed by the party against which enforcement is sought.

### 27. Severability of Provisions.

If any provision of this Agreement or the application thereof to any person or circumstance shall to any extent be held invalid or unenforceable, in whole or in part, the remainder of this Agreement, or such provision, or the application thereof to persons or circumstances other than those as to which it is held to be invalid or unenforceable, shall not be affected thereby, and each provision hereof shall be valid and enforceable to the fullest extent permitted by law.

### 28. Paragraph Headings.

The headings of the paragraphs herein are for the convenience of the parties only and are not to be considered part of this Agreement in construing the same.

### 29. Survival of Provisions.

Following termination of this Agreement, the provisions of this Agreement shall survive to the fullest extent necessary to allow the parties to enforce all of their respective rights and remedies.

### 30. Settlement of Prior Litigation.

In connection with the settlement by LEMOND of his litigation with Renegade Sports, Ltd. and CKKG, Inc. d/b/a Clark Kent Bicycles, Licensee and Licensor undertake and agree as follows:

30.01    Licensee shall pay Licensor the additional sum of One Hundred Thirty Five Thousand Dollars ($135,000), of which Fifty Thousand Dollars ($50,000) has heretofore been paid. The balance thereof, of Eighty Five Thousand Dollars ($85,000), shall be paid upon execution hereof;

- 17 -

LCI 03611
CONFIDENTIAL

30.02    Licensee shall purchase from Renegade Sports, Ltd. the inventory of one hundred one (101) frames, as set forth on Exhibit "30.03" attached, for a total of Sixty One Thousand Three Hundred Seventy Nine Dollars Five Cents ($61,379.05), which shall be paid directly to Renegade Sports, Ltd. promptly after receipt of invoice and inspection; it shall allow LEMOND to purchase up to ten (10) of such frames from it at the price paid therefor;

30.03    Licensee shall assume all warranty coverage required for bicycles heretofore sold in association with the LEMOND name and/or trademark (i.e., not manufactured by Licensee); provided, however, that Licensee shall charge against sums due Licensor hereunder fifty percent (50%) of its frame manufacturing cost (i.e., $125) as to each frame replaced thereunder; and

30.04    LEMOND maintains product liability insurance, and will cause Licensee and Guarantor to be named as covered insureds thereunder.

31.  <u>Outside Activities</u>.

At any time when LEMOND and/or Licensor becomes involved in a commercial way with a promotional project (such as consulting with a racing team, etc.), LEMOND will use reasonable efforts to provide Licensee with the opportunity to have Licensed Products utilized.  Neither LEMOND nor Licensor shall consent to or authorize in any way any association of LEMOND or the Marks with any Products other than Licensed Products, but Licensor acknowledges that they cannot control third party operations.

IN WITNESS WHEREOF,  the parties have caused this Agreement to be executed as of the date first above written.

LEMOND CYCLING, INC.

By: _____

TREK BICYCLE, CORP.

By: _____

LCI 03612
CONFIDENTIAL

LEMOND CYCLING, INC.

LICENSEE: TREK BICYCLE, CORP.

EXHIBIT 1.02

ADDITIONAL COUNTRIES TO BE INCLUDED IN THE TERRITORY AS OF THE
DATE OF THE WITHIN AGREEMENT:

ARGENTINA
ARUBA
AUSTRALIA
BAHRAIN
BERMUDA
BOLIVIA
BRAZIL
CANADA
CANARY ISLANDS
CHILE
COLOMBIA
COSTA RICA
CYPRUS
CZECH REPUBLIC
ECUADOR
EGYPT
EL SALVADOR
FINLAND
GUATEMALA
HONG KONG
HUNGARY
ICELAND
INDONESIA
IRELAND
ISRAEL
ITALY
JORDAN
KUWAIT
MEXICO
NEW CALEDONIA
NEW ZEALAND
NORWAY
OMAN
PANAMA
PERU
POLAND
PORTUGAL
PUERTO RICO
RUSSIA
SINGAPORE
SLOVENIA

SOUTH AFRICA
TAHITI
THAILAND
TURKEY
URUGUAY
VENEZUELA
WEST INDIES

AUSTRIA
BELGIUM
DENMARK
FRANCE
GERMANY
JAPAN
LUXEMBOURG
NETHERLANDS
SPAIN
SWEDEN
SWITZERLAND
UNITED KINGDOM

- 19 -

LCI 03613
CONFIDENTIAL

# LEMOND CYCLING, INC.

## LICENSEE: TREK BICYCLE, CORP.

## PRODUCT CATEGORY: BICYCLES AND FRAMES

### REPORT OF NET SALES AND ROYALTIES

PERIOD: FROM _____ TO _____

GROSS SHIPMENTS TO **RETAILERS**:    $_____ *

RETURNS    $_____

CASH DISCOUNTS    _____

TOTAL DEDUCTIONS    _____

NET **BASIC** SALES    $_____

SALES ROYALTY   3% x   $_____ = $_____

GROSS SHIPMENTS TO **DISTRIBUTORS**:    $_____ *

RETURNS    $_____

CASH DISCOUNTS    _____

TOTAL DEDUCTIONS    _____

NET **DISTRIBUTOR** SALES    $_____

SALES ROYALTY   2% x   $_____
SALES ROYALTY   3% x   $_____

    TOTAL DISTRIBUTOR SALES ROYALTY   = $_____

TOTAL ROYALTIES, RETAIL AND DISTRIBUTOR   = _____

LESS:

MINIMUM GUARANTY PAID TO DATE FOR YEAR   = _____

EARNED ROYALTY PAID TO DATE FOR YEAR   = $_____

    NET ROYALTY DUE   = $_____

\* ATTACHED IS SCHEDULE OF LICENSED PRODUCTS BY CATEGORY AND ITEM
AND/OR STYLE NUMBER, SHOWING INVOICED PRICE THEREFOR, AND TOTAL
UNITS SOLD AND GROSS SALES THEREOF, BY COUNTRY. IF THIS STATEMENT
IS FOR FOURTH CONTRACT QUARTER, IT SHALL REPORT FOR FULL CONTRACT
YEAR.

### EXHIBIT "3.03"

LCI 03614
CONFIDENTIAL

## CERTIFICATION

The undersigned,                    , chief financial officer of
TREK BICYCLE, CORP., does hereby certify this report as correct
and accurate in all respects as of _____, 199 , and otherwise
according to the books and records of TREK BICYCLE, CORP., which
have been maintained in accordance with generally acceptable
accounting principles, consistently applied.

_____

**EXHIBIT "3.03"**
CONT'D

LCI 03615
CONFIDENTIAL

<u>LEMOND CYCLING, INC.</u>

LICENSEE: TREK BICYCLE, CORP.

INVENTORY OF FRAMES TO BE ACQUIRED FROM RENEGADE SPORTS, LTD. ATTACHED HERETO, CONSISTING OF 101 FRAMES AT A TOTAL COST OF $61,379.05.

**EXHIBIT "30.03"**

LCI 03616
CONFIDENTIAL

## GUARANTIES

The undersigned corporation, INTREPID CORPORATION, of N14 W23833 Stone Ridge Drive, Suite #250, Waukesha, WI 53188, does hereby affirm and certify the accuracy of the representations and warranties made by Licensee in the foregoing Sublicense Agreement with LEMOND CYCLING, INC., dated June , 1995, and guarantees to Mr. LeMond the due and timely performance by Licensee of each and every obligation, covenant, undertaking and agreement of Licensee thereunder.  The undersigned expressly agrees to the provisions of said Agreement including, but not limited, paragraphs 2.04, 21, 28 and 29.  The undersigned acknowledges that the execution and delivery of this Guaranty is an inducement to and is being relied upon by LEMOND CYCLING, INC. and Mr. Greg LeMond, in causing them to execute and deliver the within Sublicense Agreement.

Dated: As of June 29, 1995

INTREPID CORPORATION

BY: _Ral Burke_

\*   \*   \*   \*   \*   \*   \*

The undersigned, GREG LEMOND, of 3000 Willow Drive, Medina, Minnesota 55340, does hereby affirm and undertake and agree, that I will personally perform all services require to be provided by the Licensor in the within Sublicense Agreement, and will cooperate in all reasonable respects, including consenting to applications to trademark registrations, in connection with the registration and enforcement of the Mark.  He does also affirm all representations and warranties made by Licensor in Paragraph 18 of the Sublicense Agreement.

As of June 29, 1995

_Greg LeMond_
Greg LeMond

- 23 -

LCI 03617
CONFIDENTIAL