```
 1              UNITED STATES DISTRICT COURT
 2                  DISTRICT OF MINNESOTA
 3  ------------------------------------------------
 4  LeMOND CYCLING, INC.,
                Plaintiff,
 5
                vs.                Case No. 08-1010
 6
    TREK BICYCLE CORPORATION,
 7
                Defendant/Third-Party
 8              Plaintiff,
 9              vs.
10  GREG LeMOND,
11              Third-Party Defendant.
12  ------------------------------------------------
13
14
15        Video Deposition of JOHN BURKE
16           Tuesday, April 7, 2009
17
18                  9:31 a.m.
                       at
19
              GASS WEBER MULLINS, LLC
20       309 North Water Street, Suite 700
            Milwaukee, Wisconsin  53202
21
22
        Reported by Julie K. Lyle, RPR/RMR/CRR
23
24
25
```



1    A    Yes.

2    Q    And did -- and did you discuss how you intended

3         to publicly announce the termination of the

4         LeMond brand with counsel?

5             MR. WEBER: I instruct you not to

6         answer. The subject matter of discussions with

7         counsel is within the scope of the privilege.

8             MR. MADEL: Even though those

9         communications were specifically thought to be

10        made public?

11            MR. WEBER: My objection and

12        instruction stand.

13            MR. MADEL: Okay.

14 BY MR. MADEL:

15    Q    Did you discuss your decision to have this

16        presentation with any executives at Trek?

17    A    Yes.

18    Q    Who?

19    A    To my -- to the best of my knowledge, I can't

20        recall that. We did hire a public relations firm

21        and so that was, I'm sure, discussed in those

22        meetings.

23    Q    What was the name of the public relations firm?

24    A    Public Strategies.

25    Q    Where are they located?

| | | |
|---|---|---|
| 1 | Q | Dan Bartlett who was part of the communications |
| 2 | | team for the George W. Bush White House? |
| 3 | A | That's true. |
| 4 | Q | The Public Strategies relationship was presumably |
| 5 | | led by one person; is that right? |
| 6 | A | No. |
| 7 | Q | No. There wasn't one relationship manager or one |
| 8 | | specific contact? |
| 9 | A | Well, if there is, I think you would probably say |
| 10 | | that it was Bill Colleti. |
| 11 | Q | Was Mr. Colleti the person that you communicated |
| 12 | | with the most? |
| 13 | A | Yes. |
| 14 | Q | What -- what did you ask the Public Strategies |
| 15 | | team to do? |
| 16 | A | I think what we asked the Public Strategies team |
| 17 | | to do is here's the decision that has been made, |
| 18 | | this is -- how should we best communicate it. |
| 19 | | We're not communication professionals, and we |
| 20 | | want to make sure that the story was properly |
| 21 | | presented. |
| 22 | Q | When you say "the story," do you mean Trek's side |
| 23 | | of the story? |
| 24 | A | I would call it the story. |
| 25 | Q | Okay. So do you believe that in that |



```
 1    my journal that I reviewed yesterday, and in it
 2    it says, quote -- it was a conversation between
 3    Greg and I, and it says, "What you're telling me
 4    is the same thing that Sid," his lawyer in New
 5    York, "and my lawyer in Minnesota is telling me
 6    to do."
 7              And if you go back, time and time
 8    again, everybody was telling Greg the same thing
 9    and he would do something else.  And I would
10    consider some of those episodes to be idiotic.  I
11    do not consider Greg to be an idiot.
12  Q How many meetings did you have with Public
13    Strategies?
14  A I would guess -- I do not recollect the exact
15    amount.  I would probably say four or five.
16  Q Were these in person?
17  A Yes.
18  Q Did they travel to Trek or did you travel to
19    Austin?
20  A They traveled to Trek.
21  Q And what was discussed at these meetings?
22  A Well, it was --
23              MR. WEBER:  Just a second.  Insofar as
24    the meetings included counsel, instruct you not
25    to answer as they're within the attorney-client
```

```
 1        privilege.  If you had meetings with Public
 2        Strategies outside the presence of counsel, you
 3        can answer.
 4   BY MR. MADEL:
 5   Q    Well, let's -- let's break it up then.
 6   A    Okay.  Okay.
 7   Q    Do you recall who was at meeting one?
 8   A    No.
 9   Q    Do you recall who was at meeting two?
10   A    Well, can I ask you a question?
11   Q    Sure.
12   A    I can recall some of the people at the meeting.
13   Q    Okay.
14   A    And I would also say that I think counsel was at
15        every meeting.
16   Q    Okay.  Whose -- what counsel was at every
17        meeting?
18   A    Bob Burns.
19   Q    Was Mr. Burns providing you legal advice at each
20        one of these meetings?
21   A    I would say yes.
22   Q    And each one of these meetings, the purpose of
23        the meeting was devising the message that was
24        going to be delivered at the presentation?
25   A    No.  There were -- it was --
```

```
 1              MR. WEBER:  Hold on just a second.
 2                    Instruct you not to answer insofar
 3      as, in so doing, he's going to be disclosing
 4      attorney-client privileged information, including
 5      discussions with counsel as to legal strategy.
 6                    So instruct you not to answer.
 7  BY MR. MADEL:
 8  Q   Can you answer the question without revealing
 9      attorney-client information?
10  A   I don't think I can because Bob was at all the
11      meetings.
12  Q   Well, I'm asking you what the purpose of the
13      meetings were.
14  A   And the purpose of the meetings was to put
15      together what the message would be and how the
16      message would be delivered.
17  Q   And the message was going to be delivered at that
18      April 8, 2008, presentation?
19  A   It was delivered in a number of ways.  That was
20      one of the ways.
21  Q   What were the other ways?
22  A   Letter to employees, letter to dealers, things
23      like that.
24  Q   Press release?
25  A   Sure.
```



```
 1   Q    Is the --
 2   A    You must -- you must -- it -- you must
 3        understand, in the context, we were served with a
 4        lawsuit ten days -- somewhere around ten days
 5        after my father's death.  All right?  We were --
 6        same type of lawsuit we were given in 2004.  All
 7        right?
 8             It was a lawsuit that we found to
 9        be threatening, and we wanted to make sure that
10        we were organized in how we put our message out.
11   Q    What did Trek do to Mr. LeMond within seven days
12        of his mother's death?
13   A    I don't know.  I -- to be honest with you, I
14        didn't even know that his mother had died.
15   Q    And did Mr. LeMond send you a note of condolence
16        after your father passed away?
17   A    I believe that he did.
18             (Exhibit 135 was marked for
19        identification.)
20   BY MR. MADEL:
21   Q    Exhibit 135 is a letter from Loren Brown, on
22        behalf of Trek, to Mr. LeMond dated August 10,
23        2004, right?
24   A    It is.
25   Q    And the first two paragraphs say, "My firm
```

| | | |
|---|---|---|
| 1 | Q | So you don't know that for certain?  What your |
| 2 | | knowledge is regarding LeMond turning off his |
| 3 | | website came from Mr. Burns? |
| 4 | A | That's correct. |
| 5 | Q | In addition to Trek employees and the media, was |
| 6 | | anybody else invited to your April 8, 2008, |
| 7 | | presentation? |
| 8 | A | Not to my knowledge. |
| 9 | Q | Were dealers invited? |
| 10 | A | Not to my knowledge. |
| 11 | Q | Did any dealers attend? |
| 12 | A | Not to my knowledge.  If there would have been a |
| 13 | | dealer meeting there, perhaps some dealers might |
| 14 | | have been in the audience, but I'm not aware that |
| 15 | | there was.  I'm sure we could get you that |
| 16 | | information. |
| 17 | Q | Does a video of your presentation still exist on |
| 18 | | YouTube today? |
| 19 | A | I do not know. |
| 20 | Q | All right. |
| 21 | A | I haven't checked. |
| 22 | Q | Did you ever discuss the fact that your |
| 23 | | presentation was going to be videotaped and |
| 24 | | posted on YouTube? |
| 25 | A | We did. |

1  Q    Okay.  When was that discussed?
2  A    Probably at one of the meetings.
3  Q    With Public Strategies?
4  A    Yes.
5  Q    And you approved that decision?
6  A    I did.
7  Q    And does it surprise you to know that it's still
8       on there today?
9  A    No.  Things on YouTube, I think, stay -- I mean,
10      that's not something we control.  They stay on
11      there for however long.
12 Q    And you know that the Trek website links to
13      YouTube in order to show that presentation today?
14 A    I'm not aware of that.
15 Q    Is -- is that something that you approve of?
16 A    I approve of the presentation, so yes.  I'm
17      surprised that it's still on there.  I don't
18      think it's a current topic.
19 Q    And you know that the Trek -- Trek website links
20      to LeMond's complaint as well as Trek's complaint
21      in this lawsuit?
22 A    Yes.  I think -- I think one of the important
23      things is we kept, time and time again, trying to
24      solve this -- fix this relationship.
25                As I said before, I'm an

1                 If there's a different point of
2    view that Greg has, that's Greg's responsibility
3    to get that message out.  Greg talks to the press
4    quite often, and I'm not responsible for Greg
5    getting his message out.
6  Q  Did you -- well, strike that.
7                 Do you see any responsibility on
8    behalf of Trek today in order to tell the whole
9    story with respect to the LeMond relationship as
10   opposed to just your side of the story?
11 A  No.  It's -- it is our responsibility to tell the
12   story from our point of view.  Do I stand behind
13   this story and the accuracy of this story?
14   Absolutely.
15              (Exhibit 138 was marked for
16   identification.)
17 BY MR. MADEL:
18 Q  What is Exhibit 138?
19 A  Exhibit 138 is a letter dated April 9th, 2008, to
20   me from Jeff Jones.
21 Q  And in this letter, Mr. Jones says, "I have read
22   through your website, both Trek's complaint and
23   Mr. LeMond's complaint regarding your dispute.
24   As an avid cyclist and fan of cycling, I can't
25   disagree with your position more."

```
 1  A    This is an e-mail from Reid, and I cannot
 2       pronounce his last name, N-E-U-R-E-I-T-E-R, dated
 3       April 9th, 2008.
 4  Q    I'm going to go with Neureiter.
 5  A    Okay.
 6  Q    Mr. Neureiter wrote, "I'm extremely disappointed
 7       at Trek's decision to terminate its relationship
 8       with Greg LeMond.  Mr. LeMond is a hero of mine
 9       and many others."
10                 And he then asks, in the
11       second-to-the-last -- or third-to-the-last
12       sentence here, "Why on earth would Trek continue
13       to support an athlete who, in his role of patron
14       of the tour, chased down and publicly punished
15       one of the few active cyclists to speak publicly
16       about Michele Ferrari and doping in sport?"
17                 Do you see that?
18  A    I do.
19  Q    Do you know who Michele Ferrari is?
20  A    Yes.
21  Q    Who -- who's Michele Ferrari?
22  A    Well, I don't think it's Michele.  I think that's
23       the wrong pronunciation.  I think it's a doctor,
24       sports medicine doctor in Italy.
25  Q    And do you know if he was ever convicted by the
```