CASE TYPE: CONTRACT

STATE OF MINNESOTA             DISTRICT COURT

COUNTY OF HENNEPIN          FOURTH JUDICIAL DISTRICT

---

LeMond Cycling, Inc.,

                     Plaintiff,

vs.

Trek Bicycle Corporation,

                     Defendant.

Case No. _____

**COMPLAINT**

**JURY TRIAL DEMANDED**

---

Plaintiff LeMond Cycling, Inc. ("LeMond Cycling"), for its Complaint against Defendant Trek Bicycle Corporation ("Trek"), states and alleges as follows:

## INTRODUCTION

1. LeMond Cycling is a Minnesota corporation founded by Greg LeMond. Mr. LeMond is a world-famous champion bicycle racer who won the prestigious Tour de France in 1986, 1989, and 1990. Mr. LeMond founded LeMond Cycling for two primary purposes: designing high-end bicycles and licensing various trademarks associated with his name.

2. In June 1995, LeMond Cycling entered into a Sublicense Agreement ("Agreement") with Trek. This Agreement, among other things, generally permits Trek to use Mr. LeMond's name in connection with the sale of Trek bicycles. A section in the Agreement allows Trek to terminate the Agreement before the primary term expires if LeMond Cycling or Mr. LeMond "takes any action which damages or has an adverse impact upon [Trek] or [Trek's]

business or goodwill," or if Mr. LeMond were to be "convicted of a felony involving moral turpitude or gross dishonesty."

3.  In July 2001, Mr. LeMond responded to certain questions by a reporter regarding the association between American cyclist Lance Armstrong, who has a business relationship with Trek, and Dr. Michele Ferrari, an Italian doctor convicted in 2004 of sporting fraud and abuse of the medical profession. Among other things, Mr. LeMond noted that he was "devastated" to learn of Mr. Armstrong's involvement with Dr. Ferrari. Mr. LeMond further made the unremarkable observation that if Mr. Armstrong was innocent of doping, his career represented the greatest comeback in the history of sport, and if Mr. Armstrong was not innocent of doping, his comeback represented the greatest fraud in the history of sport. Mr. LeMond's statements were generally repeated in a book published in 2004 entitled *L.A. Confidentiel: Les Secrets de Lance Armstrong*, and he made other related statements regarding Dr. Ferrari and Mr. Armstrong in response to questions from reporters regarding *L.A. Confidentiel*.

4.  Although Trek does not claim that Mr. LeMond lied or defamed Mr. Armstrong in any way, Trek now claims that Mr. LeMond's statements regarding Mr. Armstrong constitute a breach of the LeMond Cycling/Trek Agreement. And while Trek has informed LeMond Cycling that it was not immediately terminating the Agreement, Trek has effectively placed Mr. LeMond in limbo through its assertions and actions.

5.  Neither Mr. LeMond nor LeMond Cycling has taken any action that damaged, or had an adverse impact upon, Trek, Trek's business, or Trek's goodwill. Indeed, Trek has failed to provide LeMond Cycling with *any* evidence indicating *any* negative material impact caused by Mr. LeMond's factually-accurate statements. Furthermore, and upon information and belief,

2

Trek's sales of LeMond-related bicycles in the United States increased from Trek's fiscal year 2001 to 2002 (*i.e.*, approximately the year after Mr. LeMond made his 2001 statements), and increased from Trek's fiscal year 2003 to 2004.

6. Mr. LeMond was also public about his anti-doping stance before Trek extended his contract in August 1999. For example, in a July 1998 interview, Mr. LeMond stated that the doping scandal that engulfed the 1998 Tour de France was "the best thing that's happened in cycling... The worst would be for drugs to stay on the back side and nobody doing anything about it." And in January 1999, Mr. LeMond stated:

> For years now doping has been a problem in sport. But in the 1980's when I raced there was a lot of suspicion cast on individuals thought to be cheating, but not on entire teams organizing doping systematically. It's such a shame, a terrible thing for the Tour de France and sports in general. But it's a good thing it came out into the open.

7. It is thus hypocritical and duplicitous for Trek to now claim that Mr. LeMond's well-known anti-doping stance somehow harmed it.

8. Upon information and belief, Trek's notification of LeMond Cycling's breach of the Agreement and Trek's efforts to restrict Mr. LeMond's ability to comment on the subject of doping are the result of pressure from one or more third parties. Indeed, Trek's representatives have characterized Trek as "in the middle" of an alleged dispute between Mr. LeMond and Mr. Armstrong.

**PARTIES**

9. LeMond Cycling is a Minnesota corporation with its principal place of business in Wayzata, Minnesota. Mr. LeMond himself is domiciled in Hennepin County, Minnesota.

Word 20116387.1

10. Trek is a Wisconsin corporation with offices at 801 West Madison Street, Waterloo, Wisconsin 53594. Trek manufactures and sells bicycles and bicycle accessories throughout the United States, including the State of Minnesota.

## JURISDICTION AND VENUE

11. This action arises under the Minnesota Declaratory Judgment Act, Minn. Stat. § 555.01 *et. seq*, as well as the common law of Minnesota.

12. Venue is proper within this judicial district pursuant to Minn. Stat. § 542.01 *et. seq*.

## JURY TRIAL DEMAND

13. LeMond Cycling demands a jury trial on all counts so triable.

## FACTS

### I. THE AGREEMENT BETWEEN LEMOND CYCLING AND TREK

14. On June 29, 1995, LeMond Cycling and Trek entered into a "Sublicense Agreement" ("Agreement") that allowed Trek to use the name and trademark "Greg LeMond Cycles" and other similar trademarks incorporating the name "Greg LeMond" on which the parties would mutually agree. Trek entered into this Agreement because Mr. LeMond's name has "acquired a reputation for a high standard for quality." Trek wanted to use his name for the purpose of marketing its bicycles and bicycle frames.

15. Also on June 29, 1995, LeMond Cycling and Trek entered into a separate agreement for certain cycling-related products (the "TCG Agreement").

16. In August 1999, LeMond Cycling and Trek terminated the TCG Agreement for business reasons and at the same time entered into an amendment of the Agreement, pursuant to

which, among other things, the "Primary Term" of the Agreement was extended to September 30, 2010.

17. Section 5.02 of the Agreement obligates Trek to use its "best efforts" to exploit LeMond Cycling's trademarks and to promote the sale of Trek's products bearing any part of LeMond Cycling's trademarks "so as to try to maximize sales, consistent with the quality and reputation" of LeMond Cycling and Mr. LeMond.

18. Section 13.02.01 of the Agreement ("the Moral-Turpitude Section") allows Trek to terminate the Agreement before the Primary Term expires if LeMond Cycling or Mr. LeMond "takes any action which damages or has an adverse impact upon [Trek] or [Trek's] business or goodwill" or if Mr. LeMond were to be "convicted of a felony involving moral turpitude or gross dishonesty."

## II. LANCE ARMSTRONG, TREK, AND DR. MICHELE FERRARI

19. Lance Armstrong has built a veritable sports empire based on his feats as a cyclist and his recovery from cancer. Armstrong won the Tour de France in the years 1999-2004. Upon information and belief, Mr. Armstrong has a contractual relationship with Trek, pursuant to which he acts as endorser and spokesperson for Trek-branded bicycles, and Trek sponsors the professional cycling team for which Armstrong races. Trek has used Mr. Armstrong's name and image extensively in its advertising, including its website.

20. One of the key public figures in recent professional doping scandals is a Dr. Michele Ferrari, an Italian doctor. Dr. Ferrari was recently convicted in his native Italy for sporting fraud and abuse of the medical profession. "At the heart of the prosecution case is the allegation that the blood-thickness levels of Ferrari's charges varied from winter to summer,

5

coinciding with major races, and implying the possible use of EPO." William Fotheringham, *Cycling: Ferrari defends record on drugs*, The Guardian (London), Apr. 17, 2003 at 32. In addition, and upon information and belief, Dr. Ferrari corresponded with his local pharmacy with regard to a range of banned substances and received many of these substances at his home. At least one professional cyclist also provided testimony that Dr. Ferrari demonstrated to him how to use a banned substance without getting caught.

21. The substance erythropoietin ("EPO") is an endurance-boosting hormone. EPO is naturally produced in the kidney. Once released, it serves to stimulate an increase in hemoglobin, thus increasing the oxygen-carrying capacity of the blood. The *American Journal of Sports Medicine* includes references to EPO's "side effects":

> Artificially raising hemoglobin levels can have dangerous consequences. In 1987, the first year of EPO release in Europe, 5 Dutch cyclists died of unexplained reasons. Between 1997 and 2000, 18 cyclists died from stroke, myocardial infarction, or pulmonary embolism. These events have brought the drug into the forefront of discussion in endurance sport. Ramifications like these prompted the American College of Sports Medicine to take a position stand against the use of any ergogenic aid designed to artificially raise hemoglobin mass, calling them unethical and unfair, and they stated that this practice exposes the athlete to unwarranted and potentially serious health risks.

John M. Tokish, S. Mininder, and Richard J. Hawkins, *Ergogenic aids: a review of basic science, performance, side effects, and status in sports; Team Physician's Corner*, The American Journal of Sports Medicine, Sept. 1, 2004.

22. EPO is banned in professional cycling. Nevertheless, Dr. Ferrari was once quoted as stating that "EPO is no more dangerous than orange juice."

6

Word 20116387.1

23. Until Dr. Ferrari's recent conviction, Mr. Armstrong maintained a personal and professional association with Dr. Ferrari. Upon information and belief, Mr. Armstrong's professional relationship with Dr. Ferrari spanned nearly a decade, beginning as early as 1995.

24. Trek knew of Mr. Armstrong's relationship with Dr. Ferrari as early as 2001.

25. David Walsh, an award-winning sports journalist for the *Sunday Times of London*, co-authored a book entitled *L.A. Confidentiel: Le Secrets de Lance Armstrong*.

### III. TREK'S ATTEMPTS TO SILENCE MR. LEMOND

26. In July 2001, Mr. LeMond agreed to be interviewed by Mr. Walsh. After this interview, Mr. LeMond was quoted as stating:

> When Lance won the prologue to the 1999 Tour, I was in tears. When I heard he was working with Michele Ferrari, I was devastated. If Lance is clean, it is the greatest comeback in the history of sports. If he isn't, it would be the greatest fraud.

David Walsh, *Sunday Times of London*, July 29, 2001.

27. Shortly after the publication of Mr. Walsh's article in 2001, Mr. LeMond received a phone call from Mr. Armstrong. In this call, Mr. Armstrong acknowledged his use of EPO and threatened to "find" people who he could have come forward and implicate Mr. LeMond in the use of EPO unless Mr. LeMond retracted his statements. Mr. LeMond indicated to Mr. Armstrong that Mr. Armstrong could not find such people because Mr. LeMond had never used EPO, and that if such accusations surfaced, he would know that they were instigated by Mr. Armstrong.

28. After Mr. Armstrong telephoned Mr. LeMond, Trek contacted Mr. LeMond to notify him that Mr. LeMond's comments in the article upset Mr. Armstrong.

29. In the afternoon of August 13, 2001, John Burke, Trek's Chief Executive Officer, in an apparent effort to persuade Mr. LeMond to participate in efforts to appease Mr. Armstrong, said that if the situation was not taken care of, Mr. Armstrong would escalate the dispute and in graphic terms, implied that Mr. Armstrong would financially harm Mr. LeMond.

30. In the same conversation on August 13, 2001, Mr. Burke indicated that Mr. Armstrong and his agent wanted Mr. LeMond to issue a statement that had been drafted for him, and that in Mr. Burke's opinion, the draft statement allowed Mr. LeMond leeway to later claim that if Mr. Armstrong was still using performance-enhancing drugs, Mr. LeMond could remind people of his previous statements regarding Mr. Armstrong's association with Dr. Ferrari.

31. In the same conversation on August 13, 2001, Mr. Burke indicated that if Mr. LeMond did not issue a press release in a form approved by Mr. Armstrong, Mr. Armstrong would sever his relationship with Trek.

32. In a subsequent conversation on August 13, 2001, Mr. LeMond and Mr. Burke agreed that the nature of Mr. Armstrong's pressure upon Mr. LeMond and Trek constituted extortion.

33. In that same conversation on August 13, 2001, in response to Mr. LeMond's statement that people cannot threaten others, Mr. Burke told Mr. LeMond that one can threaten people over the short term.

34. In that same conversation on August 13, 2001, Mr. Burke told Mr. LeMond that he was also on the threatened list.

35. During another conversation with Mr. LeMond on August 13, 2001, Mr. Burke opined to Mr. LeMond that Dr. Ferrari was not good for Mr. Armstrong.

36. Despite concerns that Trek's ultimatum amounted to extortion, and out of concern for his business and to gratify Trek's repeated requests, among other things, Mr. LeMond eventually acquiesced to allow the release of a public statement that clarified his views regarding Dr. Ferrari.

## IV. TREK'S NOTIFICATION TO LEMOND CYCLING OF ITS ALLEGED BREACH OF THE AGREEMENT

37. Mr. LeMond's three-year old comments drew renewed focus in the summer of 2004, with the publication *L.A. Confidentiel: Les Secrets de Lance Armstrong*, which generally recounts that same quotation included in the July 2001 article referenced above. In addition, the attention created by the book's release prompted requests for follow-up interviews with Mr. LeMond, a small number of which he responded to. Numerous other individuals were interviewed as a part of the research conducted for the book and the subsequent interest it created.

38. In July 2004, Mr. LeMond was besieged with requests for interviews concerning Mr. Walsh's book. He agreed to speak to ESPN and a French newspaper, *Le Monde*, at their request. In the French newspaper, in response to questions about the phone call he had with Mr. Armstrong in 2001, Mr. LeMond was quoted as stating that "Lance is ready to do anything to keep his secret. ... I don't know how he can continue to convince everybody of his innocence." He was also quoted as stating, as he was in 2001, that "If [Lance Armstrong is] clean, it's the greatest comeback. And if he's not, then it's the greatest fraud."

9

39. In a letter dated August 10, 2004, Trek, through its attorney, wrote to LeMond Cycling and provided formal notice that Mr. LeMond's actions put LeMond Cycling in breach of the Agreement. As the basis for this alleged breach, Trek cited the above-described Moral-Turpitude Section in the Agreement.

40. Trek's notification of a breach relied in part on the arguments (1) that statements made by Mr. LeMond "harm the value of the LeMond name and trademark," which, in turn, supposedly harm Trek; (2) that Mr. LeMond made statements that constitute public accusations of doping by Mr. Armstrong; (3) that Mr. LeMond damaged Trek's "Endorsement and Spokesperson Agreement" with Mr. Armstrong; (4) that during the several weeks preceding the notice of a breach on August 10, 2004, Trek received a large number of customer and dealer complaints concerning Mr. LeMond's statements about Mr. Armstrong.

## V. MR. LEMOND HAS NOT DAMAGED TREK, TREK'S BUSINESS, OR TREK'S GOODWILL.

41. Mr. LeMond's actions have not damaged Trek, Trek's business, or its goodwill.

42. Trek has provided LeMond Cycling with no information indicating any negative material impact on Trek due to Mr. LeMond's actions.

43. Mr. LeMond's high standards and reputation in the cycling world are the reasons that Trek wanted to be in business with him. And LeMond was public about his anti-doping stance before Trek extended his contract in August 1999. For example, Mr. Lemond stated that the doping scandal that engulfed the 1998 Tour de France was "the best thing that's happened in cycling. . . . The worst would be for drugs to stay on the back side and nobody doing anything about it." Arthur Brice, *Lemond: Drug scandal is best thing to happen to cycling*, The Atlanta

10

Word 20116387.1

Journal and Constitution, Aug. 29, 1998 at 14E; *see also* Erica Bulman, *Former cyclist Greg LeMond decries recent doping scandals*, Associated Press Worldstream, Jan. 14, 1999 ("'For years now doping has been a problem in sport,' said LeMond, a three-time winner of the Tour de France. 'But in the 1980's when I raced there was a lot of suspicion cast on individuals thought to be cheating, but not on entire teams organizing doping systematically.' 'It's such a shame, a terrible thing for the Tour de France and sports in general,' said LeMond. 'But it's a good thing it came out into the open.'"); Samuel Abt, *LeMond Considers Drug Issue a Wake-Up Call*, International Herald Tribune (Neuilly-sur-Seine, France), July 30, 1998 at 18 ("'[Mr. LeMond said,] This is probably good for cycling. It's a wake-up call. I think riders will think twice now about team-influenced programs. Drugs are the sick side of sports, not just cycling but in many sports.'").

44. Cyclists' use of performance-enhancing drugs harms the sport of cycling because it injures the integrity of the sport as well as the health of the athletes.

45. Allegations regarding Mr. Armstrong's alleged involvement in doping were publicized and well known prior to the publication of the statements attributed to Mr. LeMond in 2004. Accordingly, Trek cannot prove that the statements attributed to Mr. LeMond caused some damage to Trek, Trek's business, or Trek's goodwill, as opposed to the already publicized and well-known allegations regarding Mr. Armstrong. Indeed, for example, in an article concentrating on accusations regarding American cyclist's Tyler Hamilton's alleged use of performance-enhancing drugs, *USA Today* referred to Mr. Armstrong's "constant battle with doping accusations." *Hamilton Denies Doping*, USA Today, Sept. 22, 2004 at 1C; *see also*

11

Jeremy Whittle, *Ferrari conviction leads Armstrong to cut ties with shamed doctor*, The Times (London), Oct. 2, 2004 at 31 ("Ferrari has long been one of Armstrong's main advisers.").

46. Trek has never contended that Mr. LeMond lied about Mr. Armstrong.

47. Trek has never contended that Mr. LeMond defamed Mr. Armstrong.

48. Trek has never contended that Mr. LeMond ever made any negative statements about Trek.

49. The truth cannot cause damage to Trek, Trek's business, or Trek's goodwill.

50. Mr. LeMond's comments to the press constitute an informed and honest opinion on matters of legitimate public interest. Had Mr. LeMond made no statements in response to the questions, his own reputation might well have been damaged, and if he had made any statement which was intentionally false, this dishonesty itself could possibly have constituted a breach of the Moral-Turpitude Section.

## COUNT ONE
### *Declaratory Judgment*

51. LeMond Cycling repeats and realleges each and every allegation, matter, and thing set forth in paragraphs 1-50 of this Complaint as though fully set forth herein.

52. LeMond Cycling is a "person" within the meaning of Minn. Stat. § 555.13.

53. Pursuant to the Minnesota Declaratory Judgment Act, Minn. Stat. §§ 555.01 *et seq.* (including, without limitation, Minn. Stat. §§ 555.02 and 555.03), an actual controversy exists between LeMond Cycling and Trek regarding whether LeMond Cycling breached the Agreement.

12

Word 20116387.1

54. LeMond Cycling respectfully requests that this Court enter a judgment declaring that LeMond Cycling has not breached the Agreement.

## COUNT TWO
### *Injunction*

55. LeMond Cycling repeats and realleges each and every allegation, matter, and thing set forth in paragraphs 1-54 of this Complaint as though fully set forth herein.

56. LeMond Cycling respectfully requests a temporary, preliminary, and permanent injunction maintaining the parties' existing relationship under the Agreement. Consistent with this, LeMond Cycling respectfully requests an Order enjoining Trek from taking any action that would prevent LeMond Cycling from benefiting from the specific performance of the Agreement to which it is entitled.

## PRAYER FOR RELIEF

LeMond Cycling respectfully requests that this Court:

1. enter a judgment declaring that LeMond Cycling did not breach the Agreement;

2. temporarily, preliminarily, and permanently enjoin Trek from repudiating or otherwise violating Agreement and enjoin Trek from taking any action that would prevent LeMond Cycling from benefiting from the specific performance of the Agreement to which it is entitled;

3. award LeMond Cycling its reasonable attorneys' fees pursuant to §§ 10.02 and 13.03 of the Agreement;

4. award LeMond Cycling the costs of suit; and

13

5.  award LeMond Cycling such other and further relief as the Court deems equitable.

Dated: December 8, 2004

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.

By: _____
Christopher W. Madel, #230297
Randall Tietjen #214474
Denise S. Rahne #331314

2800 LaSalle Plaza
800 LaSalle Avenue
Minneapolis, Minnesota 55402-2015
(612) 349-8500

ATTORNEYS FOR PLAINTIFF LEMOND CYCLING, INC.

14

Word 20116387.1

## ACKNOWLEDGMENT PURSUANT TO
## MINN. STAT. § 549.211, SUBD. 1

LeMond Cycling, by its undersigned attorneys, acknowledges that sanctions may be imposed under Minn. Stat. § 549.211 for violations of that section.

Dated: December 8, 2004

        ROBINS, KAPLAN, MILLER & CIRESI L.L.P.

        By: _____
        Christopher W. Madel, #230297
        Randall Tietjen #214474
        Denise S. Rahne #331314

        2800 LaSalle Plaza
        800 LaSalle Avenue
        Minneapolis, Minnesota 55402-2015
        (612) 349-8500

        ATTORNEYS FOR PLAINTIFF LEMOND
        CYCLING, INC.