# Exhibit 7

Dockets.Justia.com



```
 1              UNITED STATES DISTRICT COURT

 2                 DISTRICT OF MINNESOTA
   ---------------------------------------------------
 3
   LeMOND CYCLING, INC.,
 4
                 Plaintiff,
 5
                 vs.              Case No. 08-1010
 6
   TREK BICYCLE CORPORATION,
 7
                 Defendant/Third-Party
 8               Plaintiff,

 9               vs.

10   GREG LeMOND,

11               Third-Party Defendant.
   ---------------------------------------------------
12
                    ORIGINAL
13

14

15         Video Deposition of JOHN BURKE

16         Tuesday, April 7, 2009

17

18                 9:31 a.m.

                     at
19
           GASS WEBER MULLINS, LLC
20        309 North Water Street, Suite 700
           Milwaukee, Wisconsin  53202
21

22
       Reported by Julie K. Lyle, RPR/RMR/CRR
23

24

25
```



 1      fact, he was actually -- in certain cases, he was

 2      competing with our dealers.  There's an example

 3      of a sale up in Minneapolis where Greg was

 4      competing with our dealers.

 5                  Those are a couple of examples

 6      where Greg has damaged Trek.

 7  Q   I -- I understand that those are a couple of

 8      examples.  I want you to give me the exhaustive

 9      list.  Tell me -- tell me how else Greg LeMond

10      has damaged Trek.

11  A   Well, I just gave you a couple of the big ones

12      that -- I can be a little more specific and tell

13      you that in 2001, the LeMond business was about

14      15 or $16 million.  Everything up until that

15      point had been going pretty well.

16                  All the sudden we get to 2001, and

17      Greg starts making disparaging comments about

18      other athletes.

19                  We were in a perfect position at

20      that point in time.  The sport of cycling was

21      growing significantly.  LeMond was in a great

22      position as a brand.  That business could have

23      grown to, in my estimation, at least $30 million

24      over the next five years, and it stayed flat at

25      best.

1       There's an example.

2       Another example is what happened

3   in the PTI lawsuit.  Back in the late 1990s, Trek

4   was not doing so well financially.  We were

5   taking a look at making -- we were reviewing our

6   business to see where we could make some changes.

7   We took a look at the LeMond contract and we

8   said, you know what, we're not doing a good job

9   of selling LeMond accessories.

10      And we talked to -- I talked to

11  Greg and said, Greg, is there a way that we could

12  restructure this so that we're not going to sell

13  LeMond accessories and you can do it with another

14  company.

15      And we talked about that for a

16  while.  And sure enough, we came to an agreement

17  where we gave Greg a couple extra things, large

18  things.  We expanded the length of the contract,

19  we agreed to pay more royalties on international

20  sales, and we got out of the accessory contract.

21      I brought up to Greg at that

22  point, you know, Greg, we really don't want to

23  see LeMond accessories go to the mass merchant.

24  That's a big competitor for independent bicycle

25  retailers.  Greg said that's not going to happen.

1      If anything takes place here, I'll let you know.

2                    If you go back and you take a look

3      at it, unfortunately, once again, there had been

4      negotiations with PTI, there had been a letter of

5      intent signed even before he and I had that

6      conversation.

7                    It's just time and time again Greg

8      would make commitments.  He would say I'm going

9      to do one thing, and then he would do something

10     else.

11                   You can go back in the history and

12     take a look, in 2001, in 2004, in 2006 when we --

13     when Greg would comment on specific athletes and

14     we'd get to the end of this and Greg would say,

15     you know what, I'm not going to do that anymore.

16     I'm done with that.  I'm not going to do that.

17     I'm going to support Trek.  I'm going to support

18     your retailers.  That's the way it's going to be.

19                   And we'd say, great, and we'd go

20     out there.  And, as we always have done, you

21     know, we kept going on and on.  Despite all the

22     problems, we kept moving on.  And it was

23     disappointing.

24                   But those are just more examples.

25  Q    Do you have any other examples?

1      Ralph.

2   BY MR. MADEL:

3   Q    How about this:  Can you describe any step that

4        you've ever taken in your life to request that

5        Mr. LeMond enter into a contract with Trek that

6        would have prohibited Mr. LeMond or any of his

7        companies from providing bike accessories to the

8        mass market?

9   A    No, I can't recall that.

10  Q    Okay.  The -- you've obviously e-mailed a number

11       of times with Mr. LeMond; is that right?

12  A    A number of times, yes.

13  Q    Have you -- have you always been truthful with

14       Mr. LeMond?

15  A    Yes.

16  Q    Okay.  Have you always been truthful to Trek

17       employees?

18  A    Yes.

19  Q    And have you always been truthful in

20       communications that were going to be made on

21       behalf of Trek to the public?

22  A    Yes.

23  Q    When you say that you've been truthful with

24       Mr. LeMond, would that also include that you

25       haven't spoken any half-truths to him?

```
 1              MR. WEBER:  And if we take just a
 2     second, I think we're at 130 or 131.
 3              MS. RAHNE:  Okay.
 4              MR. WEBER:  But I'll be right back and
 5     we'll have the right number.  Meanwhile, he can
 6     take a look at the exhibit.
 7              MR. MADEL:  Let's take a break.
 8              VIDEO TECHNICIAN:  We're going off the
 9     record at 9:53 a.m.
10              (A recess was taken.)
11              VIDEO TECHNICIAN:  We are back on the
12     record at 9:55 a.m.
13   BY MR. MADEL:
14   Q     Mr. Burke, I'm showing you Exhibit 134.  Do you
15         recognize this?
16   A     I do not.
17   Q     Okay.  Is the top half of the first page of
18         Exhibit 134 an e-mail from you to Mr. LeMond with
19         a copy to Dean Gore?
20   A     Yes.
21   Q     And the -- at the beginning on the bottom of the
22         first page to the fourth page is an e-mail from
23         Mr. LeMond to Mr. Gore with a copy to you; is
24         that right?
25   A     Yes.
```

1   Q   And the e-mail from Mr. LeMond was sent on

2       Sunday, February 25, 2007; is that correct?

3   A   That is correct.

4   Q   And if you'll look at the second page of

5       Exhibit 134, Mr. LeMond states, in the middle

6       there --

7   A   Yeah.

8   Q   -- "I believe that we have created one of the

9       best bikes on the market, and I have an ambitious

10      goal of having Trek live up to their contract to

11      use their 'best efforts' to promote my bike

12      worldwide.  I think this is the year we need to

13      secure a team in order to do this.  I don't mean

14      this letter to have any negative connotations.  I

15      am extremely excited about what has been done for

16      the LeMond brand the last year and I want it to

17      continue.  But I want the Trek Company to

18      understand that they have a contractual

19      obligation to do everything necessary to build a

20      brand, which means investing in building the

21      brand in Europe, which I believe could increase

22      sales of LeMond bikes dramatically.  I really

23      want to get moving on this so that another year

24      does not go by without us being present in the

25      Pro Peleton.  I also think that it is just

1    beginning building the sales in Europe.  We need

2    to look at what can be done in terms of

3    distribution, etc."

4                    Do you see that?

5    A    Yes.

6    Q    And you responded to this e-mail; is that right?

7    A    I did.

8    Q    And you responded to it ten days later?

9    A    Okay.

10    Q    Is that right?

11    A    Yes.

12    Q    And can you show me in this -- and your response

13        was March 7, 2007, right?

14    A    Yes.

15    Q    Can you show me where in this e-mail you told

16        Mr. LeMond that in 2001 he damaged the Trek

17        brand?

18    A    I do not see that.

19    Q    And can you show me where in this e-mail you

20        wrote to Mr. LeMond and said that he damaged the

21        Trek brand in 2004 regarding his comments

22        regarding Lance Armstrong?

23    A    I don't see that.

24    Q    And can you show me in this e-mail where you told

25        Mr. LeMond that he had damaged Trek through his

| | | |
|---|---|---|
| 1 | | employee purchases of Trek bikes? |
| 2 | A | Don't see that. |
| 3 | Q | And can you show me in this e-mail where you told |
| 4 | | Mr. LeMond that he was making disparaging |
| 5 | | comments regarding other athletes and that had |
| 6 | | hurt Trek? |
| 7 | A | Don't see that. |
| 8 | Q | Show me where in this e-mail you said anything |
| 9 | | about the PTI lawsuit. |
| 10 | A | Not in here. |
| 11 | Q | But you did talk about how, in the fall of 2006, |
| 12 | | Trek made competitive offers to sponsor several |
| 13 | | top American teams that include European |
| 14 | | campaigns and their schedules, right? |
| 15 | A | I don't know -- if you take a look in here, it |
| 16 | | refers to Toyota United, Slipstream, and Kelly |
| 17 | | Benefits. I don't know if any of those are |
| 18 | | European teams. |
| 19 | Q | And you did write in this e-mail, "In general, |
| 20 | | selling bikes in Europe has been a difficult nut |
| 21 | | to crack, not just for LeMond," right? |
| 22 | A | I did. |
| 23 | Q | Was there a reason that you didn't take this |
| 24 | | opportunity to tell Mr. LeMond -- well, strike |
| 25 | | that. |

1          2004, Trek had noticed a breach of

2    LeMond Cycling with the Trek contract, right?

3  A  I would defer to the lawyers on that.

4  Q  All right.  It was sometime before 2007, though,

5    right?

6  A  I'd defer to the lawyers on that.

7  Q  On what?  On the date?

8  A  On the specifics of that.  Yeah, I don't want to

9    make a mistake.

10  Q  Well -- well -- and that's fine.

11          Did you ever consider LeMond

12    Cycling in breach of its contract with Trek prior

13    to 2007?

14  A  I'd defer, once again, to the lawyers.

15  Q  Okay.  You -- you can't answer that as you sit

16    here today?

17  A  I can't, from a -- I would say yes, based on

18    Section 13 of the agreement, that he was in

19    breach of the contract.

20          One of the things we always try

21    and do is we always try and work things out.  One

22    of the things that our company is built upon is

23    relationships.  And one of the things we always

24    tried to do with Greg, if you look at the history

25    of the relationship, is we always tried to work

| | | |
|---|---|---|
| 1 | Q | How have LeMond bike sales done in Italy since |
| 2 | | 2001? |
| 3 | A | I do not know specifically. |
| 4 | Q | Do you know generally? |
| 5 | A | I would guess that not very well. |
| 6 | Q | Okay.  Why would you guess that? |
| 7 | A | Because I think it's followed a consistent |
| 8 | | pattern of LeMond sales in Europe.  We had high |
| 9 | | hopes when we introduced LeMond in Europe, and we |
| 10 | | had poor results. |
| 11 | | We put our best efforts, as they |
| 12 | | are defined in the contract, of 3 percent of |
| 13 | | sales on marketing; we showed bikes at trade |
| 14 | | shows; we had our salespeople out there; but in |
| 15 | | the end, Europe proved to be a very difficult |
| 16 | | market for a couple of reasons. |
| 17 | | First of all, if you take a look |
| 18 | | at the U.S. market where we were very successful |
| 19 | | with LeMond, our overall company share, all the |
| 20 | | brands that Trek owns, our overall share is |
| 21 | | somewhere around 30 percent.  If you take a |
| 22 | | look -- and I mentioned it here on this note in |
| 23 | | 2007 -- our market share in Europe is somewhere |
| 24 | | between 2 and 4 percent. |
| 25 | | The reason that we really, in |



```
 1   Q    Is the --

 2   A    You must -- you must -- it -- you must

 3        understand, in the context, we were served with a

 4        lawsuit ten days -- somewhere around ten days

 5        after my father's death.  All right?  We were --

 6        same type of lawsuit we were given in 2004.  All

 7        right?

 8                          It was a lawsuit that we found to

 9        be threatening, and we wanted to make sure that

10        we were organized in how we put our message out.

11   Q    What did Trek do to Mr. LeMond within seven days

12        of his mother's death?

13   A    I don't know.  I -- to be honest with you, I

14        didn't even know that his mother had died.

15   Q    And did Mr. LeMond send you a note of condolence

16        after your father passed away?

17   A    I believe that he did.

18                     (Exhibit 135 was marked for

19        identification.)

20   BY MR. MADEL:

21   Q    Exhibit 135 is a letter from Loren Brown, on

22        behalf of Trek, to Mr. LeMond dated August 10,

23        2004, right?

24   A    It is.

25   Q    And the first two paragraphs say, "My firm
```

1    represents Trek Bicycle Corporation.  This is

2    formal notice that your recent actions are in

3    breach of LeMond Cycling, Inc.'s sublicensing

4    agreement with Trek Bicycle Corporation," right?

5  A    It is.

6  Q    And this letter came before Mr. LeMond ever

7    served any lawsuit on Trek; is that right?

8  A    I would have to ask counsel that.

9  Q    Did you see any need to tell your employees that

10    Trek was the first one to notice a breach with

11    Mr. LeMond in its relationship?

12  A    No.

13  Q    Why not?

14  A    Because that's a decision I made.

15  Q    With respect to Public Strategies meetings that

16    occurred here in Wisconsin -- well, strike that.

17              How much did you pay Public

18    Strategies for their work?

19  A    I do not know.

20  Q    Do you have any ballpark estimate of it?

21  A    Oh.

22         MR. WEBER:  Don't guess.

23         THE WITNESS:  No.

24  BY MR. MADEL:

25  Q    Who would know?

```
 1   Q    So you don't know that for certain?  What your

 2        knowledge is regarding LeMond turning off his

 3        website came from Mr. Burns?

 4   A    That's correct.

 5   Q    In addition to Trek employees and the media, was

 6        anybody else invited to your April 8, 2008,

 7        presentation?

 8   A    Not to my knowledge.

 9   Q    Were dealers invited?

10   A    Not to my knowledge.

11   Q    Did any dealers attend?

12   A    Not to my knowledge.  If there would have been a

13        dealer meeting there, perhaps some dealers might

14        have been in the audience, but I'm not aware that

15        there was.  I'm sure we could get you that

16        information.

17   Q    Does a video of your presentation still exist on

18        YouTube today?

19   A    I do not know.

20   Q    All right.

21   A    I haven't checked.

22   Q    Did you ever discuss the fact that your

23        presentation was going to be videotaped and

24        posted on YouTube?

25   A    We did.
```

```
 1   Q   Okay.  When was that discussed?

 2   A   Probably at one of the meetings.

 3   Q   With Public Strategies?

 4   A   Yes.

 5   Q   And you approved that decision?

 6   A   I did.

 7   Q   And does it surprise you to know that it's still

 8       on there today?

 9   A   No.  Things on YouTube, I think, stay -- I mean,

10       that's not something we control.  They stay on

11       there for however long.

12   Q   And you know that the Trek website links to

13       YouTube in order to show that presentation today?

14   A   I'm not aware of that.

15   Q   Is -- is that something that you approve of?

16   A   I approve of the presentation, so yes.  I'm

17       surprised that it's still on there.  I don't

18       think it's a current topic.

19   Q   And you know that the Trek -- Trek website links

20       to LeMond's complaint as well as Trek's complaint

21       in this lawsuit?

22   A   Yes.  I think -- I think one of the important

23       things is we kept, time and time again, trying to

24       solve this -- fix this relationship.

25                   As I said before, I'm an
```

| | | |
|---|---|---|
| 1 | A | We know Mr. LeMond. |
| 2 | Q | Okay.  Do you know Emma O'Reilly? |
| 3 | A | I do not know Emma O'Reilly. |
| 4 | Q | Have you ever read about her? |
| 5 | A | I have not.  I have a vague -- I think she -- was |
| 6 | | she a swaniere [phonetic]? |
| 7 | Q | I believe so. |
| 8 | A | Okay. |
| 9 | Q | Are you aware of her allegations regarding |
| 10 | | Mr. Armstrong? |
| 11 | A | I am not. |
| 12 | Q | Have you ever investigated those allegations? |
| 13 | A | I have not. |
| 14 | Q | Are you aware of Frankie -- do you know who |
| 15 | | Frankie Andreu is? |
| 16 | A | I do. |
| 17 | Q | Who's Frankie Andreu? |
| 18 | A | He used to ride for the Postal team. |
| 19 | Q | Are you aware of Frankie Andreu's allegations |
| 20 | | regarding Mr. Armstrong? |
| 21 | A | I am not.  I'm not in the -- I'm not in the |
| 22 | | doping business; I'm in the bike business. |
| 23 | Q | Understood.  But you did say during your |
| 24 | | presentation that you wouldn't do business with |
| 25 | | anybody that doped, right? |

```
 1   A    That's true.
 2   Q    And you wouldn't ever turn a blind eye to that,
 3        would you?
 4   A    No, I wouldn't.
 5   Q    I mean, if you had facts in front of you that
 6        convinced you that this person was actually a
 7        doper, you're going to drop them from the Trek
 8        family, right?
 9   A    If somebody provided me with evidence -- in this
10        country, you're innocent until proven guilty,
11        right?  So if somebody was convicted of doping,
12        then they would be dropped from the Trek family.
13   Q    I've got a trial on May 5, and I hope that you're
14        on it.  That was a joke.  It's just a joke.
15   A    It's like, I'm like where am I going to be on
16        May 5?
17                MR. WEBER:  He's a criminal defense
18        lawyer.
19                THE WITNESS:  Okay.
20                MR. MADEL:  I couldn't -- I couldn't
21        agree with you more.
22   BY MR. MADEL:
23   Q    With respect to the evidence against
24        Mr. Armstrong with respect to doping --
25   A    Yep.
```

1    know of any cyclists that have participated in

2    the Tour de France that passed a doping test but

3    were later to have found to have

4    performance-enhancing drugs?

5  A  I'm sure that just about anybody who has been

6    busted for doping would fit into that category.

7  Q  I mean, just about anybody that's been busted for

8    doping at one time or another has been tested for

9    performance-enhancing drugs, right?

10  A  I'm guessing at one time or another.

11  Q  And you're aware that there's various masking

12    agents that athletes can take in order to conceal

13    performance-enhancing drugs?

14  A  I am not.  I'm not a doping expert.

15  Q  Well, what have you done on behalf of Trek to

16    investigate any of the allegations of

17    Mr. Armstrong with respect to Mr. Armstrong

18    taking performance-enhancing drugs?

19  A  Nothing.  There's -- that's not our

20    responsibility.  He is the most tested athlete in

21    the history of sports, and I'll leave it at that.

22  Q  Well, do you think it's consistent with what you

23    said at the presentation that you won't do

24    business with people that cheat, that take

25    performance-enhancing drugs, and that you failed

1    to investigate when there are allegations of

2    somebody doing just that?

3  A  We're not investigators.  There's -- there's a

4    UCI.  They have a -- I'm sure they have rules and

5    they have doping protocol.  And it's obviously

6    worked.  I mean, they've found -- as you

7    mentioned earlier, they found a number of people

8    here in the last few years.

9  Q  Well, have there been tests where Lance Armstrong

10    proved positive for use -- taking EPO in 1999?

11  A  I do not know.

12  Q  Okay.  The -- when you said that Trek won't do

13    business with somebody that dopes, at what point

14    do you believe it has been established that

15    somebody has doped?

16  A  Well, I really don't -- I would say once the

17    governing body came to that conclusion.

18  Q  All right.  So if we take Mr. Landis, for

19    example, you would have done business with

20    Mr. Landis up to the time that the arbitration

21    panel came out and said he's -- he's guilty?

22  A  Isn't that a --

23           MR. WEBER:  Just let me object to the

24    form of the question as hypothetical.

25           THE WITNESS:  Right, hypothetical.

| | | |
|---|---|---|
| 1 | | that accessories through mass merchants damaged |
| 2 | | the LeMond brand? |
| 3 | A | As soon as I found out that he was going to sell |
| 4 | | his accessory brand through the mass merchants, I |
| 5 | | let him know that. |
| 6 | Q | And that was an oral communication? |
| 7 | A | I'm not sure whether that was oral or written. |
| 8 | Q | Okay. |
| 9 | A | I do not know. |
| 10 | Q | Do you know of any writing, as you sit here |
| 11 | | today, beyond what you've put in this lawsuit |
| 12 | | where you informed LeMond or any of his |
| 13 | | representatives that his launching an accessories |
| 14 | | brand through mass merchants has damaged the |
| 15 | | LeMond brand? |
| 16 | A | I would have to ask legal counsel on that, but I |
| 17 | | am very sure that we had quite a number of |
| 18 | | communications regarding that topic. |
| 19 | Q | What -- where are those communications? |
| 20 | A | I do not know.  I mean, those are phone calls. |
| 21 | | There were probably -- and I guess those phone |
| 22 | | calls don't exist. |
| 23 | Q | The -- have you ever made any effort in order to |
| 24 | | quantify the damage to the LeMond brand that you |
| 25 | | contend that has occurred as a result of these |

1      accessories branding through mass merchants?

2  A  You know, we haven't.  One of the things that is

3      really key in the bike business is what level of

4      support you get from retailers.  Independent

5      bicycle dealers are the key.

6           My dad came from the appliance

7      business, and he understood that the retailer --

8      the recommendation of the retailer made a huge

9      difference of what goes out the door.

10          Now, you've got a lot of these

11     retailers who helped build up the LeMond brand.

12     They put a lot of time, effort, inventory

13     dollars.  They -- they built that brand up

14     through 2000.  And all the sudden there's a

15     Target across the street that's all the sudden

16     selling LeMond accessories.  And those retailers

17     view that as a major problem to their business.

18         And whether that's reality or

19     perception, that's how they view it, and they act

20     accordingly.

21  Q  I'm assuming, like my law firm, from -- Trek has

22     probably experienced this from time to time where

23     you've lost a major customer or major dealer from

24     time to time.  Is that right?

25  A  Very, very seldom.

1    Q    Okay.  When --

2    A    Not one -- in the last ten years?  Not one that I

3         can remember.

4    Q    And I'm -- I'm just saying at any time.  But have

5         you -- when something significant --

6         significantly negative has happened to Trek's

7         bottom line, have you asked your CFO or the CFO's

8         team to quantify it for you?

9    A    You know, at times in the past we would do

10        something like that.  On something like this that

11        is more of a gut-feel type of thing, no.  It

12        just -- you know, you do it based on the feedback

13        you're getting from the marketplace.

14   Q    So when you wrote here that "Despite Trek's

15        guidance not to do so, Greg launches an

16        accessories brand through mass merchants, damaged

17        LeMond brand," you can't point me to any specific

18        statistic as to how much it has damaged the

19        LeMond brand today?

20   A    No, I can't.  What I can recall from that

21        situation is that we got out of the accessories

22        contract and, in exchange, we gave Greg a

23        longer-term contract on bicycles.  We also agreed

24        to increase the minimum royalty in Europe.  And

25        Greg had, in reflection, a signed document with

```
 1   A    It is.
 2   Q    And he writes, "The complaint filed makes a lot
 3        of sense.  What is Trek's position regarding all
 4        of your former riders who have tested positive,
 5        including Armstrong?"
 6                  Do you see that?
 7   A    I do.
 8   Q    Did you answer Mr. Pugh's question?
 9   A    This was sent to the Trek consumer site.  I'm
10        sure we got hundreds of e-mails a day and I did
11        not respond.
12   Q    With respect to just so far with Exhibits 138,
13        139, and 140, do you have any objection to
14        Mr. LeMond posting these on the Internet as you
15        have done with respect to your presentation?
16   A    I think it's a free country and Mr. LeMond can do
17        whatever he wishes.
18   Q    Okay.
19                  (Exhibit 141 was marked for
20        identification.)
21   BY MR. MADEL:
22   Q    What is Exhibit 141?
23   A    141 is a note from Greg McQuaid.  It is dated
24        April 9th, 2008.
25   Q    And again, that's the day after your
```

1          presentation, right?

2   A    It is.

3   Q    And he writes, "Attention:  John Burke - LeMond

4          action is a disgrace," right, at the top in bold?

5   A    Yes.

6   Q    And then he says, "Attention John Burke:  How

7          petty and childish you are for discontinuing your

8          business relationship with Greg LeMond.  Once

9          again, Lance Armstrong's lies have damaged the

10         reputation and livelihood of an honest cyclist

11         because they dared to speak the truth.  Cheats

12         ride on all brands of bicycles, but Trek will

13         forever be associated with the greatest fraud of

14         all, and I for one would never dream of buying

15         one of your bikes.  Greg McQuaid, San Francisco,

16         California."

17                  Do you see that?

18   A    I do.

19   Q    Did you respond to Mr. McQuaid?

20   A    I did not -- I believe I did not respond to

21         Mr. McQuaid.  This came in through the consumer

22         line.

23                But, once again, we're putting

24         e-mails out here.  You're finding the positive

25         ones and the negative -- the ones that agreed

```
 1    with Trek ran 10 to 20 to 1.  Might have even
 2    been higher.  And with any issue, you're going to
 3    have people who favor one side or another.
 4                    Greg is a rider who won the Tour
 5    de France three times.  He's got a number of
 6    people who are ardent supporters of his position,
 7    and so you're going to come up with people from
 8    time to time, and these are few and far between.
 9  Q  Who -- I'm sorry.  Go ahead.
10  A  And -- and we can go through and we can bring out
11    Trek dealers and we can, you know, go through
12    consumer e-mails on the positive side that
13    support Trek's position.
14                    And I think the one thing is what
15    you're getting at here is you're getting at the
16    integrity of Trek and of the company.  And that I
17    would challenge you to go out and talk to
18    consumers, talk to retailers, talk to people who
19    know Trek.  There's a lot of people in here who
20    bring up the issue and they say, How long will
21    Trek last as a company?
22                    Well, Trek's lasted about 30
23    years.  If we go through the list of companies
24    that existed in the bicycle industry even 20
25    years ago and who is left here today, there
```

```
 1        aren't a whole lot.  This company is part of our
 2        family.  We've got a family-run company with
 3        great employees, great retailers, and we really
 4        put the integrity at the top of the list.  It's a
 5        very important thing to us.
 6    Q   Okay.  Are you done answering?
 7    A   I am.
 8    Q   The -- when you say that the e-mails that were
 9        coming that were 10 to 20 to 1, are you talking
10        about after your presentation that the e-mails
11        that were coming in to Trek were 10 to 20 to 1 in
12        favor of Trek's position?
13    A   I am.
14    Q   And who counted those e-mails?
15    A   You know, I'm making a general statement there,
16        and I would defer to -- I would defer to counsel
17        on that.
18    Q   Where did you get the 10 to 20 to 1 statistic?
19    A   I am basing that based on conversations I've had
20        in the past with counsel.
21    Q   Because we've looked at these e-mails, and it's
22        not even close to that.
23    A   What -- what is it?
24    Q   Well, based upon -- I'll represent to you, it
25        looks 60/40 in favor of LeMond.
```

```
 1   A    It's not 60/40 in favor of LeMond.

 2   Q    Well, then, I'm going to ask, if there's more

 3        e-mails, that we're getting them and we're going

 4        to have to come back and redepose you.  Because

 5        as -- as we have right now, that's your

 6        statistic.

 7   A    Okay.

 8   Q    And if it's wrong, it's wrong.

 9   A    You know, the -- first of all, I would challenge

10        your 60 to 40 on the notes coming in.  You get

11        notes coming in.  You also talk to consumers, you

12        talk to retailers.  I can just tell you that our

13        decision was strongly supported by retailers.

14   Q    Do you think the people talking to Greg LeMond

15        that came up to him on the street were going to

16        say, hey, listen, by the way, I strongly support

17        Trek?

18   A    Yeah, I do.

19   Q    You do?

20   A    There are a number of those people.  Why don't

21        you take a look at one of the phone calls in the

22        past that Greg taped from Dan Thorton, a dealer

23        in Atlanta.

24   Q    Okay.  Well, if you -- do you honestly believe

25        that the people that are doing business with Trek
```

1    are going to come up and say, you know, John
2    Burke, I thought that that was the most shameful,
3    stupid presentation I've ever seen in my life?
4  A    No, I don't think they are because I think they
5       looked at that presentation -- and those dealers
6       had been living this program.  They've had
7       customers over the last eight years coming into
8       the stores saying I wouldn't even look at a
9       LeMond.
10               And there they had these small
11      business people who have invested in the
12      inventory, it's sitting there, and all the sudden
13      they're taking a look and there's ESPN, Greg
14      LeMond, "Lance Armstrong threatened my wife, my
15      life, and my livelihood."  And there's a bicycle
16      dealer and he's going, "Not again.  We went
17      through in this in 2001.  Now we're going through
18      this in 2004.  It just keeps going on and on."
19  Q    And these independent bike dealers, they do
20      business with you, right?
21  A    They do.
22  Q    And they send you money for bikes, you provide
23      them with bikes, right?
24  A    They do.
25  Q    So they have a business relationship with you,

```
 1        right?

 2   A    Absolutely.

 3   Q    Do they have any contracts that you know of with

 4        LeMond or LeMond Cycling?

 5   A    Not that I'm aware of.

 6   Q    So when you are in a business relationship with

 7        somebody, I mean, do you normally find that

 8        that's a contentious relationship with one

 9        another?

10   A    No, I don't.  But one of the things we do as a

11        company is we're very close to our customers, and

12        we really seek out what the problems with Trek

13        are.

14                  I spend time -- we do things like

15        town halls where I go out into the marketplace.

16        We'll sit around with all the dealers in a room,

17        usually 20 at a time, and we'll go through all

18        the things they don't like about Trek.  It's a

19        very open relationship, and when customers have

20        problems, they let us know.

21                  That's one of the reasons why

22        we've been successful as a business, is we get

23        the input, we take a look at it, and we're always

24        trying to improve our business.  So we're very

25        openminded to information and people's feelings
```

1     in the marketplace.

2   Q   Based on these three communications that I've

3       shown you, what did you take from their input

4       with respect to your future business?

5   A   I took from -- I took from these three people,

6       they were people -- there were some people who

7       disagreed with the position that we took.

8   Q   Did you take any of their input and change any of

9       your behavior going forward?

10  A   Well, I took the input, and no, I did not make

11      any change.

12                  (Exhibit 144 was marked for

13      identification.)

14  BY MR. MADEL:

15  Q   What is Exhibit 142?

16  A   Exhibit 1 -- I have 144.

17  Q   I'm sorry.  144.  Sorry.

18  A   144 is an e-mail from Peter D. Beckman.

19  Q   To Trek?

20  A   Trek consumer.

21  Q   And it's, again, dated the day after the

22      presentation, right?

23  A   It is.

24  Q   He said, "I just finished reading the article in

25      the Minneapolis Star & Tribune.  Well, count me

```
 1   A   Well, yeah.

 2   Q   -- you've moved away from what your dad did?

 3   A   No, that's not the case.  Because my dad was

 4       intimately involved in the LeMond shenanigans

 5       over the years.  And, in fact, shortly before he

 6       went into the hospital, he and I had a

 7       conversation where we decided that we were going

 8       to put an end to the LeMond agreement and we were

 9       not going to renew the contract in 2010.

10              One of the reasons was is my dad

11       was just very disappointed with Greg's behavior

12       and how at time and time again Greg would say he

13       was going to do one thing, give us his word, and

14       then he would do something completely different.

15       All right?

16              He and I had that conversation in

17       October of 2007.  And then we did the honorable

18       thing.  I met with Greg and I said, listen, Greg,

19       we obviously have two different views here.

20       We're going to go a different way.  We hope -- we

21       want -- we wish you the best of luck, but I want

22       to let you know now we're not going to renew the

23       contract after 2010.  We're going to honor the

24       contract, but this will allow you some time to go

25       out there and put together another deal or do
```

|     |   |                                                    |
| --- | - | -------------------------------------------------- |
| 1   |   | whatever you want to do.                           |
| 2   | Q | Was your dad in favor of noticing the breach of    |
| 3   |   | contract in 2004?                                  |
| 4   | A | I'm sure that he was.                              |
| 5   | Q | Okay.  You don't remember, though, for certain?    |
| 6   | A | I do not remember.  But just like I said, he       |
| 7   |   | loved negotiating and contracts.  He would have    |
| 8   |   | been aware of litigation there.  He hated          |
| 9   |   | litigation.  We did everything we could before     |
| 10  |   | we'd get into litigation.                          |
| 11  | Q | He was obviously a wise man?                       |
| 12  | A | He was.                                            |
| 13  | Q | The -- do you recall he had communications with    |
| 14  |   | different board members in 2004 that were trying   |
| 15  |   | to dissuade you from noticing a breach in 2004?    |
| 16  | A | I'm not aware of that.                             |
| 17  | Q | Do you recall any e-mails to that effect with      |
| 18  |   | you?                                               |
| 19  | A | Not to the best of my knowledge.                   |
| 20  | Q | Do you recall any communications that he had with  |
| 21  |   | you in 2004 where he said, you know, son, I think  |
| 22  |   | you're going to have to listen to the board with   |
| 23  |   | respect to what you want to do with LeMond, or     |
| 24  |   | words to that effect?                              |
| 25  | A | I'm not sure.  I'm sure there might be a            |

 1    Q    All right.

 2    A    Sounds like a big word, though.

 3    Q    All right.  You've got to show that your damage

 4         was caused by antitrust contact as opposed to

 5         something else.

 6    A    Uhm-uhm.

 7    Q    Have you ever tried to quantify the damage to

 8         Trek caused by LeMond's statements versus

 9         articles that just came out about Lance

10         Armstrong's alleged doping that LeMond had

11         nothing to do with?

12    A    No.

13    Q    Would you agree with me that the articles that

14         have come out about Lance Armstrong's alleged

15         doping have not helped Trek's sales?

16    A    They have not helped Trek's sales on the whole?

17    Q    Yes.

18    A    Lance Armstrong has been very positive for Trek.

19    Q    What -- when L'Equipe comes out with an

20         investigation on Lance Armstrong and says that he

21         tested positive, you know, six times in 1999, and

22         I think those articles came out in 2006, would

23         that have had a positive or a negative impact on

24         Trek sales?

25    A    I think in -- it does not have a positive impact.

```
 1   Q   Would it have a negative impact?
 2   A   I suppose it could.  It's not something that I
 3       really heard about.  It's not something that we
 4       saw either through dealer reaction or in the
 5       numbers.
 6   Q   Okay.  When -- when people like Frankie Andreu
 7       came out and said I know for a fact that Lance
 8       Armstrong has taken performance-enhancing drugs
 9       while he won the Tour de France, would that have
10       had a positive or a negative impact on Trek
11       sales?
12   A   I don't think it had any impact.
13   Q   Okay.  Do you think that any of these
14       articles/investigations of Lance Armstrong that
15       Mr. LeMond had nothing to do with had a positive
16       or a negative impact on Trek sales?
17   A   They would probably have a negative impact.
18   Q   Have you ever tried to quantify between those
19       sorts of articles that Mr. LeMond had nothing to
20       do with and these statements that Mr. LeMond has
21       made in 2001 or 2004?
22   A   No, we haven't, but I think --
23               MR. WEBER:  Can I -- let me just --
24       hold on.  Just let me interject, make sure we're
25       talking about the same thing.
```

```
 1                    You had a series of questions that
 2        were talking about impact on Trek sales.
 3                    MR. MADEL:  Uhm-uhm.
 4                    MR. WEBER:  Now you're jumping over to
 5        LeMond's comments and impact on LeMond sales.
 6                    MR. MADEL:  Right.
 7                    MR. WEBER:  Are you mixing the two --
 8                    MR. MADEL:  No.
 9                    MR. WEBER:  -- or what is your question
10        looking for?
11                    MR. MADEL:  I was going to ask both,
12        but, I see -- you know, I see what you're driving
13        for.
14        BY MR. MADEL:
15        Q    The -- you know, Trek sells LeMond bikes, right?
16        A    Right.
17        Q    So when you do your aggregate number at the very
18             end of your total sales --
19        A    Yeah.
20        Q    -- that includes LeMond bike sales?
21        A    It does.
22        Q    All right.  So have you ever tried to say, hey,
23             here is the slice of negative impact to Trek
24             sales caused by LeMond's statements and here is
25             the negative impact caused by general
```

1  investigations into Lance Armstrong's alleged

2  doping?

3  A  You know, Lance is the most tested athlete in

4  history and that -- doping allegations, I think,

5  were litigated in the SCA trial. And in the

6  general marketplace, the allegations against

7  Lance Armstrong have not had a measurable impact.

8  Q  But have you ever --

9  A  And the positive of Lance Armstrong has been

10  significant.

11  Q  I'll just move to strike as nonresponsive.

12        Have you ever tried to quantify

13  between the -- on the one hand --

14  A  No.

15  Q  Let me finish.

16        Have you ever tried to quantify on

17  the one hand the impact caused to Trek sales

18  caused by Greg LeMond's statements and on the

19  other hand the impact caused to Trek sales due to

20  investigations into Lance Armstrong's alleged

21  doping?

22      MR. WEBER: Let me just interject again

23  an objection as to vagueness. When you say

24  impact on Trek sales from LeMond's statements,

25  are you talking about the Trek brand, the LeMond

```
 1        brand, or both?
 2                    MR. MADEL:  Go ahead and answer.
 3                    MR. WEBER:  If you understand the
 4        question, you can answer.  If you don't
 5        understand it, you can ask him to rephrase it.
 6                    THE WITNESS:  We didn't do either.
 7                    MR. MADEL:  The -- let's just go to
 8        Exhibit 145 or 146.
 9                    (Exhibit 146 was marked for
10        identification.)
11   BY MR. MADEL:
12   Q    What is Exhibit 146?
13   A    It is a note entitled "John Burke's Tirade on
14        Greg LeMond" sent to TrekBikes.com.
15   Q    And it's from an LA, but I'm assuming that it's
16        not Lance Armstrong.  And it says
17        Lancer@Austin360.com [sic], right?
18   A    Uhm-uhm.
19   Q    Is that a yes?
20   A    Yes.
21   Q    And it's dated April 10, 2008?
22   A    It is.
23   Q    And it says, "John Burke may be a good
24        businessman, but his speech is full of lies.  His
25        use of the word family over and over was
```

1           VIDEO TECHNICIAN:  We're going off the

2     record at 3:13 p.m.

3           (A recess was taken.)

4           VIDEO TECHNICIAN:  Back on the record

5     at 3:33 p.m.

6           (Exhibit 152 was marked for

7     identification.)

8  BY MR. MADEL:

9  Q    Mr. Burke, I'm showing you what's been marked as

10     Exhibit 152.

11           You're not involved in any of the

12     e-mail strings here, but I was going to ask you

13     if you recognize the handwriting on this page?

14  A    I do.

15  Q    Whose is it?

16  A    That would be mine.

17  Q    Okay.  I'm assuming, then, that if you recall,

18     that Mr. Burns printed out this e-mail string and

19     provided it to you at some time?

20  A    I -- I guess that would be the case.

21  Q    And at the top there, it looks like there's a

22     number of numbers.

23  A    Yeah.

24  Q    And then it says "Lance call."

25  A    Okay.

```
 1   Q   Do you know what that -- does this -- do these
 2       notes reflect a conversation that you had with
 3       Lance Armstrong?
 4   A   I think it does.
 5   Q   And was this --
 6   A   I'm going with yes.
 7   Q   Okay.  Was -- was that conversation with
 8       Mr. Armstrong around June 2004?
 9   A   I do not know when that conversation took place.
10       I'm guessing it -- since the date from Sidney to
11       Bob is June 15th, 2004, and I wrote on top of
12       this, I would assume it was sometime around that
13       date.  I cannot be sure of that.
14   Q   Point 1, you said -- you wrote, "Exactly where I
15       am going."  Do you know what that refers to?
16   A   I do not.
17   Q   Point 2, it says, "Make a statement like last
18       time."  What does that refer to?
19   A   I can only guess that it might refer to the
20       statement that Greg made in 2001.
21   Q   Do you recall that in 2004 Mr. Armstrong was
22       asking you to get Mr. LeMond to retract his 2004
23       statement in a manner similar to the 2001
24       statement?
25   A   I think that statement was that Greg said that
```



```
 1        Lance threatened his life, his wife, and his
 2        livelihood, and so I think that would be correct.
 3   Q    Point 3 says, "Create a space for them to live
 4        together."
 5   A    Yep.
 6   Q    Was Mr. Armstrong asking you to, again, be the
 7        kind of secretary of state and create a space for
 8        Mr. LeMond and Mr. Armstrong to live together?
 9   A    Indeed he was.  On numerous occasions, especially
10        from 2004 on, Lance became more, "I just wish we
11        could all get along here."
12   Q    And point 4 says, "I can't tell you what to do
13        with LeMond."
14   A    That's correct.
15   Q    And that was sentiment provided by Mr. Armstrong
16        to you?
17   A    Yes.
18   Q    And point 5 is "Emma O'Reilly."
19   A    Yep.
20   Q    What was that regarding?
21   A    I do not know.
22   Q    Do you know that Emma O'Reilly is one of the
23        people that has stated that Lance Armstrong has
24        used performance-enhancing drugs?
25   A    You mentioned that earlier.
```

| | | |
|---|---|---|
| 1 | Q | Okay.  You don't recall that yourself, though, |
| 2 | | other than me telling you? |
| 3 | A | I -- I was kind of familiar with a -- probably |
| 4 | | from conversations with Greg that there was some |
| 5 | | swaniere [phonetic], and you informed me that it |
| 6 | | was Emma O'Reilly, so that's where I am on that. |
| 7 | Q | Do you recall what you discussed regarding Emma |
| 8 | | O'Reilly with Mr. Armstrong? |
| 9 | A | No, I don't remember that conversation. |
| 10 | Q | And point 6, you just wrote, "Greg LeMond."  Do |
| 11 | | you recall what that was regarding? |
| 12 | A | I do not. |
| 13 | Q | And 7, "Craig Nichols will make a statement. |
| 14 | | Not," exclamation point.  Do you know what that |
| 15 | | refers to? |
| 16 | A | You know, I don't.  That kind of seems odd, but |
| 17 | | it -- I just don't know what that means. |
| 18 | Q | Then 8, it says, "Kathy on tape," right? |
| 19 | A | It does. |
| 20 | Q | And Mr. LeMond's wife's name is Kathy, right? |
| 21 | A | That is correct. |
| 22 | Q | And it's spelled the exact same way as you have |
| 23 | | right there? |
| 24 | A | Right. |
| 25 | Q | Do you know what you were referring to when you |

1       wrote "Kathy on tape" in Exhibit 152?

2  A   I don't.

3  Q   And you know -- do you recall if Mr. Armstrong

4       was alleging that Kathy LeMond was on tape saying

5       something?

6  A   No.

7  Q   Do you recall anybody ever telling you that Kathy

8       LeMond was on tape saying something?

9  A   I don't recall anyone telling me of any taping in

10      this regard except for the phone conversations

11      that Greg LeMond taped.

12  Q   And then 9, "Critical piece is Emma O'Reilly."

13  A   Uhm-uhm.

14  Q   Do you see that?

15  A   I do.

16  Q   Do you know what that refers to?

17  A   I'm guessing that refers to something about Emma

18      O'Reilly and comments that she made.

19  Q   Is there a reason in 2004 that Mr. Armstrong

20      would be calling you in order to discuss these

21      people that were making allegations regarding

22      doping to you?

23         MR. WEBER:  Object as to foundation as

24      to Mr. Armstrong's state of mind unless he

25      explained to you why he was calling you.

1           THE WITNESS:  Yeah, I don't know.

2    BY MR. MADEL:

3    Q    Did you discern any reason from your conversation

4         with Mr. Armstrong why he was bringing up Emma

5         O'Reilly with you during this conversation?

6    A    No.  I'm guessing it's -- I mean, Greg would go

7         on and on for quite some time about doping and

8         Lance Armstrong, and so I'm guessing that somehow

9         it referred to that.

10   Q    Do you recall if Mr. Armstrong had ever asked you

11        to find out from Mr. LeMond exactly what his

12        evidence was with respect to Mr. Armstrong taking

13        performance-enhancing drugs?

14   A    Absolutely not.  Unfortunately, I had many

15        conversations with Greg listening to what Greg

16        thought was -- what he was thinking, but not from

17        Lance.

18   Q    This "Critical piece is Emma O'Reilly," did

19        Mr. Armstrong ever ask you to reach out to Emma

20        O'Reilly for anything?

21   A    Absolutely not.

22   Q    And point 10, it says, "Kathy LeMond will be

23        sued.  France, et cetera.  She will be sued."

24   A    Uhm-uhm.

25   Q    Do you see that?

| | | |
|---|---|---|
| 1 | A | I do. |
| 2 | Q | Do you recall what Mr. Armstrong told you about |
| 3 | | Kathy LeMond being sued? |
| 4 | A | I do not. |
| 5 | Q | And do you know if Mr. Armstrong has ever sued |
| 6 | | Kathy LeMond? |
| 7 | A | From what I know, he has not. |
| 8 | Q | Has Mr. Armstrong or anybody on behalf of Mr. |
| 9 | | Armstrong threatened Mr. LeMond with lawsuits |
| 10 | | over the years? |
| 11 | A | I cannot remember the specifics.  I mean, there's |
| 12 | | a point here, a point 10, at certain times |
| 13 | | Lance can get amped up and say things under the |
| 14 | | heat of the moment, but I don't think it was ever |
| 15 | | anything serious. |
| 16 | Q | Back in 2001, do you recall telling Mr. LeMond |
| 17 | | that Armstrong's going to sue you? |
| 18 | A | Yeah. |
| 19 | Q | And -- |
| 20 | A | Well, let me -- let me take that back.  No, I |
| 21 | | don't remember it, but I could assume that -- I |
| 22 | | could believe that that happened. |
| 23 | Q | And you had such conversations with Mr. Stapleton |
| 24 | | as well, right? |
| 25 | A | Possibly.  I don't recall. |

1  Q    I mean, did you ever get the impression from

2       Mr. Armstrong that any time one of these

3       statements came out, he said he was going to sue

4       Mr. LeMond?

5  A    Well, in the 2001 situation, I think there was

6       some talk of that.  But Lance, you know, he's --

7       he is -- he can get pretty excited.  And in the

8       heat of the moment, he can say things.  But, you

9       know, especially as time went on, as my notes

10      indicated up here, what he really wanted was

11      peace with Greg LeMond.

12 Q    Well, in point 10, though, he said "Kathy LeMond

13      will be sued," and you wrote it again, "She will

14      be sued."

15 A    Uhm-uhm.

16 Q    Is that a yes?

17 A    Yes, that's what I wrote.

18 Q    And that was not your belief on behalf of you or

19      Trek, right?

20 A    No, that was not my belief.  I'm just adding to

21      you from the point up here --

22 Q    Yep.

23 A    -- to create a space for them to live together,

24      and I'm also taking from my recollections of

25      other conversations with Lance that what he

| | | |
|---|---|---|
| 1 | | sought was he really wanted to coexist with Greg |
| 2 | | LeMond. |
| 3 | Q | And I'm assuming that you wrote these notes in |
| 4 | | chronologic order according to the conversation |
| 5 | | as it occurred with Mr. Armstrong? |
| 6 | A | I would guess that I did. |
| 7 | Q | And so in point 3, he's talking about creating a |
| 8 | | space to live together, and point 10 he's saying |
| 9 | | "Kathy LeMond will be sued.  She will be sued," |
| 10 | | right? |
| 11 | A | That's what it says. |
| 12 | Q | And you were writing down what Mr. Armstrong was |
| 13 | | saying with respect to these points 1 through 12 |
| 14 | | in Exhibit 152, right? |
| 15 | A | Yes, I was. |
| 16 | Q | And point 11 there, now you're writing |
| 17 | | "Affidavit" with a line to the name "Bill and |
| 18 | | lawsuit." |
| 19 | A | Uhm-uhm. |
| 20 | Q | Right? |
| 21 | A | Yep. |
| 22 | Q | So, again, points 10 and 11 are both talking |
| 23 | | about litigation? |
| 24 | A | Yes. |
| 25 | Q | And what were you referring to there when you did |

```
 1  A    By his racing accomplishments, by his
 2       endorsements of Trek products, and by being an
 3       overall excellent ambassador for the brand, by
 4       keeping his word on his commitments.  He's done a
 5       very good job with that.
 6  Q    And all of those have contributed to Trek's
 7       bottom line; is that fair?
 8  A    They have -- yes.
 9  Q    With respect to Stapleton in particular, has he
10       said a number of derogatory things regarding
11       Armstrong to you privately -- regarding LeMond to
12       you privately?
13  A    No, not to my knowledge.
14                   (Exhibit 153 was marked for
15       identification.)
16  BY MR. MADEL:
17  Q    Can you tell me what Exhibit 153 is, please.
18  A    Looks like it's an e-mail chain between Bart
19       Knaggs and I regarding Greg LeMond's lawsuit at
20       the Yellowstone Club.
21  Q    And there's a big portion on the second page that
22       has a big black box.
23                   Do you see that?
24  A    I do.
25  Q    Do you know what's beneath that?
```



| 1 | A | I do not. |
|---|---|---|
| 2 | Q | Do you know if it's any communication relating to |
| 3 | | counsel? |
| 4 | A | Not a clue.  I do not. |
| 5 | Q | Bart Knaggs here, he works for Lance Armstrong; |
| 6 | | is that right? |
| 7 | A | He does. |
| 8 | Q | And he's never been a -- an attorney on behalf of |
| 9 | | Trek, has he? |
| 10 | A | He has not. |
| 11 | Q | When -- it looks like the first e-mail here says, |
| 12 | | "Re:  Hello Bart," with a bunch of exclamation |
| 13 | | points, right? |
| 14 | A | Uhm-uhm. |
| 15 | Q | Did you send that e-mail to -- to Bart? |
| 16 | A | Which would be the first e-mail? |
| 17 | Q | Well, it looks like -- |
| 18 | A | I'm not quite -- |
| 19 | Q | -- at the very bottom of this it says -- |
| 20 | A | I'm not good on these chains. |
| 21 | Q | Yeah, if you go -- you've got to read from the |
| 22 | | bottom going up.  And it looks as if the first |
| 23 | | one is the Wednesday, November 22, 2006, at |
| 24 | | 3:48 p.m.  And -- |
| 25 | A | Yeah. |

```
 1   Q    And he says, "John:  I'll get it done, but I'm in
 2        NYC and Lance is in L.A.  Just to help, recheck
 3        on me Monday, will you?  Yellowstone Club?  Happy
 4        Thanksgiving, B," right?
 5   A    Yep.
 6   Q    So it looks like the first e-mail was from you to
 7        Bart.
 8   A    Okay.
 9   Q    Is that fair?
10   A    I don't know.
11             MR. MADEL:  I mean, and, Ralph,
12        there's --
13             THE WITNESS:  Is the first e-mail the
14        one up on the top here?
15   BY MR. MADEL:
16   Q    No, if you -- look at the times, follow the times
17        down.
18   A    Okay.  Okay.
19             MR. MADEL:  Ralph, I want you to
20        re-review this.  I don't see any reason that this
21        shouldn't be produced.  The first e-mail is
22        clearly from Burke to Knaggs, "Hello Bart," and
23        there's a big blackout of it.  So we're -- we
24        want that produced.
25             MR. WEBER:  Well, you're assuming,
```

```
 1        aren't you, that's what's been blocked out is an
 2        e-mail from John to Bart, right?
 3                  MR. MADEL:  I know e-mail and subject
 4        re inserted usually means a reply to the original
 5        e-mail.
 6                  MR. WEBER:  So you're assuming that
 7        what's blocked out is the e-mail from Bart --
 8        from John to Bart?
 9                  MR. MADEL:  Yes.
10                  MR. WEBER:  Okay.  So I'll go back and
11        see what it actually is.
12     BY MR. MADEL:
13     Q    And there it says, "What about the Yellowstone
14        Club?"
15                        And then you said, you know, "I'll
16        get it done, but I'm in NYC, Lance is in L.A.
17        Just to help, recheck on me Monday, will you?"
18        And he said, "Serious?  LeMond in big lawsuit
19        with founder.  Very, very ugly."  Right?
20     A    Uhm-uhm.  Yeah.
21     Q    And you responded, "Should discuss next time on
22        the phone."
23     A    Uhm-uhm.
24     Q    Is that a yes?
25     A    Yes.
```

1    Q    And he said, "You should research up on it online

2         and beware with your boy, he may have picked the

3         wrong fight."

4                        And then you again told him, "Give

5         me a call," right?

6    A    Yep.

7    Q    Was there an effort on your part when dealing

8         with the Armstrong camp that you did not want to

9         have written records regarding your

10        communications with them?

11   A    No.

12   Q    Why were you telling him twice then to discuss

13        this on the phone as opposed to putting it in

14        writing?

15   A    I think we talked about it earlier in regards to

16        something else where I made a phone call to a

17        board member.  I'm more of a phone guy than an

18        e-mail guy.

19   Q    And do you know the result of the Yellowstone

20        Club fight?

21   A    I do know the result of that.

22   Q    Okay.  What was that result?

23   A    The -- I'm not an expert on this, but the result

24        to the Yellowstone lawsuit is that Greg won a

25        lawsuit against the owner of the Yellowstone

```
 1        Club.  Greg told me all about that in detail a
 2        number of times.
 3   Q    Did -- do you have any reason to know why anybody
 4        from Armstrong's camp would be interested in
 5        knowing of LeMond's lawsuit minority shareholder
 6        dispute with a club in Montana?
 7   A    No.
 8                   VIDEO TECHNICIAN:  Excuse me, Counsel.
 9        May we pause to do that tape change?
10                   MR. MADEL:  Yep.
11                   VIDEO TECHNICIAN:  Great.  Thank you.
12                        This is the end of Videotape
13        No. 4.  We're going off the record at 3:55 p.m.
14                   (A recess was taken.)
15                   (Exhibit 154 was marked for
16        identification.)
17                   VIDEO TECHNICIAN:  This is the
18        beginning of Videotape No. 5 in the continuing
19        deposition of John Burke.  We are back on the
20        record at 3:58 p.m.
21   BY MR. MADEL:
22   Q    What was Exhibit 157?  No, 154, sorry.  My bad
23        writing.
24                        What is Exhibit 154?
25                   MR. WEBER:  We haven't marked 157 yet.
```

```
 1                    MR. MADEL:  I was wrong.  It's
 2          Exhibit 154.  I think it's marked.
 3                    THE WITNESS:  Okay.  I have 154.
 4     BY MR. MADEL:
 5     Q    Yeah.
 6     A    Okay.  So you're asking me what it is?
 7     Q    Yes.
 8     A    It seems to be an e-mail from Bill Stapleton to
 9          me.
10     Q    At the very top?
11     A    At the top.  So it starts with a note from Lance
12          Armstrong to me, copied to Bill Stapleton and
13          Bart Knaggs.  Subject:  "Our boy is at it again."
14     Q    And it looks like Mr. Armstrong sends you a link
15          to some story that said Landis/LeMond, right?
16          Had Landis/LeMond in that address?
17     A    Yes.
18     Q    And this would have been right around the time of
19          Mr. Landis's arbitration at the time in
20          California, right?
21     A    I do not know.
22     Q    And after Mr. Stapleton replies to all and says
23          "Unbelievable," you then replied to him and say,
24          "You might want to give me a call sometime this
25          weekend."  And then you give him your home
```

```
 1        numbers again, right?
 2   A    Right.
 3   Q    Is there a time where you sent, you know, any
 4        written communications to anybody in the
 5        Armstrong camp explaining why LeMond was saying
 6        anything?
 7   A    Not to my knowledge.
 8   Q    Was there a reason that you didn't want that in
 9        writing?
10   A    You know, I -- I mentioned a number of times I'm
11        more of a phone guy than an e-mail guy.  I'll
12        leave it at that.  I hate long e-mails.
13                 (Exhibit 155 was marked for
14        identification.)
15   BY MR. MADEL:
16   Q    Showing you what's been marked as Exhibit 155.
17        First thing, I'm going to direct your attention
18        to the e-mail on Trek 010385.
19                 Do you see that?
20   A    I do.
21   Q    And that's an -- the first e-mail is a memo or an
22        e-mail from Lawrence Temple to Bob Burns
23        regarding the LeMond deposition, right?
24   A    Yes.
25   Q    And who's -- was Lawrence Temple a lawyer?
```

```
 1   A    Yes, he is.
 2   Q    And is he an in-house lawyer for Lance
 3        Armstrong's company?
 4   A    I do not know.  I've never met him.
 5   Q    Okay.  And he writes there "Bob, in Lance's
 6        lawsuit against SCA regarding payment of the
 7        bonus insurance, SCA has noticed Greg LeMond's
 8        deposition which is scheduled for this Thursday.
 9        The lawyers representing Lance, Tim Herman and
10        Shawn Breen, would like to talk to you.  I'm
11        giving them your number, but I wanted you to
12        give" -- "but I wanted to give you a heads-up
13        first."
14                   "I'm in a meeting now and I'm
15        about to catch a plane pretty soon, but I'll give
16        you a call soon to discuss this and other things.
17        As always, thanks for all your help, Lawrence."
18   A    Uhm-uhm.
19   Q    The -- it looks as if, then, that e-mail to Burns
20        got to you; is that right?
21   A    I don't know.
22   Q    Well, do you see it says forward, "FW:  LeMond
23        deposition" and that matches identically the
24        subject of the line -- of the subject line --
25   A    Oh.
```

| | | |
|---|---|---|
| 1 | Q | -- from Lawrence Temple? |
| 2 | A | Okay. |
| 3 | Q | Do you see that? |
| 4 | A | I do. |
| 5 | Q | But there's no e-mail in between from Burns to |
| 6 | | you, right? |
| 7 | A | Okay. |
| 8 | Q | Do you know if there was an e-mail in between |
| 9 | | there? |
| 10 | A | No idea. |
| 11 | Q | And do you know why anybody from the Armstrong |
| 12 | | camp would be approaching somebody within Trek |
| 13 | | regarding a deposition of Greg LeMond and the SCA |
| 14 | | arbitration? |
| 15 | A | I do not. |
| 16 | Q | The next e-mail is from you to your dad, right? |
| 17 | A | It is. |
| 18 | Q | And you're not a lawyer, right? |
| 19 | A | I am not a lawyer. |
| 20 | Q | And your dad's not a lawyer? |
| 21 | A | Definitely not. |
| 22 | Q | Was not a lawyer.  Pardon me. |
| 23 | | Yet there's a big black box there |
| 24 | | in that e-mail, right? |
| 25 | A | There appears to be. |

1  Q   And as you sit here today, you don't know what's

2      beneath that black box?

3  A   I do not.

4  Q   The e-mail before that begins with an e-mail from

5      Mark Higgins to you, Armstrong, and Stapleton,

6      the subject line "Article," and it's dated

7      Sunday, June 25, 2006, at 12:19 p.m.

8                    Do you see that?

9  A   I do.

10  Q   And he's saying, "John, Lance was about to take

11      off for the Bahamas but asked me to send this

12      along to you.  He will be back on cell in about

13      three hours.  Thanks."

14  A   Yeah.

15  Q   Do you recall this?

16  A   I do.

17  Q   And this was the Lance threatened me, threatened

18      my wife, my business, my life, right?

19  A   Yep.

20  Q   That article was in 2006, right?

21  A   Yeah.

22  Q   And next e-mail is from you to Mark Higgins.

23                    Incidentally, what did Mark

24      Higgins do for Armstrong?

25  A   He was like a personal assistant, kind of travels

1       with him.

2   Q   And you said, "Mark, thanks for the article.  Is

3       this the entire article or just an English

4       summary translation?  If you have the entire

5       article, even if it is French, please send it.

6       Thanks, JB."

7   A   Yep.

8   Q   Why did you want the entire article?

9   A   I think always in these situations between

10      Lance and Greg, I was always the peacemaker, and

11      I always find that before you do anything, you

12      try to get all of the facts.

13                  And sometimes, you know, when you

14      see a headline like Lance threatened my wife, my

15      business, and my life, I just want to make sure

16      that it's not being taken out of context and

17      there isn't more along to it.

18  Q   Did Lance Armstrong threaten to sue Kathy LeMond?

19  A   Not that I'm aware of.

20  Q   Okay.  What -- what about in Exhibit 152?

21  A   I know.  I answered the same there.  I wrote

22      something down, but I can't recall that he said

23      "I'm going to sue Kathy LeMond."

24  Q   Other than what you wrote down, "Kathy LeMond

25      will be sued.  France, et cetera.  She will be

```
 1        sued"?
 2   A    That's what I wrote down, but I can't equate it.
 3        Why is he going to sue Kathy LeMond when Greg's
 4        the one who made the comments?
 5   Q    I have no idea.
 6   A    That's what I'm telling you; I don't know.
 7   Q    And I'm assuming also on the first page of
 8        Exhibit 155 you don't know what's beneath that
 9        black box there as well?
10   A    No idea.
11                  (Exhibit 156 was marked for
12        identification.)
13   BY MR. MADEL:
14   Q    Exhibit 156, just so I'm clear there, Mr. Burke,
15        can you tell me what the Bates label is of the
16        last page that you're looking at there on this
17        exhibit?
18   A    It's 156.
19   Q    Yeah.  Thank you.  Or, I mean -- no, that's the
20        exhibit number.  I'm sorry, these numbers right
21        here on the very last.
22   A    Oh, it's 01 --
23   Q    On the very last page, what's that?  Just the
24        last two digits is all I need.
25   A    -53.
```

```
 1   Q    -53, thanks.
 2                   The first page of Exhibit 156 is
 3        an e-mail from Lance Armstrong to you, Bill
 4        Stapleton, Bart Knaggs, Mark Higgins, and Tim
 5        Herman dated July 17th, 2008; is that right?
 6   A    Yes.
 7   Q    And Armstrong writes, "The part 2 is on
 8        Velonews.com now.  Talks about Trek and
 9        litigation.  Worth watching.  The guy's a
10        mumbling, bumbling idiot."
11   A    Yep.
12   Q    And did you take that to mean that he was
13        referring to Greg LeMond?
14   A    I -- well, I don't exactly remember what this is,
15        but I'm guessing that would probably be the case.
16   Q    The next e-mail on -- I think it begins on Trek
17        010349 is the one from you to -- to -- I'm sorry,
18        that Lance Armstrong originally wrote to you?
19   A    Yeah.
20   Q    And he writes, "Go to velonews.com and scroll
21        down a bit to the video clips/interviews on the
22        left side.  There's a plus or minus 7-minute
23        interview with LeMond that is unreal.  He is
24        either crazy or drunk.  By the way, he actually
25        seems like he's slurring his words.  He even says
```

| | | |
|---|---|---|
| 1 | | his VO2 hasn't really changed to date.  What," |
| 2 | | question mark, exclamation point, question mark. |
| 3 | | "It's nearly seven minutes and his |
| 4 | | first response to a question is close to three to |
| 5 | | four minutes.  Amazing.  Hermie, good depo stuff |
| 6 | | for sure.  This fucker is a wingnut.  L," right? |
| 7 | A | Yeah. |
| 8 | Q | Did Mr. Armstrong spend a lot of time looking for |
| 9 | | interviews that Mr. LeMond made on the Internet, |
| 10 | | to your knowledge? |
| 11 | A | Mr. Armstrong loves to surf the Internet.  He is |
| 12 | | very knowledgeable about everything going on in |
| 13 | | cycling, from Greg LeMond to the racing scene to |
| 14 | | bike snob New York City to single speeds.  He |
| 15 | | knows what's going on. |
| 16 | Q | Do you know -- have you ever talked to him about |
| 17 | | the amount of time that he spends searching for |
| 18 | | stories about him on the Internet? |
| 19 | A | The amount of time -- |
| 20 | Q | That Lance Armstrong spends searching for stories |
| 21 | | about Lance Armstrong. |
| 22 | A | I have not. |
| 23 | Q | Does it seem to be an unusual amount of e-mail |
| 24 | | here where Lance Armstrong is sending you, you |
| 25 | | know, somebody that's -- he's got a contract of |

 1    endorsement where he's sending you stories about

 2    himself and Greg LeMond to you?  Did that seem

 3    unusual?

 4  A  I mean, this -- this guy had been through a lot.

 5    I mean, this guy had been through the 2001,

 6    you're the greatest hero or the greatest fraud.

 7    He had been through the you threatened my wife,

 8    my life, and my livelihood.  He'd been through so

 9    much Greg LeMond stuff.

10          Here's a guy who's out there,

11    who's won the tour seven times.  He's done

12    possibly more than any person in the last decade

13    to fight cancer worldwide, and he's got Greg

14    LeMond shooting at him left and right.  And, you

15    know, it -- it bothered him.

16  Q  And you wrote back, "Give me a call today.  I

17    have a story that beats this, JB."

18  A  Uhm-uhm.

19  Q  Is that right?

20  A  I did.

21  Q  What was the story that beat his?

22  A  I can't remember.

23  Q  And then it -- he writes back, "Boss, tried you.

24    Give me a buzz on my cell.  Thanks, L"; is that

25    right?

```
 1   A   Yeah.
 2   Q   Was that -- did Lance Armstrong have a nickname
 3       for you where he called you boss?
 4   A   No.  He usually referred to -- well, sometimes he
 5       referred to me as boss or team manager.
 6   Q   Did you ever manage his team?
 7   A   No, I didn't.  But it stems from a situation in
 8       1999 after he won the tour.  In his contract it
 9       stated that he needed to ride two mountain bike
10       races, and we let him know you don't need to do
11       that.  He goes, no, I always live up to my
12       commitments.  And so he went to Vermont to race
13       in this race.
14              It was the first time I met him
15       and there was a press conference there, must have
16       been 3-, 400 people.  It was after he had won the
17       tour.
18              And we left the press conference
19       and we got in the car, and he said we're going
20       off to have a beer.  And I said, jeez, is there
21       drinking allowed on the Trek mountain bike team?
22       Just kind of joking.  And he said -- he said,
23       well, that's chapter 23 of the team handbook,
24       boss.  And so we would always joke about the team
25       handbook.
```

1  Q  The next two pages of Exhibit 156 are entirely

2     blacked out, right?

3  A  They seem to be.

4  Q  And do you have any idea what's beneath those

5     redactions?

6  A  I do not.

7  Q  And the top of Trek 010353 is blacked out as

8     well, right?

9  A  Yes.

10 Q  And the e-mail immediately after that is from

11    Lance Armstrong to you; the subject line, "For

12    your reading displeasure."

13 A  Uhm-uhm.

14 Q  Is that right?

15 A  Yes.

16 Q  And that's Friday, 15 February 2008, right?

17 A  It is.

18 Q  And the other e-mails were in July of '09?

19 A  Okay.

20 Q  Is that right?

21 A  Yes.

22 Q  Well, it actually seems kind of -- I think it's

23    '08.  I think I misread that.

24 A  July of '08.  We're in '09 now.

25              MR. WEBER:  We haven't gotten -- we

```
 1        haven't gotten to July of '09 yet.
 2                  MR. MADEL:  Yep.
 3    BY MR. MADEL:
 4    Q     So these were both before and after your April 8,
 5          2008, presentation?
 6    A     That's correct.
 7                  MR. WEBER:  Did we skip 155?
 8                  THE WITNESS:  155 is here.
 9                  MR. WEBER:  Okay.
10                  THE WITNESS:  And this is 156.
11                  MR. WEBER:  Right.
12              (A discussion was held off the record.)
13                  MR. MADEL:  The -- sorry, I just got to
14          get situated here one second.
15    BY MR. MADEL:
16    Q     What was the statement that LeMond said in 2004
17          that you contend damaged Trek?
18    A     I don't have it right here.
19    Q     You don't recall it?
20    A     I -- I think that was the he threatened my wife,
21          my life, and my livelihood.
22    Q     Had you ever talked to Bill Stapleton where you
23          told him that you agreed with his feelings
24          regarding Mr. LeMond?
25    A     Could you repeat that?
```

1          (The preceding question was read by the
2     reporter.)
3          THE WITNESS:  Oh.  You know, I'm sure
4     there are -- I always got put in the middle here
5     as the peacemaker, and as part of being the
6     peacemaker, I have to be a little conciliatory to
7     people.  And I'm sure there were things that I
8     agreed with that Bill Stapleton said about Greg
9     LeMond and I'm sure there are a few things that I
10    agreed with that Greg LeMond said about Lance
11    Armstrong.
12 BY MR. MADEL:
13 Q    What were the things that you agreed with Greg
14    LeMond about Lance Armstrong?
15 A    Boy, that's a good question.  Well, I think he
16    said he was a great champion.  I agreed with
17    the -- either the greatest champion in the world,
18    I agreed with the first half of that statement.
19 Q    Is there anything else?
20 A    I would agree when Greg would bring up
21    Lance taking potshots at Greg.  I didn't think
22    that was helpful, and I -- I thought Greg had
23    some -- some valid points there.
24 Q    Anything else?
25 A    Not that I can recall.