# Exhibit 10

UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

Case No. 08-CV-1010 (RHK-JSM)

-------------------------------------------x

LEMOND CYCLING, INC.,

                  Plaintiff,

     - against -

TREK BICYCLE CORPORATION,

                  Defendant and

                  Third-party Plaintiff,

     - against -

GREG LEMOND,

                  Third-party Defendant.

-------------------------------------------x

                 February 18, 2009

                 9:02  a.m.


          DEPOSITION of SIDNEY D. BLUMING,

taken by the Defendant, pursuant to

Notice, held at the offices of Bluming &

Franco, 140 East 45th Street, New York,

New York, before Debbie Zaromatidis, a

Shorthand Reporter and Notary Public of

the State of New York.

1          BLUMING

2          MS. RAHNE:  Denise Rahne,

3    counsel for Greg Lemond and the deponent.

4    S I D N E Y   D.   B L U M I N G ,

5    having first been duly sworn by a Notary

6    Public of the State of New York, was

7    examined and testified as follows:

8    EXAMINATION BY MR. WEBER:

9         Q.    Good morning.

10        A.    Good morning.

11        Q.    Could you tell us your full

12   name, please.

13        A.    Sidney Bluming.

14        Q.    And you are a lawyer, Mr.

15   Bluming?

16        A.    Yes, I am.

17        Q.    And we are in your offices in

18   New York?

19        A.    Correct.

20        Q.    Tell us a little bit about your

21   background, where you are from.

22        A.    Going back to birth or do you

23   want a starting point?

24        Q.    Where did you grow up?

25        A.    New York, born and raised.

1                          BLUMING

2          Q.      You went to Brooklyn Law School?

3          A.      That's correct.

4          Q.      Graduated in 1968?

5          A.      That's correct.

6          Q.      And since 1968, what has been

7    your line of work?

8          A.      I have always been in private

9    practice with various law firms.

10         Q.      Okay.  And has licensing been a

11   particular concentration of yours?

12         A.      Yes, it has.

13         Q.      Okay.  Tell us a little bit

14   about your practice in the area of

15   licensing?

16         A.      Since the early '70s, I have

17   been involved in various aspects of

18   licensing, really all aspects of licensing

19   representing manufacturers, designers,

20   athletes, personalities, retailers,

21   licensing representatives.  I have -- I

22   have been speaking on licensing at various

23   trade associations and licensing groups.

24   I have written some work on licensing and

25   business periodicals in business.  I have

1              **BLUMING**

2    been an expert witness in licensing

3    matters.  It is a significant component of

4    our practice.  I have a general commercial

5    business practice.  I am involved in

6    arbitration, and I sit as an arbitrator

7    with the American Arbitration Association

8    primarily in intellectual property

9    matters.

10      Q.    Okay.

11      A.    And as I said a general

12   commercial practice by and large.

13      Q.    How would you describe licensing

14   to a layperson?

15      A.    Probably the simplest way to

16   describe it is that it is renting one's

17   name and image to another for use in

18   connection with a product or service that

19   entity has an experience -- has an

20   expertise in producing and so on.

21      Q.    And in the context of renting

22   one's name and likeness to somebody else,

23   that, as I think you have written,

24   is -- becomes a shared enterprise, right?

25      A.    I think that a good licensing

BLUMING

1

2      Q.      Because in part insofar as his

3   compensation is based on bike sales, he

4   makes more money the more bikes that get

5   sold, right?

6      A.      Greg was always interested in

7   Trek doing as much marketing as they could

8   to promote bike sales.  He was always

9   enthusiastic about Trek doing that, and as

10  far as I can recall he always encouraged

11  Trek doing that.

12     Q.      Okay.  He was enthusiastic about

13  Trek doing marketing.

14             How enthusiastic was Mr. Lemond

15  about helping Trek through personal

16  appearances to sell more of his bikes?

17     A.      Well, I have specific

18  recollection of either Greg directly or

19  through me encouraging Trek to use him

20  more to promote sales particularly in

21  Europe, but he really was asking Trek

22  constantly to do more marketing and to

23  take advantage of him in doing that

24  marketing.

25     Q.      So you have specific

BLUMING

1 recollection of Greg wanting to do even

2 more than the contract required as -- of

3 him as far as personal experiences?

4 A.    I don't think Trek ever -- I

5 won't say ever but certainly in recent

6 years came close to asking him to appear

7 30 days or spend 30 days.

8 Q.    Do you recall in the contract

9 negotiations ever saying to Trek I know

10 you've asked for 30 days, but we would

11 like to do 45 because we think that will

12 help us sell more bikes? Do you remember

13 anything like that?

14 A.    Of course not.

15 Q.    Why do you say that?

16 A.    Why? Because a licensor -- any

17 contract sets limits, and once you commit

18 contractually to limits you are

19 contractually committed.   A good

20 partnership would have required

21 cooperation and planning together, which I

22 think was contemplated in the agreements

23 in terms of a marketing effort.   So if

24 Trek had a good plan to use Greg to market

BLUMING

1
2          MS. RAHNE:    I object to the
3     form.
4          A.     It seems fairly evident.
5          Q.     Well, when you say it confuses
6     the image, in what way?
7          A.     Well, what does it stand for?
8     Does it stand for a prestigious, high end
9     bicycle or does it stand for a bicycle
10    that is being sold at whatever price the
11    market will bear in any store that will
12    carry it.
13         Q.     So selling it in -- in the
14    latter hypothetical selling at any store
15    that will carry it at whatever price you
16    can get could undercut the image of being
17    a high end bike available in high end
18    stores?
19         MS. RAHNE:    I object to the
20    form.  Go ahead.
21         A.     Yes.
22         Q.     And that would damage Mr.
23    Lemond's brand image?
24         A.     Sure.  I mean that is why
25    a -- an Armani has several different

1          BLUMING

2  lines.  The high end Armani line is sold

3  in the high end stores, but Armani

4  accessories or there may be a lessor brand

5  of Armani suits or shirts could be sold at

6  low prices at different stores, and Armani

7  handkerchief could be sold anywhere, and

8  as a matter of fact that might help the

9  brand because people might say, gee, I

10  like that scarf.  Where do I get a suit?

11  Well, if you bring them upstairs and they

12  buy a suit for 5,000 dollars, that is a

13  good thing.

14       Q.    So in the approval section of

15  your deal points, you are looking to

16  protect Mr. Lemond both in terms of the

17  quality of the product and the places that

18  it is sold?

19       A.    That is what it says.

20       Q.    Paragraph 9 then of the deal

21  points relates to promotional and

22  marketing, and you explain to Mr. Dick

23  Burke "Trek should have the obligation to

24  use its best efforts to sell aggressively

25  to maximize volume," and then you go on to

BLUMING

1 ·

2  explain "It is typically for a licensee to

3  spend a percentage of its net sales on

4  advertising and promotion, which could

5  include participation in trade shows,

6  magazine advertisements, co-op

7  advertising, independent contests et

8  cetera."

9           Did I read that correctly?

10     A.    I again compliment your reading

11  skills.

12     Q.    And what were you trying to

13  explain to Trek in this deal point?

14     A.    That marketing is important.   It

15  is very important.   It is what a

16  businessman doesn't have to really be

17  told.   I wasn't trying to be pedantic with

18  him.   It was simply from a license

19  agreement perspective saying these -- how

20  these -- this is how these things are

21  generally handled.   They are generally

22  handled whereby the licensee will agree

23  that on -- that in addition to paying a

24  percentage royalty, they will apply an

25  amount to marketing and promotion so as to

BLUMING

1    maximize sales, and I was encouraging

2    them, and this is a deal point we backed

3    away from I believe the ultimate agreement

4    as part of the give and take that you

5    alluded to that there would be a -- that

6    there should be or could be this

7    percentage commitment on Trek's part. We

8    would like to know that they are going to

9    go out there. It is juxtaposed with the

10   best efforts undertaking, and I think by

11   backing away from the percentage and

12   relying on the best efforts, you know, we

13   indicated that we were relying more on

14   their best efforts and their commitment

15   and their trust in things that Trek said

16   in terms of what it would do to maximize

17   sales.

18        Q.     Well, we will look at how it

19   ultimately played out, but in any event in

20   this deal point what you are talking about

21   in terms of promotion and marketing is

22   that in your experience it is typical for

23   a percentage to be -- of net sales to be

24   set aside for promotion and marketing?