# Exhibit 12

```
 1              UNITED STATES DISTRICT COURT
 2                 DISTRICT OF MINNESOTA
    ---------------------------------------------------
 3
    LeMOND CYCLING, INC.,
 4
            Plaintiff,
 5
         vs.                     Case No. 08-1010
 6
    TREK BICYCLE CORPORATION,
 7
            Defendant/Third-Party
 8          Plaintiff,
 9       vs.
10  GREG LeMOND,
11          Third-Party Defendant.
12  ---------------------------------------------------
13
14
15        Video Deposition of ELISABETH HUBER
16            Monday, January 5th, 2009
17
18                    9:33 a.m.
19                       at
           GASS WEBER MULLINS, LLC
20       309 North Water Street, Suite 700
            Milwaukee, Wisconsin  53202
21
22
23     Reported by Julie K. Lyle, RPR/RMR/CRR
24
25
```



| | | |
|---|---|---|
| 1 | Q | What about -- excuse me. What about with -- and |
| 2 | | we may as well clarify this now. Were the bikes |
| 3 | | that Greg LeMond purchased for himself or others |
| 4 | | at a discounted price, were those considered |
| 5 | | employee purchasing transactions? |
| 6 | A | Pricingwise, yes, they were. |
| 7 | Q | Were they considered anything else for any other |
| 8 | | purpose? |
| 9 | A | Not that I'm aware of. |
| 10 | Q | And could you explain how those transactions |
| 11 | | would be executed? |
| 12 | A | Typically through e-mail the request would come |
| 13 | | in, and the model/size that needed to be sent out |
| 14 | | was listed, and then a corresponding shipping |
| 15 | | address and then also the payment, if they were |
| 16 | | going to be paying by a credit card or if Greg |
| 17 | | was going to be putting it on his personal |
| 18 | | account and paying for the bicycle or if he |
| 19 | | wanted it to be one of his free allotted bicycles |
| 20 | | for the model year. |
| 21 | Q | Would you need to use the designation LEMROYT if |
| 22 | | it was not a free bike? |
| 23 | A | No. |
| 24 | Q | Okay. That's helpful. Thank you. |
| 25 | | If you could turn to Trek 012060, |

```
 1      additional six months to help work with the
 2      distributor as we transitioned that over to
 3      Cycles Europe.
 4  Q   Do you have an understanding of the relationship
 5      between -- at least at the time you had the
 6      position --
 7  A   Uhm-uhm.
 8  Q   -- an understanding of the relationship between
 9      Trek France and Trek?
10  A   Yeah.  Yes.
11  Q   What is that relationship, to your understanding?
12  A   I guess I'm unclear of what your question is.
13  Q   You worked -- okay.  I'll back up.  You worked
14      for Trek France.  Were you -- did you actually
15      work from France?
16  A   I did.
17  Q   And did you consider that you worked for a
18      separate entity from Trek, or did you work --
19      were your paychecks cut by Trek here in -- in
20      Wisconsin?
21  A   They were cut by Trek in Wisconsin.
22  Q   And who did you report to at the time?
23  A   Mary Burke.
24  Q   How did it become your duty to manage all these
25      transactions for Greg LeMond?
```

```
 1  A    Basically, he was working through the marketing
 2       department, and it became apparent that it was
 3       kind of silly to have a middleman, the marketing
 4       department, taking his orders.  They don't have
 5       the ability to enter sales transactions.  So they
 6       realized that it would just be smarter to have
 7       him have a point person.  And initially that was
 8       Laurie Koch before me.
 9  Q    And if I could just make sure I get this now.
10       Laurie Koch was in the marking department or --
11  A    No, Laurie Koch is the -- was my manager at the
12       time.  And then she asked if I would do it, and I
13       said yes.
14  Q    Do you remember what year you began managing the
15       bike transactions for Greg LeMond?
16  A    I want to say it was late 2004, early 2005.
17  Q    Do you know how long Laurie Koch did it before
18       handing off those duties to you?
19  A    I do not.
20  Q    Do you know if Laurie Koch still works at Trek?
21  A    She does.
22  Q    Do you know why the transactions were initially
23       done through the marketing department?
24  A    That was just their point -- Greg's point person.
25  Q    And what was your position -- at what point in
```

```
 1            your line of -- of positions that you had with
 2            Trek --
 3   A        I was --
 4   Q        -- did you take on this duty?
 5   A        -- the inside regional manager.
 6   Q        And you continued to manage the transactions
 7            throughout promotions and job changes and --
 8   A        Correct.
 9   Q        Do you have some knowledge of Trek's policy, if
10            there is one, regarding employee purchasing of
11            Trek products?
12   A        I do.
13   Q        And what's the basis of your knowledge?
14   A        The employee handbook, and then also being part
15            of the sales department, it was just common
16            knowledge.
17   Q        Does the employee handbook have a provision that
18            specifically addresses employee bike purchases?
19   A        It does.
20                      MS. RAHNE:  I don't know if we have
21            that, and I'm not going to ask you to promise it
22            to me now, but we'll probably follow up with a
23            letter.
24                      MR. WEBER:  Sure.  I don't know if you
25            do or not.  We're happy to provide it.
```

```
 1   Q    But even backing up a step, it's available to
 2        Trek employees --
 3   A    Current Trek employees.
 4   Q    -- for personal use?
 5   A    Uhm-uhm.
 6   Q    In practice, is it used by nonemployees?
 7   A    No.
 8   Q    What was the rationale for Greg LeMond's use of
 9        the employee pricing?  Was he considered an
10        employee?
11   A    Pricingwise, yes.  But for him, he was considered
12        somebody to be a prominent cycling figure and
13        that he had contacts in the media, and he was
14        allowed to go beyond the normal employee
15        limitations because he wanted to get out and sell
16        his bike line.  And we also wanted to keep him
17        and his family on the most current year product.
18   Q    Is there anybody else, to your knowledge, at Trek
19        who had that right?
20   A    I have no knowledge since I've not worked with
21        anybody else except Greg LeMond.
22   Q    So you don't know if other prominent cyclists
23        with whom Trek has a relationship, for example,
24        Gary Fisher, if he has the ability to avail
25        himself of employee pricing?
```

|    |   |                                                                  |
|----|---|------------------------------------------------------------------|
| 1  |   | individuals, and I'll start with Warren.  Were                   |
| 2  |   | there ever any problems with transactions handled                |
| 3  |   | by Warren Gibson --                                              |
| 4  | A | I never had --                                                   |
| 5  | Q | -- that you recall?                                              |
| 6  | A | -- personally any problems with Warren at all.                   |
| 7  | Q | Were there ever any transactions that raised a                   |
| 8  |   | question or a concern at Trek, to your knowledge?                |
| 9  | A | Not that I'm aware of.                                           |
| 10 | Q | What about Muffy?                                                |
| 11 | A | None.  No problems at all.                                       |
| 12 | Q | What about Bernie?                                               |
| 13 | A | Same.  No problems at all.                                       |
| 14 | Q | How did you know about Mr. LeMond's ability to                   |
| 15 |   | buy Trek products at employee discount pricing?                  |
| 16 |   | Just in -- just due to your position and what you                |
| 17 |   | were being asked to do?                                          |
| 18 | A | When I was approached to take over the position,                 |
| 19 |   | it was explained to me that he at that juncture                  |
| 20 |   | was allowed ten free bicycles a year as part of                  |
| 21 |   | his contract and that then he would often                        |
| 22 |   | purchase products for friends or media contacts,                 |
| 23 |   | sometimes a touring company person, and then he                  |
| 24 |   | also would personally choose to sponsor some                     |
| 25 |   | teams and extend his discount to them.                           |

1  Q  Do you recall who explained this to you?
2  A  Laurie Koch and Dean Gore.
3  Q  How frequently would you say Trek shipped
4     products purchased to people other than
5     Mr. LeMond but that were Mr. LeMond's employee
6     pricing purchases?
7        It's a terrible question. Do you
8     understand it?
9  A  Yeah, I do understand it.
10       I've never tallied it up. I
11    would -- so I -- I don't know that I could give
12    you a distinct number.
13 Q  What -- could you guess a percentage of the total
14    bikes that Mr. LeMond purchased using employee
15    pricing?
16 A  That went to others?
17 Q  Correct.
18 A  I would probably say close to 70 percent went to
19    others.
20 Q  Are you aware of instances where bikes purchased
21    on Mr. LeMond's account were resold?
22 A  No, I'm unaware of anything specifically.
23 Q  Do you have an understanding of the involvement
24    of the dealers in Mr. LeMond's use of the
25    employee discount program?

1  A    Fairly good knowledge, yes.
2  Q    Can you describe generally how the dealers were
3       involved?
4  A    If the person who was receiving the bicycle was
5       not a certified mechanic, they were to have made
6       prior arrangements with their local dealer to
7       have the bike built and fully assembled, and they
8       were -- depending on that individual's
9       relationship with the dealer, would maybe pay an
10      assembly fee, maybe not.
11 Q    Do you know how this was communicated to the
12      individuals who received the bikes?
13 A    I don't.  It was my understanding it was most
14      likely done through Bernie.
15 Q    Did you do anything individually to ensure that
16      there had been a communication to the dealers?
17 A    I did not.
18 Q    Do you know if anybody else at Trek did?
19 A    I'm unaware of anybody else.
20 Q    Besides having the -- besides having your role
21      with the transactions explained to you by Laurie
22      Koch and Dean Gore, did you ever need to seek
23      additional authorization to fill any of the
24      orders placed on Mr. LeMond's account?
25 A    I did not.

```
 1   Q    Did anyone at Trek ever express any concern at
 2        any point with the transactions?
 3   A    No.
 4   Q    Were you ever required to report or inform anyone
 5        at Trek the volume or number of bikes purchased
 6        under Mr. LeMond's employee bike purchases --
 7   A    I was not.
 8   Q    -- purchase program?
 9             Do you ever recall hearing at Trek
10        any comments about the volume of Mr. LeMond's
11        employee bike purchase -- purchases?
12   A    No.
13   Q    Let's go ahead and look at a few documents.
14             (Exhibit 60 was marked for
15        identification.)
16  BY MS. RAHNE:
17   Q    Ms. Huber, I just want to spend a little time
18        looking through a set of documents related to the
19        employee purchase -- Mr. LeMond's employee
20        purchases.  Some of them were produced by Trek,
21        presumably from your file.
22   A    Uhm-uhm.
23   Q    Some of them were produced by LeMond Cycling.  So
24        some of them may be more or less familiar to you.
25   A    Uhm-uhm.
```

1   A   And so that was why I possibly included him in
2       this e-mail, to find out would that be part of
3       his role and responsibilities.
4   Q   Okay.  At some point during this process,
5       Mr. LeMond, or people acting on his behalf, began
6       getting credit card numbers from friends, family,
7       third parties who were purchasing bikes; is that
8       correct?
9   A   Correct.
10  Q   Do you recall when that practice began?
11  A   I don't, but I remember that it was an attempt to
12      help minimize his AR balance.
13  Q   Uhm-uhm.
14  A   And that what we would be billing directly to
15      Greg would be the things that he requested
16      specifically or if it was for his family,
17      because, if not, it cut down on the time that he
18      would have to have, at one juncture Muffy and
19      then Bernie, chase down payment.
20  Q   Okay.  So at -- once that practice began, is it
21      true that the only accounts receivables that you
22      needed to track down were for bikes that Greg was
23      agreeing to pay for personally?
24  A   Correct.
25  Q   And that anybody else who purchased a bike

```
 1              through -- you know, approved by Greg for --
 2              through his employee purchasing provided their
 3              own credit card number?
 4         A    That's correct, unless they specifically stated
 5              this is to go on Greg's account.
 6         Q    Okay.  So when you received a contact, you had a
 7              number of questions you had to ask, it sounds
 8              like.
 9         A    Uhm-uhm.
10         Q    So if we can just play it out so we have it
11              captured.  If I'm Bernie and I contact you, I
12              say, "Ms. Huber" -- you guys were on better
13              terms --
14         A    Uhm-uhm.
15         Q    -- but, "Ms. Huber, I want to place an order for
16              three bicycles," what would be your first
17              question?
18         A    Well, typically, it was all generally done
19              through e-mail.
20         Q    Uhm-uhm.
21         A    Our phone conversations typically consisted of
22              him checking availability.
23         Q    Okay.  Yeah, understood.  If it were through an
24              e-mail, what would be your --
25         A    Through an e-mail, he would give me the model,
```

```
 1   Q    Uhm-uhm.
 2   A    -- that he would have actually had a conversation
 3        with the choice.
 4   Q    Okay.  And this is -- you testified earlier that
 5        you didn't see it as your role to sort of police
 6        this?
 7   A    Correct.
 8   Q    But this was just sort of an informal
 9        conversation with Bernie about what you
10        considered the appropriate way to handle this?
11   A    Correct.
12   Q    Okay.  Okay.  Do you recall times when dealers
13        were upset about individuals purchasing bikes
14        through Mr. LeMond's employee discount?
15   A    I do.
16   Q    How many incidents do you recall?
17   A    Two specifically.
18   Q    And did they occur at the same time, at different
19        times?
20   A    They occurred at different times.
21   Q    Can you tell us about the most recent one?
22   A    The most recent one was with a bike that had gone
23        to Freewheeling Bicycle in Minneapolis.
24   Q    That was our -- our bike stop.
25   A    Yep.  And the main contact on the e-mails that
```

```
 1       had gone back was a Roxanne Kruder -- I'm not
 2       sure I'm saying her name correctly -- and that
 3       bikes had been ordered through her and that they
 4       had gone into the store after the store had spent
 5       a lot of time with them and may have even ordered
 6       product for them, thinking that the sale was
 7       going to take place through them.
 8    Q  Uhm-uhm. And so what happened? You received a
 9       contact from the store dealer?
10    A  I did not on that one. I read through it. I was
11       questioned about it when it happened. But the
12       regional manager received the e-mail from the
13       dealer.
14    Q  Okay. And was that forwarded on to somebody at
15       Trek?
16    A  Yes.
17    Q  Who was that forwarded on to?
18    A  Dan Titus.
19    Q  Okay. And then what happened?
20    A  I'm not sure what happened at that juncture.
21    Q  Okay. Do you have any knowledge about how that
22       was resolved or if it was resolved?
23    A  I do not.
24    Q  Okay. What about the other incident that you
25       remember?
```

```
 1  A    The other incident was with -- and I don't recall
 2       the time frame.  I want to say it was winter
 3       2007.  It might have been 2008.  But a woman had
 4       walked into Sunnyside Sports in Bend, Oregon, had
 5       the shop employee spend a lot of time with her
 6       getting fitted, getting set up, help me choose my
 7       model.  And they thought that they were going to
 8       be getting the sale from this individual, and
 9       then at the end of the employee spending
10       significant time with this woman, she said, "Oh,
11       I'm getting it through Greg LeMond."  And the
12       shop was -- was pretty unhappy about that.
13  Q    Okay.  And do you have any knowledge about how
14       that was ultimately resolved, if it was?
15  A    I apologized.  And then I spoke with Bernie and
16       asked him to again reiterate to people that it's
17       okay to work with a shop but to communicate what
18       they're doing.
19  Q    Be transparent about what the process is?
20  A    Yes.
21  Q    Okay.  Is there anybody else at Trek who would be
22       the recipient of dealer complaints, if you know,
23       such as the ones you've described?
24  A    Bob Burns.
25  Q    Anybody else?
```