IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| TIMEBASE PTY LTD., | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action Nos.  07-CV-1687 (JNE/JJG) |
| vs. | ) | |
| | ) | |
| THE THOMSON CORPORATION, | ) | |
| WEST PUBLISHING CORPORATION, | ) | **TIMEBASE'S OPENING** |
| AND WEST SERVICES, INC. | ) | **CLAIM CONSTRUCTION MEMORANDUM** |
| | ) | |
| Defendants. | ) | |

Michael R. Cunningham
Gray, Plant & Mooty
500 IDS Center
80 South Eighth Street
Minneapolis, MN  55402
Telephone: (612) 632-3000
Fax:  (612) 632-4444
michael.cunningham@gpmlaw.com

Joseph N. Hosteny
Arthur A. Gasey
Niro, Haller & Niro
181 West Madison, Suite 4600
Chicago, Illinois 60602
Telephone: (312) 236-0733
Fax:  (312) 236-1138
hosteny@nshn.com
gasey@nshn.com

Attorneys for Plaintiff
TimeBase Pty Ltd.

**TABLE OF CONTENTS**

**Page No.**

I.      THE '592 PATENT HAS BEEN REEXAMINED ............................................................ 1

II.     LIMITATIONS CANNOT BE IMPORTED FROM THE SPECIFICATION ............................... 2

III.    PATENTS ARE MEANT FOR PERSONS OF SKILL IN THE ART .............................. 3

IV.     CLAIM CONSTRUCTION PRIMARILY RELIES UPON INTRINSIC EVIDENCE ................... 4

V.      TIMEBASE'S PROPOSED CONSTRUCTIONS ARE CORRECT ..................................... 4

        A.      Amended (Joint Chart, Row 1) ............................................................ 4

        B.      Attributes (Joint Chart, Row 2) .......................................................... 5

                1. The Claims and Specification .................................................... 5

                2. The Prosecution History ............................................................ 7

        C.      Dividing (Joint Chart, Row 3) ............................................................ 7

                1. The Claims and Specification .................................................... 7

        D.      Displaying (Joint Chart, Row 4) ........................................................ 9

                1. The Claims and Specification .................................................... 9

                2. Extrinsic Evidence .................................................................. 11

        E.      Each (Joint Chart, Row 5) ................................................................ 11

                1. The Claims and Specification .................................................. 12

        F.      Graphical Representation (Joint Chart, Row 6) .............................. 13

                1. The Claims and Specification .................................................. 13

                2. Extrinsic Evidence .................................................................. 16

        G.      Linking Means and Link (Joint Chart, Rows 7 and 8) .................... 16

                1. The Claims and Specification .................................................. 17

                2. The Prosecution History .......................................................... 21

i

H.    Modified (Joint Chart, Row 9) ................................................................................. 22

I.    Multidimensional Space (Joint Chart, Row 10) ..................................................... 22

    1.  The Claims and Specification ......................................................................... 22

    2.  The Prosecution History ................................................................................ 25

J.    Portion and Predefined (Joint Chart, Rows 11, 12 and 13) ................................. 25

    1.  The Claims and Specification ......................................................................... 27

    2.  The Prosecution History ................................................................................ 29

K.    Means for Searching/Searching Means (Joint Chart, Row 14) ........................... 31

L.    Step of Searching/Searching Step (Joint Chart, Row 15) ...................................... 31

M.    Allowing the User to Search/Allowing the User to . . . Input
    at Least One Search Request (Joint Chart, Row 16) ................................................. 31

VI.    CONCLUSION ................................................................................................................ 31

## TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

3M Innovative Properties Co. v. Avery Dennison Corp.,
350 F.3d 1365, 1370 (Fed. Cir. 2003) .................................................................................. 3

Altiris, Inc. v. Symantec Corp.,
318 F.3d 1363, 1375 (Fed. Cir. 2003) ..................................................................................17

American Hoist & Derrick Co. v. Sowa & Sons, Inc.,
725 F.2d 1350, 1359, 220 U.S.P.Q. (BNA) 763, 770 (Fed.Cir. 1984) ......................... 2

Amgen Inc. v. Hoechst Marion Roussel, Inc.,
314 F.3d 1313, 1326 (Fed. Cir. 2003) ..................................................................................23

Amstar Corp. v. Envirotech Corp.,
730 F.2d 1476, 1482 (Fed. Cir. 1984) ..................................................................................13

Atmel Corp. v. Information Storage Devices, Inc.,
198 F.3d 1374, 1382 (Fed. Cir. 1999) .................................................................................. 3

Biedermann Motech GmbH v. Acme Spine, LLC,
2007 U.S. Dist. LEXIS 98330 at *23 (C.D. Cal. 2007) .......................................................28

CNS, Inc. v. Silver Eagle Labs, Inc.,
No. 04-968, 2004 WL 3631121, at *2 (D. Minn. Nov. 29, 2004) .................................. 1

Cole v. Kimberly-Clark Corp.,
102 F.3d 524, 531 (Fed. Cir. 1996) .......................................................................................16

General Elec. Co. v. Wabash Appliance Corp.,
304 U.S. 364, 369, 58 S.Ct. 899, 902, 82 L.Ed. 1402 (1938) ......................................... 2

Genzyme Corp. v. Transkaryotic Therapies, Inc.,
346 F.3d 1094, 1103 n.3 (Fed.Cir. 2003) ............................................................................ 2

IP Innovation L.L.C. v. Lexmark Int'l,
424 F. Supp. 2d 1078, 1085-86 (N.D. Ill. 2004)(Kocoras, C.J.) ....................................11

Ishida Co. v. Taylor,
    221 F.3d 1310, 1316 (Fed. Cir. 2000) ...............................................................................17

Markman v. Westview Instruments, Inc.,
    116 S.Ct. 1384, 1396 (1996)........................................................................................... 2

Markman v. Westview Instruments, Inc.,
    52 F.3d 967, 986 (Fed.Cir. 1995), affirmed, 517 U.S. 370 (1996) .................................. 1, 4, 31

Phillips v. AWH Corp.,
    415 F.3d 1303, 1323 (Fed Cir 2005) (en banc) ...................................................... passim

Purdue Pharma L.P. v. Boehringer Ingelheim GMBH,
    237 F.3d 1359, 1364 (Fed. Cir. 2001) ...............................................................................10

Rexnord Corp. v. Laitram Corp.,
    274 F.3d 1336, 1344 (Fed. Cir. 2001) ............................................................................... 3

S3 Inc. v. nVidia Corp.,
    259 F.3d 1364, 1371 (Fed. Cir. 2001) ............................................................................... 3

SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.,
    242 F3d 1337, 1341 (Fed Cir 2001) ................................................................................29

Spectra-Physics, Inc. v. Coherent, Inc.,
    827 F.2d 1524, 1534 (Fed.Cir. 1987) ............................................................................... 3

Superguide Corp. v. DirecTV Enterprises, Inc.,
    358 F.3d 870, 875, 69 USPQ2d 1865, 1868 (Fed. Cir. 2004)........................................24

Utah Med. Prods., Inc. v. Graphic Controls Corp.,
    350 F.3d 1376, 1383 (Fed. Cir. 2003) ...............................................................................17

VData LLC v. Aetna, Inc.,
    No. 06-1701, 2006 WL 3392889, at *6 (D. Minn. Nov. 21, 2006) (Ericksen, J.). .................... 1

Verve, LLC v. Crane Cams, Inc.,
    311 F.3d 1116, 1119 (Fed. Cir. 2002) ...............................................................................17

Vitronics Corp. v. Conceptronic, Inc.,
    90 F.3d 1576, 1582 (Fed. Cir. 1996) .............................................................................4, 29

Wenger Manufacturing, Inc. v. Coating Machinery Systems, Inc.,
    239 F.3d 1225, 1233 (Fed. Cir. 2001) ...............................................................................17

**FEDERAL STATUTES**

35 U.S.C. § 112, ¶ 6 ................................................................................................................................ 16, 17

**TABLE OF EXHIBITS**

| Exhibit Tab | Description of Exhibit |
|---|---|
| A | TimeBase's United States Patent, No. 6,233,592 B1, "System for Electronic Publishing" (filed as 2 parts).  Citations are in the form of column: line, e.g., column 15, lines 20-23 are cited as 15:20-23. |
| B | Paginated File History for the '592 Patent (filed as 8 parts). Pages in the file history are numbered individually, for example, as 592FH000001. |
| C | Reexamination Certificate for TimeBase's U.S. Patent 6,233,592 C1. |
| D | Paginated File History for the '592 Reexamination (filed as 59 parts). Pages in the file history are numbered individually as, e.g., 592REEX00001. |
| E | TimeBase's United States Patent, No. '228, "System for Electronic Publishing" (filed as 2 parts). Citations are in the form of column: line, e.g., column 15, lines 20-23 are cited as 15:20-23. |
| F | Paginated File History for the '228 Patent (filed as 32 parts). |
| G | Joint Claim Construction Chart – Each row includes a claim term, TimeBase's construction (Column C) and the Defendants' construction (Column D). |
| H | *Computer Dictionary*, Microsoft Press, Redmond, Washington, 1991, at 111. |
| I | *IBM Dictionary of Computing*, George McDaniel ed., McGraw-Hill, Inc., New York, 1994 at pp. 206 and 301. |
| J | *Encyclopedia of Computer Science & Engineering*, Anthony Ralston, Van Nostrand Reinhold, 2d ed. 1983. |
| K | *Fundamentals of Database Systems*, Ramez Elmasri and Shamkant B. Navanthe, Addison-Wesley, 2d ed. 1994. |
| L | *Extensible Markup Language (XML),* W3C Working Draft, November 14, 1996. |

| Exhibit Tab | Description of Exhibit |
|---|---|
| M | *A Gentle Introduction to SGML*, Chapter two of Guidelines for Electronic Text Encoding and Interchange (TEI P3), edited by C. M. Sperberg-McQueen and Lou Burnard, currently available at http://www.isgmlug.org/sgmlhelp/g-index.htm, 1994. |

I.      **THE '592 PATENT HAS BEEN REEXAMINED**

The defendants said that the reexamination would give the Court the benefit of the Patent Office's expertise, citing VData LLC v. Aetna, Inc., No. 06-1701, 2006 WL 3392889, at *6 (D. Minn. Nov. 21, 2006) (Ericksen, J.). (Defendants' Memorandum in Support of Motion to Stay Litigation Pending Reexamination Proceedings, Docket Item 35, June 14, 2007, pages 11-12). They said the reexamination would be conducted by people trained to understand the technologies in the patents. (Defendants' Memorandum, Docket Item 35, June 14, 2007, page 8). The defendants said that, if the claims emerged from the reexamination, "input of the Patent Office will assist in shaping, refining, and guiding this case through the issues that will remain after reexamination." (Defendants' Memorandum, Docket Item 35, June 14, 2007, page 2, quoting *CNS, Inc. v. Silver Eagle Labs, Inc.,* No. 04-968, 2004 WL 3631121, at *2 (D. Minn. Nov. 29, 2004)). The examiners construed the terms in the patents, and now is the time to take advantage of their expertise.

The construction of the claims here must be consistent with the analysis in the reexamination of the '592 patent. Patent examiners have the statutory duty to ensure compliance with Title 35 U.S.C., including §§ 101, 102, 103 and 112. They are quasi-judicial officials who are presumed to carry out their duties. *Markman v. Westview Instruments, Inc., 52* F.3d 967, 986 (Fed.Cir. 1995), *affirmed,* 517 U.S. 370 (1996) ("Patent applications, unlike contracts, are reviewed by patent examiners, quasi-judicial officials trained in the law and presumed to "have some expertise in interpreting the [prior art] references and to be familiar from their work with the level of skill in the art and whose duty it is to issue

1

only valid patents." *American Hoist & Derrick Co. v. Sowa & Sons, Inc.*, 725 F.2d 1350, 1359, 220 U.S.P.Q. (BNA) 763, 770 (Fed.Cir. 1984).

An examiner's work and decisions therefore cannot be challenged without evidence. *Genzyme Corp. v. Transkaryotic Therapies, Inc.*, 346 F.3d 1094, 1103 n.3 (Fed.Cir. 2003) (the examiner is presumed to have done his job unless there is evidence to the contrary).

Another reason to abide by the examiners' work is because that leads to a consistent public record. The rationale for Markman hearings is uniformity:

> Finally, we see the importance of uniformity in the treatment of a given patent as an independent reason to allocate all issues of construction to the court. As we noted in *General Elec. Co. v. Wabash Appliance Corp.,* 304 U.S. 364, 369, 58 S.Ct. 899, 902, 82 L.Ed. 1402 (1938), "[t]he limits of a patent must be known for the protection of the patentee, the encouragement of the inventive genius of others and the assurance that the subject of the patent will be dedicated ultimately to the public.

*Markman v. Westview Instruments, Inc.,* 116 S.Ct. 1384, 1396 (1996).

There are two asserted patents, the '592 and the '228.  (Exh. A, C and E).  The '592 patent was reexamined.  (Exh. C, D).  All of its claims were confirmed, and three new claims were added.   The '228 contains the entire specification of the '592 patent, and adds information.

## II.   <u>LIMITATIONS CANNOT BE IMPORTED FROM THE SPECIFICATION</u>

The goal of claim construction is simplicity: to provide a finder of fact - here, a jury - with reasonable and sensible instructions for deciding whether a claim is infringed. Clarity is important.  We should not dream up new limitations to claims, which would confuse a jury and wrongly increase the burden of proving infringement.

Claims cannot be limited to the embodiments in the specification. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1323 (Fed Cir. 2005) (*en banc)* ("For instance, although the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments."). That rule holds even if the specification describes only one embodiment. *Id.*

Limitations cannot be imported into the claims from the specification, either. *Id*. The examples described and illustrated in the specification are intended to be just that: examples, not claim limitations. "Specifications teach. Claims claim." *Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1344 (Fed. Cir. 2001). "[A] patent need not teach, and preferably omits, what is well known in the art." *Spectra-Physics, Inc. v. Coherent, Inc.*, 827 F.2d 1524, 1534 (Fed.Cir. 1987); *S3 Inc. v. nVidia Corp.*, 259 F.3d 1364, 1371 (Fed. Cir. 2001) ("The specification would be of enormous and unnecessary length if one had to literally reinvent and describe the wheel.", quoting *Atmel Corp. v. Information Storage Devices, Inc.,* 198 F.3d 1374, 1382 (Fed. Cir. 1999)).

## III.  <u>PATENTS ARE MEANT FOR PERSONS OF SKILL IN THE ART</u>

"[P]atents are addressed to and intended to be read by others of skill in the pertinent art." *Phillips*, 415 F.3d at 1313.  The proper definition of a claim term is the "definition that one of ordinary skill in the art could ascertain from the intrinsic evidence in the record." *Id*. (citations omitted). As a consequence, there is a heavy presumption that a claim term carries its ordinary and customary meaning to persons of skill in the art at the time of the invention. *3M Innovative Properties Co. v. Avery Dennison Corp.,* 350 F.3d 1365, 1370 (Fed. Cir. 2003).

3

**IV.**     **CLAIM CONSTRUCTION PRIMARILY RELIES UPON INTRINSIC EVIDENCE**

The basis for claim construction is the public record, called the intrinsic evidence: the claims, the specification, and the file history of the patent. *Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1582 (Fed. Cir. 1996):

> It is well-settled that, in interpreting an asserted claim, the court should look first to the intrinsic evidence of record, *i.e.*, the patent itself, including the claims, the specification and, if in evidence, the prosecution history. See *Markman*, 52 F.3d at 979, 34 USPQ2d at 1329. Such intrinsic evidence is the most significant source of the legally operative meaning of disputed claim language.

*Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 978-979 (Fed. Cir. 1995).

Everything else – dictionaries, treatises, expert testimony – is extrinsic evidence and has a lesser role. *Phillips,* 415 F.3d at 1317; *Vitronics,* 90 F.3d at 1583 ("In those cases where the public record unambiguously describes the scope of the patented invention, reliance on any extrinsic evidence is improper. The claims, specification, and file history, rather than extrinsic evidence, constitute the public record of the patentee's claim, a record on which the public is entitled to rely."). Extrinsic evidence cannot contradict the intrinsic evidence, either. *Vitronics*, 90 F.3d at 1584-1585; *Phillips,* 415 F.3d at 1318.

**V.**     **TIMEBASE'S PROPOSED CONSTRUCTIONS ARE CORRECT**

**A.**     **Amended (Joint Chart, Row 1)**

The parties agree for purposes of this case that "amended" means: Altered or changed in some way.

B.      **Attributes (Joint Chart, Row 2)**

The correct meaning is: A piece of code or mark-up that describes a point on an axis of a multidimensional space for example, the section number, or ID, or the effective date of a section of statute.

### 1.      The Claims and Specification

Multidimensional space (as discussed in section V.I.) means a number of axes or lines, as shown in Figures 1 to 4 of the '592 patent. The independent claims of the '592 patent tell us that an attribute is a point on an axis of that multidimensional space. (Exh. A, 592 patent, 155:11-12, 156:22-23, 157:41). For example, claim 1 says:

> a plurality of attributes, each attribute being a point on an axis of a multi-dimensional space....

(Exh. A, 592 patent, 155:11-12). The specification says the same, reiterating it several times.  (Abstract, 4:10-12, 7:19-21, and 31:15-20.

There can be many points in the multidimensional space. Attributes distinguish one point from another.  The nature of the attribute depends upon the particular axis. For example, in Figure 4, the X-axis is time, with different points representing different dates on that axis. The date can be, for example, the date of insertion, the date of repeal, or the date of amendment. (Exh. A, 592 patent, 99:25, 103:1-7, 105:3-9, 109:15-23, 113:10-17, 115:7-17).

The attributes consist of information about some text. This may or may not be in a form which is humanly comprehensible, but consider, for example, "CWACT-1979141-SCH-1." (Exh. A, 592 patent, 115:1-35).  These letters and numbers tell us that the text is an act (ACT).  Its year and number (1979141) are 1979, no. 141.  It is Schedule 1 (SCH-1).  It is an

income tax schedule in the Commonwealth of Australia (CW). (Exh. A, 592 patent, 115:19-22). (The embodiments use Australian legislation in the examples because the original parent application was filed there).

Once created the attributes are used in conjunction with links, in order to "travel" in the multidimensional space to a desired location representing textual data.  A simple analogy is the use of an address (state, city, street name and street number) to find a house. The house is analogous to the text, and the state, city, street name and street number are analogous to attributes.

The defendants rely only on column 7, lines 43-45 to propose that an attribute be defined merely as a characteristic or descriptor of text-based data. (Joint Chart, Cell 2D). While their reference is not incorrect, it is incomplete. Immediately following the defendants' citation, the specification says that the text can be located at a particular point in the multidimensional space "using as coordinates the attributes added to the piece or block of text." (Exh. A, 592 patent, 7:49-51). Their definition fails to heed the intrinsic evidence as a whole. It ignores the independent claims, cited above, which all say that attributes are points on the axes of the multidimensional space. It likewise ignores all of the repeated statements in the specification and file history, cited above and below, that attributes are points in the multidimensional space. Any claim construction must consider all of the intrinsic evidence, not just some of it. A person of skill reads the entire patent, not just parts of it. *Philips,* 415 F.3d at 1313.

The defendants' proposal does not construe the claims consistently with the specification, either. The claims make no mention of attributes as characteristics or

descriptors; the claims say that attributes are points on axes. The defendants agreed in

2007 with TimeBase's construction of "attribute":

> These predefined portions are also organized in the system using "attributes," where each attribute is a point on an axis or "pathway" of a multidimensional space. (*Id.*) In the context of legal information, the patent gives as examples of attributes such things as the location or address of the information, the type of information (case, legislation, or journal), the jurisdiction, the subject or content, the depth or the extent of the content, and the point in time at which the information is viewed. (*Id*., 8:13-18.)

(Defendants' Memorandum in Support of Motion to Stay Litigation Pending Reexamination

Proceedings, Docket Item 35, June 14, 2007, page 5). Their recognition of the types of

information -- cases and journals as well as legislation -- indicates that their present

construction of link (section V.G. of this brief) is incorrect as well.

### 2.    The Prosecution History

The examiner in the '592 reexamination described an attribute as a point on an axis

of the multidimensional space. (592REEX002431). He said that claim 1 was patentable in

part because it recites attributes that are points on an axis of the space. (592REEX002435).

The defendants' proposed construction contradicts the examiner and the public record.

### C.    Dividing (Joint Chart, Row 3)

The correct meaning is: Separating into suitable portions.   Thomson seeks a

definition for the term to mean "separating into two or more parts."   (Exh. G, Joint Chart,

Cell 3D).

### 1.    The Claims and Specification

This term is found only in claims 1 and 24 of the '228 patent.  The use of "dividing" is

highlighted in Claim 1, below:

1. A method for electronically publishing text-based data, the method comprising:

<mark>dividing the text-based data into a plurality of portions of text-based data;</mark>

obtaining an amended portion of text-based data that is amended relative to one of the plurality of portions of text-based data;

storing each of the plurality of portions of text-based data;

storing the amended portion of text-based data;

providing a plurality of attributes, wherein the attributes define a manner in which the plurality of portions of text-based data and the amended portion of text-based data can be organized, displayed and linked in a multidimensional space;

encoding each of the plurality of portions of text-based data and the amended portion of text-based data with a markup language to include at least one link defined by one of the plurality of attributes;

allowing a user to search the text-based data using at least one of the plurality of attributes; and

displaying the text-based data to the user by:

displaying at least one of the plurality of portions of text-based data or the amended portion of text-based data in response to the search; and

displaying text, and/or one or more selectable links representing at least one additional attribute.

(Exh. E, 228 patent, 163:12-37).  Thomson's definition seeks to substitute "parts" for the language actual used in the claim, i.e., "portions."  (See section J, infra).  Thomson offers no reason for this change, and in fact does not even use its own definition for "portions" in the proposed construction for "dividing . . . into a plurality of portions."  Thomson's proposed construction is at odds with the claim language, and should be rejected.

Thomson's proposed construction runs afoul of the specification, too.  Specifically, Thomson fails to recognize that simply dividing data into two or arbitrary parts (which would be included in their construction) is something which was specifically criticized in the specification.  The specification makes clear that the purpose of dividing is to create "suitably small pieces" or portions:

> The embodiments advantageously divide information into "suitably" small pieces (or blocks) of text, each of which is a predefined portion of data, and add to each piece of text, either expressly or implicitly, a number of attributes (characteristics or descriptors). The suitability as to size of text pieces is determined by an analysis of the information and its naturally occurring structure based on knowledge of how the information is used and consumed by the end user.

(Exh. A, 592 patent, 7:41-48).   The specification, however, specifically excludes certain "sizes" or blocks or pieces, such as a single word, because such portions would be "unmanageable." (Exh. A, 592 patent, 3:13-35, see also, section J, *infra*).   Thomson's definition ignores this intrinsic evidence, too.   Thomson's proposed definition should be rejected.

### D.   Displaying (Joint Chart, Row 4)

The correct meaning is: Putting on a visual output device of a computer; presenting data visually; providing a visual presentation of data. Output devices include printers, plotters, and other reproductive devices.   Thomson, by contrast, seeks to limit "displaying" to "showing on a computer screen." (Exh. G, Joint Chart, Cell 4D).

### 1.   The Claims and Specification

"Displaying" is found only in claims 1, 13, 24, and 36 of the '228 patent. (Exh. G, Joint Chart, Cell 4B).   An example of the "displaying" called for by the claims is shown in claim 1 of the '228, as set forth below:

> **1**. A method for electronically publishing text-based data, the method comprising:
>
> dividing the text-based data into a plurality of portions of text-based data;
>
> obtaining an amended portion of text-based data that is amended relative to one of the plurality of portions of text-based data;
>
> storing each of the plurality of portions of text-based data;
>
> storing the amended portion of text-based data;
>
> providing a plurality of attributes, wherein the attributes define a manner in which the plurality of portions of text-based data and the amended portion of text-based data can be organized, displayed and linked in a multidimensional space;
>
> encoding each of the plurality of portions of text-based data and the amended portion of text-based data with a markup language to include at least one link defined by one of the plurality of attributes;
>
> allowing a user to search the text-based data using at least one of the plurality of attributes; and
>
> displaying the text-based data to the user by:
>
> displaying at least one of the plurality of portions of text-based data or the amended portion of text-based data in response to the search; and
>
> displaying text, and/or one or more selectable links representing at least one additional attribute.

(Exh. E, 228 patent, 163, 12-37).  The claim language is silent as to how the text portions and/or links must be displayed.

The specification, however, teaches multiple types of output devices in addition to a video display or computer screen:

> The first embodiment is preferably practiced using a conventional general-purpose computer, such as the one shown in FIG. **5**, wherein processes for providing and managing the information are carried out using software executing on the computer. In particular, the legislation database, the database and the DTD(s) may be stored after a filtering process on a CD-ROM used by the computer system, and the computer system is operated using Folio View. The computer system **500** includes a computer **502**, a video display **516**, and input devices **518**. A number of output devices, including line printers, laser printers, plotters, and other reproduction devices, can be connected to the computer **502**. Further, the computer system **500** can be

(Exh. A, 592 patent, 11:58-62).  Where, as here, multiple embodiments enable the claimed function (i.e., displaying text and links), it is legal error to read in one embodiment from the specification while excluding others.  See *Purdue Pharma L.P. v. Boehringer Ingelheim*

*GMBH*, 237 F.3d 1359, 1364 (Fed. Cir. 2001) (refusing to limit claims to single-dose administrations of medication when specification made reference to both single and multiple doses);  *see also IP Innovation L.L.C. v. Lexmark Int'l,* 424 F. Supp. 2d 1078, 1085-86 (N.D. Ill. 2004)(Kocoras, C.J.)(refusing to limit an "image display device" to a video monitor, noting that it "would require us to ignore the references to printers within the specification, in essence writing them out of the patent entirely, which is not a proper exercise in circumstances such as these"). Thomson's proposed definition would read in a preferred embodiment (i.e., a computer screen) to the exclusion of others (e.g., printers), and should be rejected.

### 2.    Extrinsic Evidence

TimeBase's proposed construction is supported by the plain and ordinary meaning of "display."   Relevant dictionary definitions support a plain and ordinary meaning for "display" as a "visual presentation of data," and identify examples of "display devices" which include printers and other hardware besides computer monitors.  Exh. H, Microsoft Computer Dictionary, Microsoft Press, 1991, page 111, Exh. I, IBM Dictionary of Computing, 10th ed., 1993, page 206, Exh. J, Encyclopedia of Computer Science & Engineering, Anthony Ralston, Van Nostrand Reinhold, 2d ed. 1983, page 495. (Display devices include, e.g., "printers or card readers.") There is no requirement in the dictionary definition that the display must be on a "computer screen."

### E.    Each (Joint Chart, Row 5)

The correct meaning is: Referring individually to things.  Thomson, by contrast seeks to construe "each" to mean "every one considered separately."  (Exh. G, Joint Chart, cell 5D).

11

### 1.    The Claims and Specification

The word "each" is found in claims 1, 20, 40, 59, 60, 61 of the '592 patent, and claims 1 and 24 of the '228 patent.  (Exh. G, Joint Chart, Cell 5B).  Claim 1 (shown below) gives an example of how "each" is used in a variety of different claim elements to modify different terms (e.g., predefined portions, attribute):

> 1. A computer-implemented system for publishing an electronic publication using text-based data, comprising:
> a plurality of predefined portions of text-based data with each predefined portion being stored;
> at least one predefined portion being modified and stored;
> a plurality of linking means of a markup language, each predefined portion of said text-based data and said at least one modified predefined portion of text-based data being encoded with at least one linking means; and
> a plurality of attributes, each attribute being a point on an axis of a multidimensional space for organising said plurality of predefined portions and said at least one modified predefined portion of said text-based data.

(Exh. A, 592 patent, 155:2-14).   Thomson proposes a definition which potentially could work mischief by confusing the individual elements (e.g. a given attribute from the plurality of attributes) with the requirement that "every" (i.e., all) elements (e.g., all attributes, whether related to the accused features of the products or not) in an accused device meet a given limitation.

For instance, suppose that a given statute had five (or ten or more) sections, but only two of the sections in the statute have been encoded with links and modified.  Such a structure would literally meet the requirements of the claims, since it includes a "plurality" of predefined portions and at least one modified predefined portion that are encoded.  The existence of additional elements (i.e., additional sections or portions) could not – as a

matter of law – negate infringement. *Amstar Corp. v. Envirotech Corp.*, 730 F.2d 1476, 1482 (Fed. Cir. 1984) ("Modification by mere addition of elements . . . cannot negate infringement, without disregard of . . . long-established, hornbook law . . . ."). The insertion of "every" into the construction of "each," however, might confuse a jury otherwise. The better, safer approach, is simply to define each to mean "referring individually to things" (whether attributes or portions).

### F. Graphical Representation (Joint Chart, Row 6)

The correct meaning is: A written, printed or pictorial presentation or display. Thomson, by contrast seeks to limit the term to only "a pictorial presentation or pictorial display." (Exh. G, Joint Chart, Cell 6D).

#### 1. The Claims and Specification

"Graphical Representation" is found only in claims 24, and 36 of the '228 patent. (Exh. G, Joint Chart, Cell 6B). An example of that phrase as used in claim 36 is set forth below:

> **36**. A method for electronically searching text-based data encoded with a mark-up language, the method comprising: allowing a user to select a version date as a primary attribute and to input at least one search request;

producing results based on the text of the text-based data;

displaying the results in a format that is configured to allow the user to select one of the results;

displaying the result as a portion of text-based data corresponding to a selected result that corresponds to the at least one attribute and the at least one search request;

displaying a link;

allowing a user to select the link;

whereupon the plurality of portions related to the current portion are displayed as a graphical representation of a multidimensional space; and

allowing the user to select and thereby display text-based data represented by a point on the multidimensional space;

wherein each point on the multidimensional space is defined by the value of one or more of a plurality of attributes.

(Exh. E, 228 patent,    165:60-166:19).    Nothing in either claim using "graphical representation" requires any limitation to a "pictorial representation" as opposed to a representation which includes  written or printed symbols.

To the contrary, the specification provides examples whereby an axis (a component of a multidimensional space) can display a plurality of portions using a representation which includes a written presentation, not just a pictorial representation.  For instance, Figures 18-20 provide different screen shots of various axes of a multidimensional space:

FIG. **18** is a screen shot of a Normal axis view of a MALT publication (with a search mode enabled) in accordance with an embodiment of the present invention;

FIG. **19** is a screen shot of a Versions axis view of a MALT publication in accordance with an embodiment of the present invention;

FIG. **20** is a screen shot of a Source axis view of a MALT publication in accordance with an embodiment of the present invention;

(Exh. E, 228 patent, 8:42-51).  These screen shots further provide for representations of portions (e.g., sections of legislation) which provide text representations (e.g., timeframe

listings) which allow users to select and display data (e.g., the various versions of the section) depending upon its point in the time axis:



**Fig. 19**

(Fig. 19).  Such examples show that the graphical representation can include pictures (e.g., arrow buttons to navigate along different versions in time, identified in figure element 1915) but can also include text or written representations (e.g. the text summary showing one version up to October 1995, and another version up to December 2001, identified in figure element 1920).  The intrinsic record shows that a "graphical representation" may be pictorial, written, or both.

15

### 2.     Extrinsic Evidence

TimeBase's proposed construction is supported by the plain and ordinary meaning of "graphic."   Relevant dictionary definitions support a plain and ordinary meaning for "graphic" to including symbols through printing or writing as well as drawings or pictures. (Exh. I, BM Dictionary of Computing, 10th ed., 1993, page 301, (e.g., "graphic: a symbol produced by a process such as handwriting, drawing, or printing.")   The plain and ordinary meaning -- like the specification -- does not parse between pictorial symbols and representations which include writing.

### G.     Linking Means and Link (Joint Chart, Rows 7 and 8)

The correct meaning for both terms is: A connection which utilizes any piece of code or markup that allows departure and destination points to be created to portions, between portions, or between related material and portions.

"Linking means" is used in the '592 claims. The '228 claims use "link." TimeBase discusses them together because their meaning is the same. The use of "means" creates a presumption that "linking means" is governed by 35 U.S.C. § 112, paragraph 6. That presumption is rebutted where one of skill in the art would understand the necessary structure needed. *Cole v. Kimberly-Clark Corp.*, 102 F.3d 524, 531 (Fed. Cir. 1996). That is the case here. "Linking means" is not a means-plus-function limitation. (TimeBase has provided an alternate §112 ¶6 construction if the court so rules.  (Exh. G, Joint Chart, Cell 7C).

Means-plus-function claim elements pursuant to 35 U.S.C. § 112 ¶ 6 have two parts -- a structure and a function.  The court does only two things: (1) identify the function; and

16

(2) determine the corresponding structures described in the specification that are capable of performing the function. *Altiris, Inc. v. Symantec Corp.,* 318 F.3d 1363, 1375 (Fed. Cir. 2003). Where more than one "corresponding structure" is disclosed, nothing requires the court to "formulate a single claim interpretation to cover multiple embodiments. Rather, § 112, ¶ 6 requires only identification of the structure, or structures, in the specification that perform the recited function." *Ishida Co. v. Taylor*, 221 F.3d 1310, 1316 (Fed. Cir. 2000). Therefore, it is inappropriate to import structural limitations from the written description that are unnecessary to perform the claimed function. *Wenger Manufacturing, Inc. v. Coating Machinery Systems, Inc.,* 239 F.3d 1225, 1233 (Fed. Cir. 2001).

Only later does the fact finder decide whether the corresponding structure, material or act, or an equivalent structure, material or act, is present in the accused device or process. *Id.* at 1237-38. Thus, for elements expressed in means-plus-function format, all the court can determine as a matter of law is the structure or act disclosed in the specification and the function specified in the claim. Everything else (i.e., determining whether something is an equivalent to the structure or act) is a question of fact, reserved for the trier of fact. *Utah Med. Prods., Inc. v. Graphic Controls Corp.,* 350 F.3d 1376, 1383 (Fed. Cir. 2003).

### 1. The Claims and Specification

The parties agree that a link uses "markup," short-hand for a markup language, such as SGML (Standard Generalized Markup Language) or XML (Extensible Markup Language). (Exh. G, Joint Chart, Cells 8C and 8D). A patent is a teaching document, not an encyclopedia or a set of blueprints. *Verve, LLC v. Crane Cams, Inc.,* 311 F.3d 1116, 1119 (Fed. Cir. 2002)

("Patent documents are written for persons familiar with the relevant field; the patentee is not required to include in the specification information readily understood by practitioners, lest every patent be required to be written as a comprehensive tutorial and treatise for the generalist, instead of a concise statement for persons in the field."). The discussion in the specification of markup languages is very abbreviated, because SGML and XML were known to those of skill in the art at the time of the invention of the '592 patent. (Exh. N, O).

Markups appear inside angle brackets, that is, < and >. A simple example of the use of a markup language could be <BD+>, which means that the text following the markup will be in a bold font.  Here is a very simple example:

> a plurality of attributes, <BD+>each attribute being a point on an axis of a multi-dimensional space<BD->for organizing said plurality of predefined portions....

But when displayed on a screen or a printer, the mark up is not visible, and text appears like this:

> a plurality of attributes, **each attribute being a point on an axis of a multi-dimensional space** for organizing said plurality of predefined portions....

In actual use, many different and more complicated markups can be used. The act of marking up can also be referred to as "encoding." (Exh. A, 592 patent, 155:10).

The parties also agree that a link makes a connection. (Exh. G, Joint Chart, Cells 8C and 8D).

The parties disagree, however, about <u>what</u> can be connected, and the precise form of mark-up language or code which constitutes the linking structure.

In regard to the first issue, TimeBase says that a link may connect to a portion, may connect one portion to another, or may connect a portion and some related material. (Exh. G, Joint Chart, Cell 8C). The defendants' construction is much narrower: it permits a link <u>only</u> between portions. (Exh. G, Joint Chart, Cells 8D and 11D). The defendants equate text-based data with portions. (Exh. G, Joint Chart, Cell 11D). Thus, according to the defendants, only portions can be linked.

The defendants' narrow construction is at odds with the claims and the specification. Links can connect preceding and subsequent versions of a section of legislation. (Exh. A, 592 patent, 5:23). But links can do more; they also connect to other things such as cases, journal articles, and material from other jurisdictions. For example, Figure 4 of the 592 patent shows a multidimensional space with three dimensions. The X-axis represents time. The Y-axis represents location, that is, the provision. The Z-axis represents type, including legislation, cases and articles. (Exh. A, 592 patent, 10:48-50).

The user can travel in this space. For example, a user could research evidence and, in particular, confessions. (Exh. A, 592 patent, 10:13-15). The scope of the research could be acts and cases dealing with confessions in the last twelve months. (Exh. A, 592 patent, 10:13-15). Or a user could research the murder statutes of two different Australian states, New South Wales and Queensland. (Exh. A, 592 patent, 10:16-18).

Figure 4 of the 592 patent shows an example of a user doing research. (Exh. A, 592 patent, 10:24-36). The user looks for legislation (L) as of January 1, 1996, moves to Section 4 of the legislation, then looks at the version in existence as of January 1, 1995, and then

19

looks at cases and journal articles about that section. (Exh. A, 592 patent, 10:24-50 and 11:7-12).

The claims require this interpretation. Independent claim 13 of the '228 patent recites:

> a link to cases related to the portion of legislation and a link to additional versions of the legislations....

(Exh. E, 228 patent, 164:19-21).   The user can select either one.   (Exh. E, 228 patent, 164:23).  Claim 15 says that a portion of text-based data can be associated with a case or a version by a link.  (Exh. E, 228 patent, 164:29-32).

The defendants' proposed construction therefore contradicts claims 15 (and 38) of the '228 patent, and the specifications of both patents.

Another problem with the defendants' proposal is that it would unfairly restrict the nature of a link.  (Exh. G, Joint Chart, Cell 7D). The defendants wish to restrict the code or mark-up which constitutes the structure of the link to "a single reference ID." That term is not used in either patent, either in the claims or specifications.   It cannot be a claim limitation. The defendants cite column 4, lines 54-57 of the '592 specification, but that part makes no mention of a "single reference ID." (Exh. G, Joint Chart, Cell 7D). It says:

> The embodiments of the invention provide an entirely new way of delivering, storing and publishing information. The embodiments allow publishers to add an arbitrary
> 55  number of logical connections to a set of data, and even permit the publisher to display the precise evolution of that data set over time. This can be done without getting bogged down in the complexity of the logical connections and without limit as to storage space.

(Exh. A, 592 patent, 4:51-59). Note also that the quote above refers to "information," and a "set of data," not to blocks of text-based data, as the defendants argue.

20

The defendants also refer to Figures 3, 4 and 14 of the 592 patent. (Exh. G, Joint Chart, Cell 7D). But those figures do not refer to a "single reference ID." Furthermore, Figures 3 and 4 make clear that links can be to cases, journals and legislation. See the Z-axis in Figure 4.

They refer to column 9, line 65 to column 10, line 3. But the specification starts the text they rely on with the words "For example, . . . ." (Exh. A, 592 patent, 9:66). An example is not a claim limitation. *Phillips v. AWH Corp.,* 415 F.3d at 1323. Their references to columns 35, 97, 121 and 123 all come from Table C. The tables are descriptions of an embodiment. (Exh. A, 592 patent, 8:21-32). They cannot constitute claim limitations. *Phillips v. AWH Corp.,* 415 F.3d at 1323.

Similarly the defendants' proposed narrow definition contradicts other claims of the '592 patent. Claim 10, a dependent claim, recites one additional limitation to claim 1: an "identification code." (Exh. A, 592 patent, 155:45). Claim 1 cannot be of the same scope as claim 10. The same is true with respect to claims 40 and 49. (Exh. A, 592 patent, 157:30-44 and 158:20). The approach proposed by the defendants treats the link structure as being merely a hyperlink, something rejected in the '592 specification. (Exh. A, 592 patent, 4:67-5:7).

### 2.    The Prosecution History

The examiner in the 592 reexamination took the same view. He did not limit the links to portions.  Instead, he said variables could be linked:

> By fixing one Dimension or two (say time and location, See for example Fig 4), one can trace through the other coordinates or Dimensions (say type, See for example Fig 4) and find the changes with respect to the other variables.

21

(592REEX002435).

### H. Modified (Joint Chart, Row 9)

The parties agree for purposes of this case that "modified" means: Altered or changed in some way.

### I. Multidimensional Space (Joint Chart, Row 10)

The correct meaning is: An area not having boundaries and that is capable of, or involves, more than three dimensions. It is explicitly defined. (Exh. A, 7:52-54).

### 1. The Claims and Specification

The Defendants agree with this proposed definition, but attempt to read in an additional element limiting the term to "axes along which point-to-point movement is allowed." (Exh. G, Joint Chart, Cell 10D). None of the claims discuss "point to point movement" in the multidimensional space as Thomson urges. (Exh. G, Joint Chart, Cell 10B). Indeed, the broadest claims in the asserted patents, on which the defendants rely, do not even require any ability to move between portions, e.g., the ability to navigate, or search and retrieve different portions within the multidimensional space. For instance, claim 20 mentions that each attribute is for "organizing" portions of text based data, not moving between different portions along such axes:

22

> **20**. A computer readable recording medium for publishing an electronic publication using text-based data, comprising:
>    a plurality of predefined portions of text-based data with each predefined portion being stored;
>    at least one predefined portion being modified and stored; and
>    a plurality of linking means of a markup language, each predefined portion of said text-based data and said at least one modified predefined portion of text-based data being encoded with at least one linking means; and
>    a plurality of attributes, each attribute being a point on an axis of a multidimensional space for organising said plurality of predefined portions and said at least one modified predefined portion of said text-based data.

(Exh. A, 592 patent, 156:13-25).   The defendants rely on claim 24, but that narrows and add further limitations to claim 20. It adds retrieving (a type of moving to) a given portion using the attributes defining a given point in the multidimensional space:

> **24**. The recording medium according to claim **20**, further comprising means for searching at least one of said predefined portions of said text-based data uses said plurality of attributes, wherein said plurality of attributes are coupled to each of said predefined portions by said respective linking means, and for retrieving one or more of said predefined portions using said plurality of attributes to define a point in said multidimensional space.

(Exh. A, 592 patent, 156:35-42

Where, as here, a patent claim "'does not contain a certain limitation and another claim does, that limitation cannot be read into the former claim in determining either validity or infringement.' There is a rebuttable presumption that different claims are of different scope." *Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1326 (Fed. Cir. 2003) (citations omitted).   The defendants however, ignore the differences in scope between the claims, and fail to recognize that certain claims specifically call for different types of retrieving (e.g., moving to) a given portion by using an attribute on an axis of a

multidimensional space (claim 24), while others (claim 20) simply call for "organising" such portions using their attributes.  None of these claims limit the type of movement to "point to point" movement along an axis.  Thomson's proposed addition runs afoul of the claim language, and should be rejected.

TimeBase's proposed construction is consistent with the specification, as well as the claim language.  TimeBase's proposed construction is taken verbatim from the definition of "multidimensional space" in the specification:

> This makes it possible to locate each piece or block of text at a particular point in a "multidimensional space" using as coordinates the attributes added to the piece or block of text. Multidimensional space refers to an area not having boundaries and that is capable of, or involves, more than three dimensions.

(Exh. A, 592 patent, 7:52-54).

Thomson also cites extensively from the disclosure of the "first embodiment" of the specification (while ignoring the second embodiment) to show how that embodiment "allows movement along different axes or 'pathways[.]'"  (Exh. A, 592 patent, 8:10-12).  However, "a particular embodiment appearing in the written description may not be read into a claim when the claim language is broader than the embodiment." *Superguide Corp. v. DirecTV Enterprises, Inc.*, 358 F.3d 870, 875, 69 USPQ2d 1865, 1868 (Fed. Cir. 2004).  Thomson's proposed construction attempts to read in language from to the "first embodiment" of the specification, and should be rejected.

## 2.    The Prosecution History

The prosecution history, like the claim language itself, makes clear that the claimed "multidimensional space" only has to organize the data in the system, as opposed to "allowing point to point movement" or some other function.  For instance, TimeBase made that function clear in distinguishing the claims over the prior art Povilus reference during the original prosecution of the '592 patent:

> Povilus describes a data structure and a method for creating, maintaining, and publishing multiple renditions of a catalogue using a single product database.  That is, Povilus teaches publishing multiple versions of the entire catalog.  Liddy describes techniques for generating representations of the contents of both queries and documents in a retrieval system using natural language processing techniques.  Further, Liddy uses a multidimensional space as an abstraction used to compute a similarity measure between a query and each document.  In marked contrast, the multi-dimensional space of claim 1 is used to create a relational database.  That is, the multidimensional space of the claimed invention is a space for organising the data in the system, where the attributes associated with a predefined portion of data are points of the multidimensional space.

(6/27/00 Amendment at 11-12, 592FH000255-56).  Similarly, in rejecting the defendants' challenge to the validity of the '592 in reexamination, the Examiner noted that the function of the multidimensional space was simply organizing the portions:

> Therefore, with respect to claim 1, the claim is confirmed because, the prior art of record fails to teach a system for publishing an electronic publication using text-based data that comprises a plurality of predefined portions of text-based data with each predefined portion being stored, at least one predefined portion being modified and stored, and a plurality of attributes, each attribute being a point on ==an axis of a multidimensional space for organizing the plurality of predefined portions and the at least one modified predefined portion of said text-based data.==
>
> With respect to claims 20, the claims is a computer recording medium of the system recited in claim 1 and therefore, is confirmed for the same reasons as discussed in relation to claim 1.
>
> With respect to claim 40, the claim is confirmed because, the claim is a computer implemented method of the system recited in claim 1 and therefore, is confirmed for the same reasons as discussed in relation to claim 1.

(1/30/09 Notice of Intent to Issue Reexamination Certificate, at p. 6, 592REEX002435). There simply is no disclaimer or statement which further limits the meaning of "multidimensional space" to require "point to point movement along an axis." "Multidimensional space" is simply defined as stated in the patents, i.e.: An area not having boundaries and that is capable of, or involves, more than three dimensions.

### J.    Portion and Predefined (Joint Chart, Rows 11, 12 and 13)

A "portion," as used in the asserted patents, is simply "a part of a writing or written work and more than a single word, for example, a section in the case of a statute, act or regulation." "Predefined," as used in the patents, refers to "the size or structural type of a portion determined based upon an analysis of the nature of the information and knowledge of how the information will be used."

Thomson attempts to limit a "portion" to "a block of text based data," and "predefined portion" as "a block of text based data which has been chosen for storage." (Exh. G, Joint Chart, Cells 11D, 12D, 13D). Thomson's proposed definition has a number of problems: 1) it is vague, e.g., Thomson's definition could cover a "block" consisting of a

single word or an entire document, a prior art approach that the patent criticizes as "unmanageable;" 2) Thomson's proposed definition that "predefined" means a portion "chosen for storage" is inconsistent with the patent which rejects efforts by past publishers who have "chosen to either store new versions of an entire act (too big) or new versions of each and every change, in a method similar to redlining (too complex)" (Exh. A, 592 patent, 5:64-67); and 3) Thomson's proposed definition begs the question of what causes the portion to be "chosen" and, again, potentially includes prior art which "choose" to store every word or every document as a whole.

### 1.    The Claims and Specification

The terms "portion" or "predefined portion" are found in claims 1, 4-5, 9-11, 13-15, 17, 19-20, 23-24, 28-30, 32-34, 36, 39-40, 43-44, 48-50, 52-54, 56, and 58-61 of the '592 patent, as well as claims 1, 7- 8, 10, 12-13, 15, 17-19, 21, 24, 29-31, 33, 35-36, 38, 40-42, 44 and 46 of the '228 patent.  Claim 1 of the '592 patent is a representative claim showing the usage of the terms:

> 1. A computer-implemented system for publishing an electronic publication using text-based data, comprising:
> a plurality of predefined portions of text-based data with each predefined portion being stored;
> at least one predefined portion being modified and stored;
> a plurality of linking means of a markup language, each predefined portion of said text-based data and said at least one modified predefined portion of text-based data being encoded with at least one linking means; and
> a plurality of attributes, each attribute being a point on an axis of a multidimensional space for organising said plurality of predefined portions and said at least one modified predefined portion of said text-based data.

(Exh. A, 592 patent, 155:2-14).  The literal language of the claim adds the term "text-based data" to the term "predefined portion."  In other words, besides the literal language of the claims, Thomson's attempt to define "portion" is simply to call it a "block."  Such a definition is singularly unhelpful in assisting the trier of fact in determining issues of infringement and validity, which is one of the purposes of claim construction.  See , e.g., *Biedermann Motech GmbH v. Acme Spine, LLC*, 2007 U.S. Dist. LEXIS 98330 at *23 (C.D. Cal. 2007) ("It is important, however, to recognize that claim construction orders are narrowly tailored to assist the jury in resolving infringement and validity disputes in particular cases").  Other claims, however, offer better guidance to what a portion is:  it can be a section of statute, such as an act or regulation:

> **16**. The system according to claim **1**, wherein said text-based data comprises legislation.
> **17**. The system according to claim **16**, wherein each of said plurality of predefined portions of said text-based data is a respective provision of said legislation.
> **18**. The system according to claim **17**, wherein said provision is a section or schedule of an Act, or a regulation or schedule of a Regulation(s).

(Exh. A, 592 patent, 156:1-8).  The claim language offers better guidance to the trier of fact than simply calling a "portion" a "block."

Thomson's proposed construction ignores teachings in the specification which guide a person of skill in the art in determining how "portions" should be created:

> The embodiments advantageously divide information into "suitably" small pieces (or blocks) of text, each of which is a predefined portion of data, and add to each piece of text, either expressly or implicitly, a number of attributes (characteristics or descriptors). The suitability as to size of text pieces is determined by an analysis of the information and its naturally occurring structure based on knowledge of how the information is used and consumed by the end user.

(Exh. A, 592 patent, 7:41-48).   In other words, persons of skill understand that a "portion" is determined based upon an analysis of the nature of the information and knowledge of how the information will be used.   As in the present case, "the specification is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Phillips*, 415 F.3d at 1315 (internal quotation marks omitted) (quoting *Vitronics*, 90 F.3d at 1582).

The weight to which the teaching of the specification in the patent applies not only to an understanding of how a "portion" is determined, but also what it excludes.  When the specification criticizes or disclaims certain features in the prior art, the claims should not be read to encompass the criticized features. *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F3d 1337, 1341 (Fed Cir 2001) (finding that the criticism of one type of "lumen" in patent excluded that type from construction of the claim term).  The '592 patent says that new versions of an entire Act are too big.  It says redlining (tracking every change) is too complex.  (Exh. A, 592 patent, 5:61-67). Thus, the intrinsic record teaches that a portion: 1) must be more than a single word; and 2) must be determined by analyzing the nature of the information and knowledge of how the information will be used.

### 2.    The Prosecution History

The prosecution history further makes clear the distinction between prior art approaches (such as Arnold-Moore) and the "predefined portions" in the claims. Specifically, in determining that the claims of the patents were allowable over the prior art cited by Thomson it the reexamination, the Examiner made clear the meaning of

"predefined portions" and how a portion was determined based upon an analysis of the nature of the document/information and how it is used:

> As discussed above, the predefined portion may be an optimum storage unit that is chosen based on a particular application. For example, if the application is legislation, the predefined portion may be a section of that legislation. For a different application, the predefined portion may be determined differently. In contrast, Arnold-Moore discloses elements at an arbitrary level (see, page 19, left column, line 12). In particular, Arnold-Moore is concerned with

(592 REEX2432).   The Examiner further distinguished between "predefined portions" between the use of predefined portions in the claims, and the asserted prior art approach in Arnold Moore of using entire documents or "atomic elements" (i.e., single words):

> portion may be determined differently. In contrast, Arnold-Moore discloses elements at an arbitrary level (see, page 19, left column, line 12). In particular, Arnold-Moore is concerned with how to query the information, not store it. Therefore, Arnold-Moore relies on the conventional approaches to document storage (namely, a whole document approach and a document assembly approach). This is evidenced throughout the reference because of Arnold-Moore's use of the terms decomposing documents (whole document approach) and reconstructing documents (document assembly approach) (see, for example, page 24, and conclusion). Accordingly, in Arnold-Moore, the arbitrary portion used in either a whole document approach or document assembly approach to versioning is not a predefined portion.

(592 REX2433; see also 592 REX 2434).  Thus, the intrinsic record teaches that a "portion" is simply a part of a writing or written work (e.g., a document) and more than a single word, for example, a section in the case of a statute, act or regulation.  Likewise, the specification and the file history make clear that "predefined," refers to "the size or structural type of a portion determined based upon an analysis of the nature of the information and knowledge of how the information will be used." (Exh. A, 592 patent, 7:45-49).

**K.**     <u>**Means for Searching/Searching Means (Joint Chart, Row 14)**</u>

The parties agree that this is a means-plus-function limitation. They agree that the function is as set forth in the claims. They agree that the structure is software for locating text-based data using attributes, links, portions, words or phrases, or the equivalent.

**L.**     <u>**Step of Searching/Searching Step (Joint Chart, Row 15)**</u>

The parties agree that this is a means-plus-function limitation. They agree that the function is as set forth in dependent claims 41, 42, 43, and 44, which all depend on independent claim 40. They agree that the acts are software for locating text-based data using attributes, links, portions, words or phrases, or the equivalent.

**M.**     <u>**Allowing the User to Search/Allowing the User to . . . Input at Least One Search Request (Joint Chart, Row 16)**</u>

The defendants indicate they are no longer seeking construction of these terms.

**VI.**     <u>**CONCLUSION**</u>

TimeBase requests that the Court adopt the constructions set forth above. These constructions are consistent with the intrinsic evidence, do not limit the claims to preferred embodiments, and reflect how a person of ordinary skill would read the patents.  They follow the principles expressed in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (*en banc*), are supported by the expertise of the Patent Office, and serve the goal of uniformity expressed in the Supreme Court's opinion in *Markman.*

Respectfully submitted,

<u>/s/ Joseph N. Hosteny</u>
Joseph N. Hosteny
Arthur A. Gasey
Niro, Haller & Niro

31

181 West Madison, Suite 4600
Chicago, Illinois 60602
Telephone: (312) 236-0733

Michael R. Cunningham
Gray, Plant & Mooty
500 IDS Center
80 South Eighth Street
Minneapolis, MN  55402
Telephone: (612) 632-3000
Fax:  (612) 632-4444

Attorneys for TimeBase Pty Ltd.

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that **TIMEBASE'S OPENING CLAIM CONSTRUCTION MEMORANDUM** was served on June 11, 2010 upon Thomson's counsel, listed below, by email and first-class mail to:

Mindy Sooter; MSooter@faegre.com
Katherine S. Razavi; krazavi@faegre.com
Kevin P. Wagner; KWagner@faegre.com
David Gross; DGross@faegre.com
Calvin L. Litsey; CLitsey@faegre.com
Theodore M. Budd; TBudd@faegre.com
Faegre & Benson LLP
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, Minnesota 55402
Phone: 612-766-7000
Fax: 612-766-1600


/s/ Joseph N. Hosteny