```
1              UNITED STATES DISTRICT COURT
                  DISTRICT OF MINNESOTA
2

    ------------------------------------------------------
3   Timebase Pty, Ltd.,          )   File No. 07-1687
                                 )       (JNE/JJG)
4              Plaintiff,        )
          vs.                    )
5                                )
    The Thomson Corporation,     ) St. Paul, MN
6   West Publishing Corporation  ) April 21, 2010
    and West Services, Inc.,     ) 9:30 a.m.
7                                )
                   Defendants. )
8   ------------------------------------------------------

9        BEFORE THE HONORABLE JEANNE J. GRAHAM
           UNITED STATES MAGISTRATE JUDGE
10

                       (MOTIONS)
11

12                (AUDIO TRANSCRIPTION)

13


14  APPEARANCES

15  For the Plaintiff:      Niro, Scavone, Haller & Niro
                            JOSEPH HOSTENY
16                          Suite 4600
                            181 West Madison Street
17                          Chicago, IL 60602-4515

18  For the Defendants:     Faegre & Benson, LLP
                            CALVIN L. LITSEY, ESQ.
19                          KEVIN P. WAGNER, ESQ.
                            90 South Seventh Street
20                          Minneapolis, MN 55402

21


22
    Court Reporter:         Lorilee K. Fink, RPR CRR
23                          1005 U.S. Courthouse
                            300 S. Fourth Street
24                          Minneapolis, MN 55415

25
```

1              **(April 21, 2010, 9:30 a.m.**)

2              THE COURT:  We're here on the matter of Timebase

3    versus Thomson and West Publishing, et al, Civil File Number

4    07-1687 assigned to District Court Judge Joan Ericksen and

5    myself, Jeanne Graham as Magistrate Judge.

6         We're here today on plaintiff's motion to compel.

7    Let's have appearances, please.  First from plaintiff's

8    side.

9              MR. HOSTENY:  Good morning, Your Honor, Joseph

10   Hosteny on behalf of the plaintiff, Timebase.

11             THE COURT:  Good morning.

12             MR. LITSEY:  Good morning, Your Honor, Calvin

13   Litsey and Kevin Wagner from Faegre and Benson on behalf of

14   the defendants.

15             THE COURT:  Hello.  Who is going to be arguing

16   this morning?

17             MR. LITSEY:  I will.

18             THE COURT:  All right.  Go ahead on the

19   plaintiff's side, if I can see you over there, come on up.

20             MR. HOSTENY:  Thank you, Your Honor.  What time

21   limit would you like me to observe on this?

22             THE COURT:  Oh, we'll see how it goes.  Motions to

23   compel, it usually isn't any more than 20 minutes a side.

24             MR. HOSTENY:  Okay, I just wanted to save just a

25   couple of minutes for rebuttal --

1          THE COURT:  Okay, we'll do that.

2          MR. HOSTENY:  -- and reply.  We appreciate the

3    Court taking the time to hear the motion.

4          To get right into it, the first point I'd like to

5    address is the fact that Westlaw is accused of infringement.

6    One of the nagging problems we have had even after we filed

7    our second -- it was our actually our second amended

8    complaint which expressly accuses Westlaw of infringing.

9    The defendants continue to take the point of view that

10   Westlaw has not been accused of infringement.  They deny

11   infringement, of course, which doesn't surprise me, I'd

12   expect that.  But they even take the point of view that it

13   is not accused of infringement.

14         As we stated in our brief, we went through four or five

15   pages just to briefly summarize.  There is no question from

16   the statements by I think it was Mr. Martins, Ms. Agard and

17   Mr. Spencer to the effect that all of the products or

18   services that give rise to the initial claim of infringement

19   are integral to Westlaw, are part of the Westlaw

20   architecture, and aren't accessed other than through Westlaw

21   itself.

22         We mentioned in our brief that we had also, in our

23   supplemental infringement statement, again, expressly stated

24   that Westlaw, when somebody uses Westlaw, they are

25   infringing Timebase's patents.  It seems to me, beyond

 1  question, that the pleadings make it clear that Westlaw

 2  infringes.  And the reason I mention this, is because this

 3  seems to have some effect on discovery as described in our

 4  motion.

 5      What we're here today about deals really with damage.

 6  And as it presently stands now, no, we don't have to show

 7  who is wrong, we don't have to show who is right, we're

 8  talking about what is relevant under Rule 26.  But it's

 9  shaping up so far something like this:  It's going to be a

10  reasonable royalty case because Timebase does not sell

11  products in the United States.  It does compete with Thomson

12  in Australia, but not in the United States.

13      There appear to be no established royalties.  Timebase

14  has no -- no licenses for the patents in suit and neither do

15  the defendants to date based on the discovery I have

16  received, have anything that would constitute an established

17  royalty.  That means that we're probably going to go back to

18  what's often called the Georgia Pacific case, which Your

19  Honor might be familiar with from other patent cases.

20      We go back in time, we imagine this hypothetical

21  negotiation.  There would be a willing licensor, that would

22  be Timebase, a willing licensee, that would be the

23  defendants.  One is willing to grant a license, the other

24  wishes to obtain a license.  The patents in question would

25  be the '592 and '228, the patents in suit.  At least the

1  '952.  The '228 was later, but it was pending at that time.

2  And the assumptions would be that the a license was needed

3  and that patents are valid and would be infringed in the

4  absence of a license.

5      From that point, an expert witness and a fact finder

6  would analyze the Georgia Pacific factors.  And they most

7  recently came up in the i4i case, which we cited in our

8  brief.  And some of those factors, the ones that really

9  pertain here, evidence the linkage that we talk about in

10 our brief.  Factor 6 -- this is on page 11 of the i4i

11 opinion.  I think we attached the latest slip opinion to our

12 brief.

13     6.  The effect of selling the patented specialty in

14 promoting sales of other products of the licensee.

15     Thus, even if the defendants are correct that Westlaw

16 does not infringe, one of the things to be considered under

17 Georgia Pacific is whether the sales of the things that do

18 infringe contribute to sales of things that do not infringe.

19     Thus, even if the defendants are correct that Westlaw

20 is not accused and does not infringe, what we have to deal

21 with in discovery and in further pursuit of the case, is

22 what's the cause and effect relationship between sales,

23 subscriptions, contracts, et cetera, regarding StatutesPlus

24 PastStat Locator, Graphical Statutes, and RegulationsPlus as

25 an enhancement to Westlaw?  Does it generate revenue?  The

1    question is an unequivocal yes.  There is linkage and it

2    does generate revenue for Westlaw.  That is the point of the

3    defendant's activity.

4         Factor 8.  The established probability of the product

5    made under the patent, including its commercial success and

6    current popularity.

7         The defendants use the services, the particular main

8    services to promote the sales of Westlaw.

9         Factor 10.  The nature of the patented invention and

10   the benefits -- and I want to emphasize that word -- and the

11   benefits to those who have used the invention.

12        So, that's the benefits to the defendants and to their

13   customers, because those are the entities that are using the

14   invention.  That's Timebase's allegation.

15        Let me back up one more important thing to keep in mind

16   is the way that infringement occurs here is that the

17   defendants can do some of it themselves, okay, and I believe

18   they do.  But the larger portion of the infringement occurs

19   when subscribers, when customers logon to Westlaw -- and I

20   believe all of its machines are located here in Minnesota,

21   there might be a few -- there might be a facility in

22   Rochester, but everything I've seen says they're all in the

23   U.S.  So, if I logon to Westlaw from anywhere and use these

24   services, I am, in Timebase's view, practicing the

25   inventions.

1      In order to hold Thomson the defendants liable for

2  that, we have alleged that Thomson has induced infringement

3  -- when I say Thomson, I mean all the defendants.

4           THE COURT:  Uh-huh.

5           MR. HOSTENY:  We've alleged that Thomson has

6  induced the defendants -- the customers, I'm sorry -- the

7  defendants have induced their customers to infringe and they

8  have contributed to their customer's infringement.

9      One thing we've heard in the past in this case is that

10  we can't show either inducement or contributory infringement

11  because we haven't identified a direct infringement.  A

12  direct infringer would be a subscriber, a customer.  The

13  case law says there must be direct infringement in order to

14  show inducement or contribution.  The direct infringer does

15  not necessarily have to be identified, but there must be

16  direct infringement.  Okay.

17      So, the benefits to those who have used the

18  invention -- and benefits is a significant word -- the

19  extent to which the infringer has used the invention and

20  value of that use, that information is -- the defendants

21  say, it's all in their spreadsheets.  I disagree for reasons

22  I will get to.

23      13.  The portion of realizable profit that should be

24  credited to the invention as opposed to its non-patented

25  elements.

1        This is where the defendants will come back with their

2    theory and their theory is overwhelmingly that, for example,

3    PastStat Locator or Graphical Statutes or RegulationsPlus or

4    Graphical Bills are all taken together amount to, on the

5    average, zero -- 0.001 percent of total use.  In other

6    words, they are saying that if you measure the damages in

7    accordance with Georgia Pacific, look at our spreadsheets,

8    you will see that the use of these particular aspects of

9    Westlaw is at the vanishing point, almost nil.  Okay.

10       Now, I have some serious problems with the way they

11   calculate in their spreadsheets, mainly because we don't

12   know their formulas, but that's what their spreadsheets tend

13   to show.  I'll get to those in a couple of minutes.

14       In any event, those are the i4i factors.  I

15   characterize -- so, where are we?  We're at the point where

16   Timebase wants a reasonable royalty on Westlaw because it

17   infringes.  If it does not infringe, Timebase wants a

18   reasonable royalty that takes into account how the sales of

19   the named sub-services or sub-products contribute to the

20   benefits the defendants receive from selling Westlaw

21   subscriptions.  Okay, that's where we're headed.

22       The defendants are headed toward what I sometimes call

23   the lost-leader theory.  We put this in, we don't charge

24   much for it, we don't care if you use it, but they use it to

25   pitch Westlaw.  What they say to their customers, like they

1  said in Tarrant County, one of the contracts we had to find

2  on our own, Tarrant County or El Paso.  They said to that

3  county, you can only get this package of services from us,

4  we're the sole source.  That's a vendor's dream to have no

5  competition for a bid.  And Tarrant County recognized that

6  point in deciding to enter into a contract with Westlaw.

7  Okay.

8      They said, okay, they're the sole source and here's

9  what we'll sign up for.  And Mr. -- I think it was

10 Mr. Capaldini, a letter that we found on our own on the

11 internet -- Mr. Capaldini making the pitch that, you can't

12 get these from anyone but us.

13     The thrust, as I see it within Westlaw, has been that

14 they wanted to improve their revenue from statutory

15 research.  In fact, I think their president says -- I think

16 it's president or CEO -- this is about 2002 -- Online

17 Statutes Research -- that's the project where this came from

18 -- is an initiative to create a system that makes

19 researching statutes on Westlaw as easy as researching case

20 law.  This is a huge undertaking, one that will tap the

21 collective talent of many parts of our organization.  But

22 this initiative also is revolutionary, no one else offers a

23 product that allows easy searching and thorough-linking

24 functionality for statutes research, we will be the first.

25 Over and over and over and over again.

1       In our brief, for example, they mention -- this is page

2   7 -- without the leverage that StatutesPlus provide against

3   Lexus low-ball offer, I would not have been able to renew

4   this account.  With StatutesPlus I was able to assign them

5   to a two-year auto-renewing contract with a ten percent

6   increase the first year.

7       Next page of our brief, page 8.  Some firm -- we don't

8   know who -- was a part of -- was a part of recently closing

9   a $493,000 contract with Keycite, StatutesPlus and Westlaw

10  Litigator.  The firm -- we don't know who that is -- could

11  no longer go without having Westlaw.

12      And next page, Westlaw's StatutesPlus has the potential

13  of increasing Westlaw's share of online statutory research

14  by approximately ten percent.

15      So, the defendants want the fact finder to zero in on

16  .001 percent while ignoring the statements that Westlaw

17  people made to each other and made to their customers to the

18  effect that, we're the sole source, resign a contract with

19  us, we'll -- and then they tell each other, wow, we got this

20  contract renewed, we got a higher contract price.

21      Mr. Spencer talks about a $40 million IRS contract that

22  we've never even seen.  Online we saw signs of a Department

23  of Defense Contract, we saw contracts with El Paso, a

24  contract with Fresno County.  But those are public, the

25  defendants didn't even produce the public contracts, much

1   less the communications with those folks.

2            THE COURT:  What I'd -- what I'm going to ask you

3   to do, because while this is helpful, I need to do kind of

4   the practical -- their response -- well, two things.  First,

5   just briefly tell me, are the -- the i4i, the Georgia

6   Pacific factors, is that related solely to Interrogatory

7   Number 7 or -- I mean, not solely, but is that best

8   discussed in Interrogatory Number 7?

9            MR. HOSTENY:  I think probably so, but I think its

10  relationship pertains to both Interrogatories 1 and 7 --

11           THE COURT:  Okay.

12           MR. HOSTENY:  -- with which both call for a

13  revenue or damages-related information --

14           THE COURT:  Or damages, okay.

15           MR. HOSTENY:  -- and also to our document

16  requests.

17           THE COURT:  Okay, and then I -- what I need to

18  know just on a real basic level is, what do you think --

19  what do you want that you think they haven't produced

20  because, in essence, I might agree with you it's relevant,

21  but I have a situation where they're saying, hey, we

22  produced everything we can.  So -- so, you know, how do I

23  get -- what is it that you don't agree with on that

24  statement?

25           MR. HOSTENY:  Well, let me give you what I call

1   the hard-ball answer and the soft-ball answer and you'll

2   have to decide.

3       The hard-ball answer is that all I heard was the word

4   burden from last October.  I let a lot of time go by in an

5   effort to negotiate this away.  And I thought that our

6   second amended complaint would help, so I waited for that.

7   I thought maybe our infringement contentions would help, I

8   waited for that.

9       The defendants never particularized the burden.  In

10  other words, they didn't give me or my client any chance to

11  say, what about this?  What about that?  They never told us

12  they had 72,000 contracts, they never told us how they were

13  making their calculations in their spreadsheets.  It's only

14  in their response that they come up with this so-called

15  burden.

16      I must have cited 25 cases, the defendants haven't

17  cited one.  Their burden objection is not really

18  sustainable.  Okay.  It's gone, because they didn't

19  particularize it, for example, with an affidavit from

20  Hoffman as part of their interrogatory response.  I got a

21  problem with his declaration anyway.

22      The soft-ball answer is more like this:  Yeah, we did

23  have a discussion a couple of weeks ago because I kept -- I

24  said I'm willing to talk, I think we've done a Rule 37, but

25  I'm still willing to talk.  Mr. Litsey suggested, why don't

1    you look at five or ten customers.  I said, I can't

2    recommend that to a client by going blind into five or ten

3    customers.  He said, well, you can pick five or ten law

4    firms.  I said, A, I don't know what law firms are your

5    customers, would I pick the right ones; B, would I pick the

6    largest ones; C, I've seen signs in some of their internal

7    documentation that IBM is a user of their services, so

8    there's corporations there too.

9         So, if you're looking for a way to address the burden

10   on the defendants, then my soft-ball answer is something

11   like this:  We have to look at their contracts and we have

12   to look at them eyes wide open.  I'll come up here and do

13   that and I'll look at their database, which they say they

14   can query, and they don't tell us how they query it when

15   they generate these spreadsheets, so we're willing to do

16   that.

17        But it's too late in the day for the defendants to say,

18   we don't have to produce contracts because they're not

19   relevant.  That argument is nonsense, they are benefits.

20        A benefit is a -- look it up in the dictionary.  A

21   benefit is one of the things that Georgia Pacific talks

22   about.  A benefit is a payment, a profit, an advantage.

23   These contracts are payments and profits and advantages to

24   the defendants.  They didn't even produce -- they claim the

25   contracts are sensitive and that's part of their issue their

1   burden, but they didn't even produce the public contracts.

2   We have a protective order in place that's got two tiers of

3   confidentiality in it.

4       The only confidential contract I have right now is the

5   one that our firm has with Westlaw.  And that ones kind of

6   fun because in 2007 our firm signed up for RegulationsPlus,

7   PastStat Locator and Graphical Statutes, three services.  Do

8   you know how much our monthly fee went up?  9.5 percent.

9   9.5 percent, that's a nice benchmark for a plaintiff to

10  start with for a reasonable royalty.  We went from around 12

11  to $13,000 a month and we've only got a 30-lawyer firm to

12  about $14,000 a month.

13      The difficulty I have with the spreadsheets and why I

14  say I think it would be helpful -- one thing you could

15  consider is we'd look at that database, somebody who is

16  cleared under the higher level of the protective order.

17  They keep on calculating using a factor, I think it's --

18  yeah, page 5 of their brief -- they take a subscription

19  price, they multiply it by an actual use percentage, and

20  they come up with a what they call a versioning revenue.

21  Their brief constantly characterizes the patent as

22  versioning.  In other words, I can look at different points

23  in time of the regulation and see how it differed in 1999 to

24  2001 to 2003.

25      That's not all the patent is about.  Okay.  The patent

1    is about not only a point in time, but also looking at

2    different jurisdictions, looking at cases, looking at

3    amendments, looking at legislative reports, that's why --

4    that's why we get into the business of multidimensional in

5    the patent.

6         So, I don't know what their formula includes, whether

7    it includes all uses or just point in time.  Their brief

8    suggests just point in time.

9         Secondly, if I look at the contract that we have with

10   our firm, it has nothing to do with how many minutes we

11   spend on RegulationsPlus what we pay.  We pay a minimum

12   monthly amount that went up by 9.5 percent simply to have

13   those services into the pool of services, and that seems to

14   be consistent.  Now, that is consistent with the documents

15   we cite in our brief.  They do not look at how much a

16   customer uses a particular service as a percentage of

17   Westlaw, they say -- you know, this is like a car salesman

18   saying, well, my car has air conditioning and power windows

19   and the other guy doesn't have power windows, so buy my car.

20        So, they say to the customers, we got all of these neat

21   features including PastStat Locator, and StatutesPlus, and

22   so forth and so on.  That's how they pitch them, that's how

23   they sell it.  That's why communications with customers are

24   significant.  And I differ, I think we asked for agreements,

25   I think we asked for documentation of the benefits of using

1    the accused services and so forth in document requests.

2         I think their burden, if Your Honor wants to recognize

3    that, can be managed in a much better way than they suggest,

4    which is shut us off from what Georgia Pacific says is the

5    most relevant evidence.

6              THE COURT:  Okay.

7              MR. HOSTENY:  Let me see --

8              THE COURT:  Take a few more minutes to sum up

9    anything else you wanted to and then --

10             MR. HOSTENY:  Yeah, I dealt with the spreadsheet

11   issue and the burden.  I'm just looking at sensitivity.

12        I find it a little offensive -- keep in mind two things

13   the defendants are doing.  One is -- and it is -- when we

14   issue a document request, if it's too broad, we haven't hit

15   the right thing.  If it's too narrow, in other words, if we

16   try to make it narrower, we've been too specific and this is

17   what we should have asked for.  That's the strategy that I'm

18   dealing with here.  We only have a 100 document requests.

19   And so -- and for their own sakes, the defendants interpret

20   their document requests broadly.

21        Yesterday I was told that one document request

22   pertaining to research and development documents covered not

23   only the documents leading up to the development of the

24   inventions in the early years, the 90s and 2000 and 2001, it

25   covered everything up to 2009, anything that was arguably

1  technical in any way whatsoever.

2      Okay, I can live with that, but I think both parties

3  have to live with the same thing.  I don't take well with

4  the defendants telling me that a contract isn't a benefit

5  that isn't covered by our document requests.  I think it's

6  kind of silly.

7      In terms of subpoenas, the customers they have include

8  some of the largest law firms in the world presumably, IBM,

9  the Department of Defense, Internal Revenue Service.  I

10  don't think they're going to be intimidated and our job is

11  to pursue some discovery.  We don't plan on subpoenaing

12  everybody in the world, we have a limitation in the

13  scheduling order.  And those parties have a right to make

14  objections to subpoenas.

15      The defendants have issued a half dozen or more Hague

16  requests.  They have issued probably now about half a dozen

17  subpoenas, including to companies that have financial

18  interests in Timebase and, you know, wonder about the value

19  of their interest in Timebase.  And we haven't objected to

20  any of those subpoenas being issued and we haven't sought a

21  protective order with respect to any of them.  And their

22  cases don't involve, I might add, inducement or contributory

23  infringement.

24      So, I think that's the sensitivity issue.  With that, I

25  think I will stop, I think I've covered the central points.

1    I hope I addressed your questions and I'll sit down.

2              THE COURT:  All right.  And on behalf of the

3    defense.

4              MR. LITSEY:  Good morning, Your Honor.

5              THE COURT:  Good morning.

6              MR. LITSEY:  Mr. Hosteny has made a lot of broad

7    statements; it sounds almost like he's making a summary

8    judgment argument on damages.  But the issue before the

9    Court is very specific, there are specific discovery

10   requests that are the subject of this motion.  There are

11   really two categories of information that I want to focus on

12   and address the Court's question, what is it that plaintiff

13   wants that we haven't given and why is that not true.

14        The first category is financial information.  That's

15   really in the interrogatories.  The second one is what I'm

16   going to call is the non-requested customer information,

17   because when we get this, I think the Court will see that

18   the kinds of information Mr. Hosteny and his client are

19   seeking have not been even requested.  Notwithstanding that,

20   we've tried to broach the subject and try to come to a

21   reasonable compromise.  But the fact of the matter is, that

22   information has not been requested.

23        To benefit the Court and with the Court's permission, I

24   wanted to hand up a booklet that not only sets forth the

25   specific discovery requests, but a summary of our responses,

1    if I may approach, Your Honor.

2            THE COURT:  Have you given him a book?

3            MR. LITSEY:  Yeah.  There's also a second sheet,

4    Your Honor, that I'll turn to later that relates to the

5    hearing before this Court about the end of last year.

6        The financial information, Your Honor, is in two

7    interrogatories.  As the Court may recall when this case

8    began, Timebase accused three products of infringement.

9    There are three components of Westlaw as a whole which has

10   all kinds of services, it has case services, judge services

11   and so forth, that was focused on StatutesPlus, a new

12   feature that was added to the traditional database, PastStat

13   Locator, and RegulationsPlus.

14       Based on that, plaintiffs, in order to develop their

15   damages theory, served Interrogatory Number 1.  That's at

16   tab A of this booklet.  And I've highlighted specifically

17   what it is that was sought in Interrogatory Number 1.  First

18   was sales information; second, profits; and the third,

19   subscriber pricing information for those three products.

20       What have we provided?  We provided in the form of an

21   Xcel spreadsheet which they have and they can manipulate

22   that data and search it however they want, plus hard copies

23   that amounts to about two of those binders for each of these

24   sets of products.

25       The monthly revenue.  So, the asked-for sales, we gave

1    them the monthly revenue by month.  We gave them the costs

2    for development associated with this, the annual editorial

3    maintenance costs, and then calculated a gross profit.  So,

4    they have the sales information and the gross profit

5    information for each of those accused products.

6        We also provided the pricing information.  The way that

7    subscribers are charged for either on a pay-as-you-go basis

8    or as part of a package and so forth.  And we explained that

9    in detail in a 13-page interrogatory answer.

10       Just so the Court gets a little bit better idea of the

11   nature of the spreadsheet information, if you turn to tab B,

12   this is just one page of one example of the information that

13   was provided for one of the accused products that they

14   identified.

15       So, for example, if you just look at the first line,

16   there's the month and the year for this particular customer

17   subscription, the database from which that subscription

18   comes, the total charge for that subscription, so they have

19   that information.  And then in addition to that, we provided

20   them an allocated revenue based on the actual use of the

21   accused products.  It's not just the versioning feature of

22   that product, it's the entire product.  So, all usage of

23   that product.  But they have both, they have the total

24   subscription price.  Their damages expert can make whatever

25   argument he or she wants from that.  They have the actual

1    use percentage for that month and then for the accused

2    product, the specific component which they say is the

3    component of Westlaw that infringes, and then based on that

4    calculation, it's just the multiplication and then that's

5    the number.  We told them that, that's explained in the

6    interrogatory answer.

7         So, in terms of Interrogatory Number 1, what they've

8    asked for, we've provided it to them.  They have the entire

9    spreadsheet, they have all of the information, they have the

10   explanations and, you know, what usually happens in a

11   complex case like this is, once you have information and

12   we've tried to answer questions when they've had them --

13   we've had a series of e-mail exchanges -- is you take a

14   deposition.  They haven't done that.

15        Usually what you do in this case is if you have

16   questions about the way we allocate our financial

17   information, you take a 30(b)(6), or they can identify Mark

18   Hoffman whose affidavit is in here.  We provide the

19   information, you take a deposition.  If there are issues

20   that arise as a result of that deposition, then we'll

21   address those or work with them on that basis.  But at this

22   point, we provided a full, complete, fair, reasonable

23   response to that interrogatory.  So what happened?

24             THE COURT:  Can you just do one thing for me, I

25   know everyone has thrown this around, but can you do another

1  attempt at explaining what versioning revenue is or how that

2  differs from --

3        MR. LITSEY:  It doesn't, Your Honor.

4        THE COURT:  Okay.

5        MR. LITSEY:  It's a term that's used internally by

6  the defendants.  But in this case, that allocation, the

7  versioning revenue is for any use of the accused product.

8  So, any use of PastStat Locator, whatever it was for this

9  particular subscription, and these are identified by product

10  -- accused product in the information that we provided to

11  them.

12        THE COURT:  Okay.

13        MR. LITSEY:  So, what happened?  Obviously as

14  Mr. Hosteny suggested, customers haven't been using this.

15  His law firm didn't buy the feature until they were hired

16  for this lawsuit.  People haven't been using it.  It's nice

17  to have.  It's like a cup holder in a car or something, but

18  users haven't been using it.  90 percent of our customers

19  don't even subscribe to it.

20     So, with a low damages number before them, what did the

21  plaintiffs do?  They decided to try to expand the case.

22  They say now, they've accused all of Westlaw infringement.

23  I mean, that's sort of preposterous on its face.  I mean,

24  our case law searching feature has been around for decades;

25  it hasn't been enhanced in anyway.

1      Are they accusing that of infringement?  No, what he's

2  trying to do is get a bigger damages number.  He's making an

3  argument that these nice-to-have features drive sales for

4  Westlaw as a whole.  But Westlaw is not an accused product.

5  In fact, in the excerpts that I just provided to the Court

6  that are cited in our brief, Mr. Hosteny told the Court at

7  the end of last year when they amended their complaint, the

8  only thing they were adding as an accused product was

9  Graphical Bills.  And we provided the same information for

10  Graphical Bills as we did for the other three.

11      So, there's this big dispute about Westlaw revenue, you

12  know.  And that will be a damages argument.  That will be --

13  you know, that will be the argument -- one of the arguments

14  at summary judgment, motions in limine for trial, and

15  everything else.  I don't want to burden the Court with

16  damages issues, but the fact of the matter is, Mr. Hosteny's

17  reading of the i4i case is not correct.

18      The feature in that case was part of Microsoft Word.

19  It was not sold separately; it was a text editor feature.

20  So when the damages expert there was opining about the

21  benefit of that feature, he looked to Microsoft as a whole.

22  It would be just like trying to discern the benefit of a

23  spellcheck feature in Microsoft Word.  Microsoft doesn't

24  sell that separately.

25      The law is clear when you sell a component separately

1    as we do with each of these features, then that becomes the

2    component that you look at for purposes of computing a

3    reasonable royalty.  It would be just like a cable

4    subscription, you can get different packages, but there's a

5    separate charge for each of those, so you can make a

6    separate allocation, unlike the i4i case.

7        Notwithstanding, Your Honor, this disagreement on

8    damages, when they submitted their Interrogatory Number 7

9    which is at tab C, and seeks revenue and profit for all of

10   Westlaw, we said, look, we disagree with you.  We objected

11   to it, preserved our rights, but we said -- and we told them

12   in February, nonetheless, we will provide you with whatever

13   we have on Westlaw revenue and profitability.  And that's

14   what we did.

15       So, in February -- so, they've had it for weeks.  They

16   have had all of our Westlaw revenue as a whole by month from

17   the Westlaw brand.  We told them in our interrogatory

18   answer, we do not, in the ordinary course of our business,

19   compute net profits for Westlaw as a brand for the whole

20   thing.  What we do is we calculate profit based on the

21   business units that sell the product.  So, the business unit

22   that sells Westlaw has a profitability figure associated

23   with it.  We provided that profitability information to the

24   plaintiff.

25       So, the plaintiff has the benefit of all of the revenue

1    information and it has the benefit of the profit information

2    for that business unit.

3              THE COURT:  And it -- and let me just see if I

4    understand.  Is there anything that says -- and another

5    thing we calculate is, here's the -- here's the profit for

6    Westlaw for all of the products -- is products the same as

7    components?

8              MR. LITSEY:  Yes.

9              THE COURT:  Here's -- here's -- here it is for all

10   of Westlaw, and we've calculated as part of that revenue --

11   how do I want to say this -- what part of these profits has

12   been contributed by the sale of these individual parts?  Can

13   you do that?  Is that what you say number -- spreadsheet B

14   is or is that different?

15             MR. LITSEY:  Yes.

16             THE COURT:  You see what I mean, there might be a

17   difference in -- that's what I'm trying to figure out.  Is

18   .0 percent, 00 percent, does that show the stream to Westlaw

19   or does that just show -- no one has really used it, but

20   maybe we got those people into Westlaw because they kind of

21   like these other things, but as it turns out they didn't

22   really love it, but they stayed with Westlaw nonetheless.

23   They came for the winter, they stayed for the summer.  You

24   know, it's a -- is there a way for you to do that?  Do you

25   see my dots?

1          MR. LITSEY:  Let me see if I understand the Court

2     correctly.

3          THE COURT:  I see my dots, I may not be able to

4     tell them to you.

5          MR. LITSEY:  In terms of there's the overall

6     Westlaw revenue by month.

7          THE COURT:  Right.

8          MR. LITSEY:  So, that's provided.  Then the

9     revenue for each of these accused features and then the --

10    is provided by month.

11         THE COURT:  Okay, got that.  Is there anything

12    that says, but we know that these features contributed to

13    our Westlaw overall profit because they bought it because of

14    that or they -- do you know what I mean?

15         MR. LITSEY:  No.

16         THE COURT:  Are you able to --

17         MR. LITSEY:  I, mean there's nothing -- no, they

18    have all of our marketing and sales information.  They can

19    make whatever arguments they want from that.  They'll

20    probably have a damages expert say, well, look -- just as

21    Mr. Hosteny did -- look, they -- you know, we're trying to

22    get people to stay Westlaw customers and to continue to buy

23    it.  I mean, the fact of the matter is, people that are

24    Westlaw customers, they've been Westlaw customers for years

25    and years and years and years.  They didn't buy Westlaw

 1  because of, you know, some small feature that they don't

 2  even use.  In fact, as I said, 90 percent of the people as I

 3  said don't even buy this feature --

 4          THE COURT:  Buy that, okay.

 5          MR. LITSEY:  -- they don't even have it.

 6          THE COURT:  Okay.  And the reason I -- I'm asking,

 7  I'm trying to figure out, just to make sure I understand

 8  what the dots are is that you may be right or he may be

 9  right how it's eventually going to be looked at, but I have

10  to try to consider whether there's reasonably calculated

11  evidence to lead to that.

12          MR. LITSEY:  Sure.

13          THE COURT:  Okay, go ahead.

14          MR. LITSEY:  Understood, Your Honor.  That's why

15  I'm going to try to be very specific here.  Here's the

16  interrogatories, here's the response, here's how it's

17  responsive, here's how it's fair and reasonable.  If they

18  want some other information or some further explanation,

19  take a deposition.

20          THE COURT:  Okay.

21          MR. LITSEY:  So, that brings me to the second

22  category of information which Mr. Hosteny has alluded to,

23  which I'm going to call the non-requested customer

24  information.  It's sort of broad.  He hasn't cited

25  specifically, as you're actually required to do in your

1    motion papers under Rule 37, you know, set out in the

2    document requests; here's what we ask for and here's how

3    it's non-responsive.  They didn't do that.

4        But what I've done at tab 2, Your Honor, is set out the

5    document requests that they identified in their motion

6    papers as allegedly seeking, as I understand it, all of our

7    customer communications, all 72,000 customer communications

8    with all 600 sales representatives over the past six years.

9    All 72,000 customer contracts.  The identification of every

10   single one of our 72,000 customers over the past six years.

11   That's what I understand them to be asking -- or plaintiff

12   to be asking.

13       We've told them repeatedly, you haven't asked for that.

14   We know you can ask for that, but you haven't asked for

15   that.  If you do ask for it, we've made some reasonable

16   proposals as to how we think we ought to deal with that.

17   But if you look at the document requests, they don't ask for

18   that information.  These are document requests.

19       The thing that -- probably the request that comes

20   closest would be something like request number 61, which is

21   on the second page there.  A list by name of all users of

22   RegulationsPlus.

23       We don't maintain in the ordinary course of our

24   business a list by name of all users of RegulationsPlus.  We

25   don't have a document like that.  If they asked in

1  interrogatory, that would be a different story and then we'd

2  have to generate the information, but this is a document

3  request.  We understand they could ask that interrogatory.

4  But what we suggested is if you're going to be as

5  unreasonable as we think you're being in your motion paper

6  about when you properly ask for something, what you're going

7  to ask for, then it is likely we will be back before Your

8  Honor seeking a protective order to provide some reasonable

9  way to get at what plaintiff supposedly wants.

10 Interestingly, we've already told them, you have a lot of

11 customer information by customer.

12      As you may recall in tab B, there is a customer number,

13 not a name, they don't know who it is, but they have all of

14 the information for that customer about how much they're

15 using that product, how much they paid for it.  They have

16 that all on a searchable spreadsheet.  They can search that

17 information however they want.  They can sort it by usage,

18 by revenue or whatever.

19      We've suggested, if you come back to us, once you ask a

20 proper request, if you're reasonable, then we could work

21 with you and provide for a targeted set of information,

22 targeted set of customers.  If you want to try to make your

23 case and go out and depose some customers and ask, why did

24 you buy it, why did you use that feature, is that an

25 important factor for you?  They're entitled to do that.

1   We're not saying that they're not entitled to do that, but

2   the way you do that is through some reasonable approach

3   where they have some limited number of customers.

4       We've already told them the top 100 law firms, that

5   obviously subscribe to Westlaw.  You take your pick there.

6   You know how you use it.  They're actually accusing

7   themselves of infringement under their theory, because

8   they're a user of this product.

9       What we don't want to have happen is go out and

10  subpoena and essentially accuse of infringement indirectly

11  each of our customers or overburden them or overburden us

12  with having to produce, you know, 72,000 contracts or --

13  which have changed over time, so it's some multiple of that,

14  times some other multiple of other communications with each

15  of our sales representatives, especially on what we

16  believe -- and we know we disagree with the plaintiffs about

17  this -- on a damages theory which is speculative at best.

18  You can just look at the numbers themselves, they tell the

19  story, 90 percent of the people don't even buy it.  Of those

20  who do, only six customers, six out of 72,000 use these

21  features more than two percent of the time.

22      So, again, my analogy is to -- to it's nice to have cup

23  holder in a minivan.

24      So, very specifically, Your Honor, with respect to the

25  motion before the Court, which is to compel further answers,

1    again, unclear to us what it is exactly they want.  We've

2    provided the information in response to Interrogatory Number

3    1, provided what we have for Interrogatory Number 2, and the

4    other has not been requested.  We've said, when you do

5    request it, if you're reasonable we'll work together.  I

6    believe there is a way we can come up with a reasonable

7    solution without burdening the Court.  Now is not the time

8    to burden the Court with a hypothetical motion when the

9    parties don't even have before them an actual request and an

10   actual response by us.

11        So, for those reasons, Your Honor, we ask that the

12   motion be denied.

13            THE COURT:  Okay, thank you.

14            MR. HOSTENY:  Very briefly, Your Honor.

15            THE COURT:  Yes.

16            MR. HOSTENY:  I can only imagine the defendants

17   response if we took a 30(b)(6) deposition and said, we want

18   to come back and do another one.  There would be a fight

19   over that one.  I don't think that's feasible.

20        I think you prepare for a 30(b)(6) deposition by

21   getting the documents out there that are reasonably relevant

22   to the issues in the case and then you take a deposition.

23        I was struck by Mr. Litsey's comment that some of these

24   people have been Westlaw customers since forever.

25        Mr. Spencer, page 11 of our brief, he describes the new

1    product development StatutesPlus in particular by saying,

2    that it doubled the growth rate for usage of online statutes

3    and mature product line.  That's not in those spreadsheets.

4         The instrumental -- he goes on to say -- instrumental

5    in securing many multi-million dollar contracts, none of

6    which we have unless we found them publicly online --

7    including an IRS contract previously held by Lexus for

8    several decades valued at $20 million.

9         The internal documentation cited in our brief, and I've

10   seen -- honestly, I don't know what all kinds of documents

11   that the defendants have internally.  I'm looking at it

12   through the lens of discovery.  I do know I'm not seeing the

13   documents that show the best causal relationship between the

14   revenue earned by the defendants and the activities that are

15   accused of infringement.  I do know that I'm not seeing

16   that.  I take Mr. Litsey's word at face value to mean

17   versioning means every aspect of the patent whether it's

18   jurisdiction or case law or whatever.

19        In the spreadsheet here, for example, our firm isn't

20   identified.  We can't find ourselves in any of the

21   spreadsheets identified by the defendants.  We have no idea

22   who any of these folks are.  We have no idea which ones

23   we're told, we have these neat services that we can include

24   if you become a Westlaw subscriber.  We have no idea how

25   many were taken away from Lexus, just as Mr. Spencer

1    mentions.  We don't know the percentage calculation.

2        As I mention in our contract, it's just a 9.5 percent

3    kicker if there are services sold separately.  If

4    RegulationsPlus is available to someone without being a

5    Westlaw subscriber, I have yet to see one document that

6    indicates that to be the case.

7        In order to use any of these, you must first logon to

8    Westlaw or WestMate, which is -- the main ball game is

9    Westlaw or WestlawNext.  You've got to be a subscriber to

10   use them.

11       I think the case law is that an infringing apparatus

12   doesn't have to infringe all the time.  It can be used in

13   both infringing and non-infringing modes, and that may be a

14   relevant factor on a damages calculation.  But it doesn't --

15   the fact that it's not always used in an infringing manner

16   doesn't mean that it doesn't infringe.

17       I think the quibble with the document requests -- you

18   look at Mr. Litsey's tab and you see right there, identify

19   the benefits to using PastStat Locator; benefits, reward,

20   profit, advantage.

21       On Interrogatory Number 1, state the annual sales and

22   annual gross profits resulting from, okay, the purchase,

23   rental, lease or use of, and then I identified three.  I

24   think they're confining "from" in an unfair way.  I think

25   Georgia Pacific says, look not only at the revenue generated

 1   by the accused components, if you wanted to take these as

 2   the only accused things, look at what they contribute.

 3   Okay.  That's <u>Georgia Pacific</u>, that's well-established case

 4   law.  And I think any patent litigator reading the

 5   interrogatory knows that case law.

 6       And also the sense I had from their brief is suppose I

 7   went out and I said, now, give me all of your contracts,

 8   give me the first 2000 contracts, I think I would have

 9   another objection.

10       The thrust of their brief is not only did we ask for

11   the wrong document request, the further thrust is that this

12   stuff is too sensitive to give away.  I think we'd be

13   fighting over it again.  I don't see much point in doing

14   that since I think that discovery is closed on August 31st.

15   So, we're running short of time.

16       I think I'm probably skipping a couple of things, but I

17   think that's it.  Thank you.

18           THE COURT:  Do you think that -- and then I'm

19   going to ask you to respond to this and that's the only

20   thing I'm going to have you respond to.

21       But have they answered -- and not Interrogatory Number

22   7 -- and for each service or product that can be accessed by

23   user of or subscriber to Westlaw is --

24           MR. HOSTENY:  I don't think they have, because I

25   think they should have identified something more than just

 1  spreadsheets in connection with that.

 2          THE COURT:  Okay.

 3          MR. HOSTENY:  I think they should have identified

 4  -- and I have a problem with their responses to Rule 34

 5  requests as a general principle because the way we're

 6  getting everything is on CD.  We don't see anything produced

 7  as is kept in the ordinary course of business.  I have no

 8  chance to put eyes on that.

 9          THE COURT:  Okay.

10          MR. HOSTENY:  And we have no production in

11  accordance with this pertains to document request thus and

12  such.  So, I don't think they have, Your Honor.

13          THE COURT:  Okay.  I'll let you answer that part.

14          MR. LITSEY:  As to the last point, Your Honor, we

15  have produced documents that are consistent -- that are kept

16  in the ordinary course of business.

17      But as to Your Honor's question, for Westlaw as a whole

18  we produced overall Westlaw members, we produced each of the

19  accused product numbers.  We did not produce separate

20  revenue numbers for every other of the components or

21  products that have not been accused of infringement.

22          THE COURT:  Okay.  All right, well, I'm going to

23  take it under advisement.  Interesting, but I'm not going to

24  just willy-nilly rule from the bench, so I'll get it out as

25  quickly as I can.  All right.

1        MR. LITSEY:  Thank you, Your Honor.

2        MR. HOSTENY:  Have a nice day.

3        THE COURT:  Thanks, you too.

4                    *       *       *

5                  **CERTIFICATE**

6        I, Lorilee K. Fink, RPR-CRR, certify that the

7   foregoing is a correct transcript, transcribed to the best

8   of my ability from an audio recording of the proceedings in

9   the above-entitled matter.

10

        Certified by:          s/Lorilee K. Fink
11      Dated:  February 2, 2010 Lorilee K. Fink, RPR-CRR

12

13

14

15

16

17

18

19

20

21

22

23

24

25