IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| TIMEBASE PTY LTD., | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action Nos.  07-CV-1687 (JNE/JJG) |
| vs. | ) | |
| | ) | |
| THE THOMSON CORPORATION, | ) | |
| WEST PUBLISHING CORPORATION, | ) | **TIMEBASE'S CLAIM** |
| AND WEST SERVICES, INC. | ) | **CONSTRUCTION RESPONSE** |
| | ) | |
| Defendants. | ) | |

Michael R. Cunningham
Gray, Plant & Mooty
500 IDS Center
80 South Eighth Street
Minneapolis, MN  55402
Telephone: (612) 632-3000
Fax:  (612) 632-4444
michael.cunningham@gpmlaw.com

Joseph N. Hosteny
Arthur A. Gasey
Niro, Haller & Niro
181 West Madison, Suite 4600
Chicago, Illinois 60602
Telephone: (312) 236-0733
Fax:  (312) 236-1138
hosteny@nshn.com
gasey@nshn.com

Attorneys for Plaintiff
TimeBase Pty Ltd.

# TABLE OF CONTENTS

**Page No.**

I.   THE DEFENDANTS' BRIEF CONTAINS ERRORS .......................................................................... 1

II.  TIMEBASE'S PROPOSED CONSTRUCTIONS ARE CORRECT ..................................................... 4

A.   Attributes (Joint Chart, Row 2) ................................................................................. 4

B.   Dividing and Predefined Portion (Joint Chart, Row 3) .............................................. 6

C.   Displaying (Joint Chart, Row 4) ................................................................................. 8

D.   Each (Joint Chart, Row 5) ........................................................................................... 9

E.   Graphical Representation (Joint Chart, Row 6) ........................................................ 10

F.   Linking Means and Links (Joint Chart, Rows 7 and 8) ............................................. 12

1.  Related Materials Can be Linked .................................................................... 12

2.  "Single Unique Identifier" is
    Inconsistent With the Intrinsic Evidence ....................................................... 14

3.  A Link is Not Defined by a Single Attribute ................................................... 20

G.   Multidimensional Space (Joint Chart, Row 10) ........................................................ 22

H.   Portion (Joint Chart, Rows 11, 12 and 13) ............................................................... 29

## TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Aristocrat Technologies Australia Pty Ltd. v. International Game Technology,*
  521 F.3d 1328 (Fed. Cir. 2008) ................................................................................. 19, 20

*Blackboard, Inc. v. Desire2Learn, Inc.,*
  574 F.3d 1371 (Fed. Cir. 2009) .........................................................................................20

*Bradford Co. v. Conteyor North Am., Inc.,*
  2010 U.S. App. LEXIS 8869 at *20 (Fed. Cir. April 29, 2010).......................................24

*Caterpillar Tractor Co. v. Berco, S.P.A.,*
  714 F.2d 1110, 1116 (Fed. Cir. 1983) ............................................................................... 3

*Comark Commc'ns, Inc. v. Harris Corp.,*
  156 F.3d 1182, 1186 (Fed. Cir. 1998) ...............................................................................24

*Eli Lilly & Co. v. Aradigm Corp.,*
  376 F.3d 1352, 1360 (Fed. Cir. 2004) ......................................................................... 12, 23

*Fiskars, Inc. v. Hunt Mfg. Co.,*
  221 F.3d 1318, 1323 (Fed. Cir. 2000) ...............................................................................10

*HP Intellectual Corp. v. Sunbeam Prods.,*
  1999 U.S. Dist. LEXIS 9569 at *8 (N.D. Ill. May 12, 1999)............................................23

*Innova/Pre Water v. Safari Water Filtration,*
  381 F.3d 1111, 1116 (Fed. Cir. 2004) ...............................................................................23

*Invitrogen Corp. v. Biocrest Mfg., L.P.,*
  327 F.3d 1364, 1368 (Fed. Cir. 2003) ...............................................................................15

*Medtronic Inc. v. Guidant Corp.,*
  2004 WL 1179338 (D. Minn. 2004) ................................................................................... 9

*MIT v. ImClone Sys.,*
  498 F. Supp. 2d 435, 440 n. 9 (D. Mass. 2007)................................................................23

*On Demand Machine Corporation v. Ingram Indus.,*
  442 F.3d 1331, 1340 (Fed. Cir. 2006) .............................................................................3, 4

*Phillips v. AWH Corp.,*
    415 F.3d 1303 (Fed. Cir. 2005) (*en banc*)..................................................................3, 4, 5, 6, 15, 24

*TI Group Automotive Systems (North America), Inc. v. VDO North America, LLC,*
    375 F.3d 1126, 1136 (Fed. Cir. 2004) ......................................................................................................... 3

**TABLE OF EXHIBITS**

(Exhibits A to M are attached to the Opening Memorandum)

| Exhibit Tab | Description of Exhibit |
|:---:|:---|
| A | TimeBase's United States Patent No. 6,233,592 B1, "System for Electronic Publishing" (filed as 2 parts).  Citations are in the form of column:line, e.g., column 15, lines 20-23 are cited as 15:20-23. |
| B | Paginated File History for the '592 Patent (filed as 8 parts). Pages in the file history are numbered individually, for example, as 592FH000001. |
| C | Reexamination Certificate for TimeBase's U.S. Patent 6,233,592 C1. |
| D | Paginated File History for the '592 Reexamination (filed as 59 parts). Pages in the file history are numbered individually as, e.g., 592REEX00001. |
| E | TimeBase's United States Patent No. '228, "System for Electronic Publishing" (filed as 2 parts). Citations are in the form of column:line, e.g., column 15, lines 20-23 are cited as 15:20-23. |
| F | Paginated File History for the '228 Patent (filed as 32 parts). |
| G | Joint Claim Construction Chart – Each row includes a claim term, TimeBase's construction (Column C) and the Defendants' construction (Column D). |
| H | *Computer Dictionary*, Microsoft Press, Redmond, Washington, 1991, at 111. |
| I | *IBM Dictionary of Computing*, George McDaniel ed., McGraw-Hill, Inc., New York, 1994 at pp. 206 and 301. |
| J | *Encyclopedia of Computer Science & Engineering*, Anthony Ralston, Van Nostrand Reinhold, 2d ed. 1983. |
| K | *Fundamentals of Database Systems*, Ramez Elmasri and Shamkant B. Navanthe, Addison-Wesley, 2d ed. 1994. |
| L | *Extensible Markup Language (XML)*, W3C Working Draft, November 14, 1996. |

| Exhibit Tab | Description of Exhibit |
|:---:|:---|
| M | *A Gentle Introduction to SGML*, Chapter two of Guidelines for Electronic Text Encoding and Interchange (TEI P3), edited by C. M. Sperberg-McQueen and Lou Burnard, currently available at http://www.isgmlug.org/sgmlhelp/g-index.htm, 1994. |
| N | Extract from the Register of European Patents, European Patent Office |
| O | Commencement of Proceedings Before the Board of Appeal |
| P | IP Australia Application Details |
| Q | TimeBase's Supplemental Response of March 1, 2010 to Defendants' Interrogatory 2 (Redacted to remove confidential information) |

## I.   THE DEFENDANTS' BRIEF CONTAINS ERRORS

The defendants say that all of the independent claims require "storing of portions and modified portions of legislation or other materials." (Defs.' Memo, page 1). That is wrong; no independent claim of the '592 cites "legislation" or "other materials." (Exh. A, 155:1-14; 156:12-25; 157:30-44, and Exh. C, claims 59-62). Legislation is in independent claim 13 of the '228 patent, but <u>not</u> in other independent claims. (Exh. E, 163:13-37; 164:8-26; 164:60-165:22).

The defendants say that all of the independent claims require "linking these portions to one another." (Defs.' Memo, page 1). Wrong again. Every independent claim of the '592 requires only that a portion be encoded with a link; the place to which the link goes is not recited. (Exh. A, 155:1-14; 156:12-25; 157:30-44). Independent claim 1 of the '228 patent does not recite linking of one portion to another. (Exh. E, 163:13-38).

The defendants' introduction says all of the independent claims recite multidimensional space "to organize these portions so that they can be sequentially navigated, browsed, and retrieved by an end user." (Defs.' Memo, at 1). But no claim of either the '592 patent or the '228 patent recites "sequentially navigated," or "browsed." Independent claims 59-62 of the '592 patent involve retrieving. (Exh. C). Independent claim 1 in the '228 patent recites searching of text-based data. (Exh. E, 163:30-31). Independent claim 13 describes selection of a version date and searching. (Exh. E, 164:10-12). Independent claim 24 describes searching using one or more attributes. (Exh. E, 165:9-10). Independent claim 36 mentions searching. (Exh. E, 165:67).

The defendants' descriptions of all the independent claims are wrong. They add words and limitations that aren't there. They completely ignore the dependent claims, and the light those claims shed on the independent claims.

Rather than use drawings from the patent, the defendants create their own drawings, and provide no citations to parts of the patent that might support these extrinsic examples. (Defs.' Memo, pages 4-11). All of these are used wrongly to repeat and emphasize that all of the claims require movement, and point-to-point movement, in the multidimensional space. (Defs.' Memo, pages 5 and 12 ("point-to-point navigation"), 9 ("move"), 13 ("move from point to point" and "sequentially navigate")). The defendants say the patents claim "static" links. (Defs.' Memo, page 4). Wrong. No claim includes "static."

The defendants claim that "the patents actually *require* that the multidimensional space contains *more than* three dimensions, . . ." (Defs.' Memo, page 11). Wrong. The specification says that multidimensional space is an area that is "capable of, or involves, more than three dimensions." (Exh. A, 7:52-53).

The defendants assert that TimeBase has failed to obtain a patent in Europe saying, for example, "TimeBase's attempts to patent the invention in Europe have been unsuccessful." (Defs.' Memo, at 2). We are in the United States, where TimeBase has achieved patent protection; the '592 patent was reexamined and all of its claims were confirmed. The request for reexamination of the '592 patent was provided to the examiner of the '228 patent, and that patent issued, too. TimeBase has patents in Australia, New Zealand, Singapore and Canada. TimeBase's application remains pending in Europe. (Exhs. N and O).

Representations to a foreign patent office during the prosecution of a foreign patent application are generally not relevant for claim construction. See, e.g., *Caterpillar Tractor Co. v. Berco, S.P.A.,* 714 F.2d 1110, 1116 (Fed. Cir. 1983) (recognizing that statements made to a foreign patent office may be relevant under the doctrine of equivalents, but noting that such statements could not serve as a basis for reading a limitation into a claim for purposes of claim construction) or *TI Group Automotive Systems (North America), Inc. v. VDO North America, LLC,* 375 F.3d 1126, 1136 (Fed. Cir. 2004).

The defendants claim that TimeBase's Australian patent has lapsed. That is incorrect. (Exh. P).

The defendants' remark about "six years" suggests they believe there is something fishy about TimeBase's claim of priority, in the '228 patent, to the date in the '592 patent, January 31, 1997. (Defs.' Memo, page 2). TimeBase's claim was accepted by the U. S. Patent Office. (Exh. E, first page, fields 30 and 63, and Exh. Q).

The defendants argue that the claims cannot be broader in scope than the invention that is set forth in the specification. The defendants are endeavoring to narrow the claims by creating new limitations ("static links" and others). The defendants cite *Phillips v. AWH Corp.,* 415 F.3d 1303 (Fed. Cir. 2005) (*en banc*) but do not heed its command that limitations must not be imported into the claims from the specification. 415 F.3d at 1319-1320. The full court described doing so as one of the cardinal sins of patent law. *Id.*

The panel opinion the defendants cite, *On Demand Machine Corporation v. Ingram Indus.,* 442 F.3d 1331, 1340 (Fed. Cir. 2006)*,* cannot override a decision by the court sitting *en banc.* Nor do the defendants read *On Demand* correctly. In that case, the patent owner

3

made statements to the Patent Office that sales information was more than file identification information. 442 F.3d at 1338-39. The examiner relied on the statement in his reasons for allowance. 442 F.3d at 1339-40. Those statements caused the claims to be interpreted accordingly.

Here, TimeBase's discussion of the embodiments in the specification of the '592, and the comments made by the examiner in the reexamination of the '592 patent, is obedient to *Phillips* and consistent with *On Demand.*

## II.   TIMEBASE'S PROPOSED CONSTRUCTIONS ARE CORRECT

### A.   Attributes (Joint Chart, Row 2)

The defendants' proposed meaning for "attribute" -- a characteristic or descriptor -- does not consider all the evidence. It ignores the language chosen by the inventors for their claims and specification, and relies on extrinsic, non-technical dictionaries.

They acknowledge that the patent must be read as a whole, (Defs.' Memo, page 16) but then construe "attribute" without considering the whole patent.  Every independent claim of the reexamined '592 patent says an attribute is a point on an axis of a multidimensional space for organizing a plurality of portions. (Exh. A, 155:11-12; 156:22-23; 157:40-41 and Exh. C, 1:32-33; 2:10-11; 2:32-33). The specification is consistent. (Exh. A, Abstract, 4:10-12, 7:19-21, and 31:15-20).

Independent claims 1 and 13 of the '228 patent also weigh against the defendants' proposed construction. These claims speak of attributes in connection with multidimensional space:

> providing a plurality of attributes, wherein the attributes
> define a manner in which the plurality of portions of
> text-based data and the amended portion of text-based
> data can be organized, displayed and linked in a mul-
> tidimensional space;

> \* \* \* \*

> allowing a user to select a version date as a primary
> attribute of a multidimensional space and to input at
> least one search request;

(Exh. E, 163:21-25 and 164:10-12). Independent claim 24 is similar to claim 1. The phrases

"define a manner" and "a primary attribute of a multidimensional space" both relate the

attribute to the space.

The defendants fail to consider all the evidence. *Phillips v. AWH,* 415 F.3d at 1313.

The paragraph following the defendants' reference to "(characteristic or descriptor)"

confirms that attributes are locations in the space:

> This makes it possible to locate each piece or block of text
> at a particular point in a "multidimensional space" using as
> coordinates the attributes added to the piece or block of text.
> Multidimensional space refers to an area not having bound-
> aries and that is capable of, or involves, more than three
> dimensions.

(Exh. A, 7:49-51, emphasis added).

The defendants say that TimeBase's construction is too functional. But the space in

Figure 4 is a structure. The attributes are points on the axes of that space. (TimeBase's

Opening Memo, pages 5-6). Thus, they are points in a structure. It is the defendants'

proposed definition that is functional:  any characteristic of any word would constitute an

attribute, since a word is text-based data.  That contradicts the '592 patent. (Exh. A, claims

1, 20 and 40, and 3:65-67 and 5:61-67).

The defendants' proposal ignores the prosecution history of the '592 reexamination, too. On the page preceding the page cited by the defendants, the examiner said:

> The system has a plurality of attributes and each attribute is a point on an axis of a multidimensional space for organizing the data.

(Exh. D, 592REEX002431). On the next page, right after the language the defendants rely on, the examiner said:

> This makes it possible to locate each piece or block of text at a particular point in a "multidimensional space" using as coordinates the attributes added to the piece or block of text.

(Exh. D, 592REEX002432). The examiner regards an attribute as defining a point on an axis of the space for organizing.

The defendants provide definitions from extrinsic, non-technical dictionaries. (Defs.' Memo, page 39, and Exhibits L and N). Those are useless. *Phillips v. AWH Corp.*, 415 F.3d at 1321 ("The main problem with elevating the dictionary to such prominence is that it focuses the inquiry on the abstract meaning of words rather than on the meaning of claim terms within the context of the patent.") *Phillips* says that a general purpose dictionary cannot overcome art-specific evidence of the meaning of a claim term. 415 F.3d at 1322.

## B.    Dividing and Predefined Portion (Joint Chart, Row 3)

The main dispute between the parties in the construction of "dividing" "and "predefined portion" is defendants' insistence that those terms are divorced from any context of the surrounding evidence. Defendants' proposed construction of "dividing" would include separation into random chunks of one or more words. That would fly in the face of the intrinsic evidence:

> The embodiments advantageously divide information into "suitably" small pieces (or blocks) of text, each of which is a predefined portion of data, and add to each piece of text, either expressly or implicitly, a number of attributes (characteristics or descriptors). The suitability as to size of text pieces is determined by an analysis of the information and its naturally occurring structure based on knowledge of how the information is used and consumed by the end user.

(Exh. A, 7:41-48; see also Exh. D, 592REEX002432). Persons of skill understand that a document is "divided" into "predefined portions" based upon an analysis of the nature of the information and knowledge of how the information will be used. The specification and the file history disclaim "arbitrary" portions (dividing a document such that each single word is a portion) in overcoming the prior art:

> portion may be determined differently. In contrast, Arnold-Moore discloses elements at an arbitrary level (see, page 19, left column, line 12). In particular, Arnold-Moore is concerned with how to query the information, not store it. Therefore, Arnold-Moore relies on the conventional approaches to document storage (namely, a whole document approach and a document assembly approach). This is evidenced throughout the reference because of Arnold-Moore's use of the terms decomposing documents (whole document approach) and reconstructing documents (document assembly approach) (see, for example, page 24, and conclusion). Accordingly, in Arnold-Moore, the arbitrary portion used in either a whole document approach or document assembly approach to versioning is not a predefined portion.

(Exh. D, 592REEX002433-34). Thus, the intrinsic record teaches that a "dividing" means separating into suitable portions, i.e., "predefined portions" which are determined based upon an analysis of the nature of the information and knowledge of how the information will be used. That is hardly arbitrary.

### C.    Displaying (Joint Chart, Row 4)

The sole issue here (found only in the '228 patent) is whether "displaying" must be performed on a "computer screen," or whether "displaying" can also be performed by any of the other  "output devices" disclosed in the specification.

First, defendants argue that the specification uses the term "display" solely with a "video (computer) screen," (Defs.' Memo, page 43), yet fail to acknowledge that the phrase "computer screen" appears nowhere in their specification citations.  Even if "displaying" were narrowed from its plain and ordinary meaning to the specific "video display" relied upon by defendants, anyone familiar with video content would recognize that a "video display" can be shown by a variety of displays beyond a "computer screen," e.g., televisions, projectors and the like. Limiting "displaying" to a "computer screen" ignores the alternative output devices identified immediately after the "video display":

> View. The computer system **500** includes a computer **502**, a video display **516**, and input devices **518**. A number of output devices, including line printers, laser printers, plotters, and other reproduction devices, can be connected to the computer **502**. Further, the computer system **500** can be connected to one or more other computers using an appropriate communication channel such as a modem communications path, a computer network, or the like.

(Exh. E, 16:20-27).  The defendants' argument that printers are never cited "in conjunction" with displaying simply ignores the context in which these alternatives are identified.

Second, defendants argue that "the relevant claims make no sense" if displaying means printing, and offers a selective citation to claim 13 of the '228 patent in support of this argument.  Defendants, however, ignore that other claims (e.g., claim 1) of the '228 patent which call for "displaying" are broader in scope. Claim 1 says:

**1**. A method for electronically publishing text-based data, the method comprising:

dividing the text-based data into a plurality of portions of text-based data;

obtaining an amended portion of text-based data that is amended relative to one of the plurality of portions of text-based data;

storing each of the plurality of portions of text-based data;

storing the amended portion of text-based data;

providing a plurality of attributes, wherein the attributes define a manner in which the plurality of portions of text-based data and the amended portion of text-based data can be organized, displayed and linked in a multidimensional space;

encoding each of the plurality of portions of text-based data and the amended portion of text-based data with a markup language to include at least one link defined by one of the plurality of attributes;

allowing a user to search the text-based data using at least one of the plurality of attributes; and

displaying the text-based data to the user by:

displaying at least one of the plurality of portions of text-based data or the amended portion of text-based data in response to the search; and

displaying text, and/or one or more selectable links representing at least one additional attribute.

(Exh. E, 163:12-37). This independent claim calls for "displaying," but can simply display text and/or selectable links. Thus the displaying of text-based data may be performed by printers and other output devices, not just "computer screens."

### D.    Each (Joint Chart, Row 5)

TimeBase proposed plain and ordinary meaning, because a jury should not need to be told what "each" means. (Exh. G, Cell C5). The defendants cite *Medtronic Inc. v. Guidant Corp.,* 2004 WL 1179338 (D. Minn. 2004), which said that "The ordinary meaning of the word 'each' is 'every one of two or more considered individually or one by one.'" TimeBase will agree to that definition if the Court wants to give any instruction to the jury, so long as

the jury is instructed that "each" does not apply to additional elements. (TimeBase's Opening Memo, pages 12-13).

### E. Graphical Representation (Joint Chart, Row 6)

The one dispute about this term is defendants' insistence that TimeBase has somehow disclaimed "text-based data" – as opposed to solely pictoral data -- from the scope of "graphical representation" because of "what TimeBase told the PTO **before** it added the 'graphical representation' limitation." (Defs.' Memo, page 40, emphasis added). In other words, defendants urge that "graphical representation" should be limited based upon an amendment to claims which did not use the term "graphical representation." As the Federal Circuit has noted, "[c]laims whose allowance was not due to a particular argument are not subject to estoppel deriving from that argument." *Fiskars, Inc. v. Hunt Mfg. Co.*, 221 F.3d 1318, 1323 (Fed. Cir. 2000) (noting that where claims 1, 6 and 8 were asserted, and only one claim 6 was subject to the amendment in dispute, "[a]lthough claim 6 may be subject to prosecution history estoppel as to this element, the other claims in suit are not).

In fact, even if the claim terms "graphical representation" were involved in the prosecution history defendants rely upon (which they were not), the attorney argument which defendants cite failed to recognize the real point of distinction between the Weinberg reference and the claims at issue, i.e., the presentation of time-based versions of data:

10

*Weinberg* provides a graphical view of dynamically changing web site links. This is in contrast to the claimed invention, which provides a non-graphical view of a fixed pre-prepared multidimensional dataset. There does not appear to be any disclosure or suggestion in *Weinberg* of the presentation of time-based data as in the present application.

(Exh. F, 228FH000243).  The intrinsic evidence supports representations of portions (e.g., sections of legislation) which provide text representations (e.g., timeframe listings) that allow users to select and display data (the various versions of the section) depending upon its point in the time axis:



**Fig. 19**

(Fig. 19).  Such examples show that the graphical representation can include pictures (arrow buttons to navigate along different versions in time, identified in figure element

11

1915) but can also include text or written representations (the text summary showing one version up to October 1995, and another version up to December 2001, identified in figure element 1920). There is no "clear and unmistakeable" disclaimer of representations which include text in the phrase "graphical representation", as used in claims 24 and 36 of the '228 patent.

### F.    Linking Means and Links (Joint Chart, Rows 7 and 8)

The parties agree that link (the '228 patent) and linking means (the '592 patent) use a markup language. (TimeBase's Opening Memo, pages 17-18). The defendants maintain, however, that links and linking means (1) cannot connect related materials, and (2) employ only what the defendants call a "single unique identifier." (Defs.' Memo, pages 31-32, 35-36). They also claim that a link in the '228 is defined by a single attribute.

The defendants say that different words in the claims and specifications -- "blocks of text-based data," portions, and "portions of text-based data" – all mean the same thing. (Defs.' Memo, page 30, footnote 4). The defendants provide no reasoning to treat different words and phrases in the claims as meaning the same thing. They have waived any right to construe "block" or "text-based data." *Eli Lilly & Co. v. Aradigm Corp.*, 376 F.3d 1352, 1360 (Fed. Cir. 2004).

### 1.    Related Materials Can be Linked

Links (the '228 patent) and linking means (the '592 patent) link legislation, and related material. Figure 4 includes an X-axis for time, a Y-axis representing location, that is, the provision, and a Z-axis representing type, including legislation, cases and articles. (Exh. A, 10:24-50 and 11:7-12). Figure 13 in both patents shows a connection to "Related Info":



Family relationships definitions - couples

The description of element 1308, the button for Related Info, says:

> The Subject, Jurisdiction
> and Related Info buttons **1308** allow the user to view and
> access sections dealing with a similar subject, or similar
> sections in other jurisdictions, or related information such as
> cases and articles on or about the section.

(Exh. A, 13:46-51). The '592 patent says that a researcher can examine rules of evidence pertaining to confessions, and related cases and the law of other jurisdictions on the same topic. (TimeBase's Opening Memo, pages 19 and 20).

Dependent claim 16 of the '592 patent says the text-based data of claim 1 is legislation. (Exh. A, 156:1-2). Thus, the text-based data of claim 1, which is encoded with a linking means, cannot be limited solely to legislation. Dependent claims 35 and 55 are the same.

The claims of the '228 patent refer to links. Independent claim 13 of the '228 patent recites "displaying a link to cases related to the portion of legislation . . . ." (Exh. E, 164:19-21). The next step in that claim says the user can "select the case link or the version link." (Exh. E, 164:22).

Claim 15 of the '228 patent depends on claim 13. It says:

> The method of claim **13**, wherein the portions of
> text-based data are associated with the cases or other ver-
> sions by at least one link defined by one or more of a
> plurality of attributes.

(Exh. E, 164:29-32).

Claim 19 depends on claim 15. It says:

> The method according to claim **15**, wherein each of the portions of text-based data is a respective provision of said legislation or material related to a provision of said legislation.

(Exh. E, 164:43-46). Claims 33 and 43 are the same.

Thus, the patents show that related materials, such as cases and articles, can indeed be linked.

### 2.   "Single Unique Identifier" is Inconsistent With the Intrinsic Evidence

The defendants argue that linking means and links consist of a "single unique identifier." (Defs.' Memo, pages 32-34, 36). They contend that the structure for linking in the '592 patent can be only a single unique identifier, and that a link in the '228 consists of a single attribute which is a unique identifier. (Defs.' Memo, pages 32 and 36). "Single unique identifier" appears nowhere in the claims, in the specification, or in the history of either patent. The defendants do not properly distinguish between the two types of claims, either. An apparatus claim requires structure. A method claim requires acts. Many of the claims here are method claims: independent claim 40 (and its dependents) of the '592 patent, and all of the claims of the '228 patent.

A portion can have multiple linking means and links. Claim 1 of the '592 patent refers to a plurality of linking means, and says that a modified predefined portion is encoded with <u>at least one</u> means. (Exh. A, 155:6-10). Thus, a portion can be encoded with more than one linking means. If the defendants were correct, and if more than one linking means was used for a portion, each one would consist of the same "single unique identifier"

14

because the defendants say that this markup contains the unique identifier of a portion of text-based data, . . ." (Defs.' Memo, page 33). Their construction ignores the "plurality" of linking means in claim 1, and the "at least one" language in claim 1. Claims are not to be so construed. *Phillips v. AWH Corp.,* 415 F.3d at 1314.

Dependent claim 10 of the '592 patent depends on claim 1. Claim 10 says "wherein said linking means comprises an identification code for said respective predefined portion." (Exh. A, 155:44-46). "Comprises" is open-ended. *Invitrogen Corp. v. Biocrest Mfg., L.P.,* 327 F.3d 1364, 1368 (Fed. Cir. 2003). The linking means in this dependent claim cannot be limited solely to an identification code. It therefore cannot be limited to a single unique identifier, even if the "unique identifier" was an identification code. See also claims 20 and 29, and 40 and 49.

A single identifier is at odds with the '592 patent specification. It says that connections can be made to a range of content including versions:

> The embodiments allow publishers to add an arbitrary number of logical connections to a set of data, and even permit the publisher to display the precise evolution of that data set over time.

\* \* \* \*

> However, with the embodiments of the invention, it is possible to list all logical connections within a data set no matter how complex those connections may be.

(Exh. A, 4:53-57, and see also 5:4-6). It also says that links are available for versions, and for amending and repealing legislation:

> In the embodiments of the invention, legislation is stored using every version of each Act or Regulation. The end user can search every version of any section, schedule, or provision. For example, the required version of a section is immediately available as is the opportunity to view every preceeding and subsequent version of the same section. Also, links are available to any relevant amending legislation commencing that change, as well as the one that repealed it. Relevant Application, Saving or Transitional Provisions can also be easily accessed.

(Exh. A, 5:17-27).

The defendants refer to the markup examples provided at column 8, lines 43-49, and assert that these show how a link must be a single unique identifier. (Defs.' Memo, page 33). That is incorrect. These are, as the specification says, examples of markups. The specification describes the example as markup:

> This markup indicates that: the data from this point on is part of a section of legislation; the section has an identifier of CWACT-19950104-SEC-1; and the section has a label of "1".

(Exh. A, 8:46-49).

Following the defendants' logic, this markup would be the single unique identifier for that section. However, this markup does not include start or end dates to distinguish this Section 1 from other versions of Section 1. A user therefore could not explore how Section 1 changed over time. That is inconsistent with a point of the invention: to allow exploration of location, type, jurisdiction, subject, depth and time. (Exh. A, 8:10-20). With only one "single unique identifier," exploration would be impossible, and the time axis of Figure 4 rendered meaningless.

The defendants' single unique identifier is inconsistent with SGML and XML, which allow a user wide latitude. The '592 patent repeatedly refers to two markup languages known at the time to persons of skill in the art: SGML, Standard Generalized Markup Language, and XML, Extensible Markup Language:

> organizing the data. The plurality of predefined portions of the data may be encoded using Standard Generalized Markup Language (SGML) OR XML. Still further, the data is encoded using one or more Document Type Definitions (DTD) or Style Sheet Mechanisms (SSM).

(Exh. A, Abstract).

> Structured Generalised Markup Language (SGML) is a
> recognised way to mark up data. SGML allows logical
> 5  structure to be added to a document (unlike HTML and word
> processors which only allow the addition of visual content).

(Exh. A, 6:3-6).

> Publication data, being preferably legal information, is
> encoded using Standard Generalized Markup Language
> (SGML) or Extensible Markup Language (XML) which
> adds codes to the publication data and provides functionality
> to the data. The publication data is processed as a plurality  10

(Exh. A, 7:6-10).  Note that SGML provides structure.

The details for marking up are provided in a Document Type Definition (DTD) or in a Style Sheet Mechanism (SSM). (Exh. A, 8:21-26). A DTD is Table B in the '592 patent. (Exh. A, 8:30-32). The DTD, which begins at column 27 and continues through column 52, includes elements, and each element can have attributes. As an example, a poem could have the elements author, title and stanza, and the element author could have attributes for first name, last name, date, and more. The element stanza could have attributes for the number of lines and the rhyming scheme.

The defendants refer to a part of the DTD, but do not understand it. (Defs.' Memo, page 35). Column 35 includes <u>several</u> attributes dealing with dates and legislation references:

```
<!ENTITY % status
         "insert-date    NUMBER    #IMPLIED -- insert date --
   5      insert-leg     IDREF     #IMPLIED -- link to the inserting legislation --
          repeal-date    NUMBER    #IMPLIED -- repeal date --
          repeal-leg     IDREF     #IMPLIED -- link to the repealing legislation --
          amend-date     NUMBER    #IMPLIED -- amended date --
          amend-leg      IDREF     #IMPLIED -- link to the amending legislation --
  10      "
```

17

(Exh. A, 35:3-10). The "amend-leg" attribute permits a "link to the amending legislation" because the markup presupposes the presence of the "amend-date" attribute, that is, the date the amendment is effective. (Which attributes are used as links depends on the number of dimensions in the multidimensional space).

Another example of an attribute is date of commencement; its value will be a date formally YYMMDD.  (Exh. A, Table C, cols. 87-90).  See also the list of attributes at column 151, lines 20-48 of the '592 patent.  (Exh. A).

The history of the '592 patent is consistent. The applicant said:

> Again, each predefined portion of the text-based data is defined to be encoded with at least one linking means.  Further, the linking means has been defined to be of a markup language.  Original claim 6 defined that the predefined portions of data are encoded using SGML or XML.  Thus, the limitation of "a markup language" is based upon claim 6.  Further support for this limitation is found at page 8, line 31-35, and page 10, line 25 - page 11, line 1.

(Exh. B, 592FH000255).

The reexamination reached the same conclusion. The examiner cited column 7, lines 6-31 in concluding that the invention was patentable. (Exh. D, 532REEX002431-32).

The results are used in a database, described in the patent and recited in dependent claims 11, 12, 50 and 51 of the '592 patent.  (Exh. A, 155:49-53 and 158:22-27). Table C gives more guidance. (Exh. A, 8:26-30).

The defendants assert that Folio Views jump links are the structure for linking means.  (Defs.' Memo, pages 33-34). The '592 patent says no:  Folio Views and Dynatext are

18

text-retrieval applications, <u>not</u> markup languages. (Exh. A, 9:44-52). The '592 patent discusses Figures 7 to 17, and concludes:

> Again, the ability to relate such to time and then to mix and match types of information from different sources (jurisdictions) is a feature provided by the coding technique used for the data and not the Folio Views software used to deliver the data to the end user.

(Exh. A, 14:6-21, emphasis added).

The defendants argue that the linking means is in means-plus-function format, and assert that TimeBase has not identified structure for the linking means. First, the limitation is not means-plus-function, because the structure is right there in the claims. Each of the independent claims say that the linking means is "of a markup language." Even the defendants say that "The Linking Structure Consists of Markup Language . . . ." (Defs.' Memo, page 32).

Dependent claims provide more structure. Claim 8 says a linking means comprises "any piece of information additional to the body of text-based data." (Exh. A, 155:37-39). Additional information can be, for example, the effective date of a section. Claim 9 says the linking means comprises "a code or markup that allows departure and destination points between portions. (Exh. A, 155:40-43). Claim 10 says the linking means comprises an identification code. (Exh. A, 155:44-46). Claims 27-29 and 47-49 are comparable.

The defendants cite *Aristocrat Technologies Australia Pty Ltd. v. International Game Technology,* 521 F.3d 1328 (Fed. Cir. 2008). That patent mentioned a standard microprocessor-based gaming machine with "appropriate programming." 521 F.3d at 1334. No further structure was provided. *Aristocrat* hewed to prior CAFC cases holding that the

disclosure of a general purpose computer, without any programming to carry out the disclosed algorithm, did not comply with § 112, paragraph 6. 521 F.3d at 1136-38.

The defendants also cite *Blackboard, Inc. v. Desire2Learn, Inc.,* 574 F.3d 1371 (Fed. Cir. 2009). It follows *Aristocrat*. *Blackboard* says the concern is that, if no structure was identified, a patentee could "claim all possible means of achieving a function." 574 F.3d at 1385.

The linking means elements of the claims of the patents here do not refer to "appropriate programming" or to a "standard microprocessor." Instead, they refer to "linking means of a markup language . . . ." (Exh. A, 155:7, 156:18, and 157:37). (The defendants' argument does not even apply to claim 40, because it is a method claim, and the defendants incorrectly ignore the distinction). The inclusion of "of a markup language" signifies that this limitation is not means plus function.

If it is a means plus function limitation, "of a markup language" identifies the structure, and the specification in turn gives abundant guidance about the nature and use of markup languages. The patents do identify structure, and therefore do not create the false issue created by the defendants' failure to read all the evidence. And, as *Aristocrat* says, a "highly detailed description" is not necessary. 521 F.3d at 1338. Both of these cases support TimeBase's position.

### 3.    A Link is Not Defined by a Single Attribute

The defendants mis-quote the claims of the '228 patent. They say at page 35 that "The claims expressly state that a link is '*defined* by one of the plurality of attributes.' Because this definition appears within the claims themselves, it must govern." The

defendants do not identify the claims they quote. We believe they are referring to claims 15 and 38 of the '228 patent. But those claims recite "at least one link defined by one **or more** of the plurality of attributes." (Exh. E, 164:31-32, 166:24-25). The defendants omit "or more." In doing so, they distort the claim.

Other claims confirm that the defendants are wrong. Claims 16-18 and 39-41 add that the "at least one link" can be additional information (16 and 39), can comprise a code or markup that allows departure and destination points to be created (17 and 40), or can comprise an identification code for a corresponding portion (18 and 41).

Claim 1 of the '228 patent provides "a plurality of attributes," and recites "one or more selectable links representing <u>at least</u> one additional attribute." (Exh. E, 163:21 and 163:36, emphasis added.)

The defendants use examples in the patents to limit the claims. They refer to columns 111 and 133 of the '228 patent, which are embodiments and examples, not limitations. They misconstrue the examples, too. There is nothing in column 111 that says an ID is the only thing permissible. Column 133 refers to a variety of cross-references, including to a range of references. There is even a reference where an ID is not known. (Exh. E., 133).

The points we stated above regarding the '592 apply to the '228 as well.  Links in the '228 patent are not defined by a single attribute. Its links can and do include related materials, and cannot be limited to a "single unique identifier."

Nor does any claim refer to "logically connecting" or to a "logical connection." (Defs.' Memo, pages 29 and 35). While an arbitrary number of logical connections can be made, as

21

described above, that terminology appears in the description of the embodiments, and in the description of a problem with "haphazard hyperlinks":

> The embodiments of the invention provide an entirely new way of delivering, storing and publishing information. The embodiments allow publishers to add an arbitrary number of logical connections to a set of data, and even permit the publisher to display the precise evolution of that data set over time. This can be done without getting bogged down in the complexity of the logical connections and without limit as to storage space.
>
> Frequently, people desire to have more "information" available. However, with the advent of the Internet and new technology, many people suffer from information overload. The embodiments of the invention provide an easy and effective way to navigate large complex volumes of information.
>
> Conventionally, information may only contain very rudimentary (i.e., haphazard hyperlinks) or non existent logical connections. Thus, conventional techniques of investigating how a set of data has evolved and changed over time can only be done for small data sets and are very expensive.

(Exh. A, 4:52-5:3). "Logical connection" is used two ways: one with respect to the arbitrary number of connections, and with respect to the problems of prior, unsuccessful attempts. It does not appear in the claims because it is not a limitation of the invention.

### G. Multidimensional Space (Joint Chart, Row 10)

The defendants cannot escape the definition of "multidimensional space," which is set forth clearly and simply in the specification itself: "An area not having boundaries and that is capable of, or involves more than three dimensions."  (Defs.' Memo, page 17, citing Exh A, 7:52-54).

The defendants, however, seek a "definition of the definition," i.e., that is, a definition of the word "dimensions": "West asks the Court to hold that 'dimensions,' in the context of these patents, are 'axes along which point-to-point movement is allowed." (Defs.' Memo, page 18).  "Dimensions" is a word not found in any of the claims.  Such a construction is

22

unnecessary, and outside the purpose of <u>claim</u> construction. *MIT v. ImClone Sys.*, 498 F. Supp. 2d 435, 440 n. 9 (D. Mass. 2007)(noting the court's task under Markman is to construe "the words of the claims themselves") (Citing *Innova/Pre Water v. Safari Water Filtration*, 381 F.3d 1111, 1116 (Fed. Cir. 2004); *HP Intellectual Corp. v. Sunbeam Prods.*, 1999 U.S. Dist. LEXIS 9569 at *8 (N.D. Ill. May 12, 1999) ("In . . . a Markman hearing, this court must construe the particular words <u>of the claims</u> as a matter of law.") (citing *Markman*, 517 U.S. at 372; *Vitronics*, 90 F.3d 1576, 1583)(emphasis added). The defendants did not propose to construe "dimension" either; they have waived. *Eli Lilly,* 376 F.3d at 1360.

Limiting the claims to require "point to point movement along an axis" reads in language from embodiments, while ignoring other examples in the specification. The defendants' proposed definition seeks limiting multidimensional space by: 1) <u>requiring</u> "point to point" movement along an axis, even though the claim does not have any such limitation; and 2) limiting the movement to movement on <u>an</u> axis, even though the specification teaches the availability of alternatives for the multidimensional space.

As to the first point, Claim 1 does not recite movement. It says that the multidimensional space is a separate element from the "attributes," and that each attribute is a point on an axis of a multidimensional space for **organizing** the predefined portions within the multidimensional space:

> 1. A computer-implemented system for publishing an electronic publication using text-based data, comprising:
>   a plurality of predefined portions of text-based data with each predefined portion being stored;
>   at least one predefined portion being modified and stored;
>   a plurality of linking means of a markup language, each predefined portion of said text-based data and said at least one modified predefined portion of text-based data being encoded with at least one linking means; and
>   a plurality of attributes, each attribute being a point on an axis of a multidimensional space for organising said plurality of predefined portions and said at least one modified predefined portion of said text-based data.

(Exh. A, 155:2-14). Only in later, <u>dependent</u> claims does the claim language even infer movement between points where a given point is a departure or destination point:

> 8. The system according to claim 1, wherein said linking means comprises any piece of information additional to the body of the text-based data.
> 9. The system according to claim 8, wherein said linking means is a code or markup that allows departure and destination points to be created between portions of said text-based data.

(Exh. A, 155:37-43). The inference is clear: Timebase used "organization" instead of "departure" or "destination" because it was <u>not</u> requiring movement between points in claim 1, and only added such a requirement in the more narrow dependent claims. See *Bradford Co. v. Conteyor North Am., Inc.,* 2010 U.S. App. LEXIS 8869 at *20 (Fed. Cir. April 29, 2010)(where a dependent claim clearly states a limitation, the scope of independent is presumed to be broader) (citing *Comark Commc'ns, Inc. v. Harris Corp.,* 156 F.3d 1182, 1186 (Fed. Cir. 1998) ("The doctrine of claim differentiation create[s] a presumption that each claim in a patent has a different scope."). See also *Phillips v. AWH Corp.,* 415 F.3d at 1314. (Referring to the same presumption of claim differentiation and saying "Differences among claims can also be a useful guide in understanding the meaning of particular claim terms.").

24

The specification permits a user to "see" the organization of the points along one or more axes without requiring movement from one point to another.   For instance, defendants cite Figure 13 of the patents in suit (Defs.' Memo, page 24), yet fail to note another "button" or feature enabled in that embodiment, i.e., the "ALL" feature:



**Fig. 13**

This enables a user to see all the portions on a given axis (i.e., to view the organization of the attributes) without requiring "point to point" movement, which is a separate feature enabled by other buttons, e.g., the "previous" and "next " buttons:

FIG. **13** shows screen **1300** containing the Time Base Toolbar **1302**, which preferably provides eight buttons for accessing time based information. This Toolbar **1302** is not a feature of Folio Views, but is a designed addition added to Folio Views by the first embodiment. It is made possible by the way in which the publication data is coded. The Section Information button **1304** takes the user to an overview of information. The Previous, Next and All buttons **1306** allows the user to have access to the previous, next and all versions of the relevant section. The Subject, Jurisdiction and Related Info buttons **1308** allow the user to view and access sections dealing with a similar subject, or similar sections in other jurisdictions, or related information such as cases and articles on or about the section. This Toolbar **1302** allows a user to cycle through previous and subsequent versions of sections and as shown in screens in FIGS. **14** and **15** to refer to the text of sections amending the section. As well, the user can also call to the screen all versions of the section as one view (or display) using the "ALL" button.

(Exh. A, 13:36-56).   The claim language and the specification make clear that the "multidimensional space" may be used for "organizing," e.g., for providing an organized view, and do not require movement, much less "point to point" movement.

Second, the specifications of the patents in suit make clear that, even where movement within the multidimensional space occurs, such movement need not occur along an axis. Such movement can involve a combination of dimensions:

Thus, the embodiments of the invention provide a new computer publishing system that changes the availability of electronic information from being merely "speeded up paper" to being electronic information taking advantage of new electronic media by providing users with enhanced functionality of data retrieval and manipulation. The information included in the electronic format is of a publishable standard, meets cost constraints and is able to be accessed under any combination of dimensions from the multidimensional space (Acts, cases, time, jurisdiction, subject).

(Exh. A, 6:48-58).   For example, the specification teaches that the navigation can jump to "related information," as opposed to simply going from "point to point" along an axis:

26



Fig. 13

As the specification notes, this feature allows a user to access other forms of information which is "related to" the section, without necessarily being on the same axis:

> and Related Info buttons **1308** allow the user to view and access sections dealing with a similar subject, or similar sections in other jurisdictions, or related information such as cases and articles on or about the section. This Toolbar **1302** allows a user to cycle through previous and subsequent versions of sections and as shown in screens in FIGS. **14** and **15** to refer to the text of sections amending the section. As well, the user can also call to the screen all versions of the section as one view (or display) using the "ALL" button.

(Exh. A, 13:46-56).   In other words, the movement called for by the invention need not be along an axis, but can occur between multiple axes.

The operation of the invention does not even require a step-through or navigation-based method for locating information on any axis, but can simply involve text retrieval, as shown for example in Figures 16-17 and their related description:

> The screen shots in FIGS. 7 to **15** display a step-through or navigation-based way of locating information. There is also the more direct approach of searching for terms using text retrieval. The screen shots in FIGS. **16** and **17** illustrate such searching provided by the first embodiment. Screen **1600** shown in FIG. **16** provides a customised search template **1602** that includes a time base option allowing a user to search for versions of a section, for example. Screen **1700** shown in FIG. **17** illustrates a customised search template **1702** for case law which includes a time base option connecting cases to legislation at a particular date, for example. Again, the ability to relate such to time and then to mix and match types of information from different sources (jurisdictions) is a feature provided by the coding technique used for the data and not the Folio Views software used to deliver the data to the end user.

(Exh. A, 14:6-21).  Thus, while the defendants argue that "there is no other way to move" other than "point to point movement" (Defs.' Memo, page 23), the specification plainly teaches another alternative form of movement:  searching for terms using text retrieval.

The prosecution history supports TimeBase. The defendants quote the statement from the prosecution history that "the multidimensional space of claim 1 may be displayed in a concrete form as an end user interface (see, e.g., Figure 7-17)." (Defs.' Memo, page 28). Yet the defendants fail to address or acknowledge the mentioned Figures, 16 and 17, or the related description in the specification, because that evidence contradicts their argument.

Neither the claim language, nor the specification, nor the prosecution history limits the claims to require "point to point movement on an axis."  The defendants' argument is nothing more than an attempt to define a word not found in the claims, as well as an attempt to rewrite a definition clearly stated in the specification.

### H.    Portion (Joint Chart, Rows 11, 12 and 13)

The defendants argument about "portion" is based upon the false premise that "TimeBase seeks a narrower definition" of "portion."   (Defs.' Memo, page 45).   Not so. TimeBase's proposed definition is not so confined. There is no limitation to a "block" of data, which might be the same as or different from a "piece" of text; both can be a portion:

> The embodiments advantageously divide information into "suitably" small pieces (or blocks) of text, each of which is a predefined portion of data, and add to each piece of text, either expressly or implicitly, a number of attributes (characteristics or descriptors). The suitability as to size of text pieces is determined by an analysis of the information and its naturally occurring structure based on knowledge of how the information is used and consumed by the end user.

(Exh. A, 7:41-48).   The fact that the specification refers to pieces as an alternative to "blocks" shows that the patent is not limited to a "block" (i.e., a contiguous string of text) as defendants would try to limit the phrase.   People of skill in this field – even lawyers who frequently conduct database searches – understand that a "portion" could be identified by, for instance, key words or phrases which omit intervening words which are irrelevant to organization and searching (e.g., articles, prepositions, etc.).   Simply put, a "piece" is not a "block."

Defendants' argument that a "portion" must include an entire document is equally unfounded.   Defendants rely upon a single, three-line citation for the proposition that a "portion" must include a "case" or "articles."   But that citation refers only to "nodes" or intersection points between various axes. The cited text mentions only that a case might be "identified" at a given node – <u>no</u> mention is made of requiring the <u>entire</u> case to be stored at that node, as opposed to simply identifying the case, e.g., by the case cite.   Defendants'

argument is simply inapposite as to whether an entire case or an entire article is stored as a portion, as opposed to simply being "identified" at a node.

Equally important, defendants give no weight to the prosecution history, where the Examiner made clear the meaning of "predefined portions" and how a portion differed from the prior art approach of using entire documents or "atomic elements" (i.e., single words):

> portion may be determined differently. In contrast, Arnold-Moore discloses elements at an arbitrary level (see, page 19, left column, line 12). In particular, Arnold-Moore is concerned with how to query the information, not store it. Therefore, Arnold-Moore relies on the conventional approaches to document storage (namely, a whole document approach and a document assembly approach). This is evidenced throughout the reference because of Arnold-Moore's use of the terms decomposing documents (whole document approach) and reconstructing documents (document assembly approach) (see, for example, page 24, and conclusion). Accordingly, in Arnold-Moore, the arbitrary portion used in either a whole document approach or document assembly approach to versioning is not a predefined portion.

(Exh. D, 592REEX002433-34).  The intrinsic record teaches that a "portion" is simply a part of a writing or written work (e.g., a document) and more than a single word, but less than a "whole document."  Thus, defendants' proposed construction is wrong.

Respectfully submitted,

/s/ Joseph N. Hosteny
Joseph N. Hosteny
Arthur A. Gasey
Niro, Haller & Niro
181 West Madison, Suite 4600
Chicago, Illinois 60602
Telephone: (312) 236-0733

30

Michael R. Cunningham
Gray, Plant & Mooty
500 IDS Center
80 South Eighth Street
Minneapolis, MN  55402
Telephone: (612) 632-3000
Fax:  (612) 632-4444

Attorneys for TimeBase Pty Ltd.

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that **TIMEBASE'S CLAIM CONSTRUCTION RESPONSE** was served on July 9, 2010 upon Thomson's counsel, listed below, by email and first-class mail to:

> FaegreThomsonList@faegre.com
> Mindy Sooter;
> Katherine S. Razavi;
> Kevin P. Wagner;
> David Gross;
> Calvin L. Litsey;
> Theodore M. Budd;
> Faegre & Benson LLP
> 2200 Wells Fargo Center
> 90 South Seventh Street
> Minneapolis, Minnesota 55402
> Phone: 612-766-7000
> Fax: 612-766-1600

/s/ Joseph N. Hosteny

32