ZASTROW EXHIBIT 1

ZASTROW EXHIBIT 1

1

2  UNITED STATES DISTRICT COURT

3  DISTRICT OF MINNESOTA

4  Case No. 08-CV-1010 (RHK-JSM)

5  ------------------------------------x

6  LEMOND CYCLING, INC.,

7                    Plaintiff,

8           - against -

9  TREK BICYCLE CORPORATION,

10                   Defendant and

11                   Third-party Plaintiff,

12          - against -

13 GREG LEMOND,

14                   Third-party Defendant.

15 ------------------------------------x

16                    February 18, 2009
                      9:02 a.m.
17

18         DEPOSITION of SIDNEY D. BLUMING,

19 taken by the Defendant, pursuant to

20 Notice, held at the offices of Bluming &

21 Franco, 140 East 45th Street, New York,

22 New York, before Debbie Zaromatidis, a

23 Shorthand Reporter and Notary Public of

24 the State of New York.

25

 1                   BLUMING
 2      Q.    You went to Brooklyn Law School?
 3      A.    That's correct.
 4      Q.    Graduated in 1968?
 5      A.    That's correct.
 6      Q.    And since 1968, what has been
 7   your line of work?
 8      A.    I have always been in private
 9   practice with various law firms.
10      Q.    Okay. And has licensing been a
11   particular concentration of yours?
12      A.    Yes, it has.
13      Q.    Okay. Tell us a little bit
14   about your practice in the area of
15   licensing?
16      A.    Since the early '70s, I have
17   been involved in various aspects of
18   licensing, really all aspects of licensing
19   representing manufacturers, designers,
20   athletes, personalities, retailers,
21   licensing representatives. I have -- I
22   have been speaking on licensing at various
23   trade associations and licensing groups.
24   I have written some work on licensing and
25   business periodicals in business. I have

 1                    BLUMING
 2    been an expert witness in licensing
 3    matters.  It is a significant component of
 4    our practice.  I have a general commercial
 5    business practice.  I am involved in
 6    arbitration, and I sit as an arbitrator
 7    with the American Arbitration Association
 8    primarily in intellectual property
 9    matters.
10        Q.    Okay.
11        A.    And as I said a general
12    commercial practice by and large.
13        Q.    How would you describe licensing
14    to a layperson?
15        A.    Probably the simplest way to
16    describe it is that it is renting one's
17    name and image to another for use in
18    connection with a product or service that
19    entity has an experience -- has an
20    expertise in producing and so on.
21        Q.    And in the context of renting
22    one's name and likeness to somebody else,
23    that, as I think you have written,
24    is -- becomes a shared enterprise, right?
25        A.    I think that a good licensing

1                    BLUMING

2     Q.    Yes.  Item number 5, product
3  development refers to "bilateral agreement
4  on appropriate product."
5          Do you see that?
6     A.    Yes.
7     Q.    Do you have an understanding why
8  there would be a bilateral agreement being
9  discussed for product development?
10         MS. RAHNE:   I object to the
11  form, foundation.
12    A.    Again, you are asking me for
13  speculation.  I think there is rationale
14  to it.  I think from Trek's point of view
15  they didn't want to produce 12 wheeler
16  bikes, and from Greg's point of view he
17  didn't want bikes that looked like bubble
18  gum machines.  I think each had an
19  interest in the product representing what
20  could be done and what should be done.
21    Q.    Okay.  So when we talk about
22  bilateral approval product development, do
23  you see that as an issue that makes sense
24  for the licensor, Mr. Lemond, to be
25  concerned about?

1                   BLUMING
2   Dick Burke at Trek to you dated May 8,
3   1995.
4           (Document handed to witness.)
5       Q.   This is a seven-page fax
6   including the cover sheet for those of us
7   old enough to remember faxes as opposed to
8   E mails.
9       A.   They weren't even started.
10      Q.   Even before faxes.
11           MS. RAHNE:  I remember faxes.
12      Q.   Take a minute to look at that.
13           (Pause.)
14      A.   Okay.  Well, I -- I see that the
15  fax is addressed to me.  I don't know if
16  it is gratuitous to say, but Mr. Burke was
17  the consummate gentleman and a delight to
18  deal with and I was sorry hear about his
19  passing.  He was a lovely man, and all the
20  discussions were at an enormously gracious
21  level and courteous level.
22      Q.   Was Mr. Dick Burke your primary
23  point of contact on the Trek side of the
24  deal?
25      A.   He was the primary business

```
 1                  BLUMING
 2    which we have talked about and this
 3    current draft says, "Trek determines
 4    channels of distribution so long as they
 5    are consistent with Greg's image and
 6    reputation and that of approved products
 7    sold in better stores." Right?
 8        A.   That is the same.
 9        Q.   And your highlight is "agreed if
10    Trek is satisfied with parenthetical
11    insert, which is frequently used in such
12    cases. " That refers to the -- to what
13    parenthetical insert?
14        A.   The one you read about Greg will
15    not withhold consent to frustrate Trek's
16    exploits.
17        Q.   You explain "It allows
18    personality the needed protections of his
19    or her image, et cetera, and insures
20    licensee that there wouldn't be arbitrary
21    or vengeful sabotaging of the agreement"?
22        A.   I think I explained to Dick that
23    is what I used in the Elizabeth Taylor
24    deal.
25        Q.   Number 9, promotion and
```

1        BLUMING
2    A.   So it carried its way over into
3    this iteration.
4    Q.   Yes, and we saw in one version
5    the specific percentage was not included?
6    A.   In the deal point memo.
7    Q.   Right.  But now in this version
8    of the agreement it is, right?
9    A.   You know, it is -- it is in
10   everyone's best interests to have a
11   tangible guideline, Trek's as well.  I
12   mean Trek wouldn't want us to say it would
13   be 10 percent.  That wouldn't have been
14   reasonable.  So 3 percent is almost as
15   much a limit as it is a minimum.
16   Q.   Okay.
17            (Exhibit 127 marked for
18   identification.)
19            (Document handed to witness.)
20   Q.   Exhibit 127 is an August 14
21   letter from you to Mr. Siefkes again.
22   A.   No wonder the rain forests are
23   in trouble.
24            MS. RAHNE:  You guys produce
25   it, and we reuse it.  We are all culpable