Timebase Pty Ltd v. Thomson Corporation, The — Doc. 196

4/7/2009 Burke, John

```
 1              UNITED STATES DISTRICT COURT
 2                 DISTRICT OF MINNESOTA
     -----------------------------------------------
 3
     LeMOND CYCLING, INC.,
 4
                  Plaintiff,
 5
                       vs.           Case No. 08-1010
 6
     TREK BICYCLE CORPORATION,
 7
                  Defendant/Third-Party
 8               Plaintiff,
 9                     vs.
10   GREG LeMOND,
11               Third-Party Defendant.
12   -----------------------------------------------
13
14
15            Video Deposition of JOHN BURKE
16               Tuesday, April 7, 2009
17
                       9:31 a.m.
18
                          at
19
               GASS WEBER MULLINS, LLC
20         309 North Water Street, Suite 700
               Milwaukee, Wisconsin  53202
21
22
           Reported by Julie K. Lyle, RPR/RMR/CRR
23
24
25
```

EXHIBIT A

1

dockets.Justia.com

| | |
|---|---|
| 1 | Videotape deposition of JOHN BURKE, a |
| 2 | witness in the above-entitled action, taken at |
| 3 | the instance of the Plaintiff/Third-Party |
| 4 | Defendant, pursuant to the Federal Rules of Civil |
| 5 | Procedure, pursuant to Notice, before Julie K. |
| 6 | Lyle, RPR/RMR, Certified Realtime Reporter, and |
| 7 | Notary Public, State of Wisconsin, at GASS WEBER |
| 8 | MULLINS, LLC, 309 North Water Street, Suite 700, |
| 9 | Milwaukee, Wisconsin, on the 7th day of April, |
| 10 | 2009, commencing at 9:31 a.m. and concluding at |
| 11 | 4:28 p.m. |
| 12 | A P P E A R A N C E S: |
| 13 | ROBINS, KAPLAN, MILLER & CIRESI, LLP, by |
| | Mr. Christopher W. Madel |
| 14 | Ms. Denise S. Rahne |
| | 2800 LaSalle Plaza |
| 15 | 800 LaSalle Avenue |
| | Minneapolis, Minnesota 55402 |
| 16 | Appeared on behalf of |
| | Plaintiff/Third-Party Defendant. |
| 17 | |
| | GASS WEBER MULLINS, LLC, by |
| 18 | Mr. Ralph Weber |
| | 309 North Water Street, Suite 700 |
| 19 | Milwaukee, Wisconsin 53202 |
| | Appeared on behalf of |
| 20 | Defendant/Third-Party Plaintiff. |
| 21 | ALSO PRESENT: Mr. Bob Burns, Trek |
| | Mr. Owen May, Videographer |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

1         one?

2   A   No. As I sit here today, that's a legal
3        question, and I -- I have a very good in-house
4        counsel, and I typically go to him and I would
5        ask him that question.

6   Q   When you were performing this contract on behalf
7        of Trek --

8   A   Uhm-uhm.

9   Q   -- did you, John Burke, see any obligation, in
10       performing your obligations under that contract,
11       to achieve on that best efforts clause other than
12       hitting that 3 percent of sales statistic?

13   A   Yes.

14   Q   What were those obligations?

15   A   Obligations that -- obligations would be to put
16       together a -- a good product line. Obligations
17       would be to show the product, to try and sell the
18       product, to market the product, as we do with
19       other brands.

20   Q   How would you compare Greg LeMond's reputation in
21       Europe to Lance Armstrong's reputation?

22   A   That's a very interesting question. What time
23       frame?

24   Q   Well, that's what I try to do.

25   A   What time frame?

1 Q Let's -- let's say from the time that you signed
2 the contract to today, 2001 to today.
3 A Okay. I was in Europe --
4 MR. WEBER: Well, wait, wait.
5 THE WITNESS: No.
6 MR. WEBER: From the time you signed
7 the contract would be 1990.
8 MR. MADEL: I'm sorry. You're right.
9 Let's -- let's take from the time that you have
10 -- let's take from 2000 to today.
11 THE WITNESS: Okay. I was in Europe
12 last week. I was in the UK, I was in
13 Switzerland, I was in Germany, and I was also in
14 Spain. It was very interesting that -- I would
15 say in the period -- and -- in the period when
16 Lance was winning seven tours in a row,
17 especially in France, Lance -- Lance's popularity
18 was not real high; you either loved him or you
19 hated him.
20 And it was interesting because one
21 of our managers last week described it as when he
22 was winning all the time, he was like the
23 terminator, one, two, three, four, five, six,
24 seven.
25 Now Lance Armstrong is coming back

```
 1         and he's going to ride in the tour again and he
 2         said, you know, it's very interesting because the
 3         public opinion has totally changed and now they
 4         see him as the underdog and they really like him.
 5    Q    But compare between Mr. LeMond and Mr. Armstrong
 6         when Mr. Armstrong was winning.  Would you say
 7         that Mr. LeMond's reputation in -- in Europe was
 8         better than Mr. Armstrong's?
 9    A    I would --
10              MR. WEBER:  Objection, vague.  Just a
11         second.  Objection, vague as to what you mean by
12         "Europe."  He has talked about different
13         countries.
14              MR. MADEL:  Go ahead.
15              MR. WEBER:  Go ahead.
16              THE WITNESS:  I would say that in
17         France Mr. LeMond's reputation was -- popularity
18         rating was substantially higher than
19         Mr. LeMond's, and I would say --
20   BY MR. MADEL:
21    Q    I think you mean Mr. Armstrong's.  Why don't you
22         try that again.  I think you said Mr. LeMond
23         twice.
24    A    Oh, sorry about that.
25                   I would say that in France
```

```
 1         Mr. LeMond's popularity rating was substantially
 2         higher than Mr. Armstrong's.  I would say in
 3         other European countries, it could have been a
 4         toss-up.
 5    Q    Let's talk a little bit about Trek's
 6         organizational structure when you began to --
 7         well, why don't we just start there.  When did
 8         you first start working for Trek?
 9    A    May of 1984.
10    Q    And what did you start out at Trek doing?
11    A    I started out -- at Trek, I actually started out
12         in 1982, in the summer, working in the warehouse,
13         picking and packing parts.
14                   In 1984, three days after I
15         graduated from college, I came home, I got my
16         wisdom teeth pulled, I went out to Trek for one
17         day of training, I flew out to Boulder, Colorado,
18         on a Saturday, and I was a territory manager for
19         Colorado, Utah, New Mexico, Wyoming, part of
20         Texas, part of Nebraska, part of Idaho.
21                   I drove my car around those
22         states.  I think I put somewhere around
23         55,000 miles on in the first year.  I did that
24         for about a year and a half.
25                   I was then moved inside to Trek
```

```
1    A    Yes.
2    Q    And did -- and did you discuss how you intended
3         to publicly announce the termination of the
4         LeMond brand with counsel?
5              MR. WEBER:  I instruct you not to
6         answer.  The subject matter of discussions with
7         counsel is within the scope of the privilege.
8              MR. MADEL:  Even though those
9         communications were specifically thought to be
10        made public?
11             MR. WEBER:  My objection and
12        instruction stand.
13             MR. MADEL:  Okay.
14   BY MR. MADEL:
15   Q    Did you discuss your decision to have this
16        presentation with any executives at Trek?
17   A    Yes.
18   Q    Who?
19   A    To my -- to the best of my knowledge, I can't
20        recall that.  We did hire a public relations firm
21        and so that was, I'm sure, discussed in those
22        meetings.
23   Q    What was the name of the public relations firm?
24   A    Public Strategies.
25   Q    Where are they located?
```

| | | |
|---|---|---|
| 1 | A | They are located in Austin, Texas. |
| 2 | Q | And how did you get to know about Public |
| 3 | | Strategies? |
| 4 | A | You know, one of the things that I have done is I |
| 5 | | have served on the President's Council for |
| 6 | | Physical Fitness and Sports for I think maybe six |
| 7 | | years, the last three years as chairman. |
| 8 | | And during many trips to |
| 9 | | Washington, I got to know a number of people. |
| 10 | | One of the people that I got to know was Mark |
| 11 | | McKinnon, who worked for President Bush. And so |
| 12 | | I contacted a number of people. One of the |
| 13 | | people I contacted was Mark McKinnon. And so he |
| 14 | | had suggested Public Strategies because he |
| 15 | | actually did some work. He actually might even |
| 16 | | be an employee there. |
| 17 | Q | Did Mr. McKinnon work for President George W. |
| 18 | | Bush, for the former Bush? |
| 19 | A | He worked for President George W. Bush. I do not |
| 20 | | know if he worked for the former. |
| 21 | Q | Who did you use at Public Strategies? |
| 22 | A | We used a number of people. |
| 23 | Q | What are their names? |
| 24 | A | We used Bill Colleti, we used Mashek, we used Dan |
| 25 | | Bartlett. Those are the people I can remember. |

| | | |
|---|---|---|
| 1 | Q | So you don't know that for certain? What your |
| 2 | | knowledge is regarding LeMond turning off his |
| 3 | | website came from Mr. Burns? |
| 4 | A | That's correct. |
| 5 | Q | In addition to Trek employees and the media, was |
| 6 | | anybody else invited to your April 8, 2008, |
| 7 | | presentation? |
| 8 | A | Not to my knowledge. |
| 9 | Q | Were dealers invited? |
| 10 | A | Not to my knowledge. |
| 11 | Q | Did any dealers attend? |
| 12 | A | Not to my knowledge. If there would have been a |
| 13 | | dealer meeting there, perhaps some dealers might |
| 14 | | have been in the audience, but I'm not aware that |
| 15 | | there was. I'm sure we could get you that |
| 16 | | information. |
| 17 | Q | Does a video of your presentation still exist on |
| 18 | | YouTube today? |
| 19 | A | I do not know. |
| 20 | Q | All right. |
| 21 | A | I haven't checked. |
| 22 | Q | Did you ever discuss the fact that your |
| 23 | | presentation was going to be videotaped and |
| 24 | | posted on YouTube? |
| 25 | A | We did. |

1 Q Okay. When was that discussed?

2 A Probably at one of the meetings.

3 Q With Public Strategies?

4 A Yes.

5 Q And you approved that decision?

6 A I did.

7 Q And does it surprise you to know that it's still
8 on there today?

9 A No. Things on YouTube, I think, stay -- I mean,
10 that's not something we control. They stay on
11 there for however long.

12 Q And you know that the Trek website links to
13 YouTube in order to show that presentation today?

14 A I'm not aware of that.

15 Q Is -- is that something that you approve of?

16 A I approve of the presentation, so yes. I'm
17 surprised that it's still on there. I don't
18 think it's a current topic.

19 Q And you know that the Trek -- Trek website links
20 to LeMond's complaint as well as Trek's complaint
21 in this lawsuit?

22 A Yes. I think -- I think one of the important
23 things is we kept, time and time again, trying to
24 solve this -- fix this relationship.
25           As I said before, I'm an

```
1           30(b)(6).  Yeah.  Go ahead.
2                   MR. WEBER:  So my -- my -- yes, so he's
3           talking about you personally.
4                   THE WITNESS:  Right.  Would you --
5    BY MR. MADEL:
6    Q      Are you aware that your PowerPoint presentation
7           that you delivered at the April 8, 2008,
8           presentation to employees and the media still
9           exists today on Trek's website?
10   A      I am not.
11   Q      Do you approve of that?
12   A      Probably not.  I think that issue has -- I think
13          that issue has, from a retailers' standpoint,
14          passed.  And I think if you'd take a look at our
15          websites, in addition to the LeMond link, there's
16          probably a lot of other old information.
17   Q      Do you believe that your presentation had a
18          negative or a positive effect on LeMond-branded
19          products?  And by "presentation," I'm referring
20          to the April 8, 2008, presentation.
21   A      I would say that it had a negative effect because
22          we announced that we were no longer going to be
23          selling LeMond product.
24   Q      Is that the only reason that you think it had a
25          negative effect?
```

1    A    That's true.

2    Q    And you wouldn't ever turn a blind eye to that,
3        would you?

4    A    No, I wouldn't.

5    Q    I mean, if you had facts in front of you that
6        convinced you that this person was actually a
7        doper, you're going to drop them from the Trek
8        family, right?

9    A    If somebody provided me with evidence -- in this
10       country, you're innocent until proven guilty,
11       right? So if somebody was convicted of doping,
12       then they would be dropped from the Trek family.

13    Q    I've got a trial on May 5, and I hope that you're
14       on it. That was a joke. It's just a joke.

15    A    It's like, I'm like where am I going to be on
16       May 5?

17           MR. WEBER: He's a criminal defense
18       lawyer.

19           THE WITNESS: Okay.

20           MR. MADEL: I couldn't -- I couldn't
21       agree with you more.

22    BY MR. MADEL:

23    Q    With respect to the evidence against
24        Mr. Armstrong with respect to doping --

25    A    Yep.

1          need to do in my job is you need to take a look
2          at all the facts, and sometimes you need to make
3          difficult decisions.
4                   I had tried time and time and time
5          and time again to try and put this relationship
6          back together on a correct course. And
7          unfortunately, I failed to do so. Did we end up
8          losing a few ardent Greg LeMond supporters? Yes,
9          we did. How are Trek sales since this has
10         happened? They've been very good.
11    Q    How have LeMond's bike sales been since April 8,
12         2008?
13    A    I'm not aware. On that date, we moved on.
14                  (Exhibit 142 was marked for
15         identification.)
16    BY MR. MADEL:
17    Q    What is Exhibit 142?
18    A    Exhibit 142 is an e-mail from Jeff Haye dated
19         April 9th, 2008.
20    Q    And here his e-mail was regarding cycling in
21         general, right?
22    A    I'm reading it now.
23    Q    You can tell me when you're done, please.
24    A    Okay.
25    Q    He wrote, "Hey there. Read an article in the

1  A  Well, yeah.
2  Q  -- you've moved away from what your dad did?
3  A  No, that's not the case. Because my dad was
4     intimately involved in the LeMond shenanigans
5     over the years. And, in fact, shortly before he
6     went into the hospital, he and I had a
7     conversation where we decided that we were going
8     to put an end to the LeMond agreement and we were
9     not going to renew the contract in 2010.
10                One of the reasons was is my dad
11    was just very disappointed with Greg's behavior
12    and how at time and time again Greg would say he
13    was going to do one thing, give us his word, and
14    then he would do something completely different.
15    All right?
16                He and I had that conversation in
17    October of 2007. And then we did the honorable
18    thing. I met with Greg and I said, listen, Greg,
19    we obviously have two different views here.
20    We're going to go a different way. We hope -- we
21    want -- we wish you the best of luck, but I want
22    to let you know now we're not going to renew the
23    contract after 2010. We're going to honor the
24    contract, but this will allow you some time to go
25    out there and put together another deal or do

| | | |
|---|---|---|
| 1 | | whatever you want to do. |
| 2 | Q | Was your dad in favor of noticing the breach of |
| 3 | | contract in 2004? |
| 4 | A | I'm sure that he was. |
| 5 | Q | Okay. You don't remember, though, for certain? |
| 6 | A | I do not remember. But just like I said, he |
| 7 | | loved negotiating and contracts. He would have |
| 8 | | been aware of litigation there. He hated |
| 9 | | litigation. We did everything we could before |
| 10 | | we'd get into litigation. |
| 11 | Q | He was obviously a wise man? |
| 12 | A | He was. |
| 13 | Q | The -- do you recall he had communications with |
| 14 | | different board members in 2004 that were trying |
| 15 | | to dissuade you from noticing a breach in 2004? |
| 16 | A | I'm not aware of that. |
| 17 | Q | Do you recall any e-mails to that effect with |
| 18 | | you? |
| 19 | A | Not to the best of my knowledge. |
| 20 | Q | Do you recall any communications that he had with |
| 21 | | you in 2004 where he said, you know, son, I think |
| 22 | | you're going to have to listen to the board with |
| 23 | | respect to what you want to do with LeMond, or |
| 24 | | words to that effect? |
| 25 | A | I'm not sure. I'm sure there might be a |

```
1    A    Yep.
2    Q    -- couldn't have sold over 100 bikes, LeMond
3         bikes, in France a year since 2000 through 2007?
4    A    I probably could have done that. If that's all I
5         was doing, I probably could have done that.
6    Q    Have you ever talked to Malcolm Davies and just
7         said, you know, pardon me for my familiarity,
8         but, you know, dude, what's going on?
9    A    You know what? With the dude, I was in -- the
10        dude is the first guy I hired in Europe.
11   Q    Okay.
12   A    Okay? And he was in London.
13   Q    Pardon me. I'm thinking of the Big Lebowski.
14   A    Okay. That's okay.
15   Q    So you've got to stop with the dude. Sorry.
16   A    So Malcolm --
17   Q    All right.
18   A    -- in London, I hired him in 1988, first Trek
19        employee.
20   Q    Uhm-uhm.
21   A    We were doing zero business in Europe. Today we
22        do almost $250 million of business in Europe.
23                 Last Tuesday I was in the UK. We
24        met, as we usually do, with managers, do a
25        quarterly update. And that evening I gave a
```